## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| ALBERT PINEY, ROMAN DIAZ, JOSE MARTINEZ, FREDDY SUAZO, DESMOND GRANT, M. MOSTAYEN FAYSAL, SOPHIA DALY, CHARLIE RUIZ-REYES, JAMES DIVINO, MICHAEL KMIOTEK, DEVON DAWKINS, ALEXIS YANEZ, JULIO ROSA, JAYNEL PANTOJA, CLAUDIO DIAZ, and JORGE ZORILLA, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, TARGET CORPORATION, MSG ENTERTAINMENT HOLDINGS, LLC, THE NEW YORK YANKEES, LP, NYU LANGONE HOSPITALS, MOUNT SINAI HEALTH SYSTEM, INC., THE NEW YORK TIMES COMPANY, B.J.'S WHOLESALE CLUB HOLDINGS INC., RXR REALTY LLC, TISHMAN SPEYER ASSOCIATES LIMITED PARTNERSHIP D/B/A 509 W 34, LLC, ROCKEFELLER GROUP INTERNATIONAL, INC., RCPI LANDMARK PROPERTIES, L.L.C., BUENA VISTA THEATRICAL GROUP LTD. D/B/A DISNEY THEATRICAL GROUP, BXP, INC. F/K/A BOSTON PROPERTIES, INC., KERING AMERICAS, INC., APPLE INC., CONGREGATION RODEPH SHOLOM, 34TH STREET PARTNERSHIP, INC., BANK OF AMERICA CORPORATION, THE TJX COMPANIES, INC., D/B/A MARSHALLS AND D/B/A TJ MAXX, THE GENTING GROUP D/B/A RESORTS WORLD CASINO, PRIMARK US CORP., ROYAL REALTY LLC, NEWYORK-PRESBYTERIAN HEALTHCARE SYSTEM IPA, LLC, 99C LLC D/B/A 180 MAIDEN, ALDI, INC., BARCLAYS BANK PLC, WEGMANS FOOD MARKETS, INC., NEUE GALERIE NEW YORK, V&R PAYROLL FACTORS, INC., WAKEFERN FOOD CORP., D/B/A SHOPRITE SUPERMARKETS, INC., THE BANK OF NEW YORK MELLON CORPORATION, THE ANIMAL MEDICAL CENTER, INC. A/K/A SCHWARZMAN ANIMAL MEDICAL CENTER, QUEENS YESHIVA KETENA, INC., PARKER JEWISH INSTITUTE FOR HEALTHCARE AND REHABILITATION, YOUNG ISRAEL OF QUEENS VALLEY, YESHIVA DARCHEI INC., TORAH CENTER OF HILLCREST INC., BURLINGTON STORES, INC., DISNEY | No.: 1:25-cv-00671-LJL<br><br>**AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

ENTERTAINMENT LLC D/B/A AMERICAN
BROADCASTING COMPANY, SEPHARDIC LEBANESE
CONGREGATION INC., ROCHDALE VILLAGE
ASSOCIATION, INC., NEW YORK SOCIETY FOR THE
RELIEF OF THE RUPTURED AND CRIPPLED,
MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY
D/B/A HOSPITAL FOR SPECIAL SURGERY, VORNADO
REALTY TRUST A/K/A PENN DISTRICT, JPMORGAN
CHASE & CO., UBS FINANCIAL SERVICES, INC.,
QUEENS BALLPARK COMPANY LLC, TAINO TOWERS
APARTMENTS LLC, MIR HANSON ASSOCIATES, LLC,
NEW YORK UNIVERSITY, SBH HEALTH SYSTEM D/B/A
ST. BARNABAS HOSPITAL, MANHATTAN BEER
DISTRIBUTORS LLC, MONTEFIORE MEDICAL CENTER,
NORTHWELL HEALTH INC., RBG MANAGEMENT
CORP. D/B/A MORTON WILLIAMS SUPERMARKET, GFP
REAL ESTATE LLC, ROSCO INC., SL GREEN REALTY
CORP., GRAND CENTRAL PARTNERSHIP, INC.,
BLOOMINGDALE'S LLC, FLUSHING-FRESH MEADOWS
JEWISH CENTER INC., THE GOLDMAN SACHS GROUP,
INC., PARK AVENUE SYNAGOGUE, BNOS BAIS
YAAKOV HIGH SCHOOL OF LAKEWOOD, CHELSEA
PIERS L.P., CONGREGATION BETH-EL SEPHARDIC
CENTER FOR JAMAICA ESTATES, YESHIVA
UNIVERSITY, EMPIRE FORCE INCORPORATED, FEDEX
CORPORATION, AVENUES: THE WORLD SCHOOL, THE
MUSEUM OF MODERN ART, BRYANT PARK
CORPORATION, BROOKLYN MUSEUM, EDMOND J.
SAFRA SYNAGOGUE, BEST BUY CO. INC., CENTURY 21
USA, LLC, BROOKDALE HOSPITAL MEDICAL CENTER,
TIMES SQUARE CHURCH, INC., ASPHALT GREEN, INC.,
LEPOZZI INC D/B/A LAUREN B. JEWELRY, THE NEW
YORK BOTANICAL GARDEN, THE BROOKLYN
HOSPITAL CENTER, NBCUNIVERSAL MEDIA, LLC, SAM
ASH MUSIC CORPORATION, and DOES NOS. 1-100,

Defendants.

Plaintiffs Albert Piney ("Piney"), Roman Diaz ("R. Diaz"), Jose Martinez ("Martinez"),

Freddy Suazo ("Suazo"), Desmond Grant ("Grant"), M. Mostayen Faysal ("Faysal"), Sophia Daly

("Daly"), Charlie Ruiz-Reyes ("Ruiz-Reyes"), James Divino ("Divino"), Michael Kmiotek

("Kmiotek"), Devon Dawkins ("Dawkins"), Alexis Yanez ("Yanez"), Julio Rosa ("Rosa"), Jaynel

Pantoja ("Pantoja"), Claudio Diaz ("C. Diaz"), and Jorge Zorilla ("Zorilla") (together, the "Plaintiffs"), on behalf of themselves and others similarly situated, by and through their attorneys, Faruqi & Faruqi, LLP, hereby allege as follows against Defendants City of New York, New York Police Department (collectively, the "NYPD"), Target Corporation ("Target"), MSG Entertainment Holdings, LLC ("MSG"), The New York Yankees, LP ("Yankees"), NYU Langone Hospitals ("NYU Langone"), Mount Sinai Health System, Inc. ("Mount Sinai"), The New York Times Company ("NYT"), B.J.'s Wholesale Club Holdings Inc. ("BJs"), RXR Realty LLC ("RXR"), Tishman Speyer Associates Limited Partnership d/b/a 509 W 34, LLC  ("Tishman Speyer"), Rockefeller Group International, Inc., RCPI Landmark Properties L.L.C. (together "Rockefeller Center"), Buena Vista Theatrical Group Ltd. d/b/a Disney Theatrical Group ("Disney"), BXP, Inc. f/k/a Boston Properties Inc., ("Boston Properties"), Kering Americas, Inc. ("Kering"), Apple Inc. ("Apple"), Congregation Rodeph Sholom ("Rodeph Sholom"), 34th Street Partnership, Inc. ("34th St."), Bank of America Corporation ("BOA"), The TJX Companies, Inc., d/b/a Marshalls ("Marshalls") and d/b/a TJ Maxx ("TJ Maxx"), The Genting Group d/b/a Resorts World Casino ("Resorts World Casino"), Primark US Corp. ("Primark"), Royal Realty LLC ("Royal Realty"), NewYork-Presbyterian Healthcare System IPA, LLC ("NYP"), 99c LLC d/b/a 180 Maiden ("180 Maiden"), Aldi, Inc., ("Aldi"), Barclays Bank PLC ("Barclays Bank"), Wegmans Food Markets, Inc. ("Wegmans"), Neue Galerie New York ("Neue Galerie"), V&R Payroll Factors, Inc. ("V&R Payroll"), Wakefern Food Corp., d/b/a ShopRite Supermarkets, Inc. ("ShopRite"), The Bank of New York Mellon Corporation ("Bank of NY Mellon"), The Animal Medical Center, Inc. a/k/a Schwarzman Animal Medical Center ("Schwarzman Animal Medical"), Queens Yeshiva Ketena, Inc. ("Queens Yeshiva Ketena"), Parker Jewish Institute for Healthcare and Rehabilitation ("Parker Jewish Institute"), Young Israel of Queens Valley ("Young Israel"),

Yeshiva Darchei Inc. ("Yeshiva Darchei"), Torah Center of Hillcrest Inc. ("Torah Center"), Burlington Stores, Inc. ("Burlington"), Disney Entertainment LLC d/b/a American Broadcasting Company ("ABC"), Sephardic Lebanese Congregation Inc. ("Sephardic Lebanese"), Rochdale Village Association, Inc. ("Rochdale Village"), New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery d/b/a Hospital for Special Surgery ("HSS"), Vornado Realty Trust ("Vornado") a/k/a Penn District, JPMorgan Chase & Co. ("JPM"), UBS Financial Services, Inc. ("UBS"), Queens Ballpark Company LLC ("Citi Field"), Taino Towers Apartments LLC ("Taino Towers"), MIR Hanson Associates, LLC ("MIR Hanson"), New York University ("NYU"), SBH Health System d/b/a St. Barnabas Hospital ("SBH Health"), Manhattan Beer Distributors LLC ("Manhattan Beer"), Montefiore Medical Center ("Montefiore"), Northwell Health Inc. ("Northwell"), RBG Management Corp. d/b/a Morton Williams Supermarket ("Morton Williams"), GFP Real Estate LLC ("GFP Real Estate"), Rosco Inc. ("Rosco"), SL Green Realty Corp. ("SL Green"), Grand Central Partnership, Inc. ("Grand Central"), Bloomingdale's LLC ("Bloomingdale's"), Flushing-Fresh Meadows Jewish Center Inc. ("Fresh Meadows"), The Goldman Sachs Group, Inc. ("Goldman"), Park Avenue Synagogue, Bnos Bais Yaakov High School of Lakewood ("Bnos Bais"), Chelsea Piers L.P. ("Chelsea Piers"), Congregation Beth-El Sephardic Center for Jamaica Estates ("Beth-El"), Yeshiva University, Empire Force Incorporated ("Empire Force"), FedEx Corporation ("FedEx"), Avenues: The World School ("Avenues School"), The Museum of Modern Art ("MOMA"), Bryant Park Corporation ("Bryant Park"), Brooklyn Museum, Edmond J. Safra Synagogue ("Safra Synagogue"), Best Buy Co. Inc. ("Best Buy"), Century 21 USA, LLC ("Century 21"), Brookdale Hospital Medical Center ("Brookdale Hospital"), Times Square Church, Inc. ("Times Square Church"), Asphalt Green, Inc. ("Asphalt Green"), Lepozzi Inc d/b/a Lauren B. Jewelry ("Lauren B."), The New York Botanical

Garden ("Botanical Garden"), The Brooklyn Hospital Center ("Brooklyn Hospital"), NBCUniversal Media, LLC ("NBC"), Sam Ash Music Corporation ("Sam Ash"), and DOES NOS. 1-100 (collectively, the "Vendors"), (together with the NYPD, "Defendants"):

## NATURE OF THE CLAIMS

1.      Pursuant to its Paid Detail Program, the NYPD staffs Police Officers, Detectives, Sergeants, Lieutenants, and Captains (together, referred to as "Officers") at private businesses throughout New York City – including those owned and operated by the Vendors – to perform off-duty uniformed security work for hourly pay.

2.      The NYPD and the Vendors together control the compensation and terms and conditions of employment of the Officers assigned to the Vendors' places of business.

3.      The NYPD and the Vendors engage in a pattern and practice of failing to compensate Officers for the work they perform through the Paid Detail Program, routinely failing to pay their wages until weeks or even months after their regularly scheduled pay days.

4.      Further, the NYPD and the Vendors engage in a pattern and practice of failing to pay Officers at all for the work they perform through the Paid Detail Program.

5.      Additionally, the Vendors fail to provide their employees with Notices of Pay Rate and accurate wage statements, as required by law.

6.      Plaintiffs bring claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA") as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of themselves and all other similarly situated Officers employed by the NYPD who participated in the Paid Detail Program at any time during the full statute of limitations period.

7.      Plaintiffs also bring claims against the Vendors under the New York Labor Law, N.Y. Lab. Law §§ 1, et seq. ("NYLL") and the Freelance Isn't Free Act, N.Y.C. Admin. Code §§ 20-927, et seq. ("FIFA") as a class action, pursuant to Federal Rule of Civil Procedure ("FRCP")

23, on behalf of themselves and all other similarly situated Officers employed by the NYPD who participated in the Paid Detail Program at any time during the full statute of limitations period.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiffs' rights under the FLSA.

9.      Pursuant to 28 U.S.C § 1367, this Court has supplemental jurisdiction over Plaintiffs' related claims arising under State and City law.

10.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PARTIES

**A.      Plaintiff Albert Piney**

11.     Piney is a resident of the State of New York and has been employed by Defendants from July 6, 2011 to the present.

12.     At all relevant times, Piney was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**B.      Plaintiff Roman Diaz**

13.     R. Diaz is a resident of the State of New York and has been employed by Defendants from January 2014 to the present.

14.     At all relevant times, R. Diaz was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

C.    **Plaintiff Jose Martinez**

15.    Martinez is a resident of the State of New York and has been employed by Defendants from January 2009 to the present.

16.    At all relevant times, Martinez was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

D.    **Plaintiff Freddy Suazo**

17.    Suazo is a resident of the State of New York and has been employed by Defendants from January 8, 2008 to the present.

18.    At all relevant times, Suazo was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

E.    **Plaintiff Desmond Grant**

19.    Grant is a resident of the State of New York and has been employed by Defendants from July 5, 2017 to the present.

20.    At all relevant times, Grant was an "employee" of Defendants within the meaning of all relevant statutes and regulations

F.    **Plaintiff M. Mostaven Faysal**

21.    Faysal is a resident of the State of New York and has been employed by Defendants from January 2016 to the present.

22.    At all relevant times, Faysal was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

G.    **Plaintiff Sophia Daly**

23.    Daly is a resident of the State of New York and has been employed by Defendants from January 2016 to the present.

24.     At all relevant times, Daly was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**H.     Plaintiff Charlie Ruiz-Reyes**

25.     Ruiz-Reyes is a resident of the State of New York and has been employed by Defendants from July 2017 to the present.

26.     At all relevant times, Ruiz-Reyes was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**I.     Plaintiff James Divino**

27.     Divino is a resident of the State of New York and has been employed by Defendants from July 2018 to the present.

28.     At all relevant times, Divino was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**J.     Plaintiff Michael Kmiotek**

29.     Kmiotek is a resident of the State of New York and has been employed by Defendants from July 2010 to the present.

30.     At all relevant times, Kmiotek was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**K.     Plaintiff Devon Dawkins**

31.     Dawkins is a resident of the State of New York and has been employed by Defendants from 2020 to the present.

32.     At all relevant times, Dawkins was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**L.**    **Plaintiff Alexis Yanez**

33.    Yanez is a resident of the State of New York and has been employed by Defendants from July 2010 to the present. `

34.    At all relevant times, Yanez was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**M.**    **Plaintiff Julio Rosa**

35.    Rosa is a resident of the State of New York and was employed by Defendants from 2002 to 2024.

36.    At all relevant times, Rosa was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**N.**    **Plaintiff Jaynel Pantoja**

37.    Pantoja is a resident of the State of New York and has been employed by Defendants from 2012 to the present.

38.    At all relevant times, Pantoja was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**O.**    **Plaintiff Claudio Diaz**

39.    C. Diaz is a resident of the State of New York and has been employed by Defendants from January 2015 to the present.

40.    At all relevant times, C. Diaz was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**P.**    **Plaintiff Jorge Zorilla**

41.    Zorilla is a resident of the State of New York and has been employed by Defendants from July 2013 to the present.

42.    At all relevant times, Zorilla was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**Q.    Defendant City of New York**

43.    The City of New York is a municipal corporation that controls and oversees, *inter alia*, the operations of the NYPD throughout its five boroughs.

44.    At all relevant times, the City of New York controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

45.    At all relevant times, the City of New York established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, payroll applicable to Plaintiffs and all persons similarly situated.

46.    At all relevant times, the City of New York maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

47.    At all relevant times, the City of New York was an "employer" within the meaning of all relevant statutes and regulations.

**R.    Defendant New York City Police Department**

48.    The NYPD is a public administrative agency that controls and oversees the police throughout the City of New York's five boroughs.

49.    The NYPD maintains its principal office at One Police Plaza, New York, NY 10007.

50.    At all relevant times, the NYPD controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

51.    At all relevant times, the NYPD established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, payroll applicable to Plaintiffs and all persons similarly situated.

52.    At all relevant times, the NYPD maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

53.    At all relevant times, the NYPD was an "employer" within the meaning of all relevant statutes and regulations.

**S.    Defendant Target Corporation**

54.    Target is a foreign business corporation with its principal place of business located at 1010 Dale St. N. St. Paul, MN 55117.

55.    Target participates in the NYPD's Paid Detail Program.

56.    At all relevant times, Target controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

57.    At all relevant times, Target established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

58.    At all relevant times, Target maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

59.    At all relevant times, Target was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**T.**     **Defendant MSG Entertainment Holdings, LLC**

60.     MSG is a foreign limited liability company with its principal place of business located at 4 Pennsylvania Plaza, New York, NY 10001.

61.     MSG participates in the NYPD's Paid Detail Program.

62.     At all relevant times, MSG controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

63.     At all relevant times, MSG established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

64.     At all relevant times, MSG maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

65.     At all relevant times, MSG was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**U.**     **Defendant The New York Yankees, LP**

66.     Yankees is a domestic limited partnership with its principal place of business located at 161 St River Avenue, Bronx NY 10451.

67.     Yankees participates in the NYPD's Paid Detail Program.

68.     At all relevant times, Yankees controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

69.     At all relevant times, Yankees established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

70.     At all relevant times, Yankees maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

71.     At all relevant times, Yankees was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## V.     <u>Defendant NYU Langone Hospitals</u>

72.     NYU Langone is a domestic corporation with its principal place of business located at 150 First Avenue, New York, NY 10016.

73.     NYU Langone participates in the NYPD's Paid Detail Program.

74.     At all relevant times, NYU Langone controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

75.     At all relevant times, NYU Langone established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

76.     At all relevant times, NYU Langone maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

77.     At all relevant times, NYU Langone was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## W.     <u>Defendant Mount Sinai Health System, Inc.</u>

78.     Mount Sinai is a domestic corporation with its principal place of business located at One Gustave L. Levy Place, New York, NY 10029.

79.     Mount Sinai participates in the NYPD's Paid Detail Program.

80.     At all relevant times, Mount Sinai controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

81.     At all relevant times, Mount Sinai established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

82.     At all relevant times, Mount Sinai maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

83.     At all relevant times, Mount Sinai was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## X.     **Defendant The New York Times Company**

84.     NYT is a domestic business corporation with its principal place of business located at 620 Eighth Avenue, New York, NY 10018.

85.     NYT participates in the NYPD's Paid Detail Program.

86.     At all relevant times, NYT controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

87.     At all relevant times, NYT established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

88.     At all relevant times, NYT maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

89.     At all relevant times, NYT was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**Y.**     **Defendant B.J.'s Wholesale Club Holdings Inc.**

90.     BJs is a foreign business corporation with its principal place of business located at 350 Campus Drive, Marlborough, MA 01752.

91.     BJs participates in the NYPD's Paid Detail Program.

92.     At all relevant times, BJs controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

93.     At all relevant times, BJs established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

94.     At all relevant times, BJs maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

95.     At all relevant times, BJs was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**Z.**     **Defendant RXR Realty LLC**

96.     RXR is a foreign limited liability company with its principal place of business located at 75 Rockefeller Center, New York, NY 10019.

97.     RXR participates in the NYPD's Paid Detail Program.

98.     At all relevant times, RXR controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

99.     At all relevant times, RXR established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

100.     At all relevant times, RXR maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

101.     At all relevant times, RXR was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**AA.     Defendant Tishman Speyer Associates Limited Partnership d/b/a 509 W 34, LLC**

102.     Tishman Speyer is a domestic limited partnership with its principal place of business located at 45 Rockefeller Plaza, New York, NY 10111.

103.     Tishman Speyer participates in the NYPD's Paid Detail Program.

104.     At all relevant times, Tishman Speyer controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

105.     At all relevant times, Tishman Speyer established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

106.     At all relevant times, Tishman Speyer maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

107.     At all relevant times, Tishman Speyer was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**BB.     Defendant Rockefeller Group International, Inc. d/b/a Rockefeller Center**

108.     Rockefeller is a domestic business corporation with its principal place of business located at 1271 Avenue of the Americas, New York NY 10020.

109.     Rockefeller participates in the NYPD's Paid Detail Program.

110.     At all relevant times, Rockefeller controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

111.    At all relevant times, Rockefeller established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

112.    At all relevant times, Rockefeller maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

113.    At all relevant times, Rockefeller was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## CC.    Defendant RCPI Landmark Properties LLC d/b/a Rockefeller Center

114.    RCPI is a foreign limited liability company with its principal place of business located at 45 Rockefeller Plaza, New York NY 10111.

115.    RCPI participates in the NYPD's Paid Detail Program.

116.    At all relevant times, RCPI controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

117.    At all relevant times, RCPI established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

118.    At all relevant times, RCPI maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

119.    At all relevant times, RCPI was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**DD.    Defendant Buena Vista Theatrical Group Ltd. d/b/a Disney Theatrical Group**

120.    Disney is a domestic business corporation with its principal place of business located at 214 West 42nd Street, 8th Floor, New York, NY 10036.

121.    Disney participates in the NYPD's Paid Detail Program.

122.    At all relevant times, Disney controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

123.    At all relevant times, Disney established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

124.    At all relevant times, Disney maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

125.    At all relevant times, Disney was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**EE.    Defendant BXP, Inc. f/k/a Boston Properties Inc.**

126.    Boston Properties is a foreign limited liability company with its principal place of business located at 800 Boylston Street, Suite 1900, Boston, MA 02199.

127.    Boston Properties participates in the NYPD's Paid Detail Program.

128.    At all relevant times, Boston Properties controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

129.    At all relevant times, Boston Properties established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

130.    At all relevant times, Boston Properties maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

131.    At all relevant times, Boston Properties was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**FF.    Defendant Kering Americas, Inc.**

132.    Kering is a foreign business corporation with its principal place of business located at 65 Bleecker Street, 2nd Floor, New York, NY 10012.

133.    Kering participates in the NYPD's Paid Detail Program.

134.    At all relevant times, Kering controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

135.    At all relevant times, Kering established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

136.    At all relevant times, Kering maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

137.    At all relevant times, Kering was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**GG.    Defendant Apple Inc.**

138.    Apple is a foreign business corporation with its principal place of business located at One Apple Park Way, Cupertino, CA 95014.

139.    Apple participates in the NYPD's Paid Detail Program.

140.    At all relevant times, Apple controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

141.    At all relevant times, Apple established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

142.    At all relevant times, Apple maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

143.    At all relevant times, Apple was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**HH.    Defendant Congregation Rodeph Sholom**

144.    Rodeph Sholom is a domestic corporation with its principal place of business located at 7 West 83rd Street, New York, NY 10024.

145.    Rodeph Sholom participates in the NYPD's Paid Detail Program.

146.    At all relevant times, Rodeph Sholom controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

147.    At all relevant times, Rodeph Sholom established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

148.    At all relevant times, Rodeph Sholom maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

149.    At all relevant times, Rodeph Sholom was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## II.    <u>Defendant 34th Street Partnership, Inc.</u>

150.    34th St. is a domestic corporation with its principal place of business located at 1065 Avenue of the Americas, Suite 2400, New York, NY 10018.

151.    34th St. participates in the NYPD's Paid Detail Program.

152.    At all relevant times, 34th St. controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

153.    At all relevant times, 34th St. established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

154.    At all relevant times, 34th St. maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

155.    At all relevant times, 34th St. was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## JJ.    <u>Defendant Bank of America Corporation</u>

156.    BOA is a foreign business corporation with its principal place of business located at 100 North Tryon Street, Charlotte, NC 28255.

157.    BOA participates in the NYPD's Paid Detail Program.

158.    At all relevant times, BOA controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

159.    At all relevant times, BOA established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

160.    At all relevant times, BOA maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

161.    At all relevant times, BOA was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**KK.    Defendant The TJX Companies, Inc., d/b/a/ Marshalls and d/b/a TJ Maxx**

162.    The TJX Companies, Inc. is a foreign business corporation with its principal place of business located at 770 Cochituate Road, Framingham, MA 01701.

163.    TJX Companies, Inc. does business as "Marshalls" and "TJ Maxx," collectively referred to as "TJX."

164.    TJX participates in the NYPD's Paid Detail Program.

165.    At all relevant times, TJX controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

166.    At all relevant times, TJX established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

167.    At all relevant times, TJX maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

168.    At all relevant times, TJX was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**LL.    Defendant The Genting Group d/b/a Resorts World Casino**

169.    Resorts World Casino is a foreign business corporation with its principal place of business located at 110-00 Rockaway Blvd., Jamaica, NY 11420.

170.    Resorts World Casino participates in the NYPD's Paid Detail Program.

171.    At all relevant times, Resorts World Casino controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

172.    At all relevant times, Resorts World Casino established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

173.    At all relevant times, Resorts World Casino maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

174.    At all relevant times, Resorts World Casino was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**MM.    Defendant Primark US Corp.**

175.    Primark is a foreign business corporation with its principal place of business located at 101 Arch Street, Floor 3, Boston, MA 02110.

176.    Primark participates in the NYPD's Paid Detail Program.

177.    At all relevant times, Primark controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

178.    At all relevant times, Primark established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

179.    At all relevant times, Primark maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

180.    At all relevant times, Primark was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**NN.    Defendant Barclays Bank PLC**

181.    Barclays Bank is a foreign business corporation incorporated in the state of Delaware with its principal place of business located at 745 Seventh Avenue, New York, NY 10019.

182.    Barclays Bank participates in the NYPD's Paid Detail Program.

183.    At all relevant times, Barclays Bank controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

184.    At all relevant times, Barclays Bank established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

185.    At all relevant times, Barclays Bank maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

186.    At all relevant times, Barclays Bank was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**OO.    Defendant Royal Realty LLC**

187.    Royal Realty is a domestic business corporation with its principal place of business located at 1155 Avenue of the Americas, 4th Floor, New York, NY 10110.

188.    Royal Realty participates in the NYPD's Paid Detail Program

189.    At all relevant times, Royal Realty controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

190.    At all relevant times, Royal Realty established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

191.    At all relevant times, Royal Realty maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

192.    At all relevant times, Royal Realty was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**PP.    Defendant NewYork-Presbyterian Healthcare System IPA, LLC**

193.    NYP is a domestic business corporation with its principal place of business located at 525 East 68th Street, New York, NY 10065.

194.    NYP participates in the NYPD's Paid Detail Program

195.    At all relevant times, NYP controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

196.    At all relevant times, NYP established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, and monitoring work product, payroll applicable to Plaintiffs and all persons similarly situated.

197.    At all relevant times, NYP maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

198.    At all relevant times, NYP was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**QQ.    Defendant 99c LLC d/b/a 180 Maiden**

199.    180 Maiden is a domestic limited liability company with its principal place of business located at 249 Smith Street, Brooklyn, NY 11231].

200.    180 Maiden participates in the NYPD's Paid Detail Program.

201.    At all relevant times, 180 Maiden controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

202.    At all relevant times, 180 Maiden established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

203.    At all relevant times, 180 Maiden maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

204.    At all relevant times, 180 Maiden was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**RR.    Defendant Aldi, Inc.**

205.    Aldi is a foreign business corporation with its principal place of business located at 1200 N Kirk Rd., Batavia, IL 60510.

206.    Aldi participates in the NYPD's Paid Detail Program.

207.    At all relevant times, Aldi controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

208.    At all relevant times, Aldi established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

209.    At all relevant times, Aldi maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

210.    At all relevant times, Aldi was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**SS.    Defendant Wegmans Food Markets, Inc.**

211.    Wegmans is a domestic business corporation with its principal place of business located at 1500 Brooks Avenue, Rochester, NY 14624.

212.    Wegmans participates in the NYPD's Paid Detail Program.

213.    At all relevant times, Wegmans controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

214.    At all relevant times, Wegmans established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

215.    At all relevant times, Wegmans maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

216.    At all relevant times, Wegmans was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**TT.    Defendant Neue Galerie New York**

217.    Neue Galerie is domestic corporation with its principal place of business located at 1048 5th Ave, New York, NY 10028.

218.    Neue Galerie participates in the NYPD's Paid Detail Program.

219.    At all relevant times, Neue Galerie controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

220.    At all relevant times, Neue Galerie established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

221.    At all relevant times, Neue Galerie maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

222.    At all relevant times, Neue Galerie was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**UU.    Defendant V&R Payroll Factors, Inc.**

223.    V&R Payroll is a domestic corporation with its principal place of business located at 1048 5th Ave, New York, NY 10028.

224.    V&R Payroll participates in the NYPD's Paid Detail Program.

225.    At all relevant times, V&R Payroll controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

226.    At all relevant times, V&R Payroll established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

227.    At all relevant times, V&R Payroll maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

228.    At all relevant times, V&R Payroll was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**VV.** **Defendant Wakefern Food Corp., d/b/a ShopRite Supermarkets, Inc.**

229.    ShopRite is a domestic business corporation with its principal place of business located at 5000 Riverside Drive, Keasbey NJ 08832.

230.    ShopRite participates in the NYPD's Paid Detail Program.

231.    At all relevant times, ShopRite controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

232.    At all relevant times, ShopRite established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

233.    At all relevant times, ShopRite maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

234.    At all relevant times, ShopRite was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**WW.** **Defendant The Bank of New York Mellon Corporation**

235.    Bank of NY Mellon is a foreign business corporation with its principal place of business located at 240 Greenwich Street, New York NY 10286.

236.    Bank of NY Mellon participates in the NYPD's Paid Detail Program.

237.    At all relevant times, Bank of NY Mellon controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

238.    At all relevant times, Bank of NY Mellon established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

239.    At all relevant times, Bank of NY Mellon maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

240.    At all relevant times, Bank of NY Mellon was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## XX.    Defendant The Animal Medical Center, Inc. a/k/a Schwarzman Animal Medical Center

241.    Schwarzman Animal Medical is a domestic corporation with its principal place of business located at 510 East 62nd Street, New York NY 10065.

242.    Schwarzman Animal Medical participates in the NYPD's Paid Detail Program.

243.    At all relevant times, Schwarzman Animal Medical controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

244.    At all relevant times, Schwarzman Animal Medical established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

245.    At all relevant times, Schwarzman Animal Medical maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

246.    At all relevant times, Schwarzman Animal Medical was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## YY.    Defendant Queens Yeshiva Ketena, Inc.

247.    Queens Yeshiva Ketena is a domestic corporation with its principal place of business located at 78-15 Parsons Boulevard., Flushing NY 11366.

248.    Queens Yeshiva Ketena participates in the NYPD's Paid Detail Program.

249.    At all relevant times, Queens Yeshiva Ketena controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

250.    At all relevant times, Queens Yeshiva Ketena established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

251.    At all relevant times, Queens Yeshiva Ketena maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

252.    At all relevant times, Queens Yeshiva Ketena was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**ZZ.    Defendant Parker Jewish Institute for Healthcare and Rehabilitation**

253.    Parker Jewish Institute is a domestic corporation with its principal place of business located at 27-11 76th Avenue, New Hyde Park NY 10040.

254.    Parker Jewish Institute participates in the NYPD's Paid Detail Program.

255.    At all relevant times, Parker Jewish Institute controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

256.    At all relevant times, Parker Jewish Institute established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

257.    At all relevant times, Parker Jewish Institute maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

258.    At all relevant times, Parker Jewish Institute was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**AAA.    Defendant Young Israel of Queens Valley**

259.    Young Israel is a domestic corporation with its principal place of business located at 141-55 77th Ave, Flushing NY 11367.

260.    Young Israel participates in the NYPD's Paid Detail Program.

261.    At all relevant times, Young Israel controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

262.    At all relevant times, Young Israel established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

263.    At all relevant times, Young Israel maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

264.    At all relevant times, Young Israel was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**BBB.    Defendant Yeshiva Darchei Inc.**

265.    Yeshiva Darchei is a domestic corporation with its principal place of business located at 141-55 77th Ave, Flushing NY 11367.

266.    Yeshiva Darchei participates in the NYPD's Paid Detail Program.

267.    At all relevant times, Yeshiva Darchei controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

268.    At all relevant times, Yeshiva Darchei established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

269.    At all relevant times, Yeshiva Darchei maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

270.    At all relevant times, Yeshiva Darchei was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**CCC.  Defendant Torah Center of Hillcrest Inc.**

271.    Torah Center is a domestic corporation with its principal place of business located at 17105 Jewel Avenue, Flushing, NY 11365.

272.    Torah Center participates in the NYPD's Paid Detail Program.

273.    At all relevant times, Torah Center controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

274.    At all relevant times, Torah Center established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

275.    At all relevant times, Torah Center maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

276.    At all relevant times, Torah Center was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**DDD.  Defendant Burlington Stores, Inc.**

277.    Burlington is a foreign business corporation with its principal place of business located at 2006 Route 130, Burlington, NJ 08016.

278.    Burlington participates in the NYPD's Paid Detail Program.

279.    At all relevant times, Burlington controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

280.    At all relevant times, Burlington established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

281.    At all relevant times, Burlington maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

282.    At all relevant times, Burlington was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### EEE.    Defendant Disney Entertainment LLC d/b/a American Broadcasting Company

283.    ABC is a foreign limited liability company with its principal place of business located at 47 West 66th Street, New York, NY 10023.

284.    ABC participates in the NYPD's Paid Detail Program.

285.    At all relevant times, ABC controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

286.    At all relevant times, ABC established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

287.    At all relevant times, ABC maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

288.    At all relevant times, ABC was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**FFF.    Defendant Sephardic Lebanese Congregation Inc.**

289.    Sephardic Lebanese Congregation is a domestic corporation with its principal place of business located at 805 Avenue T, Brooklyn, NY 11223.

290.    Sephardic Lebanese Congregation participates in the NYPD's Paid Detail Program.

291.    At all relevant times, Sephardic Lebanese Congregation controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

292.    At all relevant times, Sephardic Lebanese Congregation established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

293.    At all relevant times, Sephardic Lebanese Congregation maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

294.    At all relevant times, Sephardic Lebanese Congregation was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**GGG.    Defendant Rochdale Village Association, Inc.**

295.    Rochdale Village is a domestic business corporation with its principal place of business located at 60 East 42nd Street, Suite 2108, New York, NY 10165.

296.    Rochdale Village participates in the NYPD's Paid Detail Program.

297.    At all relevant times, Rochdale Village controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

298.    At all relevant times, Rochdale Village established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

299. At all relevant times, Rochdale Village maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

300. At all relevant times, Rochdale Village was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## HHH. **Defendant Vornado Realty Trust a/k/a Penn District**

301. Vornado is a foreign business corporation with its principal place of business located at 100 South Charles Street, Baltimore MD 21201.

302. Vornado, also known as "Penn District," together referred to as "Vornado."

303. Vornado participates in the NYPD's Paid Detail Program.

304. At all relevant times, Vornado controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

305. At all relevant times, Vornado established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

306. At all relevant times, Vornado maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

307. At all relevant times, Vornado was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

III.    **Defendant New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery d/b/a Hospital for Special Surgery**

308.    HSS is a domestic business corporation with its principal place of business located at 535 East 70th Street, New York, NY 10021.

309.    HSS participates in the NYPD's Paid Detail Program.

310.    At all relevant times, HSS controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

311.    At all relevant times, HSS established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

312.    At all relevant times, HSS maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

313.    At all relevant times, HSS was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

JJJ.    **Defendant JPMorgan Chase & Co.**

314.    JPM is a foreign business corporation with its principal place of business located at 383 Madison Avenue, New York NY 10179.

315.    JPM participates in the NYPD's Paid Detail Program.

316.    At all relevant times, JPM controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

317.    At all relevant times, JPM established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter*

*alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

318.    At all relevant times, JPM maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

319.    At all relevant times, JPM was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**KKK.    Defendant UBS Financial Services, Inc.**

320.    UBS is a foreign business corporation with its principal place of business located at 1200 Harbor Boulevard, Weehawken NJ 07086.

321.    UBS participates in the NYPD's Paid Detail Program.

322.    At all relevant times, UBS controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

323.    At all relevant times, UBS established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

324.    At all relevant times, UBS maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

325.    At all relevant times, UBS was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**LLL.    Defendant Queens Ballpark Company LLC**

326.    Citi Field is a domestic limited liability company with its principal place of business located at 41 Seaver Way, Flushing NY 11368.

327.    Citi Field participates in the NYPD's Paid Detail Program.

328.    At all relevant times, Citi Field controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

329.    At all relevant times, Citi Field established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

330.    At all relevant times, Citi Field maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

331.    At all relevant times, Citi Field was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**MMM.       Defendant Taino Towers Apartments LLC**

332.    Taino Towers is a domestic limited liability company with its principal place of business located at 2253 Third Avenue, New York, NY 10035.

333.    Taino Towers participates in the NYPD's Paid Detail Program.

334.    At all relevant times, Taino Towers controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

335.    At all relevant times, Taino Towers established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

336.    At all relevant times, Taino Towers maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

337.    At all relevant times, Taino Towers was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

NNN.  **Defendant MIR Hanson Associates, LLC**

338.    MIR Hanson is a limited liability company with its principal place of business located at 300 Park Avenue, 3rd Floor, New York, NY 10022.

339.    MIR Hanson participates in the NYPD's Paid Detail Program.

340.    At all relevant times, MIR Hanson controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

341.    At all relevant times, MIR Hanson established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

342.    At all relevant times, MIR Hanson maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

343.    At all relevant times, MIR Hanson was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

OOO.  **Defendant New York University**

344.    NYU is a domestic corporation with its principal place of business located at 70 Washington Square South, 11th Floor, New York, NY 10012.

345.    NYU participates in the NYPD's Paid Detail Program.

346.    At all relevant times, NYU controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

347.    At all relevant times, NYU established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

348.    At all relevant times, NYU maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

349.    At all relevant times, NYU was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

350.    SBH Health is a domestic not-for-profit corporation with its principal place of business located at 4422 Third Avenue, Bronx, NY 10457.

**PPP.    Defendant SBH Health System d/b/a St. Barnabas Hospital**

351.    SBH Health participates in the NYPD's Paid Detail Program.

352.    At all relevant times, SBH Health controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

353.    At all relevant times, SBH Health established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

354.    At all relevant times, SBH Health maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

355.    At all relevant times, SBH Health was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**QQQ.    Defendant Manhattan Beer Distributors LLC**

356.    Manhattan Beer is a domestic limited liability company with its principal place of business located at 955 East 149th Street, Bronx, NY 10455.

357.    Manhattan Beer participates in the NYPD's Paid Detail Program.

358.    At all relevant times, Manhattan Beer controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

359.    At all relevant times, Manhattan Beer established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

360.    At all relevant times, Manhattan Beer maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

361.    At all relevant times, Manhattan Beer was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**RRR.  Defendant Montefiore Medical Center**

362.    Montefiore is a domestic corporation with its principal place of business located at 111 E 210th Street, Bronx NY 10467.

363.    Montefiore participates in the NYPD's Paid Detail Program.

364.    At all relevant times, Montefiore controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

365.    At all relevant times, Montefiore established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

366.    At all relevant times, Montefiore maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

367.    At all relevant times, Montefiore was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**SSS.**    **Defendant Northwell Health Inc.**

368.    Northwell is a domestic corporation with its principal place of business located at 2000 Marcus Avenue, New Hyde Park, NY 11042.

369.    Northwell participates in the NYPD's Paid Detail Program.

370.    At all relevant times, Northwell controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

371.    At all relevant times, Northwell established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

372.    At all relevant times, Northwell maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

373.    At all relevant times, Northwell was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**TTT.**    **Defendant RBG Management Corp. d/b/a Morton Williams Supermarket**

374.    Morton Williams is a domestic corporation with its principal place of business located at 15 E. Kingsbridge Rd., Bronx, NY 10468.

375.    Morton Williams participates in the NYPD's Paid Detail Program.

376.    At all relevant times, Morton Williams controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

377.    At all relevant times, Morton Williams established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

378.    At all relevant times, Morton Williams maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

379.    At all relevant times, Morton Williams was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**UUU.  Defendant GFP Real Estate LLC**

380.    GFP Real Estate is a domestic limited liability company with its principal place of business located at 515 Madison Avenue, 15th Floor, New York, NY 10022.

381.    GFP Real Estate participates in the NYPD's Paid Detail Program.

382.    At all relevant times, GFP Real Estate controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

383.    At all relevant times, GFP Real Estate established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

384.    At all relevant times, GFP Real Estate maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

385.    At all relevant times, GFP Real Estate was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**VVV.  Defendant Rosco Inc.**

386.    Rosco is a domestic business corporation with its principal place of business located at 144-31 91st Ave, Jamaica NY 11435.

387.    Rosco participates in the NYPD's Paid Detail Program.

388.    At all relevant times, Rosco controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

389.    At all relevant times, Rosco established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

390.    At all relevant times, Rosco maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

391.    At all relevant times, Rosco was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**WWW.**    **Defendant SL Green Realty Corp.**

392.    SL Green is a foreign corporation with its principal place of business located at One Vanderbilt Avenue, New York, NY 10017.

393.    SL Green participates in the NYPD's Paid Detail Program.

394.    At all relevant times, SL Green controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

395.    At all relevant times, SL Green established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

396.    At all relevant times, SL Green maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

397.    At all relevant times, SL Green was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**XXX.  Defendant Grand Central Partnership, Inc.**

398.    Grand Central is a domestic corporation with its principal place of business located at 122 East 42nd Street Suite 601, New York NY 10168.

399.    Grand Central participates in the NYPD's Paid Detail Program.

400.    At all relevant times, Grand Central controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

401.    At all relevant times, Grand Central established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

402.    At all relevant times, Grand Central maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

403.    At all relevant times, Grand Central was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**YYY.  Defendant Bloomingdale's LLC**

404.    Bloomingdale's is a domestic business corporation with its principal place of business located at 1000 Third Avenue, New York, NY 10022.

405.    Bloomingdale's participates in the NYPD's Paid Detail Program.

406.    At all relevant times, Bloomingdale's controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

407.    At all relevant times, Bloomingdale's established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

408.    At all relevant times, Bloomingdale's maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

409.    At all relevant times, Bloomingdale's was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**ZZZ.   Defendant Flushing-Fresh Meadows Jewish Center Inc.**

410.    Fresh Meadows is a domestic religious corporation with its principal place of business located at 193-10 Peck Avenue, Fresh Meadows, NY 11365.

411.    Fresh Meadows participates in the NYPD's Paid Detail Program.

412.    At all relevant times, Fresh Meadows controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

413.    At all relevant times, Fresh Meadows established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

414.    At all relevant times, Fresh Meadows maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

415.    At all relevant times, Fresh Meadows was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**AAAA.        Defendant The Goldman Sachs Group, Inc.**

416.    Goldman is a foreign business corporation with its principal place of business located at 200 West Street, New York, NY 10282.

417.    Goldman participates in the NYPD's Paid Detail Program.

418.    At all relevant times, Goldman controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

419.    At all relevant times, Goldman established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

420.    At all relevant times, Goldman maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

421.    At all relevant times, Goldman was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**BBBB. Defendant Park Avenue Synagogue**

422.    Park Avenue Synagogue is a domestic religious corporation with its principal place of business located at 50 East 87th Street, New York, NY 10128.

423.    Park Avenue Synagogue participates in the NYPD's Paid Detail Program

424.    At all relevant times, Park Avenue Synagogue controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

425.    At all relevant times, Park Avenue Synagogue established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

426.    At all relevant times, Park Avenue Synagogue maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

427.    At all relevant times, Park Avenue Synagogue was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**CCCC.**    <u>**Defendant Bnos Bais Yaakov High School of Lakewood**</u>

428.    Bnos Bais is a domestic corporation with its principal place of business located at 155 Oberlin Avenue North, Lakewood, NJ 08701.

429.    Bnos Bais participates in the NYPD's Paid Detail Program.

430.    At all relevant times, Bnos Bais controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

431.    At all relevant times, Bnos Bais established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

432.    At all relevant times, Bnos Bais maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

433.    At all relevant times, Bnos Bais was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**DDDD.**    <u>**Defendant Chelsea Piers L.P.**</u>

434.    Chelsea Piers is a domestic limited partnership with its principal place of business at Pier 62, Suite 300, West 23rd Street, New York, NY 10011.

435.    Chelsea Piers participates in the NYPD's Paid Detail Program.

436.    At all relevant times, Chelsea Piers controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

437.    At all relevant times, Chelsea Piers established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

438.    At all relevant times, Chelsea Piers maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

439.    At all relevant times, Chelsea Piers was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**EEEE. Defendant Congregation Beth-El Sephardic Center for Jamaica Estates**

440.    Beth-El is a domestic religious corporation with its principal place of business at 1159 Second Avenue PMB 343 New York, NY 10065.

441.    Beth-El participates in the NYPD's Paid Detail Program.

442.    At all relevant times, Beth-El controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

443.    At all relevant times, Beth-El established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

444.    At all relevant times, Beth-El maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

445.    At all relevant times, Beth-El was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**FFFF. Defendant Yeshiva University**

446.    Yeshiva University is a domestic corporation with its principal place of business located at 500 West 185th Street, New York, NY 10033.

447.    Yeshiva University participates in the NYPD's Paid Detail Program.

448.    At all relevant times, Yeshiva University controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

449.    At all relevant times, Yeshiva University established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

450.    At all relevant times, Yeshiva University maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

451.    At all relevant times, Yeshiva University was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**GGGG.    Defendant Empire Force Incorporated**

452.    Empire Force a domestic business corporation with its principal place of business at 7 West 23rd Street, 6th Floor, New York, NY 10010.

453.    Empire Force participates in the NYPD's Paid Detail Program.

454.    At all relevant times, Empire Force controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

455.    At all relevant times, Empire Force established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

456.    At all relevant times, Empire Force maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

457.    At all relevant times, Empire Force was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**HHHH.**       **Defendant FedEx Corporation**

458.    FedEx is a domestic business corporation with its principal place of business located at 942 South Shady Grove Road, Memphis, TN 38119.

459.    FedEx participates in the NYPD's Paid Detail Program.

460.    At all relevant times, FedEx controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

461.    At all relevant times, FedEx established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

462.    At all relevant times, FedEx maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

463.    At all relevant times, FedEx was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**IIII.**       **Defendant Avenues: The World School**

464.    Avenues School is a private, for-profit school with its principal place of business located at 11 Madison Square North, 16th Floor, New York, NY 10010.

465.    Avenues School participates in the NYPD's Paid Detail Program.

466.    At all relevant times, Avenues School controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

467.    At all relevant times, Avenues School established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

468.    At all relevant times, Avenues School maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

469.    At all relevant times, Avenues School was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**JJJJ.    Defendant The Museum of Modern Art**

470.    MOMA is a domestic business corporation with its principal place of business located at 11 West 53rd Street, New York, NY 10019.

471.    MOMA participates in the NYPD's Paid Detail Program.

472.    At all relevant times, MOMA controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

473.    At all relevant times, MOMA established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

474.    At all relevant times, MOMA maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

475.    At all relevant times, MOMA was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**KKKK.    Defendant Bryant Park Corporation**

476.    Bryant Park a domestic business corporation with its principal place of business at 1065 Avenue of the Americas, Suite 2400, New York, NY 10018.

477.    Bryant Park participates in the NYPD's Paid Detail Program

478.    At all relevant times, Bryant Park controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

479.    At all relevant times, Bryant Park established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

480.    At all relevant times, Bryant Park maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

481.    At all relevant times, Bryant Park was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**LLLL. Defendant Brooklyn Museum**

482.    Brooklyn Museum is a domestic business corporation with its principal place of business located at 200 Eastern Parkway, Brooklyn, NY 11238.

483.    Brooklyn Museum participates in the NYPD's Paid Detail Program.

484.    At all relevant times, Brooklyn Museum controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

485.    At all relevant times, Brooklyn Museum established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

486.    At all relevant times, Brooklyn Museum maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

487.    At all relevant times, Brooklyn Museum was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

MMMM.    **Defendant Edmond J. Safra Synagogue**

488.    Safra Synagogue is a domestic corporation with its principal place of business located at 11 E 63rd St., New York NY 10065.

489.    Safra Synagogue participates in the NYPD's Paid Detail Program.

490.    At all relevant times, Safra Synagogue controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

491.    At all relevant times, Safra Synagogue established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

492.    At all relevant times, Safra Synagogue maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

493.    At all relevant times, Safra Synagogue was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

NNNN.    **Defendant Best Buy Co. Inc.**

494.    Best Buy is a foreign business corporation with its principal place of business located at 7601 Penn Avenue South, Richfield, MN 55423.

495.    Best Buy participates in the NYPD's Paid Detail Program.

496.    At all relevant times, Best Buy controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

497.    At all relevant times, Best Buy established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

498.    At all relevant times, Best Buy maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

499.    At all relevant times, Best Buy was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**OOOO.    Defendant Century 21 USA, LLC**

500.    Century 21 is a domestic limited liability company with its principal place of business located at 2 Dey Street, Fifth Floor, New York, NY 10007.

501.    Century 21 participates in the NYPD's Paid Detail Program.

502.    At all relevant times, Century 21 controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

503.    At all relevant times, Century 21 established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

504.    At all relevant times, Century 21 maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

505.    At all relevant times, Century 21 was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**PPPP.  Defendant Brookdale Hospital Medical Center**

506.    Brookdale Hospital is a domestic business corporation with its principal place of business located at 1 Brookdale Plaza, Brooklyn, NY 11212.

507.    Brookdale Hospital participates in the NYPD's Paid Detail Program.

508.    At all relevant times, Brookdale Hospital controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

509.    At all relevant times, Brookdale Hospital established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

510.    At all relevant times, Brookdale Hospital maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

511.    At all relevant times, Brookdale Hospital was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**QQQQ.    Defendant Times Square Church, Inc.**

512.    Times Square Church is a domestic business corporation incorporated in the state of New York with its principal place of business located at 1657 Broadway, New York, NY 10019

513.    Times Square Church participates in the NYPD's Paid Detail Program.

514.    At all relevant times, Times Square Church controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

515.    At all relevant times, Times Square Church established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

516.    At all relevant times, Times Square Church maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

517.    At all relevant times, Times Square Church was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

RRRR.        **Defendant Asphalt Green, Inc.**

518.    Asphalt Green is a domestic business corporation incorporated in the state of New York with its principal place of business located at 555 East 90th Street, New York, NY 10128.

519.    Asphalt Green participates in the NYPD's Paid Detail Program.

520.    At all relevant times, Asphalt Green controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

521.    At all relevant times, Asphalt Green established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

522.    At all relevant times, Asphalt Green maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

523.    At all relevant times, Asphalt Green was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

SSSS.  **Defendant Lepozzi Inc d/b/a Lauren B. Jewelry**

524.    Lauren B is a domestic business corporation incorporated in New York with its principal place of business located at 44 East 46th Street, New York, NY 10020.

525.    Lauren B participates in the NYPD's Paid Detail Program.

526.    At all relevant times, Lauren B controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

527.    At all relevant times, Lauren B established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

528.    At all relevant times, Lauren B maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

529.    At all relevant times, Lauren B was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**TTTT. <u>Defendant The New York Botanical Garden</u>**

530.    Botanical Garden is domestic business corporation incorporated in New York with its principal place of business located at 2900 Southern Boulevard, Bronx, NY 10458.

531.    Botanical Garden participates in the NYPD's Paid Detail Program.

532.    At all relevant times, Botanical Garden controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

533.    At all relevant times, Botanical Garden established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

534.    At all relevant times, Botanical Garden maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

535.    At all relevant times, Botanical Garden was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**UUUU.    <u>Defendant The Brooklyn Hospital Center</u>**

536.    Brooklyn Hospital is a domestic business corporation incorporated in New York with its principal place of business located at 121 DeKalb Avenue, Brooklyn, NY 11201.

537.    Brooklyn Hospital participates in the NYPD's Paid Detail Program.

538.    At all relevant times, Brooklyn Hospital controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

539.    At all relevant times, Brooklyn Hospital established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

540.    At all relevant times, Brooklyn Hospital maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

541.    At all relevant times, Brooklyn Hospital was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**VVVV.    Defendant NBCUniversal Media, LLC**

542.    NBC is a foreign limited liability company incorporated in Delaware with its principal place of business located at 30 Rockefeller Plaza, New York, NY 10112.

543.    NBC participates in the NYPD's Paid Detail Program.

544.    At all relevant times, NBC controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

545.    At all relevant times, NBC established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

546.    At all relevant times, NBC maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

547.    At all relevant times, NBC was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**WWWW.**      **Defendant Sam Ash Music Corporation**

548.    Sam Ash is a domestic business corporation with its principal place of business located at 278 Duffy Avenue, Hicksville, NY 11801.

549.    Sam Ash participates in the NYPD's Paid Detail Program.

550.    At all relevant times, Sam Ash controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

551.    At all relevant times, Sam Ash established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

552.    At all relevant times, Sam Ash maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

553.    At all relevant times, Sam Ash was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**XXXX.**      **Defendants Does Nos. 1 through 100**

554.    Plaintiffs do not know the true names and capacities, whether individual, partners, or corporate, of Does Nos. 1 through 100, and for that reason sues Does Nos. 1 through 100 under fictitious names.

555.    Upon information and belief, Does Nos. 1 through 100 participate in the NYPD's Paid Detail Program.

556.    Upon information and belief, at all relevant times, Does Nos. 1 through 100 controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

557.    Upon information and belief, at all relevant times, Does Nos. 1 through 100 established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

558.    Upon information and belief, at all relevant times, Does Nos. 1 through 100 maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

559.    Upon information and belief, at all relevant times, Does Nos. 1 through 100 were "employers" and/or "hiring parties" within the meaning of all relevant statutes and regulations.

## FACTS

### A.    Background

560.    In or around the Spring of 1998, the NYPD created the Paid Detail Program ("PDP") to allow employees of the NYPD to perform off-duty uniformed security work within New York City.

561.    The primary purpose of the PDP is to provide a highly visible police presence at participating businesses.

562.    NYPD personnel who hold any of the following titles may participate in the PDP: (i) Police Officer; (ii) Detective; (iii) Sergeant; (iv) Lieutenant; or (v) Captains (collectively, "Officers").

563.    The PDP is the only authorized program for businesses to employ uniformed off-duty Officers.

564.    The PDP allows, with limited exceptions, any event planner, corporation, or interested organization approved by the NYPD to employ Officers part-time to provide uniformed security work.

565.    Officers are assigned to work at various businesses through the PDP, including, *inter alia*: (i) retail chains; (ii) department stores; (iii) supermarkets; (iv) houses of worship; (v) sports complexes; (vi) banks; (vii) office buildings; (viii) schools; (ix) hospitals; and (x) museums.

566.    The NYPD and the various Vendors work in concert to control all aspects of Officers' employment through the PDP.

**B.    NYPD's Administration of the PDP and Employment of Officers**

      **i.    Approval and Denial of Businesses**

567.    The NYPD must approve a business before it is permitted to employ Officers through the PDP.

568.    The NYPD sets the parameters for business participation in the PDP.

569.    The NYPD allows, with limited exceptions, any event planner, corporation, or interested organization to qualify for the PDP, subject to the NYPD's approval.

570.    The NYPD excludes, *inter alia*, government and quasi-governmental entities and personal protection or bodyguard companies from participating in the PDP.

571.    To qualify, businesses are required to provide various information requested by the NYPD.

572.    The NYPD also performs a general background and credit check of each business.

573.    After the NYPD reviews a business's responses, background information, and credit information, it requires the business to sign a "Participation Agreement" and submit a certificate of insurance.

574.    Finally, the Commissioner of the NYPD reviews the signed Participation Agreement and certificate of insurance before granting or denying final approval for the business to participate in the PDP.

### ii.    Approval or Denial of NYPD Employees to Qualify as Officers

575.    The NYPD also sets the parameters for Officers to participate in the PDP.

576.    To qualify, an Officer must meet various criteria, including, *inter alia*, possessing greater than one year of service in the NYPD and maintaining full duty status throughout the duration of the Officer's participation in the PDP.

577.    The NYPD excludes employees who are considered chronically sick, on performance monitoring, or in possession of "position limitations."

578.    Further, the NYPD limits participation in the PDP to personnel holding specific titles and ranks.  *See supra* ¶ 562.

579.    NYPD employees must obtain approval from their commanders and submit a written application, as well as tax documentation, to be considered for participation in the PDP.

580.    Further, the NYPD's Paid Detail Unit reviews each applicant's work record before approving them to participate in the PDP.

581.    The NYPD maintains authority to unilaterally remove an Officer from the PDP if they are promoted or transferred to a position that disqualifies them, or they are placed on performance monitoring.

### iii.    Direction and Control of PDP Shifts

582.    The NYPD maintains direction, control, and supervision of the assignment of Officers to PDP shifts.

583.    Further, the NYPD maintains and operates an online portal through which participating businesses may schedule Officers to perform off-duty uniformed security work.

584.    The NYPD controls when businesses may schedule Officers for shifts and requires that shifts last from four to 12 hours.

585.    The NYPD evaluates each requested shifts and, based on its assessment of safety and security concerns, determines the minimum number of Officers necessary for assignment, as well as the number of Officers required to supervise.

586.    The NYPD also controls and determines when Officers may accept shifts and the number of hours per month Officers may work the same.

587.    The NYPD limits Officers with more junior ranks, such as Police Officer or Detective, to a maximum of 80 hours of PDP work per month.

588.    The NYPD limits Officers with the more senior ranks, such Sergeant or Lieutenant, to a maximum of 30 hours of PDP work per month.

589.    The NYPD prohibits Officers from working PDP assignments within three hours of the start of their regularly scheduled non-PDP tours.

590.    Similarly, the NYPD prohibits Officers from working PDP assignments within one hour of the end of their regularly scheduled non-PDP tours.

591.    The NYPD requires Officers to complete Paid Detail Cards for each PDP shift they work.

592.    The NYPD prohibits Officers from trading PDP shifts with one another.

593.    Per its policies, the NYPD suspends Officers who request PDP shifts on behalf of other Officers or perform PDP shifts originally assigned to another Officer without the NYPD's prior authorization.

594.    The NYPD also requires that Officers provide documentation to their NYPD supervisors in the event they have to cancel a previously scheduled PDP shift.

595.    Officers who fail to provide such documentation risk being deemed ineligible for future PDP assignments.

596.    The NYPD prohibits Officers from working for participating businesses, including the Vendors, outside of the PDP.

597.    Officers who schedule shifts directly with a participating business are disciplined and deemed ineligible for future PDP assignments.

### iv.    Control Over Officers' Uniforms and Physical Appearance on PDP Shifts

598.    The NYPD maintains control and direction over the uniforms and physical appearance of Officers on PDP shifts.

599.    The NYPD establishes and enforces a dress code for all Officers on PDP shifts.

600.    The NYPD mandates that Officers wear NYPD-approved clothing on PDP shifts, including full uniforms, vests, and eight-point caps.

601.    The NYPD prohibits Officers from wearing, *inter alia*, baseball caps, raid jackets, and other non-uniform apparel.

602.    The NYPD requires Officers to conform to the same grooming and appearance standards applicable to Officers on regularly scheduled non-PDP tours.

603.    The NYPD directs Officers to bring NYPD-issued radios, batons, and activity logs on PDP assignments.

604.    The NYPD subjects Officers to inspection by NYPD supervisors to ensure compliance with PDP uniform and physical appearance requirements.

### v.    Control Over Officers' Work During PDP Shifts

605.    The NYPD maintains direction, control, and supervision of the work performed by Officers during PDP shifts.

606.    Upon arrival at a participating business, the NYPD commands Officers to report to the business's representative or to the ranking Officer supervising the shift.

607.    Additionally, the NYPD directs Officers to sign in on a Paid Detail Attendance Sheet when they arrive.

608.    The NYPD cautions Officers that they are subject at all times to NYPD rules and regulations while working on PDP shifts.

609.    The NYPD assigns high-ranking officials, such as Sergeants, Lieutenants, and Captains, to perform daily rounds of PDP shifts to monitor Officers' work.

610.    The NYPD mandates that Officers report to the NYPD any arrests or Officer injuries that occur on PDP shifts.

611.    At the conclusion of a PDP shift, the NYPD directs Officers to sign out on a Paid Detail Attendance Sheet and present a Paid Detail Card to the participating business's representative or the ranking Officer for signature.

612.    The NYPD instructs participating businesses to report any Officer who breaches NYPD standards.

613.    The NYPD also instructs participating businesses to report any Officer who breaches the business's own internal policies.

614.    The NYPD disciplines Officers who breach NYPD standards or a business's policies on a PDP shift by, *inter alia*: (i) removing the given Officer from the shift; (ii) banning the Officer from future shifts with a specific business; (iii) suspending an Officer's PDP eligibility; or (iv) expelling an Officer from participation in the PDP completely.

### vi.    Control Over Officers' Wages

615.    The NYPD directs and controls the manner in which Officers are paid through the PDP.

616.    The NYPD establishes uniform hourly rates based on each Officer's rank.

617.    The NYPD has set an hourly rate of $49.00 for Officers with the rank of Police Officer or Detective.

618.    The NYPD also charges participating businesses an administrative fee of $4.90 for each hour of PDP work performed by a Police Officer or Detective.

619.    The NYPD has set an hourly rate of $61.00 for Officers with the rank of Sergeant.

620.    The NYPD also charges participating businesses an administrative fee of $6.10 for each hour of PDP work performed by a Sergeant.

621.    The NYPD has set an hourly rate of $68.00 for Officers with the rank of Lieutenant.

622.    The NYPD also charges participating businesses an administrative fee of $6.80 for each hour of PDP work performed by a Lieutenant.

623.    The NYPD has set an hourly rate of $87.00 for Officers with the rank of Captain.

624.    The NYPD also charges participating businesses an administrative fee of $8.70 for each hour of PDP work performed by a Captain.

625.    The NYPD directs and controls the employment status of Officers, mandating that Officers are classified (incorrectly) as independent contractors for PDP shifts.

626.    The NYPD requires payment to Officers on an IRS Form 1099, as opposed to an IRS Form W-2.

627.    The NYPD directs Officers to list 1 Police Plaza, New York, New York 10038 (rather than the Officers' home addresses) when completing tax forms for PDP shifts.

628.    The NYPD administers payment to Officers through the NYPD's Paid Detail Unit.

629.    The NYPD does not permit participating businesses to pay Officers directly.

C.    **Businesses' Participation in the PDP and Employment of Officers**

630.    Once a business such as one of the Vendors obtains approval to employ Officers, it coordinates with the NYPD to assess how many Officers the business needs to staff a particular PDP shift.

631.    Businesses, including the Vendors, direct and control the dates Officers work on PDP shifts.

632.    Businesses post solicitations on the PDP portal for Officers to view and ultimately accept.

633.    Businesses, including the Vendors, each agree to pay Officers at the uniform hourly rates set forth in the PDP.

634.    Once an Officer is hired, participating businesses, including the Vendors, direct and control the Officer throughout the PDP shift.

635.    Businesses, including the Vendors, direct Officers to the exact location where they are to work throughout the PDP shift.

636.    Businesses, including the Vendors, determine the meal and break policies for Officers and dictate the circumstances under which an Officer may intervene, such as by detaining a customer suspected of theft.

637.    Businesses, including the Vendors, also require Officers to report their work in Activity Logs at pre-determined intervals.

638.    Businesses, including the Vendors, also subject Officers to discipline and report Officers to the NYPD for failing to follow the business's policies.

639.    Businesses, including the Vendors, enforce NYPD standards in the same manner, by reporting Officers for failing to comply with the same.

640.    Businesses, including the Vendors, control the staffing of Officers insofar as they may decline an Officer who accepts a shift through the PDP portal.

641.    Businesses, including the Vendors, possess the power to extend an Officer's PDP shift past its scheduled end time.

642.    Businesses, including the Vendors, direct and control when Officers are paid for work performed on PDP shifts.

**D.    Failure to Timely Pay Wages**

643.    Defendants engage in a pattern and practice of delaying payment of wages to Plaintiffs and all other Officers beyond their regularly scheduled paydays.

644.    Plaintiffs and all other Officers' pay periods cover a 14-day time frame, with their regularly scheduled pay day being every other Friday.

645.    However, Defendants routinely fail to pay Plaintiffs and all other Officers for PDP shifts for weeks, and even months, after Officers complete PDP shifts.

**E.    Failure to Pay Minimum and All Earned Wages**

646.    Similarly, Defendants engage in a pattern and practice of denying Plaintiffs and all other Officers minimum wages and all earned wages at their regular rates of pay.

647.    For PDP shifts, Defendants agree to pay Plaintiffs and all other Officers at established hourly rates based on the Officer's respective NYPD rank.

648.    The established hourly rates are communicated by Defendants on the PDP portal where Plaintiffs and all other Officers accept PDP shifts.

649.    However, Defendants sometimes fail to pay any wages at all to Plaintiffs and other Officers for completed PDP shifts.

F.    **Failure to Provide Notices of Pay Rate and Accurate Wage Statements**

650.    The NYLL requires that employers, including the Vendors, provide employees, "at the time of hiring, a notice containing the following information:  the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;  the regular pay day designated by the employer [ ];  the name of the employer;  any 'doing business as' names used by the employer;  the physical address of the employer's main office or principal place of business, and a mailing address if different;  the telephone number of the employer;  plus such other information as the commissioner deems material and necessary," which is commonly referred to as a Notice of Pay Rate.

651.    Throughout the statutory period, the Vendors have never provided Plaintiffs or any other Officer with Notices of Pay Rate.

652.    The NYLL also requires that employers, including the Vendors, issue or provide employees with accurate wage statements with each payment of wages.

653.    The Vendors never furnished Plaintiffs or any of the other Officers with accurate wage statements during the statutory period.

654.    As a result of Vendors' failure to furnish Notices of Pay Rate and accurate wage statements, Plaintiffs and other Officers have suffered concrete harm.

655.    Specifically, Plaintiffs and other Officers have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid and/or not paid properly; and (iii) taking appropriate action to obtain the payments due to them.

G.    **Plaintiffs' Work for Defendants**

656.    Defendants failed to properly pay Plaintiffs for their hours worked on PDP shifts in several ways.

71

657.    Defendants failed to timely pay Plaintiffs for their hours worked on PDP shifts.

658.    Throughout the statutory period, Plaintiffs were paid their wages in pay periods spanning a 14-day timeframe, with their regularly scheduled pay days being every other Friday.

659.    However, Defendants routinely failed to pay Plaintiffs for their PDP shifts on their regularly scheduled pay days, instead waiting weeks and even months to pay Plaintiffs for their work.

660.    Numerous Officers have confirmed to Plaintiffs that Defendants also failed to timely pay them their wages for their PDP shifts.

661.    Defendants also paid Plaintiffs below the federal and State minimum wage rates and below their regular rate of pay for all hours worked on PDP shifts.

662.    To this day, Plaintiffs have not been paid their wages for numerous PDP shifts they worked for Defendants.

663.    Several Officers have confirmed to Plaintiffs that Defendants have also failed to pay them their wages for their PDP shifts.

664.    Additionally, the Vendors for whom Plaintiffs worked did not provide Plaintiffs with accurate wage statements for any of the PDP shifts that they completed.

665.    Nor did any of the Vendors provide Plaintiffs with any Notices of Pay Rate.

666.    Numerous other Officers have confirmed to Plaintiffs that Defendants never provided them with accurate wage statements or Notices of Pay Rate for their PDP shifts.

### i.    Plaintiffs' Work for RXR

667.    At all times during their PDP shifts at RXR, the NYPD and RXR jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them RXR radios and RXR employee identification lanyards and signs, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and

regulations Plaintiffs were required to follow while working for RXR; (3) the conduct or behavior that was prohibited versus what was expected while working for RXR; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, emotionally disturbed individuals ("EDPs"), or other persons RXR did not want on their premises; (8) the manner in which RXR required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which third party vendors were allowed on the premises and under what circumstances; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

668.    From 2023 to 2024, Piney worked approximately 55 shifts at RXR, most recently on October 29, 2024.

669.    Piney never received timely payment of wages for the PDP shifts he worked at RXR, and instead waited weeks and even months for his paychecks.

670.    For example, on October 14, 2024, Piney completed a PDP shift at RXR for a total of eight (8) hours but was not paid for this work until approximately two months later, in late December 2024.

671.    C. Diaz also worked at least three (3) PDP shifts for RXR and was never paid timely wages for his shifts, instead waiting multiple weeks for his paychecks.

672.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for RXR.

ii.     **Plaintiffs' Work for Tishman Speyer**

673.    At all times during their PDP shifts at Tishman Speyer, the NYPD and Tishman Speyer jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Tishman Speyer radios, Tishman Speyer employee identification lanyards and signs, as well as Tishman Speyer key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Tishman Speyer; (3) the conduct or behavior that was prohibited versus what was expected while working for Tishman Speyer; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Tishman Speyer did not want on their premises; (8) the manner in which Tishman Speyer required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

674.    From 2023 to 2024, Piney worked approximately 41 shifts at Tishman Speyer, most recently on October 22, 2024.

675.    Piney never received timely payment of wages for the PDP shifts he worked at Tishman Speyer, and instead waited weeks and even months for his paychecks.

676.    For example, on June 18, 2024, Piney completed a PDP shift at Tishman Speyer for a total of eight (8) hours but was not paid for this work until several weeks later in August 2024.

677.   Kmiotek also worked at least two (2) PDP shifts at Tishman Speyer, most recently on April 4, 2023.

678.   Kmiotek never received timely payment of wages for the shifts he worked at Tishman Speyer, instead waiting multiple weeks for his paychecks.

679.   Dawkins worked at least 12 PDP shifts for Tishman Speyer, most recently on February 4, 2024.

680.   Dawkins never received timely payment of wages for the shifts he worked at Tishman Speyer, instead waiting multiple weeks for his paychecks.

681.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Tishman Speyer.

### iii.   Plaintiffs' Work for Rockefeller Center

682.   At all times during their PDP shifts at Rockefeller Center, the NYPD and Rockefeller Center jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Rockefeller Center radios and Rockefeller Center employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rockefeller Center; (3) the conduct or behavior that was prohibited versus what was expected while working for Rockefeller Center; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) strict instructions on not being permitted to sit down or stand in one location for longer than specific period of time; (6) suspicious activity they were required to look out for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) how to handle loiterers, EDPs, or other persons Rockefeller Center did not want on their premises; (9) the specific manner in which

Rockefeller Center required them to perform perimeter checks; (10) the specific time they were permitted to take a meal break; (11) what they were required to do upon their return from lunch; (12) which other Officers they were required to relieve; (13) which individuals were permitted onto the premises and which were prohibited; (14) which third party vendors were allowed on the premises and under what circumstances; and (15) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

683.    Piney worked over 120 shifts for Rockefeller Center, most recently on July 25, 2023.

684.    Piney never received timely payment of wages for the PDP shifts he worked for Rockefeller Center, and instead waited weeks and even months for his paychecks.

685.    For example, on July 24, 2023, Piney completed a PDP shift for Rockefeller Center for a total of eight (8) hours but was not paid for his work until several weeks later in late August 2023.

686.    Similarly, on December 1, 2024, Suazo worked an eight (8) hour PDP shift for Rockefeller Center.

687.    To this day, Suazo has not been paid for the eight (8) hours of work he performed for Rockefeller Center almost two (2) months earlier on December 1, 2024.

688.    Faysal also worked approximately four (4) shifts for Rockefeller Center, each eight (8) hours long, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

689.    Martinez worked approximately three (3) shifts for Rockefeller Center, each eight (8) hours long, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

690.    In November and December 2022, Divino worked three (3) PDP shifts for Rockefeller Center, each eight (8) hours long, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

691.    Likewise, Yanez worked approximately 14 shifts for Rockefeller Center, each eight (8) hours long, and was never paid timely wages, instead waiting multiple weeks for his paychecks.

692.    For example, on August 7, 2024, Yanez completed an eight (8) hour shift for Rockefeller Center, but was not paid for his work until multiple weeks later in September 2024.

693.    On December 8, 2023, Zorilla worked an eight (8) hour PDP shift for Rockefeller Center.

694.    Zorilla did not receive timely payment of wages for the PDP shift he worked for Rockefeller Center, and instead waited multiple weeks for his paycheck.

695.    Dawkins also worked at least three (3) PDP shifts for Rockefeller Center, most recently on May 12, 2023.

696.    Dawkins never received timely payment of wages for the shifts he worked for Rockefeller Center, instead waiting multiple weeks for his paychecks.

697.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rockefeller Center.

### iv.    Plaintiffs' Work for Disney

698.    At all times during their PDP shifts at Disney, the NYPD and Disney jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them

Disney radios and Disney employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Disney; (3) the conduct or behavior that was prohibited versus what was expected while working for Disney; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) how to assist Disney employees with monitoring the ticket line, the ticket box, and the metal detectors; (6) suspicious activity they were required to look out for; (7) the manner in which they were required to respond to various incidents and disturbances before, during, and after each show; (8) how to handle loiterers, EDPs, or other persons Disney did not want on their premises; (9) how to handle intoxicated individuals; (10) the specific time they were permitted to take a meal break; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

699.    From 2023 to 2024, Piney worked approximately 23 PDP shifts at Disney, most recently on March 28, 2024.

700.    Piney never received timely payment of wages for the PDP shifts he worked at Disney, and instead waited weeks and even months for his paychecks.

701.    For example, on March 28, 2024, Piney completed a PDP shift at Disney for a total of six (6) hours but was not paid for this work until approximately two months later in May 2024.

702.    On December 5, 2023, Dawkins worked a PDP shift at Disney.

703.    Dawkins did not receive timely payment of wages for the shift he worked at Disney, instead waiting multiple weeks for his paycheck.

704.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Disney.

### v.    Plaintiffs' Work for MSG

705.    At all times during their PDP shifts at MSG, the NYPD and MSG jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them MSG radios and MSG employee identification lanyards and signs, as well as MSG colored bands, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for MSG; (3) the conduct or behavior that was prohibited versus what was expected while working for MSG; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) a specific list of individuals with photographs they were required to be on the lookout for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) how to handle loiterers, EDPs, or other persons MSG did not want on their premises; (9) how to assist MSG employees with monitoring the ticket line and the metal detectors; (10) how to handle intoxicated individuals; (11) specific instructions on how to interact with and treat VIP patrons or other special individuals; (12) the specific time they were permitted to take a meal break; (13) what they were required to do upon their return from lunch; (14) which other Officers they were required to relieve; (15) which individuals were permitted into the building and which were prohibited; and (16) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

706.    Piney worked at least three (3) shifts at MSG, most recently on March 4, 2024.

707.    Piney never received timely payment of wages for the PDP shifts he worked at MSG, and instead waited weeks and even months for his paychecks.

708.    For example, on March 4, 2024, Piney completed a PDP shift at MSG for a total of five (5) hours but was not paid for this work until several weeks later in April 2024.

709.    Faysal also worked a five (5) hour shift at MSG and waited almost four (4) months to receive his paycheck.

710.    Martinez worked approximately ten (10) shifts at MSG that ranged from five (5) to 5.75 hours each, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

711.    Likewise, Yanez worked approximately 14 shifts at MSG, ranging from five (5) to 12 hours long, and was never paid timely wages, instead waiting multiple weeks for his paychecks.

712.    For example, on September 7, 2024, Yanez completed a six (6) hour shift at MSG, but was not paid for his work until over a month later in October 2024.

713.    On January 22, 2024, Daly worked a six (6) hour PDP shift at MSG.

714.    Daly did not receive timely payment of wages for the shift she worked at MSG, instead waiting multiple weeks for her paycheck.

715.    C. Diaz also worked at least 12 PDP shifts for MSG and was never paid timely wages for his shifts, instead waiting multiple weeks for his paychecks.

716.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for MSG.

**vi.    Plaintiffs' Work for Boston Properties**

717.    At all times during their PDP shifts at Boston Properties, the NYPD and Boston Properties jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Boston Properties radios and Boston Properties employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Boston Properties; (3) the conduct or behavior that was prohibited versus what was expected while working for Boston Properties; (4) the specific areas they were required to monitor

and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Boston Properties did not want on their premises; (8) the manner in which Boston Properties required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

718.    Piney worked at least four (4) shifts at Boston Properties, most recently on November 10, 2023.

719.    Piney never received timely payment of wages for the PDP shifts he worked at Boston Properties, and instead waited weeks and even months for his paychecks.

720.    Faysal also worked an eight (8) hour shift at Boston Properties and was not paid timely wages, instead waiting multiple weeks to receive his paycheck.

721.    Likewise, Yanez worked two (2) shifts at Boston Properties, each eight (8) hours long, and was never paid timely wages, instead waiting multiple weeks for his paychecks.

722.    Martinez also worked approximately two (2) PDP shifts for Boston Properties and was never paid timely wages for his shifts, instead waiting multiple weeks for his paychecks.

723.    C. Diaz also worked at least five (5) PDP shifts for Boston Properties and was never paid timely wages for his shifts, instead waiting multiple weeks for his paychecks.

724.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Boston Properties.

### vii.    Plaintiffs' Work for Royal Realty

725.    At all times during their PDP shifts at Royal Realty, the NYPD and Royal Realty jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Royal Realty radios and Royal Realty employee identification lanyards and signs, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Royal Realty; (3) the conduct or behavior that was prohibited versus what was expected while working for Royal Realty; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Royal Realty did not want on their premises; (8) the manner in which Royal Realty required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

726.    Kmiotek worked at least four (4) PDP shifts at Royal Realty, each eight (8) hours long.

727.    Kmiotek never received timely payment of wages for the shifts he worked at Royal Realty, instead waiting multiple weeks for his paychecks.

728.    Piney also worked at least two (2) shifts at Royal Realty, each eight (8) hours long, and was never paid timely wages, instead waiting multiple weeks for his paychecks.

729.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Royal Realty.

### viii.    Plaintiffs' Work for Yankees

730.    At all times during their PDP shifts at Yankees, the NYPD and Yankees jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Yankees employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yankees; (3) the conduct or behavior that was prohibited versus what was expected while working for Yankees; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) individuals they were required to be on the lookout for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) how to handle loiterers, EDPs, or other persons Yankees did not want on their premises; (9) specific instructions on how to interact with Yankees' patrons; (10) how to handle intoxicated individuals; (11) when they were permitted to take a meal break; (12) which individuals were permitted onto the premises and which prohibited; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their uniform throughout the entirety of their shift.

731.    On August 12, 2011, Suazo worked his first PDP shift at Yankees.

732.    Suazo worked over 60 shifts at Yankees, most recently on December 28, 2024.

733.    Suazo never received timely payment of wages for the PDP shifts he worked at Yankees, and instead waited weeks and even months for his paychecks.

734.    For example, on May 19, 2024, Suazo completed a PDP shift at Yankees for a total of six (6) hours but was not paid for this work until approximately two (2) months later in July 2024.

735.    Yanez also worked approximately six (6) shifts at Yankees, most recently a 6.5-hour shift on July 23, 2023.

736.    Yanez was never paid timely wages for his shifts at Yankees, instead waiting multiple weeks for his paychecks.

737.    Likewise, Daly also worked a six (6) hour shift at Yankees and did not receive timely payment of wages, instead waiting multiple weeks for her paycheck.

738.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yankees.

ix.    **Plaintiffs' Work for NYP**

739.    At all times during their PDP shifts at NYP, the NYPD and NYP jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NYP radios and NYP employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NYP; (3) the conduct or behavior that was prohibited versus what was expected while working for NYP; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NYP did not want on their premises; (8) the manner in which NYP required them to perform perimeter checks; (9) specific instructions on how to interact with NYP patients and employees; (10) which individuals are not permitted to leave NYP without specific documentation; (11) when they were permitted to take a meal break; (12) which individuals were permitted into the building and which were prohibited; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

740.    Faysal worked seven (7) shifts at NYP, each eight (8) hours long, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

741.    For example, on May 28, 2019, Faysal completed an eight (8) hour shift at NYP but was not paid until two (2) months later in July 2019.

742.    Martinez worked approximately 13 shifts at NYP, each eight (8) hours long, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

743.    Suazo also worked approximately ten (10) shifts at NYP, each eight (8) hours long, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

744.    Likewise, Yanez worked approximately six (6) shifts at NYP, each eight (8) hours long, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

745.    Pantoja also worked approximately 13 PDP shifts for NYP.

746.    Pantoja never received timely payment of wages for the shifts she worked at NYP, instead waiting multiple weeks for her paychecks.

747.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NYP.

**x.    Plaintiffs' Work for NYU Langone**

748.    At all times during their PDP shifts at NYU Langone, the NYPD and NYU Langone jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NYU Langone radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NYU Langone; (3) the conduct or behavior that was prohibited versus what was expected while working for NYU Langone; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various

incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NYU Langone did not want on their premises; (8) specific instructions on how to interact with NYU Langone patients and employees; (9) which individuals were not permitted to leave NYU Langone without specific documentation; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

749.    Martinez worked approximately five (5) shifts at NYU Langone, most recently on December 23, 2024.

750.    Martinez never received timely payment of wages for the PDP shifts he worked at NYU Langone, and instead waited weeks and even months for his paychecks.

751.    To this day Martinez has not been paid at all for the eight (8) hour shift he worked at NYU Langone on December 23, 2024.

752.    Faysal worked two (2) shifts at NYU Langone, most recently on June 18, 2024, and was never paid timely wages, instead waiting weeks and even months for his paychecks.

753.    For example, on September 30, 2019, Faysal completed an eight (8) hour shift at NYU Langone but was not paid until over three (3) months later in January 2020.

754.    Likewise, Yanez worked approximately three (3) shifts at NYU Langone, each eight (8) hours long, and was never paid timely wages, instead waiting multiple weeks for his paychecks.

755.    Dawkins worked at least 17 PDP shifts for NYU Langone, most recently on August 16, 2024.

756.    Dawkins never received timely payment of wages for the shifts he worked at NYU Langone, instead waiting multiple weeks for his paychecks.

757.    Pantoja also worked approximately 15 PDP shifts for NYU Langone.

758.    Pantoja never received timely payment of wages for the shifts she worked at NYU Langone, instead waiting multiple weeks for her paychecks.

759.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NYU Langone.

### xi.    Plaintiffs' Work for Mount Sinai

760.    At all times during their PDP shifts at Mount Sinai, the NYPD and Mount Sinai jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Mount Sinai radios, Mount Sinai employee identification lanyards and signs, as well as Mount Sinai key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Mount Sinai; (3) the conduct or behavior that was prohibited versus what was expected while working for Mount Sinai; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Mount Sinai did not want on their premises; (8) specific instructions on how to interact with Mount Sinai patients and employees; (9) which individuals were not permitted to leave Mount Sinai without specific documentation; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their

appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

761.    R. Diaz worked at least 97 shifts at Mount Sinai, most recently on January 23, 2024.

762.    R. Diaz never received timely payment of wages for the PDP shifts he worked at Mount Sinai, and instead waited weeks and even months for his paychecks.

763.    For example, on January 2, 2024, R. Diaz completed a PDP shift at Mount Sinai for a total of eight (8) hours but was not paid for this work until several weeks later in February 2024.

764.    Yanez worked approximately 66 shifts at Mount Sinai, most recently on January 1, 2025.

765.    Yanez was never paid timely wages for the shifts he worked at Mount Sinai, instead waiting weeks and even months for his paychecks.

766.    For example, on December 31, 2023, Yanez completed an eight (8) hour shift at Mount Sinai, but was not paid for his work until two (2) months later in February 2024.

767.    From 2022 to 2024, Zorilla worked approximately 14 PDP shifts for Mount Sinai.

768.    Zorilla was never paid timely wages for the shifts he worked at Mount Sinai, instead waiting multiple weeks for his paychecks.

769.    For example, on June 7, 2024, Zorilla completed an eight (8) hour shift at Mount Sinai, but was not paid for his work until two (2) months later on August 2, 2024.

770.    In February 2023, Dawkins worked at a PDP shift for Mount Sinai.

771.    Dawkins did not receive timely payment of wages for the shift he worked at Mount Sinai, instead waiting multiple weeks for his paycheck.

772. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Mount Sinai.

**xii.    Plaintiffs' Work for NYT**

773. At all times during their PDP shifts at NYT, the NYPD and NYT jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NYT radios, NYT employee identification lanyards and signs, as well as NYT key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NYT; (3) the conduct or behavior that was prohibited versus what was expected while working for NYT; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NYT did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted into the building and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

774. R. Diaz worked at least 22 PDP shifts at NYT, most recently on February 21, 2024.

775. R. Diaz never received timely payment of wages for the PDP shifts he worked at NYT, and instead waited weeks and even months for his paychecks.

776. For example, on December 8, 2023, R. Diaz completed a PDP shift at NYT for a total of eight (8) hours but was not paid for his work until approximately two (2) months later, February 2024.

777.    Yanez also worked approximately six (6) shifts at NYT, most recently on August 6, 2024.

778.    Yanez was never paid timely wages for the shifts he worked at NYT, instead waiting weeks and even months for his paychecks.

779.    For example, on August 6, 2024, Yanez completed an eight (8) hour shift at NYT, but was not paid for his work until two (2) months later in October 2024.

780.    Likewise, on December 9, 2022, Divino worked an eight (8) hour shift at NYT.

781.    Divino did not receive timely payment of wages for the shift he worked at NYT, instead waiting multiple weeks for his paycheck.

782.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NYT.

**xiii.    Plaintiffs' Work for Kering**

783.    At all times during their PDP shifts at Kering, the NYPD and Kering jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Kering; (3) the conduct or behavior that was prohibited versus what was expected while working for Kering; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Kering did not want on their premises; (8) specific instructions on how to interact with Kering customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in

which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

784.    On November 29, 2022, Martinez worked his first PDP shift at Kering.

785.    Martinez worked approximately 89 shifts at Kering, most recently on January 19, 2025.

786.    Martinez never received timely payment of wages for the PDP shifts he worked at Kering, and instead waited weeks and even months for his paychecks.

787.    For example, on October 21, 2024, Martinez completed a PDP shift at Kering for a total of 8.25 hours but was not paid for this work until over two (2) months later on December 23, 2024.

788.    To this day, Martinez has not been paid for his last three (3) PDP shifts at Kering.

789.    On August 10, 2023, Yanez also worked an eight (8) hour shift at Kering but was not paid for his work until multiple weeks later.

790.    Likewise, Daly worked a 9.75-hour shift at Kering and waited multiple weeks for her paycheck.

791.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Kering.

**xiv.    Plaintiffs' Work for BJs**

792.    At all times during their PDP shifts at BJs, the NYPD and BJs jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them BJs radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for BJs; (3) the conduct or behavior that was prohibited versus what was expected while working for BJs; (4) the specific areas they were required to monitor and the manner in which they were required

to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons BJs did not want on their premises; (8) specific instructions on how to interact with BJs' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

793.    On March 31, 2016, Martinez worked his first PDP shift at BJs.

794.    Martinez worked approximately eight (8) shifts at BJs, most recently on December 18, 2024.

795.    Martinez never received timely payment of wages for the shifts he worked at BJs, and instead waited weeks and even months for his paychecks.

796.    For example, on September 12, 2024, Martinez completed a shift at BJs for a total of eight (8) hours but was not paid for this work until approximately one (1) month later in October 2024.

797.    Faysal also worked approximately three (3) shifts for BJs, most recently on June 15, 2024.

798.    Faysal was never paid timely wages for the shifts he worked at BJs, instead waiting multiple weeks for his paychecks.

799.    For example, on June 21, 2022, Faysal completed an eight (8) hour shift at BJs but was not paid for this work until over one (1) month later in August 2022.

800.    Yanez also worked approximately three (3) shifts at BJs, most recently on January 12, 2025.

801.    Yanez was never paid timely wages for the shifts he worked at BJs, instead waiting multiple weeks for his paychecks.

802.    To this day, Yanez has not been paid for the January 12, 2025 shift he worked at BJs.

803.    Likewise, Daly worked a 5.5-hour shift at BJs and waited multiple weeks for her paycheck.

804.    Kmiotek worked at least 136 PDP shifts at BJs, most recently on February 5, 2025.

805.    Kmiotek was never paid timely wages for the shifts he worked at BJs, instead waiting weeks and even months for his paychecks.

806.    To this day, Kmiotek has not been paid wages for the shift he worked on January 16, 2025, or any subsequent PDP shifts he worked at BJs.

807.    Dawkins also worked at least two (2) PDP shifts for BJs, most recently in April 2024.

808.    Dawkins never received timely payment of wages for the shifts he worked at BJs, instead waiting multiple weeks for his paychecks.

809.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for BJs.

### xv.    Plaintiffs' Work for Rodeph Sholom

810.    At all times during their PDP shifts at Rodeph Sholom, the NYPD and Rodeph Sholom jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for

Rodeph Sholom; (3) the conduct or behavior that was prohibited versus what was expected while working for Rodeph Sholom; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rodeph Sholom did not want on their premises; (8) specific instructions on how to interact with Rodeph Sholom visitors and students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Rodeph Sholom employees with clearing traffic and monitoring students; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

811.    On March 10, 2017, Martinez worked his first PDP shift at Rodeph Sholom.

812.    Martinez worked approximately nine (9) shifts at Rodeph Sholom, most recently on September 21, 2024.

813.    Martinez never received timely payment of wages for the shifts he worked at Rodeph Sholom, and instead waited weeks and even months for his paychecks.

814.    For example, on September 21, 2024, Martinez completed a 6.5-hour shift at Rodeph Sholom but was not paid for this work until approximately one (1) month later in October 2024.

815.    Faysal also worked an 8.5-hour shift at Rodeph Sholom and was not paid until multiple weeks later for his work.

816.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rodeph Sholom.

xvi.    **Plaintiffs' Work for Apple**

817.    At all times during their PDP shifts at Apple, the NYPD and Apple jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Apple; (3) the conduct or behavior that was prohibited versus what was expected while working for Apple; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Apple did not want on their premises; (8) specific instructions on how to interact with Apple's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

818.    On September 18, 2024, Martinez worked his first PDP shift at Apple.

819.    Martinez worked approximately two (2) shifts at Apple, most recently on September 19, 2024.

820.    Martinez never received timely payment of wages for the shifts he worked at Apple, instead waiting multiple weeks for his paychecks.

821.    For example, on September 18, 2024, Martinez completed a shift at Apple for seven (7) hours but was not paid for this work until several weeks later in October 2024.

822.    In August 2022, Faysal also worked two (2) shifts at Apple, both six (6) hours long.

823.    Faysal never received timely payment of wages for the shifts he worked at Apple, instead waiting multiple weeks for his paychecks.

824.    Dawkins worked at least four (4) PDP shifts for Apple, most recently on October 8, 2023.

825.    Dawkins never received timely payment of wages for the shifts he worked at Apple, instead waiting multiple weeks for his paychecks.

826.    Pantoja also worked a PDP shift for Apple on February 2, 2025 for which she has not yet been paid.

827.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Apple.

**xvii.    Plaintiffs' Work for 34th Street**

828.    At all times during their PDP shifts at 34th Street, the NYPD and 34th Street jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for 34th Street; (3) the conduct or behavior that was prohibited versus what was expected while working for 34th Street; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons 34th Street did not want on their premises; (8) the manner in which 34th Street required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances,

including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

829.    On March 16, 2023, Martinez worked a PDP shift at 34th Street.

830.    Martinez did not receive timely payment of wages for the shift he worked at 34th Street, and instead waited months for his paycheck.

831.    For example, Martinez was not paid for his March 16, 2023 eight (8) hour shift at 34th Street until approximately three months later in June 2023.

832.    Likewise, Daly worked an eight (8) hour shift at 34th Street and waited multiple weeks for her paycheck.

833.    Dawkins worked at least eight (8) PDP shifts for 34th Street, most recently on July 17, 2024.

834.    Dawkins never received timely payment of wages for the shifts he worked at 34th Street, instead waiting multiple weeks for his paychecks.

835.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for 34th Street.

xviii.    **Plaintiffs' Work for BOA**

836.    At all times during their PDP shifts at BOA, the NYPD and BOA jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for BOA; (3) the conduct or behavior that was prohibited versus what was expected while working for BOA; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond

to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons BOA did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted into the building and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

837.   On March 6, 2023, Martinez worked a PDP shift at BOA.

838.   Martinez did not receive timely payment of wages for the shift he worked at BOA, and instead waited weeks for his paycheck.

839.   For example, Martinez was not paid for his March 6, 2023 four (4) hour shift at BOA until several weeks later in April 2023.

840.   Likewise, Daly worked a six (6) hour shift at BOA and waited multiple weeks for her paycheck.

841.   Yanez also worked a six (6) hour shift at BOA and waited multiple weeks for his paycheck.

842.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for BOA.

**xix.   Plaintiffs' Work for 180 Maiden**

843.   At all times during their PDP shifts at 180 Maiden, the NYPD and 180 Maiden jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for 180 Maiden; (3) the conduct or behavior that was prohibited versus what was expected while working for 180 Maiden; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which

they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons 180 Maiden did not want on their premises; (8) the manner in which 180 Maiden required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

844.    On December 1, 2022, Martinez worked a PDP shift at 180 Maiden.

845.    Martinez did not receive timely payment of wages for the shift he worked at 180 Maiden, and instead waited multiple weeks for his paycheck.

846.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for 180 Maiden.

**xx.    Plaintiffs' Work for Target**

847.    At all times during their PDP shifts at Target, the NYPD and Target jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Target radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Target; (3) the conduct or behavior that was prohibited versus what was expected while working for Target; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Target did not want on their premises; (8) specific instructions on how to interact with Target's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11)

specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

848.    Most recently, on March 17, 2024, Grant worked a seven (7) hour PDP shift at Target.

849.    Grant never received timely payment of wages for the PDP shifts he worked at Target, and instead waited months for his paychecks.

850.    For example, Grant was not paid for his March 17, 2024 seven (7) hour shift at Target until approximately three (3) months later in June 2024.

851.    Faysal also worked two (2) PDP shifts at Target, most recently on January 26, 2025.

852.    Faysal never received timely payment of wages for the shifts he worked at Target, and instead waited multiple weeks for his paychecks.

853.    For example, Faysal worked an eight (8) hour shift at Target on February 13, 2024, but waited multiple weeks to receive his paycheck.

854.    Faysal has still not been paid for the eight (8) hour shift he worked at Target on January 26, 2025.

855.    In February and March 2023, Ruiz-Reyes worked four (4) PDP shifts at Target, most recently on March 24, 2023.

856.    Ruiz-Reyes never received timely payment of wages for the shifts he worked at Target, and instead waited multiple weeks for his paychecks.

857.    From November 2022 to August 2023, Divino worked four (4) shifts at Target, most recently on August 31, 2023.

858.    Divino never received timely payment of wages for the shifts he worked at Target, and instead waited multiple weeks for his paychecks.

859.    Likewise, Daly worked at least seven (7) shifts for Target, most recently on July 31, 2024.

860.    Daly never received timely payment of wages for the shifts she worked at Target, and instead waited weeks and even months for her paychecks.

861.    For example, Daly worked an eight (8) hour shift at Target on July 28, 2024 and waited almost two months until September 2024 to receive her paycheck.

862.    Yanez worked approximately 79 shifts at Target, most recently on January 15, 2025 and January 13, 2025.

863.    Yanez never received timely payment of wages for the shifts he worked at Target, and instead waited weeks and even months for his paychecks.

864.    To this day, Yanez has not been paid for the last two (2) shifts he worked at Target.

865.    Also, on July 9, 2024, Yanez completed a seven (7) hour shift at Target, but was not paid for his work until three (3) months in October 2024.

866.    As another example, on July 3, 2024, Yanez completed an eight (8) hour shift at Target but was not paid until over two (2) months later in September 2024.

867.    Martinez also worked a seven (7) hour shift at Target and waited multiple weeks for his paycheck.

868.    Kmiotek also worked at least seven (7) PDP shifts at Target and never received timely payment of wages, instead waiting weeks and even months for his paychecks.

869.    Dawkins worked at least 25 PDP shifts for Target, most recently on August 18, 2024.

870.    Dawkins never received timely payment of wages for the shifts he worked at Target, instead waiting weeks and even months for his paychecks.

871.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Target.

**xxi.    Plaintiffs' Work for Marshalls**

872.    At all times during their PDP shifts at Marshalls, the NYPD and Marshalls jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Marshalls; (3) the conduct or behavior that was prohibited versus what was expected while working for Marshalls; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Marshalls did not want on their premises; (8) specific instructions on how to interact with Marshalls' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

873.    On May 11, 2022, Grant worked a six (6) hour PDP shift at Marshalls.

874.    Grant never received timely payment of wages for the shifts he worked at Marshalls, and instead waited weeks and even months for his paychecks.

875.    For example, Grant was not paid for his May 11, 2022 six (6) hour shift at Marshalls until several weeks later July 2022.

876.    Faysal also worked an eight (8) hour shift at Marshalls and did not receive timely payment of wages, instead waiting multiple weeks for his paycheck.

877.    On February 28, 2023, Kmiotek worked a 5.5 hour shift at Marshalls.

878.    Kmiotek did not receive timely payment of wages for the shift he worked ay Marshalls, and instead waited multiple weeks for his paycheck.

879.    From March 2022 to April 2023, Ruiz-Reyes worked approximately 22 shifts at Marshalls, most recently on April 25, 2023.

880.    Ruiz-Reyes never received timely payment of wages for the shifts he worked at Marshalls, instead waiting weeks and even months his paychecks.

881.    Likewise, Yanez worked two (2) shifts for Marshalls, each 12.5-hours long, and was never paid timely wages, instead waiting multiple weeks for his paychecks.

882.    Dawkins also worked at least seven (7) PDP shifts for Marshalls, most recently on June 29, 2024.

883.    Dawkins never received timely payment of wages for the shifts he worked at Marshalls, instead waiting multiple weeks for his paychecks.

884.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Marshalls.

**xxii.    Plaintiffs' Work for TJ Maxx**

885.    At all times during their PDP shifts at TJ Maxx, the NYPD and TJ Maxx jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for TJ Maxx; (3) the conduct or behavior that was prohibited versus what was expected while working for TJ Maxx; (4) the specific areas they were required to monitor and the manner in which they were required

to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons TJ Maxx did not want on their premises; (8) specific instructions on how to interact with TJ Maxx's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

886.    Ruiz-Reyes worked at least eight (8) PDP shifts at TJ Maxx, most recently in June 2024.

887.    Ruiz-Reyes never received timely payment of wages for the shifts he worked at TJ Maxx, instead waiting weeks and even months for his paychecks.

888.    Yanez also work approximately three (3) shifts at TJ Maxx, each ranging from six (6) to nine (9) hours long.

889.    Yanez never received timely payment of wages for the shifts he worked at TJ Maxx, and instead waited multiple weeks for his paychecks.

890.    Daly also worked at least three (3) shifts at TJ Maxx, each ranging from four (4) to five (5) hours long.

891.    Daly never received timely payment of wages for the shifts she worked at TJ Maxx, and instead waited multiple weeks for her paychecks.

892.    On July 9, 2023, Dawkins worked a PDP shift at TJ Maxx.

893.    Dawkins did not receive timely payment of wages for the shift he worked at TJ Maxx, instead waiting multiple weeks for his paycheck.

894.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for TJ Maxx.

### xxiii.  Plaintiffs' Work for Resorts World Casino

895.    At all times during their PDP shifts at Resorts World Casino, the NYPD and Resorts World Casino jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Resorts World Casino radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Resorts World Casino; (3) the conduct or behavior that was prohibited versus what was expected while working for Resorts World Casino; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle EDPs or other persons Resorts World Casino did not want on their premises; (8) the specific time they were permitted to take a meal break; (9) what they were required to do upon their return from lunch; (10) which other Officers they were required to relieve; (11) which individuals were permitted onto the premises and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

896.    Grant worked at least three (3) PDP shifts at Resorts World Casino, most recently on August 13, 2023.

897.    Grant never received timely payment of wages for the PDP shifts he worked at Resorts World Casino, and instead waited weeks and even months for his paychecks.

898.    For example, on August 13, 2023, Grant completed a PDP shift at Resorts World Casino for a total of five (5) hours but was not paid for this work until several weeks later October 2023.

899.    Daly also worked at least 14 shifts at Resorts World Casino, most recently on August 16, 2024.

900.    Daly never received timely payment of wages for the shifts she worked at Resorts World Casino, and instead waited weeks and even months for her paychecks.

901.    For example, on July 17, 2024 Daly completed a ten (10) hour shift at Resorts World Casino, but was not paid until several weeks later in August 2024.

902.    Likewise, Faysal worked approximately four (4) shifts at Report World Casino, most recently on June 19, 2024.

903.    Faysal never received timely payment of wages for the shifts he worked at Resorts World Casino, and instead waited multiple weeks for his paychecks.

904.    For example, on September 3, 2021, Faysal completed an eight (8) hour shift at Resorts World Casino, but was not paid until over a month later in October 2021.

905.    Yanez also worked approximately six (6) shifts at Resorts Work Casino, most recently working a ten (10) hour shift on June 2, 2024.

906.    Yanez never received timely payment of wages for the shifts he worked at Resorts World Casino, and instead waited multiple weeks for his paychecks.

907.    Dawkins worked at least 11 PDP shifts for Resorts World Casino, most recently on August 17, 2024.

908.    Dawkins never received timely payment of wages for the shifts he worked at Resorts World Casino, instead waiting multiple weeks for his paychecks.

909.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Resorts World Casino.

**xxiv.    Plaintiffs' Work for Primark**

910.    At all times during their PDP shifts at Primark, the NYPD and Primark jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Primark radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Primark; (3) the conduct or behavior that was prohibited versus what was expected while working for Primark; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Primark did not want on their premises; (8) specific instructions on how to interact with Primark's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

911.    Yanez worked approximately five (5) shifts at Primark, most recently working a nine (9) hour shift on December 1, 2024 and a five (5) hour shift on September 12, 2024.

912.    Yanez never received timely payment of wages for the shifts he worked at Primark, and instead waited weeks and even months for his paychecks.

913.    To this day, Yanez has still not been paid for the two shifts he worked at Primark on December 1, 2024 and September 12, 2024.

914.    As another example, on August 18, 2024, Yanez completed an eight (8) hour shift at Primark, but was not paid for his work until over two (2) months later in October 2024.

915.    Dawkins also worked at least two (2) PDP shifts for Primark, most recently on April 8, 2024.

916.    Dawkins never received timely payment of wages for the shifts he worked at Primark, instead waiting multiple weeks for his paychecks.

917.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Primark.

### xxv.    Plaintiffs' Work for Aldi

918.    At all times during their PDP shifts at Aldi, the NYPD and Aldi jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Aldi; (3) the conduct or behavior that was prohibited versus what was expected while working for Aldi; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Aldi did not want in their stores; (8) specific instructions on how to interact with Aldi's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

919.    Starting on January 14, 2025, Faysal worked three (3) shifts at Aldi.

920.    Faysal has not received timely payment of wages for any PDP shifts he worked at Aldi.

921.    To this day, Faysal has not been paid for the three (3) shifts he worked for Aldi in 2025.

922.    On May 12, 2024, Dawkins worked a PDP shift at Aldi.

923.    Dawkins did not receive timely payment of wages for the shift he worked at Aldi, instead waiting multiple weeks for his paycheck.

924.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Aldi.

   **xxvi.  Plaintiffs' Work for Wegmans**

925.    At all times during their PDP shifts at Wegmans, the NYPD and Wegmans jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Wegmans radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Wegmans; (3) the conduct or behavior that was prohibited versus what was expected while working for Wegmans; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Wegmans did not want on their premises; (8) specific instructions on how to interact with Wegmans' customers; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted into the store and which were prohibited; (13) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (14) the manner in which they maintained

their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

926.   Faysal worked over 85 shifts at Wegmans, most recently on December 22, 2024.

927.   Faysal never received timely payment of wages for the shifts he worked at Wegmans, instead waiting weeks and even months for his paychecks.

928.   For example, on November 15, 2021, Faysal completed an 8.5-hour shift at Wegmans, but was not paid for this shift until almost two (2) months later in January 2022.

929.   Yanez worked approximately three (3) shifts at Wegmans, most recently on January 11, 2025.

930.   Yanez never received timely payment of wages for the shifts he worked at Wegmans, and instead waited multiple weeks for his paychecks.

931.   For example, on June 24, 2024, Yanez completed an eight (8) hour shift at Wegmans but was not paid until over a month later at the end of July 2024.

932.   Kmiotek also worked at least 26 PDP shifts at Wegmans, most recently on July 11, 2024.

933.   Kmiotek never received timely payment of wages for the shifts he worked at Wegmans, instead waiting multiple weeks for his paychecks.

934.   Pantoja also worked approximately 13 PDP shifts for Wegmans.

935.   Pantoja never received timely payment of wages for the shifts she worked at Wegmans, instead waiting multiple weeks for her paychecks.

936.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Wegmans.

xxvii.  **Plaintiffs' Work for Neue Galerie**

937.    At all times during their PDP shifts at Neue Galerie, the NYPD and Neue Galerie jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Neue Galerie radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Neue Galerie; (3) the conduct or behavior that was prohibited versus what was expected while working for Neue Galerie; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) strict instructions on not being permitted inside the building regardless of the weather; (6) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Neue Galerie did not want on their premises; (8) a specific list of individuals with photographs they were required to be on the lookout for; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

938.    On November 10, 2024, Faysal worked a nine (9) hour PDP shift at Neue Galerie.

939.    Faysal was not paid for this November 10, 2024 shift until over a 1.5 months later in the end of December 2024.

940.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Neue Galerie.

### xxviii. Plaintiffs' Work for V&R Payroll

941.    At all times during their PDP shifts at V&R Payroll, the NYPD and V&R Payroll jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for V&R Payroll; (3) the conduct or behavior that was prohibited versus what was expected while working for V&R Payroll; (4) the specific areas they were required to monitor and the manner in which they were required to monitor them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons V&R Payroll did not want on their premises; (8) specific instructions on how to interact with V&R Payroll's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

942.    On October 17, 2024, Faysal worked an eight (8) hour PDP shift at V&R Payroll.

943.    Faysal did not receive timely payment of wages for the shift he worked at V&R Payroll, instead waiting multiple weeks for his paycheck.

944.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for V&R Payroll.

### xxix. Plaintiffs' Work for ShopRite

945.    At all times during their PDP shifts at ShopRite, the NYPD and ShopRite jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific

policies and regulations Plaintiffs were required to follow while working for ShopRite; (3) the conduct or behavior that was prohibited versus what was expected while working for ShopRite; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons ShopRite did not want on their premises; (8) specific instructions on how to interact with ShopRite's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

946.    On May 13, 2024, Faysal worked a five (5) hour PDP shift at ShopRite.

947.    Faysal did not receive timely payment of wages for the shift he worked at ShopRite, instead waiting multiple weeks for his paycheck.

948.    On December 31, 2024, Kmiotek worked a five (5) hour shift at ShopRite.

949.    Kmiotek did not receive timely payment of wages for the shift he worked at ShopRite, instead waiting multiple weeks for his paycheck.

950.    Daly also worked at least two (2) PDP shifts at ShopRite, most recently on August 31, 2024.

951.    Daly never received timely payment of wages for the shifts she worked at ShopRite, instead waiting multiple weeks for her paychecks.

952.    Dawkins also worked at least four (4) PDP shifts for ShopRite, most recently on July 6, 2023.

953.    Dawkins never received timely payment of wages for the shifts he worked at ShopRite, instead waiting multiple weeks for his paychecks.

954.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for ShopRite.

**xxx.    Plaintiffs' Work for Barclays Bank**

955.    At all times during their PDP shifts at Barclays Bank, the NYPD and Barclays Bank jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Barclays Bank; (3) the conduct or behavior that was prohibited versus what was expected while working for Barclays Bank; (4) the specific areas they were required to monitor and the manner in which they were required to monitor them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Barclays Bank did not want on their premises; (8) when they were permitted to take a meal break; (9) specific instructions on how to interact with Barclays Bank's customers; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

956.    Faysal worked two (2) PDP shifts at Barclays Bank, on May 4, 2024 and May 5, 2024.

957.    Faysal never received timely payment of wages for the shift he worked at Barclays Bank, instead waiting multiple weeks for his paychecks.

958.    Dawkins worked at least three (3) PDP shifts for Barclays Bank, most recently on August 29, 2024.

959.    Dawkins never received timely payment of wages for the shifts he worked at Barclays Bank, instead waiting multiple weeks for his paychecks.

960.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Barclays Bank.

### xxxi.    Plaintiffs' Work for Bank of NY Mellon

961.    At all times during their PDP shifts at Bank of NY Mellon, the NYPD and Bank of NY Mellon jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Bank of NY Mellon radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Bank of NY Mellon; (3) the conduct or behavior that was prohibited versus what was expected while working for Bank of NY Mellon; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bank of NY Mellon did not want on their premises; (8) the manner in which Bank of NY Mellon required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted into the building and which were prohibited; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

962.    Faysal worked two (2) PDP shifts at Bank of NY Mellon, on May 3, 2024 and November 21, 2022.

963.    Faysal never received timely payment of wages for the shift he worked at Bank of NY Mellon, instead waiting multiple weeks for his paychecks.

964.    Yanez also worked approximately three (3) shifts at Bank of NY Mellon, most recently on June 1, 2024.

965.    Yanez never received timely payment of wages for the shifts he worked at Bank of NY Mellon, instead waiting multiple weeks for his paychecks.

966.    For example, on April 10, 2024, Yanez completed a 10.5-hour shift at Bank of NY Mellon, but was not paid for his work until multiple weeks later in May 2024.

967.    Likewise, Divino worked at least 16 PDP shifts at Bank of NY Mellon, most recently on October 30, 2023.

968.    Divino never received timely payment of wages for the shifts he worked at Bank of NY Mellon, instead waiting multiple weeks for his paychecks.

969.    On July 7, 2023, Dawkins worked a PDP shift at Bank of NY Mellon.

970.    Dawkins did not receive timely payment of wages for the shift he worked at Bank of NY Mellon, instead waiting multiple weeks for his paycheck.

971.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Bank of NY Mellon.

### xxxii.    Plaintiffs' Work for Schwarzman Animal Medical

972.    At all times during their PDP shifts at Schwarzman Animal Medical, the NYPD and Schwarzman Animal Medical jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Schwarzman Animal Medical radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Schwarzman Animal

Medical; (3) the conduct or behavior that was prohibited versus what was expected while working for Schwarzman Animal Medical; (4) the specific areas they were required to monitor and the manner in which they were required to monitor them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Schwarzman Animal Medical did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted into the building and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

973.    On April 20, 2024, Faysal worked an eight (8) hour PDP shift at Schwarzman Animal Medical.

974.    Faysal did not receive timely payment of wages for the shift he worked at Schwarzman Animal Medical, instead waiting multiple weeks for his paycheck.

975.    Dawkins also worked at least 10 PDP shifts for Schwarzman Animal Medical, most recently on July 12, 2024.

976.    Dawkins never received timely payment of wages for the shifts he worked at Schwarzman Animal Medical, instead waiting multiple weeks for his paychecks.

977.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Schwarzman Animal Medical.

**xxxiii.  Plaintiffs' Work for Queens Yeshiva Ketena**

978.    At all times during their PDP shifts at Queens Yeshiva Ketena, the NYPD and Queens Yeshiva Ketena jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were

to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Queens Yeshiva Ketena; (3) the conduct or behavior that was prohibited versus what was expected while working for Queens Yeshiva Ketena; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Queens Yeshiva Ketena did not want on their premises; (8) specific instructions on how to interact with Queens Yeshiva Ketena's students and their parents; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Queens Yeshiva Ketena employees with clearing traffic and monitoring students; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

979.    On February 14, 2024, Faysal worked a ten (10) hour PDP shift at Queens Yeshiva Ketena.

980.    Faysal did not receive timely payment of wages for the shift he worked at Queens Yeshiva Ketena, instead waiting multiple weeks for his paycheck.

981.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Queens Yeshiva Ketena.

### xxxiv. Plaintiffs' Work for Parker Jewish Institute

982.    At all times during their PDP shifts at Parker Jewish Institute, the NYPD and Parker Jewish Institute jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Parker Jewish Institute radios and Parker Jewish Institute employee identification lanyards and signs, and directing them as to: (1) the specific instructions and

directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Parker Jewish Institute; (3) the conduct or behavior that was prohibited versus what was expected while working for Parker Jewish Institute; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Parker Jewish Institute did not want on their premises; (8) specific instructions on how to interact with Parker Jewish Institute's patients; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

983.    On August 15, 2022, Faysal worked an eight (8) hour PDP shift at Parker Jewish Institute.

984.    Faysal did not receive timely payment of wages for the shift he worked at Parker Jewish Institute, instead waiting multiple weeks for his paycheck.

985.    Kmiotek also worked at least seven (7) PDP shifts at Parker Jewish Institute, most recently on May 14, 2024.

986.    Kmiotek never received timely payment of wages for the shifts he worked at Parker Jewish Institute, instead waiting multiple weeks for his paychecks.

987.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Parker Jewish Institute.

**xxxv.  Plaintiffs' Work for Young Israel**

988.    At all times during their PDP shifts at Young Israel, the NYPD and Young Israel jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Young Israel radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Young Israel; (3) the conduct or behavior that was prohibited versus what was expected while working for Young Israel; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Young Israel did not want on their premises; (8) specific instructions on how to interact with Young Israel's students and their parents; (9) the manner in which Young Israel required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist Young Israel employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

989.    On July 23, 2022, Faysal worked a five (5) hour PDP shift at Young Israel.

990.    Faysal did not receive timely payment of wages for the shift he worked at Young Israel, instead waiting multiple weeks for his paycheck.

991.    On October 5, 2022, Kmiotek worked a six (6) shift at Young Israel.

992.    Kmiotek did not receive timely payment of wages for the shift he worked at Young Israel, instead waiting multiple weeks for his paycheck.

993.    On February 10, 2024, Daly worked a five (5) hour PDP shift at Young Israel.

120

994.    Daly did not receive timely payment of wages for the shift she worked at Young Israel, instead waiting multiple weeks for her paycheck.

995.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Young Israel.

### xxxvi.  Plaintiffs' Work for Yeshiva Darchei

996.    At all times during their PDP shifts at Yeshiva Darchei, the NYPD and Yeshiva Darchei jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Yeshiva Darchei radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yeshiva Darchei; (3) the conduct or behavior that was prohibited versus what was expected while working for Yeshiva Darchei; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Yeshiva Darchei did not want on their premises; (8) specific instructions on how to interact with Yeshiva Darchei's students and their parents; (9) the manner in which Yeshiva Darchei required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist Yeshiva Darchei employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

997.    Faysal worked two (2) PDP shifts at Yeshiva Darchei, on June 23, 2022 and July 22, 2022.

998.    Faysal did not receive timely payment of wages for the shifts he worked at Yeshiva Darchei, instead waiting multiple weeks for his paychecks.

999.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yeshiva Darchei.

### xxxvii.  Plaintiffs' Work for Torah Center

1000.   At all times during their PDP shifts at Torah Center, the NYPD and Torah Center jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Torah Center; (3) the conduct or behavior that was prohibited versus what was expected while working for Torah Center; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Torah Center did not want on their premises; (8) specific instructions on how to interact with Torah Center visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1001.   Kmiotek worked at least two (2) PDP shifts at Torah Center, most recently on September 27, 2022.

1002.   Kmiotek never received timely payment of wages for the shifts he worked at Torah Center, instead waiting multiple weeks for his paychecks.

1003.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Torah Center.

### xxxviii. Plaintiffs' Work for Burlington

1004.   At all times during their PDP shifts at Burlington, the NYPD and Burlington jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Burlington; (3) the conduct or behavior that was prohibited versus what was expected while working for Burlington; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Burlington did not want on their premises; (8) specific instructions on how to interact with Burlington's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1005.   On June 29, 2022, Faysal worked a seven (7) hour PDP shift at Burlington.

1006.   Faysal did not receive timely payment of wages for the shift he worked at Burlington, instead waiting multiple weeks for his paycheck.

1007.   Ruiz-Reyes also worked at least 11 PDP shifts at Burlington, most recently on April 24, 2023.

1008.  Ruiz-Reyes never received timely payment of wages for the shifts he worked at Burlington, instead waiting multiple weeks for his paychecks.

1009.  Dawkins also worked at least 15 PDP shifts for Burlington, most recently on November 26, 2023.

1010.  Dawkins never received timely payment of wages for the shifts he worked at Burlington, instead waiting multiple weeks for his paychecks.

1011.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Burlington.

### xxxix.  Plaintiffs' Work for ABC

1012.  At all times during their PDP shifts at ABC, the NYPD and ABC jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them ABC radios and ABC employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for ABC; (3) the conduct or behavior that was prohibited versus what was expected while working for ABC; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons ABC did not want on their premises; (8) the manner in which ABC required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1013.    Faysal worked four (4) PDP shifts at ABC, most recently on June 28, 2022.

1014.    Faysal never received timely payment of wages for the shifts he worked at ABC, instead waiting multiple weeks for his paycheck.

1015.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for ABC.

**xl.    Plaintiffs' Work for Sephardic Lebanese Congregation**

1016.    At all times during their PDP shifts at Sephardic Lebanese Congregation, the NYPD and Sephardic Lebanese Congregation jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Sephardic Lebanese Congregation; (3) the conduct or behavior that was prohibited versus what was expected while working for Sephardic Lebanese Congregation; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Sephardic Lebanese Congregation did not want on their premises; (8) specific instructions on how to interact with Sephardic Lebanese Congregation visitors; (9) the manner in which Sephardic Lebanese Congregation required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1017.    Faysal worked two (2) PDP shifts at Sephardic Lebanese Congregation, on June 25, 2022 and August 21, 2021.

1018.    Faysal never received timely payment of wages for the shifts he worked at Sephardic Lebanese Congregation, instead waiting multiple weeks for his paychecks.

1019.    For example, on June 25, 2022, Faysal completed a five (5) hour shift at Sephardic Lebanese Congregation, but was not paid for his work until over a month later in the end of July 2022.

1020.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Sephardic Lebanese Congregation.

### xli.    Plaintiffs' Work for Rochdale Village

1021.    At all times during their PDP shifts at Rochdale Village, the NYPD and Rochdale Village jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Rochdale Village radios and Rochdale Village employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rochdale Village; (3) the conduct or behavior that was prohibited versus what was expected while working for Rochdale Village; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rochdale Village did not want on their premises; (8) the manner in which Rochdale Village required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted onto the premises and which were prohibited; and

(13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1022.   Faysal worked three (3) PDP shifts at Rochdale Village, most recently on June 16, 2022.

1023.   Faysal never received timely payment of wages for the shifts he worked at Rochdale Village, instead waiting multiple weeks for his paychecks.

1024.   Yanez also worked two (2) PDP shifts at Rochdale Village, each eight (8) hours long, and was never paid timely wages, instead waiting multiple weeks for his paychecks.

1025.   On November 6, 2022, Dawkins worked a PDP shift at Rochdale Village.

1026.   Dawkins did not receive timely payment of wages for the shift he worked at Rochdale Village, instead waiting multiple weeks for his paycheck.

1027.   Pantoja also worked a PDP shift for Rochdale Village.

1028.   Pantoja did not receive timely payment of wages for the shift she worked at Rochdale Village, instead waiting multiple weeks for her paycheck.

1029.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rochdale Village.

**xlii.    Plaintiffs' Work for Vornado**

1030.   At all times during their PDP shifts at Vornado, the NYPD and Vornado jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Vornado radios and Vornado employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Vornado; (3) the conduct or behavior that was prohibited versus what was expected while working for Vornado; (4)

the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Vornado did not want on their premises; (8) the manner in which Vornado required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1031.   Faysal worked four (4) PDP shifts at Vornado, and was never paid timely wages, instead waiting multiple weeks and even months for his paychecks.

1032.   For example, on May 27, 2019, Faysal completed a ten (10) hour shift at Vornado, but was not paid for his work until three (3) months later at the end of August 2019.

1033.   Yanez also worked six (6) PDP shifts for Vornado, each eight (8) hours long, and was never paid timely wages, instead waiting multiple weeks for his paychecks.

1034.   Kmiotek also worked at least 17 PDP shifts at Vornado, most recently on March 28, 2023.

1035.   Kmiotek never received timely payment of wages for the shifts he worked at Vornado, instead waiting multiple weeks for his paychecks.

1036.   Pantoja worked approximately 13 PDP shifts for Vornado.

1037.   Pantoja never received timely payment of wages for the shifts she worked at Vornado, instead waiting multiple weeks for her paychecks.

1038.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Vornado.

### xliii.    Plaintiffs' Work for HSS

1039.    At all times during their PDP shifts at HSS, the NYPD and HSS jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them HSS radios and HSS employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for HSS; (3) the conduct or behavior that was prohibited versus what was expected while working for HSS; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons HSS did not want on their premises; (8) specific instructions on how to interact with HSS patients and employees; (9) how to assist HSS employees with clearing traffic; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1040.    Faysal worked three (3) PDP shifts at HSS, most recently on September 12, 2022.

1041.    Faysal was never paid timely wages for the shifts he worked at HSS, instead waiting multiple weeks for his paychecks.

1042.    For example, on August 16, 2019, Faysal completed an eight (8) hour shift at HSS, but was not paid for his work until over a month later in September 2019.

1043.    Martinez also worked an eight (8) hour PDP shift for HSS and was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

1044.    Pantoja also worked a PDP shift for HSS.

1045.   Pantoja did not receive timely payment of wages for the shift she worked at HSS, instead waiting multiple weeks for her paycheck.

1046.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for HSS.

### xliv.   Plaintiffs' Work for JPM

1047.   At all times during their PDP shifts at JPM, the NYPD and JPM jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them JPM radios and JPM employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for JPM; (3) the conduct or behavior that was prohibited versus what was expected while working for JPM; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons JPM did not want on their premises; (8) the manner in which JPM required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1048.   Faysal worked four (4) PDP shifts at JPM, most recently on June 18, 2022.

1049.   Faysal never received timely payment of wages for the shift he worked at JPM, instead waiting multiple weeks for his paychecks.

1050.   For example, on September 2, 2019, Faysal completed an eight (8) hour shift at JPM, but was not paid for his work until almost a month later in the end of September 2019.

1051.  Yanez also worked eight (8) shifts at JPM, most recently on December 9, 2024.

1052.  Yanez never received timely payment of wages for the shifts he worked at JPM, instead waiting multiple weeks for his paychecks.

1053.  For example, on December 9, 2024 Yanez completed an eight (8) shift at JPM, but was not paid for his work until over a month later in late January 2024.

1054.  As another example, on March 28, 2024, Yanez completed another eight (8) hour shift at JPM, but was not paid for his work until a month later in the end of April 2024.

1055.  Martinez also worked approximately four (4) shifts for JPM, but was not paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1056.  Likewise, Divino worked at least five (5) PDP shifts at JPM, most recently on December 20, 2023.

1057.  Divino never received timely payment of wages for the shifts he worked at JPM, instead waiting multiple weeks for his paychecks.

1058.  From 2022 to 2024, Zorilla worked approximately 13 PDP shifts for JPM.

1059.  Zorilla was not paid timely wages for the shifts he worked at JPM, instead waiting multiple weeks for his paychecks.

1060.  Pantoja also worked a PDP shift for JPM.

1061.  Pantoja did not receive timely payment of wages for the shift she worked at JPM, instead waiting multiple weeks for her paycheck.

1062.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for JPM.

**xlv.  Plaintiffs' Work for UBS**

1063.  At all times during their PDP shifts at UBS, the NYPD and UBS jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them UBS radios and

UBS employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for UBS; (3) the conduct or behavior that was prohibited versus what was expected while working for UBS; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons UBS did not want on their premises; (8) the manner in which UBS required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1064.   Yanez worked five (5) PDP shifts at UBS, most recently on November 20, 2024.

1065.   Yanez never received timely payment of wages for the shifts he worked at UBS, instead waiting multiple weeks for his paychecks.

1066.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for UBS.

**xlvi.   Plaintiffs' Work for Citi Field**

1067.   At all times during their PDP shifts at Citi Field, the NYPD and Citi Field jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Citi Field radios and Citi Field employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Citi Field; (3) the conduct or behavior that was prohibited versus what was expected while working for Citi Field; (4) the

specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) individuals they were required to be on the lookout for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) the manner in which Citi Field required them to perform perimeter checks; (9) how to handle loiterers, EDPs, or other persons Citi Field did not want on their premises; (10) specific instructions on how to interact with Citi Field's patrons; (11) how to handle intoxicated individuals; (12) specific instructions on how to interact with and treat VIP patrons or other special individuals; (13) when they were permitted to take a meal break; (14) which individuals were permitted onto the premises and which were prohibited; and (15) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their uniform throughout the entirety of their shift.

1068.   Yanez worked three (3) PDP shifts at Citi Field, most recently on June 9, 2024.

1069.   Yanez never received timely payment of wages for the shifts he worked at Citi Field, instead waiting multiple weeks for his paychecks.

1070.   For example, on June 9, 2024, Yanez completed a 7.75-hour shift at Citi Field, but was not paid for his work until a month later in July 2024.

1071.   Kmiotek also worked at least eight (8) PDP shifts at Citi Field, most recently on June 14, 2023.

1072.   Kmiotek never received timely payment of wages for the shifts he worked at Citi Field, instead waiting multiple weeks for his paychecks.

1073.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Citi Field.

xlvii.    **Plaintiffs' Work for Taino Towers**

1074.    At all times during their PDP shifts at Taino Towers, the NYPD and Taino Towers jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Taino Towers radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Taino Towers; (3) the conduct or behavior that was prohibited versus what was expected while working for Taino Towers; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Taino Towers did not want on their premises; (8) the manner in which Taino Towers required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1075.    On August 5, 2022 Yanez worked an eight (8) hour PDP shift at Taino Towers.

1076.    Yanez did not receive timely payment of wages for the shift he worked at Taino Towers, instead waiting multiple weeks for his paycheck.

1077.    Dawkins also worked at least eight (8) PDP shifts for Taino Towers, most recently on October 7, 2023.

1078.    Dawkins never received timely payment of wages for the shifts he worked at Taino Towers, instead waiting multiple weeks for his paychecks.

1079.    Pantoja worked approximately four (4) PDP shifts for Taino Towers.

1080.   Pantoja never received timely payment of wages for the shifts she worked at Taino Towers, instead waiting multiple weeks for her paychecks.

1081.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Taino Towers.

### xlviii.  Plaintiffs' Work for MIR Hanson

1082.   At all times during their PDP shifts at MIR Hanson, the NYPD and MIR Hanson jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them MIR Hanson radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for MIR Hanson; (3) the conduct or behavior that was prohibited versus what was expected while working for MIR Hanson; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons MIR Hanson did not want on their premises; (8) specific instructions on how to interact with customers; (9) the manner in which MIR Hanson required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted onto the premises and which were prohibited; (12) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1083.   Yanez worked two (2) PDP shifts at MIR Hanson, most recently on March 14, 2024.

1084.   Yanez never received timely payment of wages for the shifts he worked at MIR Hanson, instead waiting multiple weeks for his paychecks.

1085.   In 2024, Divino worked four (4) PDP shifts at MIR Hanson, each eight (8) hours long.

1086.   Divino never received timely payment of wages for the shifts he worked at MIR Hanson, instead waiting multiple weeks for his paychecks.

1087.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for MIR Hanson.

### xlix.    Plaintiffs' Work for NYU

1088.   At all times during their PDP shifts at NYU, the NYPD and NYU jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NYU radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NYU; (3) the conduct or behavior that was prohibited versus what was expected while working for NYU; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NYU did not want on their premises; (8) the manner in which NYU required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1089.   Yanez worked two (2) PDP shifts at NYU, both eight (8) hours long, most recently on December 9, 2023.

1090.   Yanez never received timely payment of wages for the shifts he worked at NYU, instead waiting multiple weeks for his paychecks.

1091.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NYU.

**l.    Plaintiffs' Work for SBH Health**

1092.   At all times during their PDP shifts at SBH Health, the NYPD and SBH Health jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them SBH Health radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for SBH Health; (3) the conduct or behavior that was prohibited versus what was expected while working for SBH Health; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons SBH Health did not want on their premises; (8) specific instructions on how to interact with SBH Health patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1093.   Ruiz-Reyes worked at least 27 PDP shifts at SBH Health, most recently in April 2024.

1094.   Ruiz-Reyes never received timely payment of wages for the shifts he worked at SBH Health, instead waiting multiple weeks for his paychecks.

1095.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for SBH Health.

### li.    Plaintiffs' Work for Manhattan Beer

1096.   At all times during their PDP shifts at Manhattan Beer, the NYPD and Manhattan Beer jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Manhattan Beer; (3) the conduct or behavior that was prohibited versus what was expected while working for Manhattan Beer; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Manhattan Beer did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1097.   Ruiz-Reyes worked at least two (2) PDP shifts at Manhattan Beer, most recently on March 15, 2024.

1098.   Ruiz-Reyes never received timely payment of wages for the shifts he worked at Manhattan Beer, instead waiting multiple weeks for his paychecks.

1099.   On May 6, 2024, Faysal worked an eight (8) hour shift at Manhattan Beer.

1100.   Faysal did not receive timely payment of wages for the shift he worked at Manhattan Beer, instead waiting multiple weeks for his paycheck.

1101.   In 2023, Rosa worked at last two (2) PDP shifts for Manhattan Beer.

1102.   Rosa never received timely payment of wages for the shifts he worked at Manhattan Beer, but instead waited at least three (3) months for his paychecks.

1103.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Manhattan Beer.

**lii.    Plaintiffs' Work for Montefiore**

1104.   At all times during their PDP shifts at Montefiore, the NYPD and Montefiore jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Montefiore radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Montefiore; (3) the conduct or behavior that was prohibited versus what was expected while working for Montefiore; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Montefiore did not want on their premises; (8) specific instructions on how to interact with Montefiore patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1105.   Ruiz-Reyes worked at least two (2) PDP shifts at Montefiore, both eight (8) hours long, most recently on February 14, 2023.

1106.   Ruiz-Reyes never received timely payment of wages for the shifts he worked at Montefiore, instead waiting multiple weeks for his paychecks.

1107.   Yanez also worked a PDP shift at Montefiore, for a total of eight (8) hours, and was not paid timely wages, instead waiting multiple weeks for his paycheck.

1108.   Likewise, Daly worked an eight (8) hour shift at Montefiore, and was not paid timely wages, instead waiting multiple weeks for her paycheck.

1109.   Martinez also worked an eight (8) hour shift at Montefiore, and was not paid timely wages, instead waiting multiple weeks for his paycheck.

1110.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Montefiore.

**liii.    Plaintiffs' Work for Penn District**

1111.   At all times during their PDP shifts at Penn District, the NYPD and Penn District jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Penn District radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Penn District; (3) the conduct or behavior that was prohibited versus what was expected while working for Penn District; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Penn District did not want on their premises; (8) the manner in which Penn District required them to perform

perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1112.   Kmiotek worked at least two (2) PDP shifts at Penn District, on October 29, 2024 and January 22, 2025.

1113.   Kmiotek never received timely payment of wages for the shifts he worked at Penn District, instead waiting multiple weeks for his paychecks.

1114.   To this day, Kmiotek has not been paid for the last shift he worked at Penn District on January 22, 2025.

1115.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Penn District.

    **liv.**    **Plaintiffs' Work for Northwell**

1116.   At all times during their PDP shifts at Northwell, the NYPD and Northwell jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Northwell radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Northwell; (3) the conduct or behavior that was prohibited versus what was expected while working for Northwell; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Northwell did not want on their premises; (8) specific instructions on how to interact with Northwell patients and employees; (9)

when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1117.   Kmiotek worked at least ten (10) PDP shifts at Northwell, most recently on January 23, 2025.

1118.   Kmiotek never received timely payment of wages for the shifts he worked at Northwell, instead waiting multiple weeks for his paychecks.

1119.   To this day, Kmiotek has not been paid for the PDP shift he worked at Northwell in January 2025.

1120.   Daly worked at least two (2) PDP shifts at Northwell, most recently on February 22, 2024.

1121.   Daly never received timely payment of wages for the shifts she worked at Northwell, instead waiting multiple weeks for her paychecks.

1122.   Faysal also worked an eight (8) hour PDP shift at Northwell and did not receive timely payment of his wages, instead waiting multiple weeks for his paycheck.

1123.   Yanez also worked approximately five (5) PDP shifts at Northwell, each eight (8) hours long.

1124.   Yanez never received timely payment of wages for the shifts he worked at Northwell, instead waiting multiple weeks for his paychecks.

1125.   Martinez also worked approximately four (4) PDP shifts for Northwell and was never paid timely wages for his shifts, instead waiting multiple weeks for his paychecks.

1126.  Dawkins worked at least three (3) PDP shifts for Northwell, most recently on September 5, 2023.

1127.  Dawkins never received timely payment of wages for the shifts he worked at Northwell, instead waiting multiple weeks for his paychecks.

1128.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Northwell.

**lv.    Plaintiffs' Work for Morton Williams**

1129.  At all times during their PDP shifts at Morton Williams, the NYPD and Morton Williams jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Morton Williams; (3) the conduct or behavior that was prohibited versus what was expected while working for Morton Williams; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Morton Williams did not want in their stores; (8) specific instructions on how to interact with Morton Williams' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1130.  Kmiotek also worked at least 15 PDP shifts at Morton Williams, most recently on January 16, 2023.

1131.   Kmiotek never received timely payment of wages for the shifts he worked at Morton Williams, instead waiting multiple weeks for his paychecks.

1132.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Morton Williams.

**lvi.    Plaintiffs' Work for GFP Real Estate**

1133.   At all times during their PDP shifts at GFP Real Estate, the NYPD and GFP Real Estate jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for GFP Real Estate; (3) the conduct or behavior that was prohibited versus what was expected while working for GFP Real Estate; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons GFP Real Estate did not want on their premises; (8) the manner in which GFP Real Estate required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1134.   Kmiotek worked at least three (3) PDP shifts at GFP Real Estate, most recently on January 11, 2023.

1135.   Kmiotek never received timely payment of wages for the shifts he worked at GFP Real Estate, instead waiting multiple weeks for his paychecks.

1136. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for GFP Real Estate.

### lvii.    Plaintiffs' Work for Rosco

1137. At all times during their PDP shifts at Rosco, the NYPD and Rosco jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rosco; (3) the conduct or behavior that was prohibited versus what was expected while working for Rosco; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rosco did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1138. Kmiotek worked at least three (3) PDP shifts at Rosco, most recently on March 21, 2022.

1139. Kmiotek never received timely payment of wages for the shifts he worked at Rosco, instead waiting multiple weeks for his paychecks.

1140. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rosco.

lviii.    **Plaintiffs' Work for SL Green**

1141.    At all times during their PDP shifts at SL Green, the NYPD and SL Green jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for SL Green; (3) the conduct or behavior that was prohibited versus what was expected while working for SL Green; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons SL Green did not want on their premises; (8) the manner in which SL Green required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1142.    Daly worked at least four (4) PDP shifts at SL Green, most recently on September 22, 2024.

1143.    Daly never received timely payment of wages for the shifts she worked at SL Green, instead waiting multiple weeks for her paychecks.

1144.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for SL Green.

lix.    **Plaintiffs' Work for Grand Central**

1145.    At all times during their PDP shifts at Grand Central, the NYPD and Grand Central jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Grand Central radios and Grand Central employee identification lanyards and signs, and directing

them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Grand Central; (3) the conduct or behavior that was prohibited versus what was expected while working for Grand Central; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Grand Central did not want on their premises; (8) the manner in which Grand Central required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which third party vendors were allowed on the premises and under what circumstances; (11) which individuals they were required to be on the lookout for; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1146.   On September 15, 2024, Daly worked a ten (10) hour PDP shift at Grand Central.

1147.   Daly did not receive timely payment of wages for the shift she worked at Grand Central, instead waiting multiple weeks for her paycheck.

1148.   Dawkins worked at least three (3) PDP shifts for Grand Central, most recently on February 14, 2024.

1149.   Dawkins never received timely payment of wages for the shifts he worked at Grand Central, instead waiting multiple weeks for his paychecks.

1150.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Grand Central.

lx.    **Plaintiffs' Work for Bloomingdale's**

1151.    At all times during their PDP shifts at Bloomingdale's, the NYPD and Bloomingdale's jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Bloomingdale's radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Bloomingdale's; (3) the conduct or behavior that was prohibited versus what was expected while working for Bloomingdale's; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bloomingdale's did not want on their premises; (8) specific instructions on how to interact with Bloomingdale's' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1152.    Daly worked at least seven (7) PDP shifts at Bloomingdale's, most recently on August 11, 2024.

1153.    Daly never received timely payment of wages for the shifts she worked at Bloomingdale's, instead waiting multiple weeks for her paychecks.

1154.    Yanez also worked an 11-hour PDP shift at Bloomingdale's, but did not receive timely payment of his wages, instead waiting multiple weeks for his paycheck.

1155.    Dawkins worked at least 13 PDP shifts for Bloomingdale's, most recently on June 26, 2024.

1156.  Dawkins never receive timely payment of wages for the shifts he worked at Bloomingdale's, instead waiting multiple weeks for his paychecks.

1157.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Bloomingdale's.

      **lxi.**    **Plaintiffs' Work for Fresh Meadows**

1158.  At all times during their PDP shifts at Fresh Meadows, the NYPD and Fresh Meadows jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Fresh Meadows; (3) the conduct or behavior that was prohibited versus what was expected while working for Fresh Meadows; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Fresh Meadows did not want on their premises; (8) specific instructions on how to interact with Fresh Meadows visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1159.  On July 27, 2024, Daly worked a four (4) hour PDP shift at Fresh Meadows.

1160.  Daly did not receive timely payment of wages for the shift she worked at Fresh Meadows, instead waiting multiple weeks for her paycheck.

1161.  On August 7, 2021, Faysal also worked a four (4) hour shift at Fresh Meadows, but was not paid for his work until over two months later in late October 2021.

1162.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Fresh Meadows.

**lxii.    Plaintiffs' Work for Goldman**

1163.   At all times during their PDP shifts at Goldman, the NYPD and Goldman jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Goldman radios and Goldman employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Goldman; (3) the conduct or behavior that was prohibited versus what was expected while working for Goldman; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Goldman did not want on their premises; (8) the manner in which Goldman required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1164.   Zorilla worked at least two (2) PDP shifts at Goldman, most recently on September 16, 2024.

1165.   Zorilla never receive timely payment of wages for the shifts he worked at Goldman, instead waiting multiple weeks for his paychecks.

1166.   For example, on September 16, 2024, Zorilla completed an eight (8) hour shift at Goldman, but was not paid for his work until about 1.5 months later on October 28, 2024.

1167.   Faysal also worked approximately two (2) PDP shifts for Goldman and was never paid timely wages for his shifts.

1168.   For example, on March 29, 2019, Faysal completed an eight (8) hour shift at Goldman, but was not paid for his work until six (6) months later in September 2019.

1169.   Yanez also worked approximately four (4) PDP shifts at Goldman and was never paid timely wages, instead waiting multiple weeks for his paychecks.

1170.   Martinez also worked approximately five (5) PDP shifts for Goldman and was never paid timely wages for his shifts, instead waiting multiple weeks for his paychecks.

1171.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Goldman.

**lxiii.    Plaintiffs' Work for Park Avenue Synagogue**

1172.   At all times during their PDP shifts at Park Avenue Synagogue, the NYPD and Park Avenue Synagogue jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Park Avenue Synagogue; (3) the conduct or behavior that was prohibited versus what was expected while working for Park Avenue Synagogue; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Park Avenue Synagogue did not want on their premises; (8) specific instructions on how to interact with Park Avenue Synagogue visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in

which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1173.   Zorilla worked at least five (5) PDP shifts for Park Avenue Synagogue, most recently on March 1, 2022.

1174.   Zorilla never receive timely payment of wages for the shifts he worked at Park Avenue Synagogue, instead waiting multiple weeks for his paychecks.

1175.   Yanez also worked a 12-hour shift at Park Avenue Synagogue and was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

1176.   Likewise, Martinez worked an eight (8) hour shift at Park Avenue Synagogue and was paid timely for his work, also waiting multiple weeks for his paycheck.

1177.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Park Avenue Synagogue.

### lxiv.   Plaintiffs' Work for Bnos Bais

1178.   At all times during their PDP shifts at Bnos Bais, the NYPD and Bnos Bais jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Bnos Bais; (3) the conduct or behavior that was prohibited versus what was expected while working for Bnos Bais; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bnos Bais did not want on their premises; (8) specific instructions on how to interact with Bnos Bais visitors; (9) when they were permitted to take a meal break; (10) which

individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1179.  On March 6, 2024, Daly worked a nine (9) hour PDP shift at Bnos Bais.

1180.  Daly did not receive timely payment of wages for the shift she worked at Bnos Bais, instead waiting multiple weeks for her paycheck.

1181.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Bnos Bais.

### lxv.    Plaintiffs' Work for Chelsea Piers

1182.  At all times during their PDP shifts at Chelsea Piers, the NYPD and Chelsea Piers jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Chelsea Piers radios and Chelsea Piers employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Chelsea Piers; (3) the conduct or behavior that was prohibited versus what was expected while working for Chelsea Piers; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Chelsea Piers did not want on their premises; (8) the specific manner in which Chelsea Piers required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which individuals were permitted onto the premises and which were prohibited; (12) which third party vendors were allowed on the premises and under what circumstances; and (13)

the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1183.   On January 26, 2024, Daly worked an eight (8) hour PDP shift at Chelsea Piers.

1184.   Daly did not receive timely payment of wages for the shift she worked at Chelsea Piers, instead waiting multiple weeks for her paycheck.

1185.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Chelsea Piers.

**lxvi.    Plaintiffs' Work for Beth-El**

1186.   At all times during their PDP shifts at Beth-El, the NYPD and Beth-El jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Beth-El; (3) the conduct or behavior that was prohibited versus what was expected while working for Beth-El; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Beth-El did not want on their premises; (8) specific instructions on how to interact with Beth-El visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1187.   On January 20, 2024, Daly worked a ten (10) hour PDP shift at Beth-El.

1188.   Daly did not receive timely payment of wages for the shift she worked at Beth-El, instead waiting multiple weeks for her paycheck.

1189.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Beth-El.

### lxvii.   Plaintiffs' Work for Yeshiva University

1190.   At all times during their PDP shifts at Yeshiva University, the NYPD and Yeshiva University jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yeshiva University; (3) the conduct or behavior that was prohibited versus what was expected while working for Yeshiva University; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Yeshiva University did not want on their premises; (8) specific instructions on how to interact with Yeshiva University students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Yeshiva University required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1191.   Dawkins worked at least 10 PDP shifts for Yeshiva University, most recently in March 2024.

1192.   Dawkins never receive timely payment of wages for the shifts he worked at Yeshiva University, instead waiting multiple weeks for his paychecks.

1193.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yeshiva University.

**lxviii.    Plaintiffs' Work for Empire Force**

1194.   At all times during their PDP shifts for Empire Force, the NYPD and Empire Force jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Empire Force; (3) the conduct or behavior that was prohibited versus what was expected while working for Empire Force; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Empire Force did not wanted on the premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1195.   On May 5, 2024, Dawkins worked a PDP shift for Empire Force.

1196.   Dawkins did not receive timely payment of wages for the shift he worked for Empire Force, instead waiting multiple weeks for his paycheck.

1197.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Empire Force.

lxix.    **Plaintiffs' Work for FedEx**

1198.  At all times during their PDP shifts at FedEx, the NYPD and FedEx jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for FedEx; (3) the conduct or behavior that was prohibited versus what was expected while working for FedEx; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons FedEx did not wanted on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1199.  On February 28, 2024, Dawkins worked a PDP shift at FedEx.

1200.  Dawkins did not receive timely payment of wages for the shift he worked at FedEx, instead waiting multiple weeks for his paycheck.

1201.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for FedEx.

lxx.    **Plaintiffs' Work for Avenues School**

1202.  At all times during their PDP shifts at Avenues School, the NYPD and Avenues School jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Avenues School; (3) the conduct or behavior that was prohibited versus what was expected while

working for Avenues School; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Avenues School did not want on their premises; (8) specific instructions on how to interact with Avenues School's students and their parents; (9) the manner in which Avenues School required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist Avenues School employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1203.   Dawkins worked at least two (2) PDP shifts for Avenues School, most recently on April 12, 2023.

1204.   Dawkins never receive timely payment of wages for the shifts he worked at Avenues School, instead waiting multiple weeks for his paychecks.

1205.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Avenues School.

**lxxi.   Plaintiffs' Work for MOMA**

1206.   At all times during their PDP shifts at MOMA, the NYPD and MOMA jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them MOMA radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for MOMA; (3) the conduct or behavior that was prohibited versus what was expected while working for MOMA; (4) the specific areas they were required to monitor and the

manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons MOMA did not wanted on their premises; (8) how to interact with MOMA patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1207.   On March 5, 2023, Dawkins worked a PDP shift at MOMA.

1208.   Dawkins did not receive timely payment of wages for the shift he worked at MOMA, instead waiting multiple weeks for his paycheck.

1209.   Yanez also worked approximately two (2) PDP shifts at MOMA.

1210.   Yanez never received timely payment of wages for the shifts he worked at Bryant Park, instead waiting multiple weeks for his paychecks.

1211.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for MOMA.

**lxxii.   Plaintiffs' Work for Bryant Park**

1212.   At all times during their PDP shifts at Bryant Park, the NYPD and Bryant Park jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Bryant Park radios and Bryant Park employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Bryant Park; (3) the conduct or behavior that was prohibited versus what was expected while working for Bryant Park; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which

they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bryant Park did not want on their premises; (8) the specific manner in which Bryant Park required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which individuals were permitted onto the premises and which were prohibited; (12) which third party vendors were allowed on the premises and under what circumstances; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1213.  Dawkins worked at least three (3) PDP shifts for Bryant Park, most recently on December 7, 2023.

1214.  Dawkins never receive timely payment of wages for the shifts he worked at Bryant Park, instead waiting multiple weeks for his paychecks.

1215.  Yanez also worked approximately two (2) PDP shifts at Bryant Park.

1216.  Yanez never received timely payment of wages for the shifts he worked at Bryant Park, instead waiting multiple weeks for his paychecks.

1217.  Daly also worked at least 11 PDP shifts at Bryant Park.

1218.  Daly never received timely payment of wages for the shifts she worked at Bryant Park, instead waiting multiple weeks for her paychecks.

1219.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Bryant Park.

### lxxiii.  Plaintiffs' Work for Brooklyn Museum

1220.  At all times during their PDP shifts at Brooklyn Museum, the NYPD and Brooklyn Museum supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning

them Brooklyn Museum radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Brooklyn Museum; (3) the conduct or behavior that was prohibited versus what was expected while working for Brooklyn Museum; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Brooklyn Museum did not wanted on their premises; (8) how to interact with Brooklyn Museum patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1221.    On November 5, 2022, Dawkins worked a PDP shift at Brooklyn Museum.

1222.    Dawkins did not receive timely payment of wages for the shift he worked at Brooklyn Museum, instead waiting multiple weeks for his paycheck.

1223.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Brooklyn Museum.

**lxxiv.    Plaintiffs' Work for Safra Synagogue**

1224.    At all times during their PDP shifts at Safra Synagogue, the NYPD and Safra Synagogue jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Safra Synagogue; (3) the conduct or behavior that was prohibited versus what was expected while

161

working for Safra Synagogue; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Safra Synagogue did not want on their premises; (8) specific instructions on how to interact with Safra Synagogue visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1225.   On October 14, 2023, Dawkins worked a PDP shift at Safra Synagogue.

1226.   Dawkins did not receive timely payment of wages for the shift he worked at Safra Synagogue waiting multiple weeks for his paycheck.

1227.   Faysal also worked approximately two (2) PDP shifts at Safra Synagogue.

1228.   Faysal never received timely payment of wages for the shifts he worked at Safra Synagogue, instead waiting weeks and even months for his paychecks.

1229.   For example, on May 11, 2019, Faysal completed a nine (9) hour shift at Safra Synagogue, but was not paid for his work until almost two (2) months later in July 2019.

1230.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Safra Synagogue.

### lxxv.  Plaintiffs' Work for Best Buy

1231.   At all times during their PDP shifts at Best Buy, the NYPD and Best Buy jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Best Buy radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while

working for Best Buy; (3) the conduct or behavior that was prohibited versus what was expected while working for Best Buy; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Best Buy did not want on their premises; (8) specific instructions on how to interact with Best Buy's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1232.    On October 9, 2023, Dawkins worked a PDP shift at Best Buy.

1233.    Dawkins did not receive timely payment of wages for the shift he worked at Best Buy, instead waiting multiple weeks for his paycheck.

1234.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Best Buy.

**lxxvi.  Plaintiffs' Work for Century 21**

1235.    At all times during their PDP shifts at Century 21, the NYPD and Century 21 jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Century 21; (3) the conduct or behavior that was prohibited versus what was expected while working for Century 21; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers,

EDPs, or other persons Century 21 did not want on their premises; (8) specific instructions on how to interact with Century 21's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1236.  Dawkins worked at least three (3) PDP shifts for Century 21, most recently on July 15, 2023.

1237.  Dawkins never receive timely payment of wages for the shifts he worked at Century 21, instead waiting multiple weeks for his paychecks.

1238.  Yanez also worked at least four (4) PDP shifts for Century 21, most recently on December 6, 2024.

1239.  Yanez never receive timely payment of wages for the shifts he worked at Century 21, instead waiting multiple weeks for his paychecks.

1240.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Century 21.

### lxxvii. Plaintiffs' Work for Brookdale Hospital

1241.  At all times during their PDP shifts at Brookdale Hospital, the NYPD and Brookdale Hospital jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Brookdale Hospital radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Brookdale Hospital; (3) the conduct or behavior that was prohibited versus what was expected while working for Brookdale

Hospital; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Brookdale Hospital did not want on their premises; (9) specific instructions on how to interact with Brookdale Hospital patients and employees; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1242.    Dawkins worked at least three (3) PDP shifts for Brookdale Hospital, most recently on July 1, 2023.

1243.    Dawkins never receive timely payment of wages for the shifts he worked at Brookdale Hospital, instead waiting multiple weeks for his paychecks.

1244.    Yanez also worked approximately three (3) PDP shifts at Brookdale Hospital.

1245.    Yanez never received timely payment of wages for the shifts he worked at Brookdale Hospital, instead waiting multiple weeks for his paychecks.

1246.    Daly also worked at an eight (8) hour PDP shift at Brookdale Hospital.

1247.    Daly did not receive timely payment of wages for the shift she worked at Brookdale Hospital, instead waiting multiple weeks for her paycheck.

1248.    Pantoja also worked a PDP shift for Brookdale Hospital.

1249.    Pantoja did not receive timely payment of wages for the shift she worked at Brookdale Hospital, instead waiting multiple weeks for her paycheck.

1250.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Brookdale Hospital.

### lxxviii.  Plaintiffs' Work for Times Square Church

1251.    At all times during their PDP shifts at Times Square Church, the NYPD and Times Square Church jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Times Square Church; (3) the conduct or behavior that was prohibited versus what was expected while working for Times Square Church; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Times Square Church did not want on their premises; (8) specific instructions on how to interact with Times Square Church visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Times Square Church required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1252.    On August 3, 2023, Dawkins worked a PDP shift at Times Square Church.

1253.    Dawkins did not receive timely payment of wages for the shift he worked at Times Square Church, instead waiting multiple weeks for his paycheck.

1254.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Times Square Church.

**lxxix.   Plaintiffs' Work for Asphalt Green**

1255.   At all times during their PDP shifts at Asphalt Green, the NYPD and Asphalt Green jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Asphalt Green; (3) the conduct or behavior that was prohibited versus what was expected while working for Asphalt Green; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Asphalt Green did not want on their premises; (8) specific instructions on how to interact with Asphalt Green members and visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; (11) the specific manner in which Asphalt Green required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1256.   On August 9, 2023, Dawkins worked a PDP shift at Asphalt Green.

1257.   Dawkins did not receive timely payment of wages for the shift he worked at Asphalt Green, instead waiting multiple weeks for his paycheck.

1258.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Asphalt Green.

### lxxx.   Plaintiffs' Work for Lauren B

1259.   At all times during their PDP shifts at Lauren B, the NYPD and Lauren B jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Lauren B; (3) the conduct or behavior that was prohibited versus what was expected while working for Lauren B; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Lauren B did not want on their premises; (8) specific instructions on how to interact with Lauren B's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1260.   On June 18, 2023, Dawkins worked a PDP shift at Lauren B.

1261.   Dawkins did not receive timely payment of wages for the shift he worked at Lauren B, instead waiting multiple weeks for his paycheck.

1262.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Lauren B.

### lxxxi.  Plaintiffs' Work for Botanical Garden

1263.   At all times during their PDP shifts at Botanical Garden, the NYPD and Botanical Garden supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning

them Botanical Garden radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Botanical Garden; (3) the conduct or behavior that was prohibited versus what was expected while working for Botanical Garden; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Botanical Garden did not wanted on their premises; (8) how to interact with Botanical Garden patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1264.   In 2023, Rosa worked at last three (3) PDP shifts for Botanical Garden.

1265.   Rosa never received timely payment of wages for the shifts he worked at Botanical Garden, but instead waited at least three (3) months, until well into 2024, to be paid for each of the shifts he worked in 2023.

1266.   Daly also worked at least two (2) PDP shifts at Botanical Garden.

1267.   Daly never received timely payment of wages for the shifts she worked at Botanical Garden, instead waiting multiple weeks for her paychecks.

1268.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Botanical Garden.

### lxxxii.  Plaintiffs' Work for Brooklyn Hospital

1269.   At all times during their PDP shifts at Brooklyn Hospital, the NYPD and Brooklyn Hospital jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Brooklyn Hospital radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Brooklyn Hospital; (3) the conduct or behavior that was prohibited versus what was expected while working for Brooklyn Hospital; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Brooklyn Hospital did not want on their premises; (8) specific instructions on how to interact with Brooklyn Hospital patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1270.   Pantoja worked at least three PDP shifts at Brooklyn Hospital, most recently on January 19, 2025.

1271.   Pantoja never received timely payment of wages for the shifts she worked at Brooklyn Hospital, instead waiting multiple weeks for her paychecks.

1272.   For example, on December 30, 2024, Pantoja completed an eight (8) hour shift at Brooklyn Hospital, but was not paid for her work until almost a month later in late January 2025.

1273.   To this day, Pantoja has not been paid for the eight (8) hour PDP shift she completed on January 19, 2025.

1274.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Botanical Garden.

**lxxxiii. Plaintiffs' Work for NBC**

1275.   At all times during their PDP shifts at NBC, the NYPD and NBC jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NBC radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NBC; (3) the conduct or behavior that was prohibited versus what was expected while working for NBC; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NBC did not wanted on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1276.   On November 2, 2022, Divino worked a 6.5-hour PDP shift at NBC.

1277.   Divino did not receive timely payment of wages for the shift he worked at NBC, instead waiting multiple weeks for his paycheck.

1278.   Faysal also worked at least six (6) PDP shifts at NBC, most recently on June 27, 2022.

1279.   Faysal did not receive timely payment of his wages for the shifts he worked at NBC, instead waiting multiple weeks for his paychecks.

1280.   Yanez also worked at least five (5) PDP shifts at NBC.

1281.    Yanez did not receive timely payment of his wages for the shifts he worked at NBC, instead waiting multiple weeks for his paychecks.

1282.    Martinez worked at least five (5) PDP shifts at NBC.

1283.    Martinez also did not receive timely payment of his wages for the shifts he worked at NBC, instead waiting multiple weeks for his paychecks.

1284.    Piney also worked at least three (3) PDP shifts at NBC.

1285.    Piney also did not receive timely payment of his wages for the shifts he worked at NBC, instead waiting multiple weeks for his paychecks.

1286.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NBC.

**lxxxiv. Plaintiffs' Work for Sam Ash**

1287.    At all times during their PDP shifts at Sam Ash, the NYPD and Sam Ash jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Sam Ash; (3) the conduct or behavior that was prohibited versus what was expected while working for Sam Ash; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Sam Ash did not wanted on their premises; (8) when they were permitted to take a meal break; (9) the specific manner in which Sam Ash required them to perform perimeter checks; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1288.   In 2023, C. Diaz worked at least eight (8) PDP shifts at Sam Ash.

1289.   C. Diaz never received timely payment of wages for the shifts he worked at Sam Ash, instead waiting at least two (2) to (3) months for each of his paychecks.

1290.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Sam Ash.

## FLSA COLLECTIVE ACTION ALLEGATIONS

1291.   Plaintiffs bring their FLSA claims as a collective action on behalf of themselves and all other similarly situated persons who have been employed by the NYPD and participated in the PDP at any time during the full statute of limitations period (the "FLSA Collective").

1292.   At all relevant times, Plaintiffs and the FLSA Collective were similarly situated, had substantially similar job requirements, were paid in the same manner and under the same common policies, and were subject to Defendants' practices of: (i) failing to compensate Plaintiffs and the FLSA Collective at the federal minimum wage for all hours worked in a workweek; and (ii) failing and refusing to timely pay all wages owed.

1293.   At all relevant times, Defendants have been fully aware of the duties performed by Plaintiffs and the FLSA Collective, and that those duties are not exempt from the provisions of the FLSA.

1294.   Defendants' violations of the FLSA have been willful, repeated, knowing, intentional, and without a good faith basis, and have significantly damaged Plaintiffs and the FLSA Collective.

1295.   As a result of their unlawful conduct, Defendants are liable to Plaintiffs and the FLSA Collective for the full amount of their unpaid and late wages, with interest, plus an additional equal amount as liquidated damages, plus reasonable attorneys' fees and costs incurred by Plaintiffs and the FLSA Collective.

1296.   While the exact number is unknown to Plaintiffs at this time, upon information and belief, there are approximately 4,500 members of the FLSA Collective.

1297.   Plaintiffs are currently unaware of the identities of the individual members of the FLSA Collective.

1298.   Accordingly, the Court should require Defendants to provide Plaintiffs with a list of all members of the proposed FLSA Collective, along with their last known home addresses, telephone numbers, and email addresses, so that Plaintiffs may provide the members of the FLSA Collective with notice of this action and an opportunity to make an informed decision regarding whether to participate in the same.

## CLASS ACTION ALLEGATIONS

1299.   Plaintiffs bring this action, in part, as a class action under the NYLL and FIFA, as well as all applicable regulations thereunder.

### A.    Class Definition

1300.   Plaintiffs seek to maintain claims, pursuant to FRCP 23, on behalf of themselves and a class of all other Officers who worked for the NYPD and participated in the PDP at any time during the full statute of limitations period (the "Class").

1301.   Plaintiffs alleges, on behalf of themselves and the Class, that the Vendors violated the NYLL and FIFA by, *inter alia*: (i) failing to compensate Plaintiffs and the Class at the State minimum wage for all hours worked; (ii) failing to compensate Plaintiffs and the Class at their established regular rates of pay and in accordance with their agreed terms of employment; (iii) failing to timely pay all wages owed; (iv) failing to provide Plaintiffs and the Class with Notices of Pay Rate; and (v) failing to furnish accurate wage statements to Plaintiffs and the Class.

1302.   Plaintiffs and the Class have standing to seek such relief because of the adverse effects that the Vendors' wage practices have had on them individually and as a group.

1303.   The wage practices described herein are part of the Vendors' normal course of conduct.

1304.   Pursuant to FRCP 23, Plaintiffs' NYLL and FIFA claims may be pursued by all similarly situated persons who do not opt out of the Class.

B.    **Numerosity and Impracticability of Joinder**

1305.   The members of the Class are so numerous that joinder is impracticable.

1306.   While the exact number is unknown to Plaintiffs at this time, upon information and belief, there are approximately 6,750 members of the Class.

1307.   Therefore, the numerosity requirement of FRCP 23(a) is satisfied.

C.    **Common Questions of Law and Fact**

1308.   Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Class and predominate over any questions only affecting the members of the Class individually.

1309.   Indeed, there are few, if any, purely individual issues in this action.

1310.   The questions of law and fact that are common to Plaintiffs and the Class include, without limitation:

(a)    Whether the Vendors failed to pay Plaintiffs and the Class all minimum wages owed;

(b)    Whether the Vendors failed to pay Plaintiffs and the Class all wages owed at their regular rates of pay and in accordance with their agreed terms of employment;

(c)    Whether the Vendors failed to timely pay Plaintiffs and the Class their wages;

(d)    Whether the Vendors failed to provide Plaintiffs and the Class with Notices

of Pay Rate;

(e)    Whether the Vendors failed to furnish accurate wage statements to Plaintiffs and the Class; and

(f)    Whether Plaintiffs and the Class are entitled to liquidated damages and injunctive relief.

1311.  Therefore, the common question requirement of FRCP 23(a) is satisfied.

**D.    Typicality of Claims and Relief Sought**

1312.  Plaintiffs' claims are typical of the claims of the members of the Class they seek to represent.

1313.  Plaintiffs and the Class work, or have worked, for the Vendors and are, or were, subject to the same compensation policies and practices.

1314.  The wage practices suffered by Plaintiffs, and the damages resulting therefrom, are typical of the Vendors' treatment of Officers assigned to them through the PDP, generally, and of the Class specifically.

1315.  Therefore, the typicality requirement of FRCP 23(a) is satisfied.

**E.    Adequacy of Representation**

1316.  Plaintiffs will fairly and adequately protect the interests of the Class because their interests are coextensive and aligned with those of the Class.

1317.  Plaintiffs have no interests adverse to the Class they seek to represent.

1318.  Plaintiffs are willing and able to represent the Class as fairly and vigorously as they pursue their similar individual claims.

1319.  Plaintiffs have retained competent counsel who are qualified and experienced in employment class action litigation and able to meet the demands necessary to litigate a class action of this size and complexity.

1320.   The combined interests, experience, and resources of Plaintiffs and their counsel to competently litigate the individual and Class claims at issue in the instant action satisfy the adequacy of representation requirement of FRCP 23(a).

## F.    Requirements of Rule 23(b)(1)

1321.   Without certification of the Class, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

1322.   Accordingly, certification of the Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Class, and the Vendors.

1323.   By filing this Complaint, Plaintiffs preserve the rights of the members of the Class with respect to the statute of limitations on their claims.

1324.   Therefore, not certifying the Class would substantially impair and/or impede the ability of the members thereof to protect their interests.

## G.    Requirements of Rule 23(b)(2)

1325.   The Vendors acted on grounds, described herein, generally applicable to Plaintiffs and the Class by denying Plaintiffs and the Class minimum wages, failing to pay them in accordance with their agreed terms of employment, failing to pay wages on time, failing to pay wages at their regular rates of pay, and failing to provide Notices of Pay Rate and furnish accurate wage statements.

1326.   These acts are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Class as a whole.

1327.   Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the entitlement to, and denial of, minimum wages,

wages paid at their regular rates of pay, timely payment of wages, Notices of Pay Rate and accurate wage statements.

1328.   Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Class's entitlement to monetary and non-monetary remedies for such wage violations.

1329.   Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**H.**     **Requirements of Rule 23(b)(3)**

1330.   The common issues of fact and law affecting Plaintiffs' claims and those of the Class – including, without limitation, the common issues identified above – predominate over issues affecting only individual claims.

1331.   A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and those of the Class.

1332.   The cost of proving the Vendors' pattern and practice of denying minimum and other wages makes it impractical for the members of the Class to pursue their claims individually.

1333.   This class action will not be difficult to manage for reasons including, without limitation, the discrete organizational nature of the members of the Class (they must have worked for the NYPD and participated in the PDP during the statutory period), as well as the common questions of law and fact described herein.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE FLSA: LATE PAYMENT OF WAGES**
*(On Behalf of Plaintiffs and the FLSA Collective against all Defendants)*

1334.   Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1335.   During the full statutory period, Plaintiffs and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, et seq., and all applicable regulations thereunder.

1336.   The FLSA requires covered employers, including Defendants, to pay Officers all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

1337.   Plaintiffs and the FLSA Collective were not exempt from the requirement that Defendants timely pay them their wages.

1338.   During the statute of limitations period, Defendants have engaged in a policy and practice of failing to pay Plaintiffs and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

1339.   As a result of Defendants' failure to pay Plaintiffs and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, Defendants have violated the FLSA and/or applicable regulations thereunder.

1340.   Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA.

1341.   Defendants' violations of the FLSA have significantly harmed Plaintiffs and the FLSA Collective and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE FLSA: FAILURE TO PAY MINIMUM WAGE
### *(On Behalf of Plaintiffs and the FLSA Collective against all Defendants)*

1342.   Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1343.   During the full statutory period, Plaintiffs and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, et seq., and applicable regulations thereunder.

1344.   The FLSA requires covered employers, including Defendants, to compensate employees at a rate not less than the federal minimum wage for all hours worked in a workweek.

1345.   Plaintiffs and the FLSA Collective were not exempt from the requirement that their employer pay them minimum wages under the FLSA.

1346.   During the statute of limitations period, Defendants have engaged in a policy and practice of failing to compensate Plaintiffs and the FLSA Collective at a rate not less than the federal minimum wage for all hours worked in a workweek.

1347.   As a result of Defendants' failures to compensate Plaintiffs and the FLSA Collective at a rate not less than the federal minimum wage for all hours worked in a workweek, Defendants have violated the FLSA and/or applicable regulations thereunder.

1348.   Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA.

1349.   Defendants' violations of the FLSA have significantly damaged Plaintiffs and the FLSA Collective and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: LATE PAYMENT OF WAGES
*(On Behalf of Plaintiffs and the Class against the Vendors)*

1350.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1351.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, et seq., and all applicable regulations thereunder.

1352.   The NYLL requires covered employers, including the Vendors to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

1353.   Plaintiffs and the Class were not exempt from the requirement that the Vendors timely pay them their wages.

1354.   Throughout the statute of limitations period, the Vendors have engaged in a policy and practice of failing to pay Plaintiffs all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

1355.   As a result of the Vendors' failure to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, the Vendors have violated the NYLL and/or applicable regulations thereunder.

1356.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

1357.   The Vendors' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**FOURTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PAY MINIMUM WAGE**
***(On Behalf of Plaintiffs and the Class against the Vendors)***

1358.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1359.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, et seq., and all applicable regulations thereunder.

1360.   The NYLL requires covered employers, including the Vendors, to compensate Officers at a rate not less than the applicable State minimum wage for all hours worked in a workweek.

1361.   Plaintiffs and the Class were not exempt from the requirement that the Vendors pay them minimum wages under the NYLL.

1362.   During the statute of limitations period, the Vendors have engaged in a policy and practice of failing to compensate Plaintiffs and the Class at a rate not less than the applicable State minimum wage for all hours worked in a workweek.

1363.   As a result of the Vendors' failure to compensate Plaintiffs and the Class at a rate not less than the applicable State minimum wage for all hours worked in a workweek, the Vendors have violated the NYLL and/or applicable regulations thereunder.

1364.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

1365.   The Vendors' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PAY ALL WAGES OWED**
*(On Behalf of Plaintiffs and the Class against the Vendors)*

1366.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1367.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, et seq., and all applicable regulations thereunder.

1368.   The NYLL requires covered employers, including the Vendors, to compensate Officers at their established regular rates of pay for all hours worked.

1369.   Plaintiffs and the Class were not exempt from the requirement that the Vendors pay them at their established regular rates of pay for all hours worked under the NYLL.

1370.   During the statute of limitations period, the Vendors have engaged in a common policy and practice of failing to compensate Plaintiffs and the Class at their established regular rates of pay for all hours worked in a workweek.

1371.   As a result of the Vendors' failures to compensate Plaintiffs and the Class at their established regular rates of pay for all hours worked in a workweek, the Vendors have violated the NYLL and/or applicable regulations thereunder.

1372.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

1373.   The Vendors' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: FAILURE TO PROVIDE NOTICES OF PAY RATE**
*(On Behalf of Plaintiffs and the Class against the Vendors)*

1374.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1375.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

1376.   The NYLL requires covered employers, including the Vendors, to provide employees, "at the time of hiring, a notice containing the following information:  the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; . . . the regular pay day designated by the employer [ ]; the name of the employer; any 'doing business as' names used by the employer;  the physical address of the employer's main office or principal place of business, and a mailing address if different;  the telephone number of

the employer; plus such other information as the commissioner deems material and necessary[,]" which is commonly referred to as a Notice of Pay Rate.

1377.    Plaintiffs and the Class were not exempt from the requirement that the Vendors provide them with Notices of Pay Rate.

1378.    During the statute of limitations period, the Vendors have engaged in a policy and practice of unlawfully failing to provide Notices of Pay Rate to Plaintiffs and the Class.

1379.    As a result of the Vendors' failure to provide Notices of Pay Rate to Plaintiffs and the Class, the Vendors have violated the NYLL and/or applicable regulations thereunder, including, *inter alia*, NYLL § 195.

1380.    The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to provide proper notices to Plaintiffs and the Class in accordance with the NYLL.

1381.    Further, due to the Vendors' failure to provide Notices of Pay Rate, Plaintiffs and the Class have suffered concrete harm.

1382.    Specifically, Plaintiffs and the Class have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid and/or not paid properly; and (iii) taking appropriate action to obtain payments due to them.

1383.    The Vendors' violations of the NYLL entitle Plaintiffs and each member of the Class to recover $50 for each workday the violation occurred, not to exceed $5,000, plus attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYLL: INACCURATE WAGE STATEMENTS**
***(On Behalf of Plaintiffs and the Class against the Vendors)***

1384.    Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1385.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

1386.   The NYLL requires covered employers, including the Vendors, to "furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; . . . and net wages."

1387.   Plaintiffs and the Class were not exempt from the requirement that the Vendors furnish them proper wage statements.

1388.   During the statute of limitations period, the Vendors have engaged in a policy and practice of unlawfully failing to provide accurate wage statements to Plaintiffs and the Class.

1389.   As a result of the Vendors' failure to furnish accurate wage statements to Plaintiffs and the Class, the Vendors have violated the NYLL and/or applicable regulations thereunder, including, *inter alia*, NYLL § 195.

1390.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to provide proper wage statements to Plaintiffs and the Class in accordance with the NYLL.

1391.   Further, due to the Vendors' failure to furnish accurate wage statements, Plaintiffs and the Class have suffered concrete harm.

1392.   Specifically, Plaintiffs and the Class have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid and/or not paid properly; and (iii) taking appropriate action to obtain payments due to them.

1393.   The Vendors' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover $250 for each workday the violation occurred, not to exceed $5,000, plus attorneys' fees and costs.

**EIGHTH CAUSE OF ACTION**
**VIOLATIONS OF THE FIFA: LATE PAYMENT OF COMPENSATION**
*(On Behalf of Plaintiffs and the Class against the Vendors)*
*(Brought in the Alternative to Plaintiffs' and the Class' Claims under the FLSA and NYLL)*

1394.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1395.   In the alternative to their claims brought under the FLSA and NYLL, Plaintiffs and the Class allege violations of the FIFA, N.Y.C. Admin. Code §§ 20-927, et seq., and all applicable regulations thereunder.

1396.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the FIFA and all applicable regulations thereunder.

1397.   The FIFA requires hiring parties, including the Vendors, to pay freelance workers all contracted compensation on or before the date such contracted compensation is due under the terms of a contract or, if the contract does not specify when the contracted compensation is due or the mechanism by which such due date shall be determined, no later than 30 days after completion of the freelance worker's services under the contract.

1398.   Plaintiffs and the Class were not exempt from the requirement that the Vendors timely pay them their contracted compensation under the FIFA.

1399.   During the statute of limitations period, the Vendors have engaged in a policy and practice of hiring Plaintiffs and the Class to complete services without specifying when contracted compensation is due or the mechanism by which such due date shall be determined.

1400.   As a result, Plaintiffs and the Class are owed all contracted compensation within 30 days of the completion of services by Plaintiffs and the Class.

1401.   Throughout the full statute of limitations periods, the Vendors have engaged in a policy and practice of failing to pay Plaintiffs and the Class all contracted compensation within 30 days of the completion of services performed by Plaintiffs and the Class under their contracts.

1402.   As a result of the Vendors' failure to pay Plaintiffs and the Class all contracted compensation within 30 days of completion of services, the Vendors have violated the FIFA and/or applicable regulations thereunder.

1403.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the FIFA.

1404.   The Vendors' violations of the FIFA have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid compensation, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF THE FIFA: FAILURE TO PAY ALL COMPENSATION
*(On Behalf of Plaintiffs and the Class against the Vendors)*
*(Brought in the Alternative to Plaintiffs' and the Class' Claims under the FLSA and NYLL)*

1405.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

1406.   In the alternative to their claims brought under the FLSA and NYLL, Plaintiffs and the Class allege violations of the FIFA, N.Y.C. Admin. Code §§ 20-927, et seq., and all applicable regulations thereunder.

1407.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the FIFA and all applicable regulations thereunder.

1408.   The FIFA requires hiring parties, including the Vendors, to pay freelance workers all contracted compensation on or before the date such contracted compensation is due under the terms of a contract or, if the contract does not specify when the contracted compensation is due or the mechanism by which such due date shall be determined, no later than 30 days after completion of the freelance worker's services under the contract.

1409.   Plaintiffs and the Class were not exempt from the requirement that the Vendors pay them their contracted compensation under the FIFA, and they are entitled to be paid all contracted compensation for all services completed for the Vendors.

1410.   During the statute of limitations period, the Vendors have engaged in a policy and practice of hiring Plaintiffs and the Class to complete services without specifying when contracted compensation is due or the mechanism by which such due date shall be determined.

1411.   As a result, the Vendors owe all contracted compensation to Plaintiffs and the Class within 30 days of the completion of services by Plaintiffs and the Class.

1412.   During the statute of limitations periods, the Vendors have engaged in a policy and practice of failing to pay Plaintiffs and the Class all contracted compensation for the completion of services by Plaintiffs and the Class.

1413.   As a result of the Vendors' failure to pay Plaintiffs and the Class all contracted compensation for completion of services by Plaintiffs and the Class, the Vendors have violated the FIFA and/or applicable regulations thereunder.

1414.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the FIFA.

1415.   The Vendors' violation of the FIFA have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid compensation, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the FLSA Collective, and the Class, respectfully request that this Court:

A.    Declare that the practices complained of herein are unlawful under applicable federal, State, and City law;

B.    Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. § 216, and direct Defendants to provide Plaintiffs with a list of all members of the FLSA Collective, including all last known addresses, telephone numbers, and e-mail addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

D.    Declare this action to be maintainable as a class action pursuant to FRCP 23, and direct Defendants to provide Plaintiffs with a list of all members of the Class, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

E.    Designate Plaintiffs as the representatives of the Class, and their counsel of record as class counsel;

F.    Determine the damages sustained by Plaintiffs and the FLSA Collective as a result of Defendants' violations of the FLSA, and award those damages against Defendants and in favor

of Plaintiffs and the FLSA Collective, plus such pre-judgment and post-judgment interest as may be allowed by law;

G.      Determine the damages sustained by Plaintiffs and the Class as a result of the Vendors' violations of the NYLL and FIFA, and award those damages against the Vendors and in favor of Plaintiffs and the Class, plus such pre-judgment and post-judgment interest as may be allowed by law;

H.      Award Plaintiffs, the FLSA Collective, and/or the Class an additional equal amount as liquidated damages because Defendants' violations were without a good faith basis;

I.      Award Plaintiffs, the FLSA Collective, and/or the Class their reasonable attorneys' fees and costs and disbursements in this action including, without limitation, any accountants' or experts' fees; and

J.      Grant Plaintiffs, the FLSA Collective, and/or the Class such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves, the FLSA Collective and the Class, hereby demand a trial by jury on all issues of fact and damages.

Dated:  February 7, 2025
        New York, New York

FARUQI & FARUQI, LLP

By:  /s/ Innessa M. Huot
     Innessa M. Huot

685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
ihuot@faruqilaw.com

*Attorneys for Plaintiffs, the Proposed*
*FLSA Collective, and the Proposed Class*