**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALBERT PINEY, ROMAN DIAZ, JOSE MARTINEZ, FREDDY SUAZO, DESMOND GRANT, M. MOSTAYEN FAYSAL, SOPHIA DALY, CHARLIE RUIZ-REYES, JAMES DIVINO, MICHAEL KMIOTEK, DEVON DAWKINS, ALEXIS YANEZ, JULIO ROSA, JAYNEL PANTOJA, CLAUDIO DIAZ, DOMINIQUE EVEILLARD, SUDAN OSORIO, RANDY CHOW, JORGE ZORRILLA, WANG TING, JUSTIN SENESE, TUHIN KHAN, TAMARA LAUZIER, JOHN RONDON, BRAYAN ANTONIO, ANNA GARLINSKA, JASON MANSOUR, ARTURO DELGADO, JOHN CANNON, MICHAEL MIRON and WADIH ABOUABDALLAH on behalf of themselves and others similarly situated, | No.: 1:25-cv-00671-DEH-SLC<br><br>**THIRD AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs,

v.

CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, TARGET CORPORATION, MSG ENTERTAINMENT HOLDINGS, LLC, YANKEE GLOBAL ENTERPRISES LLC, NYU LANGONE HOSPITALS, MOUNT SINAI HEALTH SYSTEM, INC., THE NEW YORK TIMES COMPANY, BJ'S WHOLESALE CLUB, INC., RXR REALTY LLC, 509 W34, L.L.C. D/B/A THE SPIRAL, LIC SITE B-1 OWNER, L.L.C. D/B/A LIC SITE B-1, RCPI LANDMARK PROPERTIES, L.L.C. D/B/A ROCKEFELLER CENTER, TISHMAN SPEYER ASSOCIATES LIMITED PARTNERSHIP D/B/A LIC SITE B-1 D/B/A THE SPIRAL AND D/B/A ROCKEFELLER CENTER, BUENA VISTA THEATRICAL GROUP LTD. D/B/A DISNEY THEATRICAL GROUP, BXP, INC. F/K/A BOSTON PROPERTIES, INC., KERING AMERICAS, INC., APPLE INC., CONGREGATION RODEPH SHOLOM, 34TH STREET PARTNERSHIP, INC., BANK OF AMERICA CORPORATION, THE TJX COMPANIES, INC., D/B/A MARSHALLS AND D/B/A TJ MAXX, GENTING NEW YORK LLC D/B/A RESORTS WORLD CASINO, PRIMARK US CORP., ROYAL REALTY CORP., THE NEW YORK AND PRESBYTERIAN HOSPITAL, 99C LLC A/K/A 180 MAIDEN LANE LLC, ALDI, INC., BARCLAYS BANK PLC, WEGMANS FOOD MARKETS, INC., NEUE GALERIE NEW YORK, V&R PAYROLL FACTORS, INC., WAKEFERN FOOD CORP., GLASS GARDENS, INC. D/B/A SHOPRITE,

GATEWAY SHOPRITE ASSOCIATES, LLC D/B/A SHOPRITE, QUEENS SHOPRITE ASSOCIATES LLC D/B/A SHOPRITE, NYC SHOPRITE ASSOCIATES, INC. D/B/A SHOPRITE, VILLAGE SUPER MARKET, INC. D/B/A SHOPRITE AND D/B/A FAIRWAY MARKETS, VILLAGE SUPER MARKET OF NJ, L.P. D/B/A SHOPRITE, THE BANK OF NEW YORK MELLON CORPORATION, THE ANIMAL MEDICAL CENTER A/K/A SCHWARZMAN ANIMAL MEDICAL CENTER, QUEENS YESHIVA KETANA, INC., PARKER JEWISH INSTITUTE FOR HEALTHCARE AND REHABILITATION, YOUNG ISRAEL OF QUEENS VALLEY, YESHIVA DARCHEI TORAH, TORAH CENTER OF HILLCREST INC., BURLINGTON COAT FACTORY WAREHOUSE CORPORATION, AMERICAN BROADCASTING COMPANIES, INC., SEPHARDIC LEBANESE CONGREGATION INC., ROCHDALE VILLAGE ASSOCIATION, INC., NEW YORK SOCIETY FOR THE RELIEF OF THE RUPTURED AND CRIPPLED, MAINTAINING THE HOSPITAL FOR SPECIAL SURGERY D/B/A HOSPITAL FOR SPECIAL SURGERY, VORNADO OFFICE MANAGEMENT LLC D/B/A PENN DISTRICT, JPMORGAN CHASE & CO., UBS FINANCIAL SERVICES INC., QUEENS BALLPARK COMPANY LLC, TAINO TOWERS APARTMENTS LLC, MIR HANSON ASSOCIATES, LLC, NEW YORK UNIVERSITY, ST. BARNABAS HOSPITAL, INC., MANHATTAN BEER DISTRIBUTORS LLC, MONTEFIORE MEDICAL CENTER, NORTHWELL HEALTH, INC., RBG MANAGEMENT CORP. D/B/A MORTON WILLIAMS SUPERMARKET, GFP REAL ESTATE LLC, ROSCO, INC., SL GREEN REALTY CORP., GRAND CENTRAL PARTNERSHIP, INC., BLOOMINGDALE'S LLC, FLUSHING-FRESH MEADOWS JEWISH CENTER INC., THE GOLDMAN SACHS GROUP, INC., PARK AVENUE SYNAGOGUE, BNOS BAIS YAAKOV OF FAR ROCKAWAY, BAIS YAAKOV ACADEMY FOR GIRLS, CHELSEA PIERS L.P., CONGREGATION BETH-EL SEPHARDIC CENTER OF JAMAICA ESTATES, YESHIVA UNIVERSITY, EMPIRE FORCE INCORPORATED, FEDERAL EXPRESS CORPORATION, AVENUE NEW YORK LLC D/B/A AVENUES: THE WORLD SCHOOL, MUSEUM OF MODERN ART, BRYANT PARK CORPORATION, BROOKLYN INSTITUTE OF ARTS AND SCIENCES A/K/A BROOKLYN MUSEUM, THE EDMOND J. SAFRA SYNAGOGUE, BEST BUY CO. INC., CENTURY 21 USA LLC, THE BROOKDALE HOSPITAL MEDICAL

CENTER, TIMES SQUARE CHURCH, INC., ASPHALT GREEN, INC., LEPOZZI, INC. D/B/A LAUREN B. JEWELRY, THE NEW YORK BOTANICAL GARDEN, THE BROOKLYN HOSPITAL CENTER, NBCUNIVERSAL MEDIA, LLC, SAM ASH MUSIC CORPORATION, ZARA USA, INC., MUSEUM OF JEWISH HERITAGE A LIVING MEMORIAL TO THE HOLOCAUST, TORAH ACADEMY FOR GIRLS, OMNI EYE SURGERY OF NEW YORK, P.C., PLAZA MOTORS, LLC F/K/A PLAZA MOTORS OF BROOKLYN, INC. D/B/A PLAZA AUTO MALL D/B/A PLAZA HONDA, 47TH STREET BUSINESS IMPROVEMENT DISTRICT, INC., BREEZY POINT COOPERATIVE, INC., CITIGROUP INC., ASTORIA QUEENS ENTERPRISES, LLC D/B/A DII DEALS & DISCOUNTS, FIFTH AVENUE ASSOCIATION BUSINESS IMPROVEMENT DISTRICT, INC., FSP 787 SEVENTH, LLC, MACY'S RETAIL HOLDINGS, LLC, THE RAMAZ SCHOOL, MANHATTAN HIGH SCHOOL FOR GIRLS, CONGREGATION BNAI JESHURUN STARAFROLER HEBRIA, CENTRAL SYNAGOGUE, CONGREGATION SHEIRIS ISRAEL OF BAY RIDGE, ST. THOMAS CHURCH FIFTH AVENUE, BLACKROCK, INC., MORGAN STANLEY, RICHMOND MEDICAL CENTER, RAL HOSPITALITY GROUP, INC. D/B/A PASTAVINO, COLOR IMAGE APPAREL, INC. D/B/A ALO YOGA, NEWSMAX MEDIA, INC., CHURCH OF THE CITY NEW YORK, BROOKFIELD CORPORATION, YAVNEH MINYAN OF FLATBUSH, BRONXCARE HEALTH SYSTEM, PEI MEDIA INC., RUDIN MANAGEMENT CO. INC., CVS HEALTH CORPORATION, BROOKLYN BOTANIC GARDEN CORPORATION, BROOKLYN HEIGHTS SYNAGOGUGE, LEVY PREMIUM FOODSERVICE LIMITED PARTNERSHIP, TASHKENT SUPERMARKET LLC, MESIVTA YESHIVA RABBI CHAIM BERLIN, THE BROOKYLN TABERNACLE, FANCY FARMS NY, LLC D/B/A OKKA FOODS MARKET, TEMPLE SHAARAY TEFILA, PARAMOUNT GROUP, INC., CONGREGATION OHAV SHOLOM, CONGREGATION EMANU-EL OF THE CITY OF NEW YORK D/B/A TEMPLE EMANU-EL, TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, THE JEWISH MUSEUM, MONROE UNIVERSITY, LTD. F/K/A MONROE COLLEGE, NEW WATER STREET CORP., NEW YORK HISTORICAL SOCIETY, REGO PARK JEWISH CENTER, SALANTER AKIBA RIVERDALE ACADEMY D/B/A SAR ACADEMY, ISRAEL CENTER OF CONSERVATIVE JUDAISM, INC.,

THE YOUNG MEN'S AND YOUNG WOMEN'S HEBREW ASSOCIATION D/B/A 92ND ST. Y, YESHIVA HAR TORAH, HINES INTERESTS LIMITED PARTNERSHIP, YESHIVA SHOLOM SCHACHNA, KEHILA KEDOSHA JANINA PRESERVATION AND CULTURAL FUND INC. D/B/A KEHILA KEDOSHA JANINA SYNAGOGUE, CIVIC CENTER SYNAGOGUE, INC., METLIFE GROUP, INC., KHAL BNEI AVROHOM YAAKOV INC., TRINITY TABERNACLE D/B/A TRINITY TABERNACLE OF GRAVESEND, YOUNG ISRAEL OF FOREST HILLS, BENJAMIN PARTNERS LLC, EO STATEN ISLAND PROPERTY OWNER LLC D/B/A EMPIRE OUTLETS, CONGREGATION ETZ CHAIM OF FLATBUSH, CONGREGATION NER MITZVAH, INC., TREECO/HYLAN LIMITED PARTNERSHIP D/B/A HYLAN COMMONS, PLAZA COLLEGE, LTD., CONGREGATION MACHANE CHODOSH, INC., QUEENS JEWISH CENTER AND TALMUD TORAH, SHOLOM SHOLOM, INC., STEPHEN WISE FREE SYNAGOGUE, RAINBOW HILL HOMEOWNERS ASSOCIATION D/B/A CELEBRATION AT RAINBOW HILL, TIME OUT FOR VALUES, INC., CONGREGATION ETZ CHAIM OF KEW GARDENS HILLS, RABBINICAL SEMINARY OF AMERICA, TEMPLE GATES OF PRAYER, THE HEBREW HOME FOR THE AGED AT RIVERDALE FOUNDATION, INC., UNITED NATIONS INTERNATIONAL SCHOOL, CONGREGATION BAITH ISRAEL ANSHEI EMES D/B/A KANE STREET SYNAGOGUE, WAGNER COLLEGE, SALESFORCE, INC., GREATER JAMAICA DEVELOPMENT CORPORATION, MANHATTAN BEACH JEWISH CENTER, SVA ALUMNI SOCIETY INC., HILLCREST JEWISH CENTER INC., CHABAD LUBAVITCH OF WEST BRIGHTON D/B/A SEA BREEZE JEWISH CENTER, ROSS DRESS FOR LESS, INC., AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., and DOES NOS. 1-100,

Defendants.

Plaintiffs Albert Piney ("Piney"), Roman Diaz ("R. Diaz"), Jose Martinez ("Martinez"), Freddy Suazo ("Suazo"), Desmond Grant ("Grant"), M. Mostayen Faysal ("Faysal"), Sophia Daly ("Daly"), Charlie Ruiz-Reyes ("Ruiz-Reyes"), James Divino ("Divino"), Michael Kmiotek ("Kmiotek"), Devon Dawkins ("Dawkins"), Alexis Yanez ("Yanez"), Julio Rosa ("Rosa"), Jaynel Pantoja ("Pantoja"), Claudio Diaz ("C. Diaz"), Dominique Eveillard ("Eveillard"), Sudan Osorio ("Osorio"), Randy Chow ("Chow"), Jorge Zorrilla ("Zorrilla"), Wang Ting ("Ting"), Justin Senese ("Senese"), Tuhin Khan ("Khan"), Tamara Lauzier ("Lauzier"), John Rondon ("Rondon"), Brayan Antonio ("Antonio"), Anna Garlinska ("Garlinska"), Jason Mansour ("Mansour"), Arturo Delgado ("Delgado"), John Cannon ("Cannon"), Michael Miron ("Miron") and Wadih Abouabdallah ("Abouabdallah") (together, the "Plaintiffs"), on behalf of themselves and others similarly situated, by and through their attorneys, Faruqi & Faruqi, LLP, hereby allege as follows against Defendants City of New York, New York City Police Department (collectively, the "NYPD"), Target Corporation ("Target"), MSG Entertainment Holdings, LLC ("MSG"), Yankee Global Enterprises LLC, ("Yankees"), NYU Langone Hospitals ("NYU Langone"), Mount Sinai Health System, Inc. ("Mount Sinai"), The New York Times Company ("NYT"), BJ's Wholesale Club, Inc. ("BJs"), RXR Realty LLC ("RXR"), 509 W34, L.L.C. ("509 W 34") d/b/a The Spiral, LIC Site B-1 Owner L.L.C. ("LIC Site B-1") d/b/a LIC Site B-1, RCPI Landmark Properties, L.L.C. ("RCPI") d/b/a Rockefeller Center, Tishman Speyer Associates Limited Partnership ("Tishman Speyer") d/b/a LIC Site B-1 d/b/a The Spiral and d/b/a Rockefeller Center (509 W 34 and Tishman Speyer d/b/a The Spiral are together referred to as "The Spiral") (LIC Site B-1 and Tishman Speyer d/b/a LIC Site B-1 are together referred to as "LIC Site B-1") (RCPI and Tishman Speyer d/b/a Rockefeller Center are together referred to as "Rockefeller Center"), Buena Vista Theatrical Group Ltd. d/b/a Disney Theatrical Group ("Disney"), BXP, Inc. f/k/a Boston Properties, Inc. ("Boston

Properties"), Kering Americas, Inc. ("Kering"), Apple Inc. ("Apple"), Congregation Rodeph Sholom ("Rodeph Sholom"), 34th Street Partnership, Inc. ("34th St."), Bank of America Corporation ("BOA"), The TJX Companies, Inc., d/b/a Marshalls ("Marshalls") and d/b/a TJ Maxx ("TJ Maxx"), Genting New York LLC d/b/a Resorts World Casino ("Resorts World Casino"), Primark US Corp. ("Primark"), Royal Realty Corp. ("Royal Realty"), The New York and Presbyterian Hospital ("NYP"), 99c LLC a/k/a 180 Maiden Lane LLC ("180 Maiden"), Aldi, Inc., ("Aldi"), Barclays Bank PLC ("Barclays Bank"), Wegmans Food Markets, Inc. ("Wegmans"), Neue Galerie New York ("Neue Galerie"), V&R Payroll Factors, Inc. ("V&R Payroll"), Wakefern Food Corp. ("Wakefern"), Glass Gardens, Inc. d/b/a ShopRite ("Glass"), Gateway ShopRite Associates, LLC d/b/a ShopRite ("Gateway"), Queens ShopRite Associates LLC d/b/a ShopRite ("College Point"), NYC ShopRite Associates, Inc. d/b/a ShopRite ("McDonald Ave"), Village Super Market, Inc. d/b/a ShopRite and d/b/a Fairway Markets, Village Super Market of NJ, L.P. d/b/a ShopRite ("Bruckner Blvd") (Wakefern, Glass, Gateway, College Point, McDonald Ave, Village Super Market Inc. d/b/a ShopRite and Bruckner Blvd are collectively referred to as "ShopRite") (Village Super Market, Inc. d/b/a Fairway Markets is referred to as "Fairway Markets"), The Bank of New York Mellon Corporation ("Bank of NY Mellon"), The Animal Medical Center a/k/a Schwarzman Animal Medical Center ("Schwarzman Animal Medical"), Queens Yeshiva Ketana Inc. ("Queens Yeshiva Ketana"), Parker Jewish Institute for Healthcare and Rehabilitation ("Parker Jewish Institute"), Young Israel of Queens Valley, Yeshiva Darchei Torah ("Yeshiva Darchei"), Torah Center of Hillcrest Inc. ("Torah Center"), Burlington Coat Factory Warehouse Corporation ("Burlington"), American Broadcasting Companies, Inc. ("ABC"), Sephardic Lebanese Congregation Inc. ("Sephardic Lebanese"), Rochdale Village Association, Inc. ("Rochdale Village"), New York Society for the

2

Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery d/b/a Hospital for Special Surgery ("HSS"), Vornado Office Management LLC d/b/a Penn District ("Vornado"), JPMorgan Chase & Co. ("JPM"), UBS Financial Services Inc. ("UBS"), Queens Ballpark Company LLC ("Citi Field"), Taino Towers Apartments LLC ("Taino Towers"), MIR Hanson Associates, LLC ("MIR Hanson"), New York University ("NYU"), St. Barnabas Hospital, Inc. ("St. Barnabas"), Manhattan Beer Distributors LLC ("Manhattan Beer"), Montefiore Medical Center ("Montefiore"), Northwell Health, Inc. ("Northwell"), RBG Management Corp. d/b/a Morton Williams Supermarket ("Morton Williams"), GFP Real Estate LLC ("GFP Real Estate"), Rosco, Inc. ("Rosco"), SL Green Realty Corp. ("SL Green"), Grand Central Partnership, Inc. ("Grand Central"), Bloomingdale's LLC ("Bloomingdale's"), Flushing-Fresh Meadows Jewish Center Inc. ("Fresh Meadows"), The Goldman Sachs Group, Inc. ("Goldman"), Park Avenue Synagogue, Bnos Bais Yaakov of Far Rockaway ("Bnos Bais"), Bais Yaakov Academy For Girls (together with Bnos Bais referred to as "Bais Yaakov"), Chelsea Piers L.P. ("Chelsea Piers"), Congregation Beth-El Sephardic Center of Jamaica Estates ("Beth-El"), Yeshiva University, Empire Force Incorporated ("Empire Force"), Federal Express Corporation ("FedEx"), Avenue New York LLC d/b/a Avenues: The World School ("Avenues School"), Museum of Modern Art ("MOMA"), Bryant Park Corporation ("Bryant Park"), Brooklyn Institute of Arts and Sciences a/k/a Brooklyn Museum ("Brooklyn Museum"), The Edmond J. Safra Synagogue ("Safra Synagogue"), Best Buy Co. Inc. ("Best Buy"), Century 21 USA LLC ("Century 21"), The Brookdale Hospital Medical Center ("Brookdale Hospital"), Times Square Church, Inc. ("Times Square Church"), Asphalt Green, Inc. ("Asphalt Green"), Lepozzi, Inc. d/b/a Lauren B. Jewelry ("Lauren B"), The New York Botanical Garden ("NY Botanical Garden"), The Brooklyn Hospital Center ("Brooklyn Hospital"), NBCUniversal Media, LLC ("NBC"), Sam Ash Music Corporation

3

("Sam Ash"), Zara USA, Inc. ("Zara"), Museum of Jewish Heritage A Living Memorial To The Holocaust ("Jewish Heritage"), Torah Academy for Girls ("Torah Academy"), Omni Eye Surgery of New York, P.C. ("Omni Eye"), Plaza Motors, LLC f/k/a Plaza Motors of Brooklyn, Inc. d/b/a Plaza Auto Mall d/b/a Plaza Honda ("Plaza Honda"), 47th Street Business Improvement District, Inc. ("47th Street BID"), Breezy Point Cooperative, Inc. ("Breezy Point"), Citigroup Inc. ("Citigroup"), Astoria Queens Enterprises, LLC d/b/a DII Deals & Discounts ("DII Deals & Discounts"), Fifth Avenue Association Business Improvement District, Inc. ("Fifth Avenue BID"), FSP 787 Seventh, LLC ("787 Seventh Avenue"), Macy's Retail Holdings, LLC ("Macy's"), The Ramaz School ("Ramaz School"), Manhattan High School For Girls, Congregation Bnai Jeshurun Starafroler Hebria ("Bnai Jeshurun"), Central Synagogue, Congregation Sheiris Israel of Bay Ridge ("Sheiris Israel"), St. Thomas Church Fifth Avenue ("St. Thomas Church"), Blackrock, Inc. ("Blackrock"), Morgan Stanley, Richmond Medical Center, RAL Hospitality Group, Inc. d/b/a Pastavino ("Pastavino"), Color Image Apparel, Inc. d/b/a Alo Yoga ("Alo Yoga"), Newsmax Media, Inc. ("Newsmax"), Church of the City New York, Brookfield Corporation ("Brookfield"), Yavneh Minyan of Flatbush ("Yavneh Minyan"), BronxCare Health System ("BronxCare"), PEI Media Inc. ("PEI Media"), Rudin Management Co. Inc. ("Rudin Management"), CVS Health Corporation ("CVS"), Brooklyn Botanic Garden Corporation ("BK Botanic Garden"), Brooklyn Heights Synagogue, Levy Premium Foodservice Limited Partnership ("Levy Foods"), Tashkent Supermarket LLC ("Tashkent"), Mesivta Yeshiva Rabbi Chaim Berlin ("Yeshiva Rabbi Chaim Berlin"), The Brooklyn Tabernacle ("BK Tabernacle"), Fancy Farms NY, LLC d/b/a Okka Foods Market ("Okka Foods Market"), Temple Shaaray Tefila, Paramount Group, Inc. ("Paramount Group"), Congregation Ohav Sholom ("Ohav Sholom"), Congregation Emanu-El of the City of New York d/b/a Temple Emanu-El ("Temple Emanu-El"), Trustees of Columbia University in the

4

City of New York ("Columbia University"), The Jewish Museum, Monroe University, Ltd. f/k/a Monroe College ("Monroe College"), New Water Street Corp. ("New Water Street"), New York Historical Society ("NY Historical Society"), Rego Park Jewish Center, Salanter Akiba Riverdale Academy d/b/a SAR Academy ("SAR Academy"), Israel Center of Conservative Judaism, Inc. ("Israel Center"), The Young Men's and Young Women's Hebrew Association d/b/a 92nd St. Y ("92nd St. Y"), Yeshiva Har Torah, Hines Interests Limited Partnership ("Hines"), Yeshiva Sholom Schachna, Kehila Kedosha Janina Preservation and Cultural Fund Inc. d/b/a Kehila Kedosha Janina Synagogue ("Kehila Kedosha"), Civic Center Synagogue Inc. ("Tribeca Synagogue"), MetLife Group, Inc. ("MetLife"), Khal Bnei Avrohom Yaakov, Inc. ("Khal Bnei"), Trinity Tabernacle d/b/a Trinity Tabernacle of Gravesend ("Trinity Tabernacle"), Young Israel of Forest Hills, Benjamin Partners LLC ("Benjamin Partners"), EO Staten Island Property Owner LLC d/b/a Empire Outlets ("Empire Outlets"), Congregation Etz Chaim of Flatbush ("Etz Chaim of Flatbush"), Congregation Ner Mitzvah, Inc. ("Ner Mitzvah"), Treeco/Hylan Limited Partnership d/b/a Hylan Commons ("Treeco Hylan"), Plaza College, Ltd. ("Plaza College"), Congregation Machane Chodosh, Inc. ("Machane Chodosh"), Queens Jewish Center and Talmud Torah ("Queens Jewish Center"), Sholom Sholom, Inc. ("Sholom Sholom"), Stephen Wise Free Synagogue ("Stephen Wise Free"), Rainbow Hill Homeowners Association d/b/a Celebration at Rainbow Hill ("Rainbow Hill"), Time Out For Values, Inc. ("TOV"), Congregation Etz Chaim of Kew Gardens Hill ("Etz Chaim of Kew Gardens Hills"), Rabbinical Seminary of America, Temple Gates of Prayer, The Hebrew Home For The Aged at Riverdale Foundation, Inc. ("Hebrew Home"), United Nations International School ("UN School"), Congregation Baith Israel Anshei Emes d/b/a Kane Street Synagogue ("Kane Street"), Wagner College, Salesforce, Inc. ("Salesforce"), Greater Jamaica Development Corporation ("Greater Jamaica"), Manhattan Beach

5

Jewish Center ("Manhattan Beach"), SVA Alumni Society Inc. ("School of Visual Arts"), Hillcrest

Jewish Center Inc. ("Hillcrest Jewish"), Chabad Lubavitch of West Brighton d/b/a Sea Breeze

Jewish Center ("Sea Breeze Jewish Center"), Ross Dress For Less, Inc. ("Ross Dress For Less"),

American Express Travel Related Services Company, Inc. ("Amex"), and DOES NOS. 1-100

(collectively, the "Vendors") (together with the NYPD, "Defendants"):

## **NATURE OF THE CLAIMS**

1.      Pursuant to its Paid Detail Program (the "PDP"), the NYPD staffs Police Officers,

Detectives, Sergeants, Lieutenants, Captains, and Inspectors (together, referred to as "Officers")

at private businesses throughout New York City – including those owned and operated by the

Vendors – to perform off-duty uniformed security work for hourly pay.

2.      The NYPD and the Vendors together control the compensation and terms and

conditions of employment of the Officers assigned to the Vendors' places of business.

3.      The NYPD and the Vendors engage in a pattern and practice of failing to

compensate Officers for the work they perform through the PDP, routinely failing to pay their

wages until weeks or even months after their regularly scheduled pay days.

4.      Further, the NYPD and the Vendors engage in a pattern and practice of failing to

pay Officers at all for the work they perform through the PDP.

5.      Additionally, the Vendors fail to provide their employees with Notices of Pay Rate

and accurate wage statements, as required by law.

6.      Plaintiffs bring claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et

seq.* ("FLSA") as a collective action pursuant to 29 U.S.C. § 216(b), on behalf of themselves and

all other similarly situated Officers employed by the NYPD who participated in the PDP at any

time during the full statute of limitations period.

7.     Plaintiffs also bring claims against the Vendors under the New York Labor Law, N.Y. Lab. Law §§ 1, *et seq.* ("NYLL") and the Freelance Isn't Free Act, N.Y.C. Admin. Code §§ 20-927, *et seq.* ("FIFA") as a class action, pursuant to Federal Rule of Civil Procedure ("FRCP") 23, on behalf of themselves and all other similarly situated Officers employed by the NYPD who participated in the PDP at any time during the full statute of limitations period.

## JURISDICTION AND VENUE

8.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiffs' rights under the FLSA.

9.     Pursuant to 28 U.S.C § 1367, this Court has supplemental jurisdiction over Plaintiffs' related claims arising under State and City law.

10.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PARTIES

**A.     Plaintiffs:**

**1)     Plaintiff Albert Piney**

11.      Piney is a resident of the State of New York and has been employed by Defendants from July 6, 2011 to the present.

12.     At all relevant times, Piney was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**2)     Plaintiff Roman Diaz**

13.     R. Diaz is a resident of the State of New York and has been employed by Defendants from 2014 to the present.

14. At all relevant times, R. Diaz was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### 3)    Plaintiff Jose Martinez

15. Martinez is a resident of the State of New York and has been employed by Defendants from 2009 to the present.

16. At all relevant times, Martinez was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### 4)    Plaintiff Freddy Suazo

17. Suazo is a resident of the State of New York and has been employed by Defendants from January 2008 to the present.

18. At all relevant times, Suazo was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### 5)    Plaintiff Desmond Grant

19. Grant is a resident of the State of New York and has been employed by Defendants from July 5, 2017 to the present.

20. At all relevant times, Grant was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### 6)    Plaintiff M. Mostayen Faysal

21. Faysal is a resident of the State of New York and has been employed by Defendants from January 2016 to the present.

22. At all relevant times, Faysal was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**7)      Plaintiff Sophia Daly**

23.      Daly is a resident of the State of New York and has been employed by Defendants from 2016 to the present.

24.      At all relevant times, Daly was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**8)      Plaintiff Charlie Ruiz-Reyes**

25.      Ruiz-Reyes is a resident of the State of New York and has been employed by Defendants from July 2017 to the present.

26.      At all relevant times, Ruiz-Reyes was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**9)      Plaintiff James Divino**

27.      Divino is a resident of the State of New York and has been employed by Defendants from 2008 to the present.

28.      At all relevant times, Divino was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**10)     Plaintiff Michael Kmiotek**

29.      Kmiotek is a resident of the State of New York and has been employed by Defendants from July 2010 to the present.

30.      At all relevant times, Kmiotek was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**11)     Plaintiff Devon Dawkins**

31.      Dawkins is a resident of the State of New York and has been employed by Defendants from 2020 to the present.

9

32.     At all relevant times, Dawkins was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**12)     Plaintiff Alexis Yanez**

33.     Yanez is a resident of the State of New York and has been employed by Defendants from 2012 to the present.

34.     At all relevant times, Yanez was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**13)     Plaintiff Julio Rosa**

35.     Rosa is a resident of the State of New York and was employed by Defendants from 2002 to 2024.

36.     At all relevant times, Rosa was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**14)     Plaintiff Jaynel Pantoja**

37.     Pantoja is a resident of the State of New York and has been employed by Defendants from 2012 to the present.

38.     At all relevant times, Pantoja was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**15)     Plaintiff Claudio Diaz**

39.     C. Diaz is a resident of the State of New York and has been employed by Defendants from January 2015 to the present.

40.     At all relevant times, C. Diaz was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**16)     Plaintiff Jorge Zorrilla**

41.     Zorrilla is a resident of the State of New York and has been employed by Defendants from 2013 to the present.

42.     At all relevant times, Zorrilla was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**17)     Plaintiff Dominique Eveillard**

43.     Eveillard is a resident of the State of New York and has been employed by Defendants from 2018 to the present.

44.     At all relevant times, Eveillard was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**18)     Plaintiff Sudan Osorio**

45.     Osorio is a resident of the State of New York and has been employed by Defendants from July 2019 to the present.

46.     At all relevant times, Osorio was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**19)     Plaintiff Randy Chow**

47.     Chow is a resident of the State of New York and has been employed by Defendants from 2013 to the present.

48.     At all relevant times, Chow was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**20)     Plaintiff Wang Ting**

49.     Ting is a resident of the State of New York and has been employed by Defendants from January 2015 to the present.

11

50.    At all relevant times, Ting was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### 21)    Plaintiff Justin Senese

51.    Senese is a resident of the State of New York and has been employed by Defendants from October 2015 to the present.

52.    At all relevant times, Senese was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### 22)    Plaintiff Tuhin Khan

53.    Khan is a resident of the State of New York and has been employed by Defendants from October 2015 to the present.

54.    At all relevant times, Khan was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### 23)    Plaintiff Tamara Lauzier

55.    Lauzier is a resident of the State of New York and has been employed by Defendants from July 2020 to the present.

56.    At all relevant times, Lauzier was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

### 24)    Plaintiff John Rondon

57.    Rondon is a resident of the State of New York and has been employed by Defendants from October 2015 to the present.

58.    At all relevant times, Rondon was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**25)    Plaintiff Brayan Antonio**

59.    Antonio is a resident of the State of New York and has been employed by Defendants from July 2023 to the present.

60.    At all relevant times, Antonio was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**26)    Plaintiff Anna Garlinska**

61.    Garlinska is a resident of the State of New York and has been employed by Defendants from April 2016 to the present.

62.    At all relevant times, Garlinska was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**27)    Plaintiff Jason Mansour**

63.    Mansour is a resident of the State of New York and has been employed by Defendants from January 2018 to the present.

64.    At all relevant times, Mansour was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**28)    Plaintiff Arturo Delgado**

65.    Delgado is a resident of the State of New York and has been employed by Defendants from July 2013 to the present.

66.    At all relevant times, Delgado was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**29)    Plaintiff John Cannon**

67.    Cannon is a resident of the State of New York and has been employed by Defendants from December 2021 to the present.

68.    At all relevant times, Cannon was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**30)    Plaintiff Michael Miron**

69.    Miron is a resident of the State of New York and has been employed by Defendants from July 2007 to the present.

70.    At all relevant times, Miron was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**31)    Plaintiff Wadih Abouabdallah**

71.    Abouabdallah is a resident of the State of New York and has been employed by Defendants from July 2019 to the present.

72.    At all relevant times, Abouabdallah was an "employee" of Defendants within the meaning of all relevant statutes and regulations.

**B.    Defendants:**

**1)    Defendant City of New York**

73.    The City of New York is a municipal corporation that controls and oversees, *inter alia*, the operations of the NYPD throughout its five boroughs.

74.    At all relevant times, the City of New York controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

75.    At all relevant times, the City of New York established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

14

76.    At all relevant times, the City of New York maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

77.    At all relevant times, the City of New York was an "employer" within the meaning of all relevant statutes and regulations.

**2)    Defendant New York City Police Department**

78.    The New York City Police Department is a public administrative agency that controls and oversees the police throughout the City of New York's five boroughs.

79.    The New York City Police Department maintains its principal office at One Police Plaza, New York, NY 10007.

80.    At all relevant times, the New York City Police Department controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

81.    At all relevant times, the New York City Police Department established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

82.    At all relevant times, the NYPD maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

83.    At all relevant times, the NYPD was an "employer" within the meaning of all relevant statutes and regulations.

**3)    Defendant Target Corporation**

84.    Target is a foreign business corporation with its principal place of business located at 1010 Dale Street North, Saint Paul, MN 55117.

85.    Target participates in the NYPD's PDP.

15

86. At all relevant times, Target controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

87. At all relevant times, Target established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

88. At all relevant times, Target maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

89. At all relevant times, Target was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**4)     Defendant MSG Entertainment Holdings, LLC**

90. MSG is a foreign limited liability company with its principal place of business located at 4 Pennsylvania Plaza, New York, NY 10001.

91. MSG participates in the NYPD's PDP.

92. At all relevant times, MSG controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

93. At all relevant times, MSG established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

94. At all relevant times, MSG maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

95. At all relevant times, MSG was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

16

**5)    Defendant Yankee Global Enterprises LLC**

96.    Yankees is a domestic limited partnership with its principal place of business located at East 161st Street and River Avenue, Bronx, NY 10451.

97.    Yankees participates in the NYPD's PDP.

98.    At all relevant times, Yankees controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

99.    At all relevant times, Yankees established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

100.    At all relevant times, Yankees maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

101.    At all relevant times, Yankees was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**6)    Defendant NYU Langone Hospitals**

102.    NYU Langone is a domestic corporation with its principal place of business located at 150 First Avenue, New York, NY 10016.

103.    NYU Langone participates in the NYPD's PDP.

104.    At all relevant times, NYU Langone controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

105.    At all relevant times, NYU Langone established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

106.    At all relevant times, NYU Langone maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

107.    At all relevant times, NYU Langone was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**7)      Defendant Mount Sinai Health System, Inc.**

108.    Mount Sinai is a domestic corporation with its principal place of business located at One Gustave L. Levy Place, New York, NY 10029.

109.    Mount Sinai participates in the NYPD's PDP.

110.    At all relevant times, Mount Sinai controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

111.    At all relevant times, Mount Sinai established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

112.    At all relevant times, Mount Sinai maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

113.    At all relevant times, Mount Sinai was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**8)      Defendant The New York Times Company**

114.    NYT is a domestic business corporation with its principal place of business located at 620 Eighth Avenue, New York, NY 10018.

115.    NYT participates in the NYPD's PDP.

116.    At all relevant times, NYT controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

18

117. At all relevant times, NYT established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

118. At all relevant times, NYT maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

119. At all relevant times, NYT was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 9) Defendant BJ's Wholesale Club, Inc.

120. BJs is a foreign business corporation with its principal place of business located at 350 Campus Drive, Marlborough, MA 01752.

121. BJs participates in the NYPD's PDP.

122. At all relevant times, BJs controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

123. At all relevant times, BJs established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

124. At all relevant times, BJs maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

125. At all relevant times, BJs was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

19

**10)    Defendant RXR Realty LLC**

126.    RXR is a foreign limited liability company with its principal place of business located at 75 Rockefeller Center, New York, NY 10019.

127.    RXR participates in the NYPD's PDP.

128.    At all relevant times, RXR controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

129.    At all relevant times, RXR established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

130.    At all relevant times, RXR maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

131.    At all relevant times, RXR was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**11)    Defendant 509 W34, L.L.C. d/b/a The Spiral**

132.    509 W 34 is a domestic limited partnership with its principal place of business located at 509 West 34th Street, New York, NY 10001.

133.    509 West 34th Street is a subsidiary of Tishman Speyer.

134.    509 W 34 participates in the NYPD's PDP.

135.    At all relevant times, 509 W 34 controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

136.    At all relevant times, 509 W 34 established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

20

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

137. At all relevant times, 509 W 34 maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

138. At all relevant times, 509 W 34 was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 12) Defendant LIC Site B-1 Owner L.L.C. d/b/a LIC Site B-1

139. LIC Site B-1 is a foreign limited liability company with its principal place of business located at 28-07 Jackson Avenue, Long Island City, NY 11101.

140. LIC Site B-1 is a subsidiary of Tishman Speyer.

141. LIC Site B-1 participates in the NYPD's PDP.

142. At all relevant times, LIC Site B-1 controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

143. At all relevant times, LIC Site B-1 established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

144. At all relevant times, LIC Site B-1 maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

145. At all relevant times, LIC Site B-1 was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 13) Defendant RCPI Landmark Properties, L.L.C. d/b/a Rockefeller Center

146. RCPI is a foreign limited liability company with its principal place of business located at 45 Rockefeller Plaza, New York, NY 10111.

21

147. RCPI is a subsidiary of Tishman Speyer.

148. RCPI participates in the NYPD's PDP.

149. At all relevant times, RCPI controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

150. At all relevant times, RCPI established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

151. At all relevant times, RCPI maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

152. At all relevant times, RCPI was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**14)    Defendant Tishman Speyer Associates Limited Partnership d/b/a LIC Site B-1 d/b/a The Spiral and d/b/a Rockefeller Center**

153. Tishman Speyer is a domestic limited partnership that oversees and operates businesses located at 66 East Hudson Boulevard, New York, NY 10001, 45 Rockefeller Plaza, New York, NY 10111, and 28-07 Jackson Avenue, Long Island City, NY 11101.

154. Tishman Speyer participates in the NYPD's PDP.

155. At all relevant times, Tishman Speyer controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

156. At all relevant times, Tishman Speyer established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

157.    At all relevant times, Tishman Speyer maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

158.    At all relevant times, Tishman Speyer was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**15)    Defendant Buena Vista Theatrical Group Ltd. d/b/a Disney Theatrical Group**

159.    Disney is a domestic business corporation with its principal place of business located at 214 West 42nd Street, 8th Floor, New York, NY 10036.

160.    Disney participates in the NYPD's PDP.

161.    At all relevant times, Disney controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

162.    At all relevant times, Disney established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

163.    At all relevant times, Disney maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

164.    At all relevant times, Disney was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**16)    Defendant BXP, Inc. f/k/a Boston Properties, Inc.**

165.    Boston Properties is a foreign limited liability company with its principal place of business located at 800 Boylston Street, Suite 1900, Boston, MA 02199.

166.    Boston Properties participates in the NYPD's PDP.

167.    At all relevant times, Boston Properties controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

23

168.    At all relevant times, Boston Properties established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

169.    At all relevant times, Boston Properties maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

170.    At all relevant times, Boston Properties was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 17)    **Defendant Kering Americas, Inc.**

171.    Kering is a foreign business corporation with its principal place of business located at 65 Bleecker Street, 2nd Floor, New York, NY 10012.

172.    Kering participates in the NYPD's PDP.

173.    At all relevant times, Kering controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

174.    At all relevant times, Kering established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

175.    At all relevant times, Kering maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

176.    At all relevant times, Kering was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

24

**18)     Defendant Apple Inc.**

177.     Apple is a foreign business corporation with its principal place of business located at One Apple Park Way, Cupertino, CA 95014.

178.     Apple participates in the NYPD's PDP.

179.     At all relevant times, Apple controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

180.     At all relevant times, Apple established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

181.     At all relevant times, Apple maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

182.     At all relevant times, Apple was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**19)     Defendant Congregation Rodeph Sholom**

183.     Rodeph Sholom is a domestic corporation with its principal place of business located at 7 West 83rd Street, New York, NY 10024.

184.     Rodeph Sholom participates in the NYPD's PDP.

185.     At all relevant times, Rodeph Sholom controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

186.     At all relevant times, Rodeph Sholom established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

187.    At all relevant times, Rodeph Sholom maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

188.    At all relevant times, Rodeph Sholom was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**20)    Defendant 34th Street Partnership, Inc.**

189.    34th St. is a domestic corporation with its principal place of business located at 1065 Avenue of the Americas, Suite 2400, New York, NY 10018.

190.    34th St. participates in the NYPD's PDP.

191.    At all relevant times, 34th St. controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

192.    At all relevant times, 34th St. established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

193.    At all relevant times, 34th St. maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

194.    At all relevant times, 34th St. was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**21)    Defendant Bank of America Corporation**

195.    BOA is a foreign business corporation with its principal place of business located at 100 North Tryon Street, Charlotte, NC 28255.

196.    BOA participates in the NYPD's PDP.

197.    At all relevant times, BOA controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

198. At all relevant times, BOA established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

199. At all relevant times, BOA maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

200. At all relevant times, BOA was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**22)    Defendant The TJX Companies, Inc., d/b/a Marshalls and d/b/a TJ Maxx**

201. The TJX Companies, Inc. is a foreign business corporation with its principal place of business located at 770 Cochituate Road, Framingham, MA 01701.

202. The TJX Companies, Inc. does business as "Marshalls" and "TJ Maxx," collectively referred to as "TJX."

203. TJX participates in the NYPD's PDP.

204. At all relevant times, TJX controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

205. At all relevant times, TJX established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

206. At all relevant times, TJX maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

207. At all relevant times, TJX was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

27

**23)     Defendant Genting New York LLC d/b/a Resorts World Casino**

208.     Resorts World Casino is a foreign business corporation with its principal place of business located at 110-00 Rockaway Boulevard, Jamaica, NY 11420.

209.     Resorts World Casino participates in the NYPD's PDP.

210.     At all relevant times, Resorts World Casino controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

211.     At all relevant times, Resorts World Casino established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

212.     At all relevant times, Resorts World Casino maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

213.     At all relevant times, Resorts World Casino was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**24)     Defendant Primark US Corp.**

214.     Primark is a foreign business corporation with its principal place of business located at 101 Arch Street, 3rd Floor, Boston, MA 02110.

215.     Primark participates in the NYPD's PDP.

216.     At all relevant times, Primark controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

217.     At all relevant times, Primark established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

28

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

218.    At all relevant times, Primark maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

219.    At all relevant times, Primark was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**25)    Defendant Barclays Bank PLC**

220.    Barclays Bank is a foreign business corporation incorporated in the state of Delaware with its principal place of business located at 745 Seventh Avenue, New York, NY 10019.

221.    Barclays Bank participates in the NYPD's PDP.

222.    At all relevant times, Barclays Bank controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

223.    At all relevant times, Barclays Bank established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

224.    At all relevant times, Barclays Bank maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

225.    At all relevant times, Barclays Bank was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**26)    Defendant Royal Realty Corp.**

226.    Royal Realty is a domestic business corporation with its principal place of business located at 1155 Avenue of the Americas, 4th Floor, New York, NY 10110.

29

227.    Royal Realty participates in the NYPD's PDP.

228.    At all relevant times, Royal Realty controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

229.    At all relevant times, Royal Realty established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

230.    At all relevant times, Royal Realty maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

231.    At all relevant times, Royal Realty was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 27)    Defendant The New York and Presbyterian Hospital

232.    NYP is a domestic business corporation with its principal place of business located at 525 East 68th Street, New York, NY 10065.

233.    NYP participates in the NYPD's PDP.

234.    At all relevant times, NYP controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

235.    At all relevant times, NYP established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

236.    At all relevant times, NYP maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

237. At all relevant times, NYP was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**28)    Defendant 99c LLC a/k/a 180 Maiden Lane LLC**

238. 180 Maiden is a domestic limited liability company with its principal place of business located at 249 Smith Street, Brooklyn, NY 11231.

239. 180 Maiden participates in the NYPD's PDP.

240. At all relevant times, 180 Maiden controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

241. At all relevant times, 180 Maiden established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

242. At all relevant times, 180 Maiden maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

243. At all relevant times, 180 Maiden was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**29)    Defendant Aldi, Inc.**

244. Aldi is a foreign business corporation with its principal place of business located at 1200 North Kirk Road, Batavia, IL 60510.

245. Aldi participates in the NYPD's PDP.

246. At all relevant times, Aldi controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

247. At all relevant times, Aldi established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter*

31

*alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

248. At all relevant times, Aldi maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

249. At all relevant times, Aldi was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 30)    Defendant Wegmans Food Markets, Inc.

250. Wegmans is a domestic business corporation with its principal place of business located at 1500 Brooks Avenue, Rochester, NY 14624.

251. Wegmans participates in the NYPD's PDP.

252. At all relevant times, Wegmans controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

253. At all relevant times, Wegmans established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

254. At all relevant times, Wegmans maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

255. At all relevant times, Wegmans was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 31)    Defendant Neue Galerie New York

256. Neue Galerie is a domestic corporation with its principal place of business located at 1048 5th Avenue, New York, NY 10028.

257. Neue Galerie participates in the NYPD's PDP.

258.    At all relevant times, Neue Galerie controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

259.    At all relevant times, Neue Galerie established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

260.    At all relevant times, Neue Galerie maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

261.    At all relevant times, Neue Galerie was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 32)    Defendant V&R Payroll Factors, Inc.

262.    V&R Payroll is a domestic corporation with its principal place of business located at 369 West 35th Street, New York, NY 10001.

263.    V&R Payroll participates in the NYPD's PDP.

264.    At all relevant times, V&R Payroll controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

265.    At all relevant times, V&R Payroll established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

266.    At all relevant times, V&R Payroll maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

267.    At all relevant times, V&R Payroll was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**33)    Defendant Wakefern Food Corp.**

268.    Wakefern is a foreign business corporation licensed to do business in New York with its principal place of business located at 5000 Riverside Drive, Keasbey, NJ 08832.

269.    Wakefern is a grocery cooperative that oversees the operations of ShopRite and Fairway Market stores throughout the United States.

270.    Indeed, on its website, Wakefern boasts that "[t]ogether with our member companies, Wakefern employs nearly 80,000 people."[1]

271.    Upon information and belief, Wakefern entered into cooperative contracts and agreements with ShopRite and Fairway Market stores operated by Glass and Village Super Market Inc., which are subject to Wakefern's retail and employment policies.

272.    Such contracts and agreements require that ShopRite and Fairway Market stores adhere, comply, and operate in accordance with specific policies and practices dictated by Wakefern.

273.    Pursuant to the contracts and agreements, ShopRite and Fairway Market stores are only permitted to use Wakefern "Marks" if they are approved to do so by Wakefern after they prove compliance with specific Wakefern policies, practices, terms and conditions of employment, and image guidelines as dictated and articulated by Wakefern.

274.    On its website, Wakefern features its deep involvement in its ShopRite and Fairway stores, stressing that it provides them with human resources services, payroll management, training and development, financial planning, quality assurance and product monitoring, customer care and customer support, logistical support, marketing, and strategic planning.[2]

---

[1] https://www2.wakefern.com/ (last viewed March 11, 2026)
[2] https://www2.wakefern.com/services/ at video (last viewed March 11, 2026)

275.    Upon information and belief, Wakefern requires its ShopRite and Fairway Market stores to buy 85% of their products from Wakefern.

276.    Wakefern requires their ShopRite and Fairway Market stores to provide them with detailed reports regarding inventory, merchandise, and other details affecting purchases and sales.

277.    Upon information and belief, Wakefern requires its ShopRite and Fairway Market stores to buy all of their beef from Wakefern.

278.    Upon information and belief, Wakefern requires its ShopRite and Fairway Market stores to maintain quality assurance and advertising standards.

279.    Upon information and belief, Wakefern requires its employees to adhere to its human resources policies and procedures.

280.    Upon information and belief, Wakefern requires its employees to adhere to its loss prevention policies and procedures.

281.    Wakefern also directly employs "Retail Investigators" in the New York City area who are responsible for overseeing and managing Shoprite employees.

282.    Among other responsibilities, these Retail Investigators "spot check employee purchases for accuracy," regulate whether detectives employed by Shoprite stores "are certified in all aspects of shoplifting and apprehension procedures," maintain records documenting "all store visits, investigations, special assignments, or auditing activities" of Shoprite stores, perform "Mock OSHA audits" and "inspections," train Shoprite employees, and hire store detectives for Shoprite stores. These Retail Investigators will also handle "labor issues, robberies, power outages, and other business interruptions" at NYC-area Shoprite stores.[3]

283.    Wakefern's ShopRite and Fairway Market stores participate in the NYPD's PDP.

---

[3]https://www.linkedin.com/jobs/view/retail-investigator-at-wakefern-food-corp4341903859/?skipRedirect=true (last viewed December 15, 2025)

284. At all relevant times, Wakefern controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

285. At all relevant times, Wakefern established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

286. At all relevant times, Wakefern maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

287. At all relevant times, Wakefern was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 34) Defendant Glass Gardens, Inc. d/b/a ShopRite

288. Glass is a foreign business corporation licensed to do business in New York.

289. Glass entered into a cooperative agreement with Wakefern to own and operate three ShopRite stores in New York City including: (1) ShopRite of College Point located at 133-11 20th Avenue, College Point, New York, NY 11356; (2) ShopRite of Gateway Plaza, located at 590 Gateway Drive, Brooklyn, NY 11239; and (3) ShopRite of Brooklyn (Avenue I) located at 1080 McDonald Avenue, Brooklyn, NY 11230.

290. Glass participates in the NYPD's PDP.

291. At all relevant times, Glass controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

292. At all relevant times, Glass established employment policies including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

293.    At all relevant times, Glass maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

294.    At all relevant times, Glass was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**35)    Gateway ShopRite Associates, LLC d/b/a ShopRite**

295.    Gateway is a foreign limited liability corporation licensed to do business in New York and is a subsidiary of Glass that operates ShopRite of Gateway Plaza, located at 590 Gateway Drive, Brooklyn, NY 11239.

296.    Gateway participates in the NYPD's PDP.

297.    At all relevant times, Gateway controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

298.    At all relevant times, Gateway established employment policies including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

299.    At all relevant times, Gateway maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

300.    At all relevant times, Gateway was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**36)    Defendant Queens ShopRite Associates LLC d/b/a ShopRite**

301.    College Point is a foreign limited liability corporation licensed to do business in New York and is a subsidiary of Glass, which operates ShopRite of College Point, located at 590 Gateway Drive, Brooklyn, NY 11239.

302.    College Point participates in the NYPD's PDP.

37

303. At all relevant times, College Point controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

304. At all relevant times, College Point established employment policies including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

305. At all relevant times, College Point maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

306. At all relevant times, College Point was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 37)    Defendant NYC ShopRite Associates, Inc. d/b/a ShopRite

307. McDonald Ave is a foreign corporation licensed to do business in New York and is a subsidiary of Glass, which operates ShopRite of Brooklyn (Avenue I) located at 1080 McDonald Avenue, Brooklyn, NY 11230.

308. McDonald Ave participates in the NYPD's PDP.

309. At all relevant times, McDonald Ave controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

310. At all relevant times, McDonald Ave established employment policies including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

311. At all relevant times, McDonald Ave maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

312. At all relevant times, McDonald Ave was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

38

**38)     Defendant Village Super Market, Inc. d/b/a ShopRite and d/b/a Fairway Markets**

313.     Village Super Market Inc. is a foreign corporation licensed to do business in New York and is headquartered at 733 Mountain Avenue, Springfield, NJ 07081.

314.     Village Super Market Inc. entered into a cooperative agreement with Wakefern to own and operate ShopRite of Bruckner Boulevard, located at 1994 Bruckner Boulevard, Bronx, NY 10473 and Fairway Market of 74th Street located at 2131 Broadway, New York, NY 10023.

315.     Village Super Market Inc. participates in the NYPD's PDP.

316.     At all relevant times, Village Super Market Inc. controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

317.     At all relevant times, Village Super Market Inc. established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

318.     At all relevant times, Village Super Market Inc. maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

319.     At all relevant times, Village Super Market Inc. was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**39)     Defendant Village Super Market of NJ, L.P. d/b/a ShopRite**

320.     Bruckner Blvd is a foreign limited partnership licensed to do business in New York and is a subsidiary of Village Super Market Inc. that operates ShopRite of Bruckner Boulevard located at 1994 Bruckner Boulevard, Bronx, NY 10473

321.     Bruckner Blvd participates in the NYPD's PDP.

39

322.    At all relevant times, Bruckner Blvd controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

323.    At all relevant times, Bruckner Blvd established employment policies including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

324.    At all relevant times, Bruckner Blvd maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

325.    At all relevant times, Bruckner Blvd was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**40)    Defendant The Bank of New York Mellon Corporation**

326.    Bank of NY Mellon is a foreign business corporation with its principal place of business located at 240 Greenwich Street, New York, NY 10286.

327.    Bank of NY Mellon participates in the NYPD's PDP.

328.    At all relevant times, Bank of NY Mellon controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

329.    At all relevant times, Bank of NY Mellon established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

330.    At all relevant times, Bank of NY Mellon maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

331.    At all relevant times, Bank of NY Mellon was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**41)    Defendant The Animal Medical Center a/k/a Schwarzman Animal Medical Center**

332.    Schwarzman Animal Medical is a domestic corporation with its principal place of business located at 510 East 62nd Street, New York, NY 10065.

333.    Schwarzman Animal Medical participates in the NYPD's PDP.

334.    At all relevant times, Schwarzman Animal Medical controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

335.    At all relevant times, Schwarzman Animal Medical established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

336.    At all relevant times, Schwarzman Animal Medical maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

337.    At all relevant times, Schwarzman Animal Medical was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**42)    Defendant Queens Yeshiva Ketana Inc.**

338.    Queens Yeshiva Ketana is a domestic corporation with its principal place of business located at 78-15 Parsons Boulevard, Flushing, NY 11366.

339.    Queens Yeshiva Ketana participates in the NYPD's PDP.

340.    At all relevant times, Queens Yeshiva Ketana controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

341.    At all relevant times, Queens Yeshiva Ketana established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons

similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

342. At all relevant times, Queens Yeshiva Ketana maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

343. At all relevant times, Queens Yeshiva Ketana was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**43)** **Defendant Parker Jewish Institute for Healthcare and Rehabilitation**

344. Parker Jewish Institute is a domestic corporation with its principal place of business located at 27-11 76th Avenue, New Hyde Park, NY 10040.

345. Parker Jewish Institute participates in the NYPD's PDP.

346. At all relevant times, Parker Jewish Institute controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

347. At all relevant times, Parker Jewish Institute established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

348. At all relevant times, Parker Jewish Institute maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

349. At all relevant times, Parker Jewish Institute was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**44)    Defendant Young Israel of Queens Valley**

350.    Young Israel of Queens Valley is a domestic corporation with its principal place of business located at 141-55 77th Ave, Flushing, NY 11367.

351.    Young Israel of Queens Valley participates in the NYPD's PDP.

352.    At all relevant times, Young Israel of Queens Valley controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

353.    At all relevant times, Young Israel of Queens Valley established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

354.    At all relevant times, Young Israel of Queens Valley maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

355.    At all relevant times, Young Israel of Queens Valley was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**45)    Defendant Yeshiva Darchei Torah**

356.    Yeshiva Darchei is a domestic corporation with its principal place of business located at 2-57 Beach 17th Street, Far Rockaway, NY 11691.

357.    Yeshiva Darchei participates in the NYPD's PDP.

358.    At all relevant times, Yeshiva Darchei controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

359.    At all relevant times, Yeshiva Darchei established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

43

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

360.    At all relevant times, Yeshiva Darchei maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

361.    At all relevant times, Yeshiva Darchei was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 46)    Defendant Torah Center of Hillcrest Inc.

362.    Torah Center is a domestic corporation with its principal place of business located at 171-05 Jewel Avenue, Flushing, NY 11365.

363.    Torah Center participates in the NYPD's PDP.

364.    At all relevant times, Torah Center controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

365.    At all relevant times, Torah Center established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

366.    At all relevant times, Torah Center maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

367.    At all relevant times, Torah Center was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 47)    Defendant Burlington Coat Factory Warehouse Corporation

368.    Burlington is a foreign business corporation with its principal place of business located at 2006 Route 130, Burlington, NJ 08016.

369.    Burlington participates in the NYPD's PDP.

44

370.    At all relevant times, Burlington controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

371.    At all relevant times, Burlington established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

372.    At all relevant times, Burlington maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

373.    At all relevant times, Burlington was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**48)    Defendant American Broadcasting Companies, Inc.**

374.    ABC is a foreign limited liability company with its principal place of business located at 47 West 66th Street, New York, NY 10023.

375.    ABC participates in the NYPD's PDP.

376.    At all relevant times, ABC controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

377.    At all relevant times, ABC established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

378.    At all relevant times, ABC maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

379.    At all relevant times, ABC was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**49)    Defendant Sephardic Lebanese Congregation Inc.**

380.    Sephardic Lebanese is a domestic corporation with its principal place of business located at 805 Avenue T, Brooklyn, NY 11223.

381.    Sephardic Lebanese participates in the NYPD's PDP.

382.    At all relevant times, Sephardic Lebanese controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

383.    At all relevant times, Sephardic Lebanese established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

384.    At all relevant times, Sephardic Lebanese maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

385.    At all relevant times, Sephardic Lebanese was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**50)    Defendant Rochdale Village Association, Inc.**

386.    Rochdale Village is a domestic business corporation with its principal place of business located at 60 East 42nd Street, Suite 2108, New York, NY 10165.

387.    Rochdale Village participates in the NYPD's PDP.

388.    At all relevant times, Rochdale Village controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

389.    At all relevant times, Rochdale Village established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

46

390.    At all relevant times, Rochdale Village maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

391.    At all relevant times, Rochdale Village was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**51)    Defendant Vornado Office Management LLC d/b/a Penn District**

392.    Vornado is a foreign business corporation with its principal place of business located at 100 South Charles Street, Baltimore, MD 21201.

393.    Vornado participates in the NYPD's PDP.

394.    At all relevant times, Vornado controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

395.    At all relevant times, Vornado established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

396.    At all relevant times, Vornado maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

397.    At all relevant times, Vornado was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**52)    Defendant New York Society for the Relief of the Ruptured and Crippled, maintaining the Hospital for Special Surgery d/b/a Hospital for Special Surgery**

398.    HSS is a domestic business corporation with its principal place of business located at 535 East 70th Street, New York, NY 10021.

399.    HSS participates in the NYPD's PDP.

47

400.    At all relevant times, HSS controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

401.    At all relevant times, HSS established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

402.    At all relevant times, HSS maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

403.    At all relevant times, HSS was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**53)    Defendant JPMorgan Chase & Co.**

404.    JPM is a foreign business corporation with its principal place of business located at 383 Madison Avenue, New York, NY 10179.

405.    JPM participates in the NYPD's PDP.

406.    At all relevant times, JPM controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

407.    At all relevant times, JPM established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

408.    At all relevant times, JPM maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

409.    At all relevant times, JPM was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**54)    Defendant UBS Financial Services Inc.**

410.    UBS is a foreign business corporation with its principal place of business located at 1200 Harbor Boulevard, Weehawken, NJ 07086.

411.    UBS participates in the NYPD's PDP.

412.    At all relevant times, UBS controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

413.    At all relevant times, UBS established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

414.    At all relevant times, UBS maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

415.    At all relevant times, UBS was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**55)    Defendant Queens Ballpark Company LLC**

416.    Citi Field is a domestic limited liability company with its principal place of business located at 41 Seaver Way, Flushing, NY 11368.

417.    Citi Field participates in the NYPD's PDP.

418.    At all relevant times, Citi Field controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

419.    At all relevant times, Citi Field established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

420. At all relevant times, Citi Field maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

421. At all relevant times, Citi Field was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 56)    Defendant Taino Towers Apartments LLC

422. Taino Towers is a domestic limited liability company with its principal place of business located at 2253 Third Avenue, New York, NY 10035.

423. Taino Towers participates in the NYPD's PDP.

424. At all relevant times, Taino Towers controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

425. At all relevant times, Taino Towers established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

426. At all relevant times, Taino Towers maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

427. At all relevant times, Taino Towers was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 57)    Defendant MIR Hanson Associates, LLC

428. MIR Hanson is a limited liability company with its principal place of business located at 300 Park Avenue, 3rd Floor, New York, NY 10022.

429. MIR Hanson participates in the NYPD's PDP.

430. At all relevant times, MIR Hanson controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

431. At all relevant times, MIR Hanson established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

432. At all relevant times, MIR Hanson maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

433. At all relevant times, MIR Hanson was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**58)** **Defendant New York University**

434. NYU is a domestic corporation with its principal place of business located at 70 Washington Square South, 11th Floor, New York, NY 10012.

435. NYU participates in the NYPD's PDP.

436. At all relevant times, NYU controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

437. At all relevant times, NYU established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

438. At all relevant times, NYU maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

439. At all relevant times, NYU was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**59)    Defendant St. Barnabas Hospital, Inc.**

440.    St. Barnabas is a domestic corporation with its principal place of business located at 4422 Third Avenue, Bronx, NY 10457.

441.    St. Barnabas participates in the NYPD's PDP.

442.    At all relevant times, St. Barnabas controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

443.    At all relevant times, St. Barnabas established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

444.    At all relevant times, St. Barnabas maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

445.    At all relevant times, St. Barnabas was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**60)    Defendant Manhattan Beer Distributors LLC**

446.    Manhattan Beer is a domestic limited liability company with its principal place of business located at 955 East 149th Street, Bronx, NY 10455.

447.    Manhattan Beer participates in the NYPD's PDP.

448.    At all relevant times, Manhattan Beer controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

449.    At all relevant times, Manhattan Beer established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

450. At all relevant times, Manhattan Beer maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

451. At all relevant times, Manhattan Beer was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**61)    Defendant Montefiore Medical Center**

452. Montefiore is a domestic corporation with its principal place of business located at 111 E 210th Street, Bronx, NY 10467.

453. Montefiore participates in the NYPD's PDP.

454. At all relevant times, Montefiore controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

455. At all relevant times, Montefiore established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

456. At all relevant times, Montefiore maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

457. At all relevant times, Montefiore was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**62)    Defendant Northwell Health, Inc.**

458. Northwell is a domestic corporation with its principal place of business located at 2000 Marcus Avenue, New Hyde Park, NY 11042.

459. Northwell participates in the NYPD's PDP.

460. At all relevant times, Northwell controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

461.    At all relevant times, Northwell established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

462.    At all relevant times, Northwell maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

463.    At all relevant times, Northwell was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 63)    Defendant RBG Management Corp. d/b/a Morton Williams Supermarket

464.    Morton Williams is a domestic corporation with its principal place of business located at 15 East Kingsbridge Road, Bronx, NY 10468.

465.    Morton Williams participates in the NYPD's PDP.

466.    At all relevant times, Morton Williams controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

467.    At all relevant times, Morton Williams established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

468.    At all relevant times, Morton Williams maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

469.    At all relevant times, Morton Williams was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**64)    Defendant GFP Real Estate LLC**

470.    GFP Real Estate is a domestic limited liability company with its principal place of business located at 515 Madison Avenue, 15th Floor, New York, NY 10022.

471.    GFP Real Estate participates in the NYPD's PDP.

472.    At all relevant times, GFP Real Estate controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

473.    At all relevant times, GFP Real Estate established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

474.    At all relevant times, GFP Real Estate maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

475.    At all relevant times, GFP Real Estate was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**65)    Defendant Rosco, Inc.**

476.    Rosco is a domestic business corporation with its principal place of business located at 144-31 91st Avenue, Jamaica, NY 11435.

477.    Rosco participates in the NYPD's PDP.

478.    At all relevant times, Rosco controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

479.    At all relevant times, Rosco established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

480.    At all relevant times, Rosco maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

481.    At all relevant times, Rosco was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 66)    Defendant SL Green Realty Corp.

482.    SL Green is a foreign corporation with its principal place of business located at One Vanderbilt Avenue, New York, NY 10017.

483.    SL Green participates in the NYPD's PDP.

484.    At all relevant times, SL Green controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

485.    At all relevant times, SL Green established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

486.    At all relevant times, SL Green maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

487.    At all relevant times, SL Green was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 67)    Defendant Grand Central Partnership, Inc.

488.    Grand Central is a domestic corporation with its principal place of business located at 122 East 42nd Street, Suite 601, New York, NY 10168.

489.    Grand Central participates in the NYPD's PDP.

490.    At all relevant times, Grand Central controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

56

491. At all relevant times, Grand Central established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

492. At all relevant times, Grand Central maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

493. At all relevant times, Grand Central was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 68)    Defendant Bloomingdale's LLC

494. Bloomingdale's is a domestic business corporation with its principal place of business located at 1000 Third Avenue, New York, NY 10022.

495. Bloomingdale's participates in the NYPD's PDP.

496. At all relevant times, Bloomingdale's controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

497. At all relevant times, Bloomingdale's established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

498. At all relevant times, Bloomingdale's maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

499. At all relevant times, Bloomingdale's was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**69)    Defendant Flushing-Fresh Meadows Jewish Center Inc.**

500.    Fresh Meadows is a domestic religious corporation with its principal place of business located at 193-10 Peck Avenue, Fresh Meadows, NY 11365.

501.    Fresh Meadows participates in the NYPD's PDP.

502.    At all relevant times, Fresh Meadows controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

503.    At all relevant times, Fresh Meadows established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

504.    At all relevant times, Fresh Meadows maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

505.    At all relevant times, Fresh Meadows was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**70)    Defendant The Goldman Sachs Group, Inc.**

506.    Goldman is a foreign business corporation with its principal place of business located at 200 West Street, New York, NY 10282.

507.    Goldman participates in the NYPD's PDP.

508.    At all relevant times, Goldman controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

509.    At all relevant times, Goldman established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

58

510. At all relevant times, Goldman maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

511. At all relevant times, Goldman was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**71)    Defendant Park Avenue Synagogue**

512. Park Avenue Synagogue is a domestic religious corporation with its principal place of business located at 50 East 87th Street, New York, NY 10128.

513. Park Avenue Synagogue participates in the NYPD's PDP.

514. At all relevant times, Park Avenue Synagogue controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

515. At all relevant times, Park Avenue Synagogue established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

516. At all relevant times, Park Avenue Synagogue maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

517. At all relevant times, Park Avenue Synagogue was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**72)    Defendant Bnos Bais Yaakov of Far Rockaway**

518. Bnos Bais is a domestic corporation that operates a school located at 6-13 Beach 9th Street, Far Rockaway, NY 11691.

519. Bnos Bais participates in the NYPD's PDP.

520.    At all relevant times, Bnos Bais controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

521.    At all relevant times, Bnos Bais established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

522.    At all relevant times, Bnos Bais maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

523.    At all relevant times, Bnos Bais was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 73)    Defendant Bais Yaakov Academy for Girls

524.    Bais Yaakov Academy for Girls is a domestic corporation that operates a school located at 124-50 Metropolitan Avenue, Kew Gardens, NY 11415.

525.    Bais Yaakov Academy for Girls participates in the NYPD's PDP.

526.    At all relevant times, Bais Yaakov Academy for Girls controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

527.    At all relevant times, Bais Yaakov Academy for Girls established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

528.    At all relevant times, Bais Yaakov Academy for Girls maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

529.    At all relevant times, Bais Yaakov Academy for Girls was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**74)    Defendant Chelsea Piers L.P.**

530.    Chelsea Piers is a domestic limited partnership with its principal place of business at Pier 62, Suite 300, West 23rd Street, New York, NY 10011.

531.    Chelsea Piers participates in the NYPD's PDP.

532.    At all relevant times, Chelsea Piers controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

533.    At all relevant times, Chelsea Piers established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

534.    At all relevant times, Chelsea Piers maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

535.    At all relevant times, Chelsea Piers was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**75)    Defendant Congregation Beth-El Sephardic Center of Jamaica Estates**

536.    Beth-El is a domestic religious corporation with its principal place of business at 180-01 Union Turnpike, Fresh Meadows, NY 11366.

537.    Beth-El participates in the NYPD's PDP.

538.    At all relevant times, Beth-El controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

539.    At all relevant times, Beth-El established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

540.    At all relevant times, Beth-El maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

541.    At all relevant times, Beth-El was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 76)    Defendant Yeshiva University

542.    Yeshiva University is a domestic corporation with its principal place of business located at 500 West 185th Street, New York, NY 10033.

543.    Yeshiva University participates in the NYPD's PDP.

544.    At all relevant times, Yeshiva University controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

545.    At all relevant times, Yeshiva University established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

546.    At all relevant times, Yeshiva University maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

547.    At all relevant times, Yeshiva University was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 77)    Defendant Empire Force Incorporated

548.    Empire Force is a domestic business corporation with its principal place of business at 7 West 23rd Street, 6th Floor, New York, NY 10010.

549.    Empire Force participates in the NYPD's PDP.

550.    At all relevant times, Empire Force controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

551.    At all relevant times, Empire Force established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

552.    At all relevant times, Empire Force maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

553.    At all relevant times, Empire Force was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 78)    **Defendant Federal Express Corporation**

554.    FedEx is a domestic business corporation with its principal place of business located at 942 South Shady Grove Road, Memphis, TN 38119.

555.    FedEx participates in the NYPD's PDP.

556.    At all relevant times, FedEx controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

557.    At all relevant times, FedEx established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

558.    At all relevant times, FedEx maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

559.    At all relevant times, FedEx was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**79)    Defendant Avenue New York LLC d/b/a Avenues: The World School**

560.    Avenues School is a private, for-profit school with its principal place of business located at 11 Madison Square North, 16th Floor, New York, NY 10010.

561.    Avenues School participates in the NYPD's PDP.

562.    At all relevant times, Avenues School controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

563.    At all relevant times, Avenues School established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

564.    At all relevant times, Avenues School maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

565.    At all relevant times, Avenues School was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**80)    Defendant Museum of Modern Art**

566.    MOMA is a domestic business corporation with its principal place of business located at 11 West 53rd Street, New York, NY 10019.

567.    MOMA participates in the NYPD's PDP.

568.    At all relevant times, MOMA controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

569.    At all relevant times, MOMA established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

64

570.     At all relevant times, MOMA maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

571.     At all relevant times, MOMA was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 81)     Defendant Bryant Park Corporation

572.     Bryant Park is a domestic business corporation with its principal place of business at 1065 Avenue of the Americas, Suite 2400, New York, NY 10018.

573.     Bryant Park participates in the NYPD's PDP.

574.     At all relevant times, Bryant Park controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

575.     At all relevant times, Bryant Park established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

576.     At all relevant times, Bryant Park maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

577.     At all relevant times, Bryant Park was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 82)     Defendant Brooklyn Institute of Arts and Sciences a/k/a Brooklyn Museum

578.     Brooklyn Museum is a domestic business corporation with its principal place of business located at 200 Eastern Parkway, Brooklyn, NY 11238.

579.     Brooklyn Museum participates in the NYPD's PDP.

580.     At all relevant times, Brooklyn Museum controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

65

581.    At all relevant times, Brooklyn Museum established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

582.    At all relevant times, Brooklyn Museum maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

583.    At all relevant times, Brooklyn Museum was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 83)    Defendant The Edmond J. Safra Synagogue

584.    Safra Synagogue is a domestic corporation with its principal place of business located at 11 East 63rd Street, New York, NY 10065.

585.    Safra Synagogue participates in the NYPD's PDP.

586.    At all relevant times, Safra Synagogue controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

587.    At all relevant times, Safra Synagogue established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

588.    At all relevant times, Safra Synagogue maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

589.    At all relevant times, Safra Synagogue was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**84)     Defendant Best Buy Co. Inc.**

590.     Best Buy is a foreign business corporation with its principal place of business located at 7601 Penn Avenue South, Richfield, MN 55423.

591.     Best Buy participates in the NYPD's PDP.

592.     At all relevant times, Best Buy controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

593.     At all relevant times, Best Buy established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

594.     At all relevant times, Best Buy maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

595.     At all relevant times, Best Buy was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**85)     Defendant Century 21 USA LLC**

596.     Century 21 is a domestic limited liability company with its principal place of business located at 2 Dey Street, 5th Floor, New York, NY 10007.

597.     Century 21 participates in the NYPD's PDP.

598.     At all relevant times, Century 21 controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

599.     At all relevant times, Century 21 established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

600.    At all relevant times, Century 21 maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

601.    At all relevant times, Century 21 was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**86)    Defendant The Brookdale Hospital Medical Center**

602.    Brookdale Hospital is a domestic business corporation with its principal place of business located at 1 Brookdale Plaza, Brooklyn, NY 11212.

603.    Brookdale Hospital participates in the NYPD's PDP.

604.    At all relevant times, Brookdale Hospital controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

605.    At all relevant times, Brookdale Hospital established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

606.    At all relevant times, Brookdale Hospital maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

607.    At all relevant times, Brookdale Hospital was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**87)    Defendant Times Square Church, Inc.**

608.    Times Square Church is a domestic business corporation incorporated in the state of New York with its principal place of business located at 1657 Broadway, New York, NY 10019.

609.    Times Square Church participates in the NYPD's PDP.

610.    At all relevant times, Times Square Church controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

611. At all relevant times, Times Square Church established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

612. At all relevant times, Times Square Church maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

613. At all relevant times, Times Square Church was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 88) **Defendant Asphalt Green, Inc.**

614. Asphalt Green is a domestic business corporation incorporated in the state of New York with its principal place of business located at 555 East 90th Street, New York, NY 10128.

615. Asphalt Green participates in the NYPD's PDP.

616. At all relevant times, Asphalt Green controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

617. At all relevant times, Asphalt Green established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

618. At all relevant times, Asphalt Green maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

619. At all relevant times, Asphalt Green was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

69

**89)    Defendant Lepozzi, Inc. d/b/a Lauren B. Jewelry**

620.    Lauren B is a domestic business corporation incorporated in New York with its principal place of business located at 44 East 46th Street, New York, NY 10020.

621.    Lauren B participates in the NYPD's PDP.

622.    At all relevant times, Lauren B controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

623.    At all relevant times, Lauren B established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

624.    At all relevant times, Lauren B maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

625.    At all relevant times, Lauren B was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**90)    Defendant The New York Botanical Garden**

626.    NY Botanical Garden is domestic business corporation incorporated in New York with its principal place of business located at 2900 Southern Boulevard, Bronx, NY 10458.

627.    NY Botanical Garden participates in the NYPD's PDP.

628.    At all relevant times, NY Botanical Garden controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

629.    At all relevant times, NY Botanical Garden established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task

70

supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

630.    At all relevant times, NY Botanical Garden maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

631.    At all relevant times, NY Botanical Garden was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**91)     Defendant The Brooklyn Hospital Center**

632.    Brooklyn Hospital is a domestic business corporation incorporated in New York with its principal place of business located at 121 DeKalb Avenue, Brooklyn, NY 11201.

633.    Brooklyn Hospital participates in the NYPD's PDP.

634.    At all relevant times, Brooklyn Hospital controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

635.    At all relevant times, Brooklyn Hospital established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

636.    At all relevant times, Brooklyn Hospital maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

637.    At all relevant times, Brooklyn Hospital was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**92)     Defendant NBCUniversal Media, LLC**

638.    NBC is a foreign limited liability company incorporated in Delaware with its principal place of business located at 30 Rockefeller Plaza, New York, NY 10112.

639.    NBC participates in the NYPD's PDP.

71

640.    At all relevant times, NBC controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

641.    At all relevant times, NBC established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

642.    At all relevant times, NBC maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

643.    At all relevant times, NBC was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 93)    Defendant Sam Ash Music Corporation

644.    Sam Ash is a domestic business corporation with its principal place of business located at 278 Duffy Avenue, Hicksville, NY 11801.

645.    Sam Ash participates in the NYPD's PDP.

646.    At all relevant times, Sam Ash controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

647.    At all relevant times, Sam Ash established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

648.    At all relevant times, Sam Ash maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

649.    At all relevant times, Sam Ash was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

94)    **Defendant Zara USA, Inc.**

650.    Zara is a domestic business corporation with its principal place of business located at 500 Fifth Avenue, New York, NY 10110.

651.    Zara participates in the NYPD's PDP.

652.    At all relevant times, Zara controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

653.    At all relevant times, Zara established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

654.    At all relevant times, Zara maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

655.    At all relevant times, Zara was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

95)    **Defendant Museum of Jewish Heritage A Living Memorial To The Holocaust**

656.    Jewish Heritage is a domestic corporation with its principal place of business located at 36 Battery Place, New York, NY 10280.

657.    Jewish Heritage participates in the NYPD's PDP.

658.    At all relevant times, Jewish Heritage controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

659.    At all relevant times, Jewish Heritage established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

73

660. At all relevant times, Jewish Heritage maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

661. At all relevant times, Jewish Heritage was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 96)    Defendant Torah Academy for Girls

662. Torah Academy is a domestic corporation that operates an elementary school located at 4-44 Beach 6th Street, Far Rockaway, NY 11691, and a high school located at 6-36 Lanett Avenue, Far Rockaway, NY 11691.

663. Torah Academy participates in the NYPD's PDP.

664. At all relevant times, Torah Academy controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

665. At all relevant times, Torah Academy established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

666. At all relevant times, Torah Academy maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

667. At all relevant times, Torah Academy was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 97)    Defendant Omni Eye Surgery of New York, P.C.

668. Omni Eye is a domestic professional service corporation with its principal place of business located at 20 East 46th Street, New York, NY 10017.

669. Omni Eye participates in the NYPD's PDP.

670.    At all relevant times, Omni Eye controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

671.    At all relevant times, Omni Eye established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

672.    At all relevant times, Omni Eye maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

673.    At all relevant times, Omni Eye was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**98)    Defendant Plaza Motors, LLC f/k/a Plaza Motors of Brooklyn, Inc. d/b/a Plaza Auto Mall d/b/a Plaza Honda**

674.    Plaza Honda is a domestic business corporation with its principal place of business located at 2740 Nostrand Avenue, Brooklyn, NY 11210.

675.    Plaza Honda participates in the NYPD's PDP.

676.    At all relevant times, Plaza Honda controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

677.    At all relevant times, Plaza Honda established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

678.    At all relevant times, Plaza Honda maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

679.    At all relevant times, Plaza Honda was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 99)    Defendant 47th Street Business Improvement District, Inc.

680.    47th Street BID is a domestic corporation located at 580 5th Avenue, Suite 323, New York, NY 10036.

681.    47th Street BID participates in the NYPD's PDP.

682.    At all relevant times, 47th Street BID controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

683.    At all relevant times, 47th Street BID established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

684.    At all relevant times, 47th Street BID maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

685.    At all relevant times, 47th Street BID was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 100)    Defendant Breezy Point Cooperative, Inc.

686.    Breezy Point is a domestic corporation located at 202-30 Rockaway Point Boulevard, Rockaway Point, NY 11697.

687.    Breezy Point participates in the NYPD's PDP.

688.    At all relevant times, Breezy Point controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

689.    At all relevant times, Breezy Point established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

76

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

690. At all relevant times, Breezy Point maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

691. At all relevant times, Breezy Point was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 101) Defendant Citigroup Inc.

692. Citigroup is a foreign business corporation licensed to do business in New York and is located at 388 Greenwich Street, New York, NY 10013.

693. Citigroup participates in the NYPD's PDP.

694. At all relevant times, Citigroup controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

695. At all relevant times, Citigroup established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

696. At all relevant times, Citigroup maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

697. At all relevant times, Citigroup was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 102) Defendant Astoria Queens Enterprises, LLC d/b/a DII Deals & Discounts

698. DII Deals & Discounts is a domestic limited liability company located at 626 Sheepshead Bay Road, Suite 320, Brooklyn, NY 11224.

699. DII Deals & Discounts participates in the NYPD's PDP.

77

700.    At all relevant times, DII Deals & Discounts controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

701.    At all relevant times, DII Deals & Discounts established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

702.    At all relevant times, DII Deals & Discounts maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

703.    At all relevant times, DII Deals & Discounts was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 103)    Defendant Fifth Avenue Association Business Improvement District, Inc.

704.    Fifth Avenue BID is a domestic corporation located at 350 Fifth Avenue, Suite 828, New York, NY 10001.

705.    Fifth Avenue BID participates in the NYPD's PDP.

706.    At all relevant times, Fifth Avenue BID controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

707.    At all relevant times, Fifth Avenue BID established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

708.    At all relevant times, Fifth Avenue BID maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

709.    At all relevant times, Fifth Avenue BID was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 104)    Defendant FSP 787 Seventh, LLC

710.    787 Seventh Avenue is a foreign limited liability company licensed to do business in New York and is located at 787 Seventh Avenue, New York, NY 10019.

711.    787 Seventh Avenue participates in the NYPD's PDP.

712.    At all relevant times, 787 Seventh Avenue controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

713.    At all relevant times, 787 Seventh Avenue established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

714.    At all relevant times, 787 Seventh Avenue maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

715.    At all relevant times, 787 Seventh Avenue was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 105)    Defendant Macy's Retail Holdings, LLC

716.    Macy's is a foreign limited liability company licensed to do business in New York and is located at 151 34th Street, New York, NY 10001.

717.    Macy's participates in the NYPD's PDP.

718.    At all relevant times, Macy's controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

719.    At all relevant times, Macy's established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

79

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

720. At all relevant times, Macy's maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

721. At all relevant times, Macy's was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 106)   Defendant The Ramaz School

722. Ramaz School is a private school located at 60 East 78th Street, New York, NY 10075.

723. Ramaz School participates in the NYPD's PDP.

724. At all relevant times, Ramaz School controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

725. At all relevant times, Ramaz School established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

726. At all relevant times, Ramaz School maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

727. At all relevant times, Ramaz School was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 107)   Defendant Manhattan High School For Girls

728. Manhattan High School for Girls is a private school located at 154 East 54th Street, #156, New York, NY 10021.

729. Manhattan High School for Girls participates in the NYPD's PDP.

730.    At all relevant times, Manhattan High School for Girls controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

731.    At all relevant times, Manhattan High School for Girls established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

732.    At all relevant times, Manhattan High School for Girls maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

733.    At all relevant times, Manhattan High School for Girls was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**108)    Defendant Congregation Bnai Jeshurun Starafroler Hebria**

734.    Bnai Jeshurun is a domestic corporation located at 257 West 88th Street, New York, NY 10024.

735.    Bnai Jeshurun participates in the NYPD's PDP.

736.    At all relevant times, Bnai Jeshurun controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

737.    At all relevant times, Bnai Jeshurun established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

738.    At all relevant times, Bnai Jeshurun maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

739.    At all relevant times, Bnai Jeshurun was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**109)    Defendant Central Synagogue**

740.    Central Synagogue is a domestic corporation located at 652 Lexington Avenue, New York, NY 10022.

741.    Central Synagogue participates in the NYPD's PDP.

742.    At all relevant times, Central Synagogue controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

743.    At all relevant times, Central Synagogue established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

744.    At all relevant times, Central Synagogue maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

745.    At all relevant times, Central Synagogue was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**110)    Defendant Congregation Sheiris Israel of Bay Ridge**

746.    Sheiris Israel is a domestic corporation located at 405 81st Street, Brooklyn, NY 11209.

747.    Sheiris Israel participates in the NYPD's PDP.

748.    At all relevant times, Sheiris Israel controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

749.    At all relevant times, Sheiris Israel established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

750.   Sheiris Israel maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

751.   At all relevant times, Sheiris Israel was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 111)   Defendant St. Thomas Church Fifth Avenue

752.   St. Thomas Church is a domestic corporation located at 1 West 53rd Street, New York, NY 10019.

753.   St. Thomas Church participates in the NYPD's PDP.

754.   At all relevant times, St. Thomas Church controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

755.   At all relevant times, St. Thomas Church established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

756.   St. Thomas Church maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

757.   At all relevant times, St. Thomas Church was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 112)   Defendant Blackrock, Inc.

758.   Blackrock is a foreign business corporation licensed to do business in New York, and its principal place of business is located at 50 Hudson Yards, New York, NY 10001.

759.   Blackrock participates in the NYPD's PDP.

760. At all relevant times, Blackrock controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

761. At all relevant times, Blackrock established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

762. Blackrock maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

763. At all relevant times, Blackrock was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 113) **Defendant Morgan Stanley**

764. Morgan Stanley is a foreign corporation licensed to do business in New York, and its principal place of business is located at 1585 Broadway, New York, NY 10036.

765. Morgan Stanley participates in the NYPD's PDP.

766. At all relevant times, Morgan Stanley controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

767. At all relevant times, Morgan Stanley established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

768. Morgan Stanley maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

769. At all relevant times, Morgan Stanley was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**114)    Defendant Richmond Medical Center**

770.    Richmond Medical Center is a domestic company located at 355 Bard Avenue, Staten Island, NY 10310.

771.    Richmond Medical Center participates in the NYPD's PDP.

772.    At all relevant times, Richmond Medical Center controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

773.    At all relevant times, Richmond Medical Center established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

774.    Richmond Medical Center maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

775.    At all relevant times, Richmond Medical Center was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**115)    Defendant RAL Hospitality Group, Inc. d/b/a Pastavino**

776.    Pastavino is a foreign business corporation licensed to do business in New York that operates Pastavino, a restaurant located at 44 Navy Pier Court, Staten Island, NY 10304.

777.    Pastavino participates in the NYPD's PDP.

778.    At all relevant times, Pastavino controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

779.    At all relevant times, Pastavino established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

85

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

780.   Pastavino maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

781.   At all relevant times, Pastavino was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 116)   Defendant Color Image Apparel, Inc. d/b/a Alo Yoga

782.   Alo Yoga is a foreign business corporation that is licensed to do business in New York, and its principal place of business is 96 Spring Street, New York, NY 10012.

783.   Alo Yoga participates in the NYPD's PDP.

784.   At all relevant times, Alo Yoga controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

785.   At all relevant times, Alo Yoga established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

786.   Alo Yoga maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

787.   At all relevant times, Alo Yoga was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 117)   Defendant Newsmax Media, Inc.

788.   Newsmax is a foreign business corporation licensed to do business in New York, and its principal place of business is 805 3rd Avenue, New York, NY 10022.

789.   Newsmax participates in the NYPD's PDP.

86

790.    At all relevant times, Newsmax controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

791.    At all relevant times, Newsmax established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

792.    Newsmax maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

793.    At all relevant times, Newsmax was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 118)    Defendant Church of the City New York

794.    Church of the City New York is a domestic corporation located at 417 West 57th Street, New York, NY 10019.

795.    Church of the City New York participates in the NYPD's PDP.

796.    At all relevant times, Church of the City New York controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

797.    At all relevant times, Church of the City New York established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

798.    Church of the City New York maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

799.    At all relevant times, Church of the City New York was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 119)    Defendant Brookfield Corporation

800.    Brookfield is a foreign business corporation licensed to do business in New York, and its principal place of business is 225 Liberty Street, New York, NY 10281.

801.    Brookfield participates in the NYPD's PDP.

802.    At all relevant times, Brookfield controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

803.    At all relevant times, Brookfield established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

804.    Brookfield maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

805.    At all relevant times, Brookfield was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 120)    Defendant Yavneh Minyan of Flatbush

806.    Yavneh Minyan is a domestic corporation located at 1102 Avenue L, Brooklyn, NY 11230.

807.    Yavneh Minyan participates in the NYPD's PDP.

808.    At all relevant times, Yavneh Minyan controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

809.    At all relevant times, Yavneh Minyan established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

88

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

810. Yavneh Minyan maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

811. At all relevant times, Yavneh Minyan was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 121) **Defendant BronxCare Health System**

812. BronxCare is a domestic corporation located at 1650 Grand Concourse, Bronx, NY 10457.

813. BronxCare participates in the NYPD's PDP.

814. At all relevant times, BronxCare controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

815. At all relevant times, BronxCare established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

816. BronxCare maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

817. At all relevant times, BronxCare was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 122) **Defendant PEI Media Inc.**

818. PEI Media is a domestic business corporation with its principal place of business at 530 5th Avenue, 14th Floor, New York, NY 10036.

819. PEI Media participates in the NYPD's PDP.

820.    At all relevant times, PEI Media controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

821.    At all relevant times, PEI Media established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

822.    PEI Media maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

823.    At all relevant times, PEI Media was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 123)    Defendant Rudin Management Co. Inc.

824.    Rudin Management is a domestic business corporation located at 345 Park Avenue, 33rd Floor, New York, NY 10154.

825.    Rudin Management participates in the NYPD's PDP.

826.    At all relevant times, Rudin Management controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

827.    At all relevant times, Rudin Management established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

828.    Rudin Management maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

829.    At all relevant times, Rudin Management was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**124)    Defendant CVS Health Corporation**

830.    CVS is a foreign business corporation licensed to do business in New York with its principal place of business at 1 CVS Drive Woonsocket, RI 02895, and operates retail pharmacy stores throughout New York City.

831.    CVS participates in the NYPD's PDP.

832.    At all relevant times, CVS controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

833.    At all relevant times, CVS established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

834.    CVS maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

835.    At all relevant times, CVS was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**125)    Defendant Brooklyn Botanic Garden Corporation**

836.    BK Botanic Garden is a domestic corporation located at 1000 Washington Avenue, Brooklyn, NY 11225.

837.    BK Botanic Garden participates in the NYPD's PDP.

838.    At all relevant times, BK Botanic Garden controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

839.    At all relevant times, BK Botanic Garden established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

840.    BK Botanic Garden maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

841.    At all relevant times, BK Botanic Garden was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 126)    Defendant Brooklyn Heights Synagogue

842.    Brooklyn Heights Synagogue is a domestic corporation located at 131 Remsen Street, Brooklyn, NY 11201.

843.    Brooklyn Heights Synagogue participates in the NYPD's PDP.

844.    At all relevant times, Brooklyn Heights Synagogue controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

845.    At all relevant times, Brooklyn Heights Synagogue established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

846.    Brooklyn Heights Synagogue maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

847.    At all relevant times, Brooklyn Heights Synagogue was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 127)    Defendant Levy Premium Foodservice Limited Partnership

848.    Levy Foods is a foreign limited partnership licensed to do business in New York that provides concessions at New York sporting events, including at the U.S. Open.

92

849.   Levy Foods participates in the NYPD's PDP.

850.   At all relevant times, Levy Foods controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

851.   At all relevant times, Levy Foods established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

852.   Levy Foods maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

853.   At all relevant times, Levy Foods was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 128)   Defendant Tashkent Supermarket LLC

854.   Tashkent is a domestic limited liability company that operates several supermarkets throughout New York City, and is headquartered at 713 Brighton Beach Avenue, Brooklyn, NY 11235.

855.   Tashkent participates in the NYPD's PDP.

856.   At all relevant times, Tashkent controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

857.   At all relevant times, Tashkent established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

858.   Tashkent maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

859. At all relevant times, Tashkent was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 129) Defendant Mesivta Yeshiva Rabbi Chaim Berlin

860. Yeshiva Rabbi Chaim Berlin is a domestic corporation located at 1605 Coney Island Avenue, Brooklyn, NY 11230.

861. Yeshiva Rabbi Chaim Berlin participates in the NYPD's PDP.

862. At all relevant times, Yeshiva Rabbi Chaim Berlin controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

863. At all relevant times, Yeshiva Rabbi Chaim Berlin established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

864. Yeshiva Rabbi Chaim Berlin maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

865. At all relevant times, Yeshiva Rabbi Chaim Berlin was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 130) Defendant The Brooklyn Tabernacle

866. BK Tabernacle is a domestic corporation located at 17 Smith Street, Brooklyn, NY 11201.

867. BK Tabernacle participates in the NYPD's PDP.

868. At all relevant times, BK Tabernacle controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

869. At all relevant times, BK Tabernacle established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

870. BK Tabernacle maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

871. At all relevant times, BK Tabernacle was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 131) Defendant Fancy Farms NY, LLC d/b/a Okka Foods Market

872. Okka Foods Market is a domestic limited liability corporation located at 1524 Sheepshead Bay Road, Brooklyn, NY 11235.

873. Okka Foods Market participates in the NYPD's PDP.

874. At all relevant times, Okka Foods Market controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

875. At all relevant times, Okka Foods Market established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

876. Okka Foods Market maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

877. At all relevant times, Okka Foods Market was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**132)  Defendant Temple Shaaray Tefila**

878.  Temple Shaaray Tefila is a domestic corporation located at 250 East 79th Street, New York, NY 10075.

879.  Temple Shaaray Tefila participates in the NYPD's PDP.

880.  At all relevant times, Temple Shaaray Tefila controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

881.  At all relevant times, Temple Shaaray Tefila established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

882.  Temple Shaaray Tefila maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

883.  At all relevant times, Temple Shaaray Tefila was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**133)  Defendant Paramount Group, Inc.**

884.  Paramount Group is a foreign business corporation licensed to do business in New York and is headquartered at 1633 Broadway, Suite 1801, New York, NY 10019.

885.  Paramount Group participates in the NYPD's PDP.

886.  At all relevant times, Paramount Group controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

887.  At all relevant times, Paramount Group established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

888.    Paramount Group maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

889.    At all relevant times, Paramount Group was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**134)    Defendant Congregation Ohav Sholom**

890.    Ohav Sholom is a domestic corporation located at 270 West 84th Street, New York, NY 10024.

891.    Ohav Sholom participates in the NYPD's PDP.

892.    At all relevant times, Ohav Sholom controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

893.    At all relevant times, Ohav Sholom established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

894.    Ohav Sholom maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

895.    At all relevant times, Ohav Sholom was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**135)    Defendant Congregation Emanu-El of the City of New York d/b/a Temple Emanu-El**

896.    Temple Emanu-El is a domestic corporation located at 1 East 65th Street, New York, NY 10065.

897.    Temple Emanu-El participates in the NYPD's PDP.

898.    At all relevant times, Temple Emanu-El controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

899.    At all relevant times, Temple Emanu-El established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

900.    Temple Emanu-El maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

901.    At all relevant times, Temple Emanu-El was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

## 136)    Defendant Trustees of Columbia University in the City of New York

902.    Columbia University is a domestic corporation located at 2960 Broadway, New York, NY 10027.

903.    Columbia University participates in the NYPD's PDP.

904.    At all relevant times, Columbia University controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

905.    At all relevant times, Columbia University established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

906.    Columbia University maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

907.    At all relevant times, Columbia University was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 137)    Defendant The Jewish Museum

908.    The Jewish Museum is a domestic corporation located at 1109 Fifth Avenue, New York, NY 10128.

909.    The Jewish Museum participates in the NYPD's PDP.

910.    At all relevant times, The Jewish Museum controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

911.    At all relevant times, The Jewish Museum established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

912.    The Jewish Museum maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

913.    At all relevant times, The Jewish Museum was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 138)    Defendant Monroe University, Ltd. f/k/a Monroe College

914.    Monroe College is a domestic business corporation located at 2501 Jerome Avenue, Bronx, NY 10468.

915.    Monroe College participates in the NYPD's PDP.

916.    At all relevant times, Monroe College controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

917.    At all relevant times, Monroe College established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

918.    Monroe College maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

919.    At all relevant times, Monroe College was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**139)    Defendant New Water Street Corp.**

920.    New Water Street is a foreign business corporation licensed to do business in New York and is located at 55 Water Street, New York, NY 10041.

921.    New Water Street participates in the NYPD's PDP.

922.    At all relevant times, New Water Street controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

923.    At all relevant times, New Water Street established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

924.    New Water Street maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

925.    At all relevant times, New Water Street was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**140)    Defendant New York Historical Society**

926.    NY Historical Society is a domestic corporation located at 170 Central Park West, New York, NY 10024.

927.    NY Historical Society participates in the NYPD's PDP.

928.    At all relevant times, NY Historical Society controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

929.    At all relevant times, NY Historical Society established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

930.    NY Historical Society maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

931.    At all relevant times, NY Historical Society was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 141)    Defendant Rego Park Jewish Center

932.    Rego Park Jewish Center is a domestic corporation located at 97-30 Queens Boulevard, Rego Park, NY 11374.

933.    Rego Park Jewish Center participates in the NYPD's PDP.

934.    At all relevant times, Rego Park Jewish Center controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

935.    At all relevant times, Rego Park Jewish Center established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

936.    Rego Park Jewish Center maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

937.    At all relevant times, Rego Park Jewish Center was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**142)   Defendant Salanter Akiba Riverdale Academy d/b/a SAR Academy**

938.    SAR Academy is a domestic corporation located at 655 West 254th Street, Bronx, NY 10471.

939.    SAR Academy participates in the NYPD's PDP.

940.    At all relevant times, SAR Academy controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

941.    At all relevant times, SAR Academy established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

942.    SAR Academy maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

943.    At all relevant times, SAR Academy was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**143)   Defendant Israel Center of Conservative Judaism, Inc.**

944.    Israel Center is a domestic religious corporation located at 167-11 73rd Avenue, Fresh Meadows, NY 11366.

945.    Israel Center participates in the NYPD's PDP.

946.    At all relevant times, Israel Center controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

947.    At all relevant times, Israel Center established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

948.    Israel Center maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

949.    At all relevant times, Israel Center was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 144)    Defendant The Young Men's and Young Women's Hebrew Association d/b/a 92nd St. Y

950.     92nd St. Y is a domestic corporation located at 1395 Lexington Avenue, New York, NY 10128.

951.    92nd St. Y participates in the NYPD's PDP.

952.    At all relevant times, 92nd St. Y controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

953.    At all relevant times, 92nd St. Y established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

954.    92nd St. Y maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

955.    At all relevant times, 92nd St. Y was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 145)    Defendant Yeshiva Har Torah

956.    Yeshiva Har Torah is a domestic corporation located at 250-10 Grand Central Parkway, Little Neck, NY 11426.

957.    Yeshiva Har Torah participates in the NYPD's PDP.

958.    At all relevant times, Yeshiva Har Torah controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

959.    At all relevant times, Yeshiva Har Torah established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

960.    Yeshiva Har Torah maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

961.    At all relevant times, Yeshiva Har Torah was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 146)    Defendant Hines Interests Limited Partnership

962.    Hines is a foreign limited partnership with its principal place of business located at 1095 6th Ave, New York, NY 10036.

963.    Hines participates in the NYPD's PDP.

964.    At all relevant times, Hines controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

965.    At all relevant times, Hines established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

966.    Hines maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

967. At all relevant times, Hines was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**147) <u>Defendant Yeshiva Sholom Schachna</u>**

968. Yeshiva Sholom Schachna is a domestic corporation located at 401 Elmwood Avenue, Brooklyn, NY 11230.

969. Yeshiva Sholom Schachna participates in the NYPD's PDP.

970. At all relevant times, Yeshiva Sholom Schachna controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

971. At all relevant times, Yeshiva Sholom Schachna established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

972. Yeshiva Sholom Schachna maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

973. At all relevant times, Yeshiva Sholom Schachna was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**148) <u>Defendant Kehila Kedosha Janina Preservation and Cultural Fund Inc. d/b/a Kehila Kedosha Janina Synagogue</u>**

974. Kehila Kedosha is a domestic corporation located at 280 Broome Street, New York, NY 10002.

975. Kehila Kedosha participates in the NYPD's PDP.

976. At all relevant times, Kehila Kedosha controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

977.    At all relevant times, Kehila Kedosha established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

978.    Kehila Kedosha maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

979.    At all relevant times, Kehila Kedosha was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 149)    Defendant Civic Center Synagogue, Inc.

980.    Tribeca Synagogue is a domestic corporation located at 49 White Street, New York, NY 10013.

981.    Tribeca Synagogue participates in the NYPD's PDP.

982.    At all relevant times, Tribeca Synagogue controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

983.    Tribeca Synagogue established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

984.    Tribeca Synagogue maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

985.    At all relevant times, Tribeca Synagogue was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**150)   Defendant MetLife Group, Inc.**

986.   MetLife is a domestic business corporation headquartered at 200 Park Avenue, New York, NY 10166.

987.   MetLife participates in the NYPD's PDP.

988.   At all relevant times, MetLife controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

989.   MetLife established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

990.   MetLife maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

991.   At all relevant times, Metlife was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**151)   Defendant Khal Bnei Avrohom Yaakov Inc.**

992.   Khal Bnei is a domestic corporation located at 2701 Avenue North, Brooklyn, NY 11210.

993.   Khal Bnei participates in the NYPD's PDP.

994.   At all relevant times, Khal Bnei controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

995.   Khal Bnei established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

996. Khal Bnei maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

997. At all relevant times, Khal Bnei was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**152)  Defendant Trinity Tabernacle d/b/a Trinity Tabernacle of Gravesend**

998. Trinity Tabernacle is a domestic corporation located at 121 Gravesend Neck Road, Brooklyn, NY 11223.

999. Trinity Tabernacle participates in the NYPD's PDP.

1000. At all relevant times, Trinity Tabernacle controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1001. Trinity Tabernacle established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1002. Trinity Tabernacle maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1003. At all relevant times, Trinity Tabernacle was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**153)  Defendant Young Israel of Forest Hills**

1004. Young Israel of Forest Hills is a domestic corporation located at 71-00 Yellowstone Boulevard, Forest Hills, NY 11375.

1005. Young Israel of Forest Hills participates in the NYPD's PDP.

1006. At all relevant times, Young Israel of Forest Hills controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1007.  Young Israel of Forest Hills established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1008.  Young Israel of Forest Hills maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1009.  At all relevant times, Young Israel of Forest Hills was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 154)  **Defendant Benjamin Partners LLC**

1010.  Benjamin Partners is a domestic limited liability company located at 589 Broadway, 4th Floor, New York, NY 10012.

1011.  Benjamin Partners participates in the NYPD's PDP.

1012.  At all relevant times, Benjamin Partners controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1013.  Benjamin Partners established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1014.  Benjamin Partners maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1015.  At all relevant times, Benjamin Partners was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**155)    Defendant EO Staten Island Property Owner LLC d/b/a Empire Outlets**

1016.    Empire Outlets is a domestic limited liability company with its principal place of business at 55 Richmond Terrace, Staten Island, NY 10301.

1017.    Empire Outlets participates in the NYPD's PDP.

1018.    At all relevant times, Empire Outlets controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1019.    Empire Outlets established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1020.    Empire Outlets maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1021.    At all relevant times, Empire Outlets was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**156)    Defendant Congregation Etz Chaim of Flatbush**

1022.    Etz Chaim of Flatbush is a domestic corporation located at 1649 13th Street, Brooklyn, NY 11229.

1023.    Etz Chaim of Flatbush participates in the NYPD's PDP.

1024.    At all relevant times, Etz Chaim of Flatbush controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1025.    At all relevant times, Etz Chaim of Flatbush established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task

110

supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1026. Etz Chaim of Flatbush maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1027. At all relevant times, Etz Chaim of Flatbush was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**157)    Defendant Congregation Ner Mitzvah, Inc.**

1028. Ner Mitzvah is a domestic corporation located at 62 Sand Lane, Staten Island, NY 10305.

1029. Ner Mitzvah participates in the NYPD's PDP.

1030. At all relevant times, Ner Mitzvah controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1031. At all relevant times, Ner Mitzvah established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1032. Ner Mitzvah maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1033. At all relevant times, Ner Mitzvah was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**158)    Defendant Treeco/Hylan Limited Partnership d/b/a Hylan Commons**

1034. Treeco Hylan is a foreign limited partnership licensed to do business in New York and is located at 2530 Hylan Boulevard, Staten Island, NY 10306.

1035. Treeco Hylan participates in the NYPD's PDP.

111

1036. At all relevant times, Treeco Hylan controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1037. At all relevant times, Treeco Hylan established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1038. Treeco Hylan maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1039. At all relevant times, Treeco Hylan was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**159)    Defendant Plaza College, Ltd.**

1040. Plaza College is a domestic business corporation located at 118-33 Queens Boulevard, Forest Hills, NY 11375.

1041. Plaza College participates in the NYPD's PDP.

1042. At all relevant times, Plaza College controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1043. At all relevant times, Plaza College established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1044. Plaza College maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1045. At all relevant times, Plaza College was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

112

### 160)    Defendant Congregation Machane Chodosh, Inc.

1046.    Machane Chodosh is a domestic corporation located at 67-29 108th Street, Flushing, NY 11375.

1047.    Machane Chodosh participates in the NYPD's PDP.

1048.    At all relevant times, Machane Chodosh controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1049.    At all relevant times, Machane Chodosh established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1050.    Machane Chodosh maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1051.    At all relevant times, Machane Chodosh was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 161)    Defendant Queens Jewish Center and Talmud Torah

1052.    Queens Jewish Center is a domestic corporation located at 66-05 108th Street, Flushing, NY 11375.

1053.    Queens Jewish Center participates in the NYPD's PDP.

1054.    At all relevant times, Queens Jewish Center controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1055.    At all relevant times, Queens Jewish Center established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task

113

supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1056. Queens Jewish Center maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1057. At all relevant times, Queens Jewish Center was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 162) Defendant Sholom Sholom, Inc.

1058. Sholom Sholom is a domestic educational corporation located at 84-15 Beverly Road, Kew Gardens, NY 11415.

1059. Sholom Sholom participates in the NYPD's PDP.

1060. At all relevant times, Sholom Sholom controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1061. At all relevant times, Sholom Sholom established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1062. Sholom Sholom maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1063. At all relevant times, Sholom Sholom was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 163) Defendant Stephen Wise Free Synagogue

1064. Stephen Wise Free is a domestic corporation located at 30 West 68th Street, New York, NY 10023.

1065. Stephen Wise Free participates in the NYPD's PDP.

114

1066. At all relevant times, Stephen Wise Free controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1067. At all relevant times, Stephen Wise Free established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1068. Stephen Wise Free maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1069. At all relevant times, Stephen Wise Free was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**164) Defendant Rainbow Hill Homeowners Association d/b/a Celebration at Rainbow Hill**

1070. Rainbow Hill is a domestic corporation located 15 Circle Loop, Staten Island, NY 10304.

1071. Rainbow Hill participates in the NYPD's PDP.

1072. At all relevant times, Rainbow Hill controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1073. At all relevant times, Rainbow Hill established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1074. Rainbow Hill maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1075.   At all relevant times, Rainbow Hill was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 165)   Defendant Time Out For Values, Inc.

1076.   TOV is a domestic corporation located at 68-58 147th Street, Flushing, NY 11367.

1077.   TOV participates in the NYPD's PDP.

1078.   At all relevant times, TOV controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1079.   At all relevant times, TOV established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1080.   TOV maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1081.   At all relevant times, TOV was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 166)   Defendant Congregation Etz Chaim of Kew Gardens Hills

1082.   Etz Chaim of Kew Gardens Hills is a domestic corporation located at 147-19 73rd Avenue, Flushing, NY 11367.

1083.   Etz Chaim of Kew Gardens Hills participates in the NYPD's PDP.

1084.   At all relevant times, Etz Chaim of Kew Gardens Hills controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1085.   At all relevant times, Etz Chaim of Kew Gardens Hills established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task

116

supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1086. Etz Chaim of Kew Gardens Hills maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1087. At all relevant times, Etz Chaim of Kew Gardens Hills was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 167)    Defendant Rabbinical Seminary of America

1088. Rabbinical Seminary of America is a domestic corporation located at 76-01 147th Street, Flushing, NY 11367.

1089. Rabbinical Seminary of America participates in the NYPD's PDP.

1090. At all relevant times, Rabbinical Seminary of America controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1091. At all relevant times, Rabbinical Seminary of America established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1092. Rabbinical Seminary of America maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1093. At all relevant times, Rabbinical Seminary of America was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 168)    Defendant Temple Gates of Prayer

1094. Temple Gates of Prayer is a domestic corporation located at 171-39 Northern Boulevard, Flushing, NY 11358.

117

1095.   Temple Gates of Prayer participates in the NYPD's PDP.

1096.   At all relevant times, Temple Gates of Prayer controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1097.   At all relevant times, Temple Gates of Prayer established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1098.   Temple Gates of Prayer maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1099.   At all relevant times, Temple Gates of Prayer was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 169)   Defendant The Hebrew Home For The Aged At Riverdale Foundation, Inc.

1100.   Hebrew Home is a domestic corporation located at 5901 Palisade Avenue, Riverdale, NY 10471.

1101.   Hebrew Home participates in the NYPD's PDP.

1102.   At all relevant times, Hebrew Home controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1103.   At all relevant times, Hebrew Home established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1104.   Hebrew Home maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

118

1105. At all relevant times, Hebrew Home was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**170) Defendant United Nations International School**

1106. UN School is a domestic corporation located at 24-50 FDR Drive, New York, NY 10001.

1107. UN School participates in the NYPD's PDP.

1108. At all relevant times, UN School controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1109. At all relevant times, UN School established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1110. UN School maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1111. At all relevant times, UN School was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**171) Defendant Congregation Baith Israel Anshei Emes d/b/a Kane Street Synagogue**

1112. Kane Street is a domestic corporation located at 236 Kane Street, Brooklyn, NY 11231.

1113. Kane Street participates in the NYPD's PDP.

1114. At all relevant times, Kane Street controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1115. At all relevant times, Kane Street established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated,

including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1116. Kane Street maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1117. At all relevant times, Kane Street was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**172)   Defendant Wagner College**

1118. Wagner College is a domestic corporation located at 1 Campus Road, Staten Island, NY 10301.

1119. Wagner College participates in the NYPD's PDP.

1120. At all relevant times, Wagner College controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1121. At all relevant times, Wagner College established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1122. Wagner College maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1123. At all relevant times, Wagner College was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**173)   Defendant Salesforce, Inc.**

1124. Salesforce is a domestic corporation located at 1095 6th Avenue, New York, NY 10036.

1125. Salesforce participates in the NYPD's PDP.

1126. At all relevant times, Salesforce controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1127. At all relevant times, Salesforce established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1128. Salesforce maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1129. At all relevant times, Salesforce was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**174)  <u>Defendant Greater Jamaica Development Corporation</u>**

1130. Greater Jamaica is a domestic corporation that operates a food court located at 90-31 160th Street, Jamaica, NY 11432.

1131. Greater Jamaica participates in the NYPD's PDP.

1132. At all relevant times, Greater Jamaica controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1133. At all relevant times, Greater Jamaica established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1134. Greater Jamaica maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1135. At all relevant times, Greater Jamaica was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**175)    Defendant Manhattan Beach Jewish Center**

1136.  Manhattan Beach is a domestic corporation located at 60 West End Avenue, Brooklyn, NY 11235.

1137.  Manhattan Beach participates in the NYPD's PDP.

1138.  At all relevant times, Manhattan Beach controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1139.  At all relevant times, Manhattan Beach established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1140.  Manhattan Beach maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1141.  At all relevant times, Manhattan Beach was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**176)    Defendant SVA Alumni Society Inc.**

1142.  School of Visual Arts is a domestic corporation located at 209 East 23rd Street, New York, NY 10010.

1143.  School of Visual Arts participates in the NYPD's PDP.

1144.  At all relevant times, School of Visual Arts controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1145.  At all relevant times, School of Visual Arts established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task

122

supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1146. School of Visual Arts maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1147. At all relevant times, School of Visual Arts was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**177)    Defendant Hillcrest Jewish Center Inc.**

1148. Hillcrest Jewish is a domestic corporation located at 183-02 Union Turnpike, Flushing, NY 11366.

1149. Hillcrest Jewish participates in the NYPD's PDP.

1150. At all relevant times, Hillcrest Jewish controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1151. At all relevant times, Hillcrest Jewish established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1152. Hillcrest Jewish maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1153. At all relevant times, Hillcrest Jewish was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**178)    Defendant Chabad Lubavitch of West Brighton d/b/a Sea Breeze Jewish Center**

1154. Sea Breeze Jewish Center is a domestic corporation located at 311 Sea Breeze Avenue, Brooklyn, NY 11224.

1155. Sea Breeze Jewish Center participates in the NYPD's PDP.

123

1156.    At all relevant times, Sea Breeze Jewish Center controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1157.    At all relevant times, Sea Breeze Jewish Center established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1158.    Sea Breeze Jewish Center maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1159.    At all relevant times, Sea Breeze Jewish Center was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

### 179)    Defendant Ross Dress For Less, Inc.

1160.    Ross Dress For Less is a foreign business corporation licensed to do business in New York, and is headquartered at 5130 Hacienda Drive, Dublin, CA 94568.

1161.    Ross Dress For Less participates in the NYPD's PDP.

1162.    At all relevant times, Ross Dress For Less controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1163.    At all relevant times, Ross Dress For Less established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1164.    At all relevant times, Ross Dress For Less maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1165. At all relevant times, Ross Dress For Less was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**180)    Defendant American Express Travel Related Services Company, Inc.**

1166. Amex is a domestic business corporation with its principal place of business located at 200 Vesey Street, New York, NY 10285.

1167. Amex participates in the NYPD's PDP.

1168. At all relevant times, Amex controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1169. At all relevant times, Amex established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1170. At all relevant times, Amex maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1171. At all relevant times, Amex was an "employer" and/or "hiring party" within the meaning of all relevant statutes and regulations.

**181)    Defendant Does No. 1 Through 100**

1172. Plaintiffs do not know the true names and capacities, whether individual, partners, or corporate, of Does Nos. 1 through 100, and for that reason sues Does Nos. 1 through 100 under fictitious names.

1173. Upon information and belief, Does Nos. 1 through 100 participate in the NYPD's PDP.

1174. Upon information and belief, at all relevant times, Does Nos. 1 through 100 controlled and directed the terms of employment and compensation of Plaintiffs and all persons similarly situated.

1175. Upon information and belief, at all relevant times, Does Nos. 1 through 100 established, implemented, disseminated, and controlled the employment policies applicable to Plaintiffs and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll applicable to Plaintiffs and all persons similarly situated.

1176. Upon information and belief, at all relevant times, Does Nos. 1 through 100 maintained and exercised authority to hire, fire, discipline, and promote Plaintiffs and all persons similarly situated.

1177. Upon information and belief, at all relevant times, Does Nos. 1 through 100 were "employers" and/or "hiring parties" within the meaning of all relevant statutes and regulations.

## FACTS

A.    **Background**

1178. In or around the Spring of 1998, the NYPD created the PDP to allow employees of the NYPD to perform off-duty uniformed security work within New York City.

1179. The primary purpose of the PDP is to provide a highly visible police presence at participating businesses.

1180. NYPD personnel who hold any of the following titles may participate in the PDP: (i) Police Officer; (ii) Detective; (iii) Sergeant; (iv) Lieutenant; (v) Captains; or (vi) Inspectors (collectively, "Officers").

1181. The PDP is the only authorized program for businesses to employ uniformed off-duty Officers.

1182. The PDP allows, with limited exceptions, any event planner, corporation, or interested organization approved by the NYPD to employ Officers part-time to provide uniformed security work.

1183. Officers are assigned to work at various businesses through the PDP, including, *inter alia*: (i) retail chains; (ii) department stores; (iii) supermarkets; (iv) houses of worship; (v) sports complexes; (vi) banks; (vii) office buildings; (viii) schools; (ix) hospitals; and (x) museums.

1184. The NYPD and the various Vendors work in concert to control all aspects of Officers' employment through the PDP.

## B.      NYPD's Administration of the PDP and Employment of Officers

### i.      Approval and Denial of Businesses

1185. The NYPD must approve a business before it is permitted to employ Officers through the PDP.

1186. The NYPD sets the parameters for business participation in the PDP.

1187. The NYPD allows, with limited exceptions, any event planner, corporation, or interested organization to qualify for the PDP, subject to the NYPD's approval.

1188. The NYPD excludes, *inter alia,* government and quasi-governmental entities and personal protection or bodyguard companies from participating in the PDP.

1189. To qualify, businesses are required to provide various information requested by the NYPD.

1190. The NYPD also performs a general background and credit check of each business.

1191. After the NYPD reviews a business's responses, background information, and credit information, it requires the business to sign a "Participation Agreement" and submit a certificate of insurance.

1192. Finally, the Commissioner of the NYPD reviews the signed Participation Agreement and certificate of insurance before granting or denying final approval for the business to participate in the PDP.

### ii.    Approval or Denial of NYPD Employees to Qualify as Officers

1193. The NYPD also sets the parameters for Officers to participate in the PDP.

1194. To qualify, an Officer must meet various criteria, including, *inter alia,* possessing greater than one year of service in the NYPD and maintaining full duty status throughout the duration of the Officer's participation in the PDP.

1195. The NYPD excludes employees who are considered chronically sick, on performance monitoring, or in possession of "position limitations."

1196. Further, the NYPD limits participation in the PDP to personnel holding specific titles and ranks. *See supra* ¶ 1174.

1197. NYPD employees must obtain approval from their commanders and submit a written application, as well as tax documentation, to be considered for participation in the PDP.

1198. Further, the NYPD's Paid Detail Unit reviews each applicant's work record before approving them to participate in the PDP.

1199. The NYPD maintains authority to unilaterally remove an Officer from the PDP if they are promoted or transferred to a position that disqualifies them, or they are placed on performance monitoring.

### iii.    Direction and Control of PDP Shifts

1200. The NYPD maintains direction, control, and supervision of the assignment of Officers to PDP shifts.

1201. Further, the NYPD maintains and operates an online portal through which participating businesses may schedule Officers to perform off-duty uniformed security work.

1202. The NYPD controls when businesses may schedule Officers for shifts and requires that shifts last from four to twelve hours.

1203. The NYPD evaluates each requested shift and, based on its assessment of safety and security concerns, determines the minimum number of Officers necessary for assignment, as well as the number of Officers required to supervise.

1204. The NYPD also controls and determines when Officers may accept shifts and the number of hours per month Officers may work the same.

1205. The NYPD limits Officers with more junior ranks, such as Police Officer or Detective, to a maximum of 80 hours of PDP work per month.

1206. The NYPD limits Officers with the more senior ranks, such Sergeant or Lieutenant, to a maximum of 30 hours of PDP work per month.

1207. The NYPD prohibits Officers from working PDP assignments within three hours of the start of their regularly scheduled non-PDP tours.

1208. Similarly, the NYPD prohibits Officers from working PDP assignments within one hour of the end of their regularly scheduled non-PDP tours.

1209. The NYPD requires Officers to complete Paid Detail Cards for each PDP shift they work.

1210. The NYPD prohibits Officers from trading PDP shifts with one another.

1211. Per its policies, the NYPD suspends Officers who request PDP shifts on behalf of other Officers or perform PDP shifts originally assigned to another Officer without the NYPD's prior authorization.

1212. The NYPD also requires that Officers provide documentation to their NYPD supervisors in the event they have to cancel a previously scheduled PDP shift.

129

1213. Officers who fail to provide such documentation risk being deemed ineligible for future PDP assignments.

1214. The NYPD prohibits Officers from working for participating businesses, including the Vendors, outside of the PDP.

1215. Officers who schedule shifts directly with a participating business are disciplined and deemed ineligible for future PDP assignments.

### iv.    Control Over Officers' Uniforms and Physical Appearance on PDP Shifts

1216. The NYPD maintains control and direction over the uniforms and physical appearance of Officers on PDP shifts.

1217. The NYPD establishes and enforces a dress code for all Officers on PDP shifts.

1218. The NYPD mandates that Officers wear NYPD-approved clothing on PDP shifts, including full uniforms, vests, and eight-point caps.

1219. The NYPD prohibits Officers from wearing, *inter alia,* baseball caps, raid jackets, and other non-uniform apparel.

1220. The NYPD requires Officers to conform to the same grooming and appearance standards applicable to Officers on regularly scheduled non-PDP tours.

1221. The NYPD directs Officers to bring NYPD-issued radios, batons, and activity logs on PDP assignments.

1222. The NYPD subjects Officers to inspection by NYPD supervisors to ensure compliance with PDP uniform and physical appearance requirements.

### v.    Control Over Officers' Work During PDP Shifts

1223. The NYPD maintains direction, control, and supervision of the work performed by Officers during PDP shifts.

1224.    Upon arrival at a participating business, the NYPD commands Officers to report to the business's representative or to the ranking Officer supervising the shift.

1225.    Additionally, the NYPD directs Officers to sign in on a Paid Detail Attendance Sheet when they arrive.

1226.    The NYPD cautions Officers that they are subject at all times to NYPD rules and regulations while working on PDP shifts.

1227.    The NYPD assigns high-ranking officials, such as Sergeants, Lieutenants, and Captains, to perform daily rounds of PDP shifts to monitor Officers' work.

1228.    The NYPD mandates that Officers report to the NYPD any arrests or Officer injuries that occur on PDP shifts.

1229.    At the conclusion of a PDP shift, the NYPD directs Officers to sign out on a Paid Detail Attendance Sheet and present a Paid Detail Card to the participating business's representative or the ranking Officer for signature.

1230.    The NYPD instructs participating businesses to report any Officer who breaches NYPD standards.

1231.    The NYPD also instructs participating businesses to report any Officer who breaches the business's own internal policies.

1232.    The NYPD disciplines Officers who breach NYPD standards or a business's policies on a PDP shift by, *inter alia*: (i) removing the given Officer from the shift; (ii) banning the Officer from future shifts with a specific business; (iii) suspending an Officer's PDP eligibility; or (iv) expelling an Officer from participation in the PDP completely.

### vi.    Control Over Officers' Wages

1233.    The NYPD directs and controls the manner in which Officers are paid through the PDP.

1234.   The NYPD establishes uniform hourly rates based on each Officer's rank.

1235.   The NYPD has set an hourly rate of $49.00 for Officers with the rank of Police Officer or Detective.

1236.   The NYPD also charges participating businesses an administrative fee of $4.90 for each hour of PDP work performed by a Police Officer or Detective.

1237.   The NYPD has set an hourly rate of $61.00 for Officers with the rank of Sergeant.

1238.   The NYPD also charges participating businesses an administrative fee of $6.10 for each hour of PDP work performed by a Sergeant.

1239.   The NYPD has set an hourly rate of $68.00 for Officers with the rank of Lieutenant.

1240.   The NYPD also charges participating businesses an administrative fee of $6.80 for each hour of PDP work performed by a Lieutenant.

1241.   The NYPD has set an hourly rate of $87.00 for Officers with the rank of Captain and Inspector.

1242.   The NYPD also charges participating businesses an administrative fee of $8.70 for each hour of PDP work performed by a Captain or Inspector.

1243.   The NYPD directs and controls the employment status of Officers, mandating that Officers are classified (incorrectly) as independent contractors for PDP shifts.

1244.   The NYPD requires payment to Officers on an IRS Form 1099, as opposed to an IRS Form W-2.

1245.    The NYPD directs Officers to list 1 Police Plaza, New York, NY 10038 (rather than the Officers' home addresses) when completing tax forms for PDP shifts.

1246.   The NYPD administers payment to Officers through the NYPD's Paid Detail Unit.

1247.   The NYPD does not permit participating businesses to pay Officers directly.

132

**C.**      **Businesses' Participation in the PDP and Employment of Officers**

1248. Once a business, such as one of the Vendors obtains approval to employ Officers, it coordinates with the NYPD to assess how many Officers the business needs to staff a particular PDP shift.

1249. Businesses, including the Vendors, direct and control the dates Officers work on PDP shifts.

1250. Businesses post solicitations on the PDP portal for Officers to view and ultimately accept.

1251. Businesses, including the Vendors, each agree to pay Officers at the uniform hourly rates set forth in the PDP.

1252. Once an Officer is hired, participating businesses, including the Vendors, direct and control the Officer throughout the PDP shift.

1253. Businesses, including the Vendors, direct Officers to the exact location where they are to work throughout the PDP shift.

1254. Businesses, including the Vendors, determine the meal and break policies for Officers and dictate the circumstances under which an Officer may intervene, such as by detaining a customer suspected of theft.

1255. Businesses, including the Vendors, also require Officers to report their work in Activity Logs at pre-determined intervals.

1256. Businesses, including the Vendors, also subject Officers to discipline and report Officers to the NYPD for failing to follow the business's policies.

1257. Businesses, including the Vendors, enforce NYPD standards in the same manner, by reporting Officers for failing to comply with the same.

1258.    Businesses, including the Vendors, control the staffing of Officers insofar as they may decline an Officer who accepts a shift through the PDP portal.

1259.    Businesses, including the Vendors, possess the power to extend an Officer's PDP shift past its scheduled end time.

1260.    Businesses, including the Vendors, direct and control when Officers are paid for work performed on PDP shifts.

**D.    Failure to Timely Pay Wages**

1261.    Defendants engage in a pattern and practice of delaying payment of wages to Plaintiffs and all other Officers beyond their regularly scheduled paydays.

1262.    Plaintiffs and all other Officers' pay periods cover a 14-day time frame, with their regularly scheduled pay day being every other Friday.

1263.    However, Defendants routinely fail to pay Plaintiffs and all other Officers for PDP shifts for weeks, and even months, after Officers complete PDP shifts.

**E.    Failure to Pay Minimum and All Earned Wages**

1264.    Similarly, Defendants engage in a pattern and practice of denying Plaintiffs and all other Officers minimum wages and all earned wages at their regular rates of pay.

1265.    For PDP shifts, Defendants agree to pay Plaintiffs and all other Officers at established hourly rates based on the Officer's respective NYPD rank.

1266.    The established hourly rates are communicated by Defendants on the PDP portal where Plaintiffs and all other Officers accept PDP shifts.

1267.    However, Defendants sometimes fail to pay any wages at all to Plaintiffs and other Officers for completed PDP shifts.

**F.** **Failure to Provide Notices of Pay Rate and Accurate Wage Statements**

1268.   The NYLL requires that employers, including the Vendors, provide employees, "at the time of hiring, a notice containing the following information:  the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; . . . the regular pay day designated by the employer [ ];  the name of the employer;  any 'doing business as' names used by the employer;  the physical address of the employer's main office or principal place of business, and a mailing address if different;  the telephone number of the employer;  plus such other information as the commissioner deems material and necessary," which is commonly referred to as a Notice of Pay Rate.  NYLL § 195(1)(a).

1269.   Throughout the statutory period, the Vendors have never provided Plaintiffs or any other Officer with Notices of Pay Rate.

1270.   The NYLL also requires that employers, including the Vendors, issue or provide employees with accurate wage statements with each payment of wages.

1271.   The Vendors never furnished Plaintiffs or any of the other Officers with accurate wage statements during the statutory period.

1272.   As a result of Vendors' failure to furnish Notices of Pay Rate and accurate wage statements, Plaintiffs and other Officers have suffered concrete harm.

1273.   Specifically, Plaintiffs and other Officers have been prevented from, inter alia: (i) realizing their true hours worked; (ii) realizing that they were underpaid and/or not paid properly; and (iii) taking appropriate action to obtain the payments due to them.

**G.** **Plaintiffs' Work for Defendants**

1274.   Defendants failed to properly pay Plaintiffs for their hours worked on PDP shifts in several ways.

135

1275.   Defendants failed to timely pay Plaintiffs for their hours worked on PDP shifts.

1276.   Throughout the statutory period, Plaintiffs were paid their wages in pay periods spanning a 14-day timeframe, with their regularly scheduled pay days being every other Friday.

1277.   However, Defendants routinely failed to pay Plaintiffs for their PDP shifts on their regularly scheduled pay days, instead waiting multiple weeks and even months to pay Plaintiffs for their work.

1278.   Numerous Officers have confirmed to Plaintiffs that Defendants also failed to timely pay them their wages for their PDP shifts.

1279.   Defendants also paid Plaintiffs below the federal and State minimum wage rates and below their regular rate of pay for all hours worked on PDP shifts.

1280.   To this day, Plaintiffs have not been paid their wages for numerous PDP shifts they worked for Defendants.

1281.   Several Officers have confirmed to Plaintiffs that Defendants have also failed to pay them their wages for their PDP shifts.

1282.   Additionally, the Vendors for whom Plaintiffs worked did not provide Plaintiffs with accurate wage statements for any of the PDP shifts that they completed.

1283.   Nor did any of the Vendors provide Plaintiffs with any Notices of Pay Rate.

1284.   Numerous other Officers have confirmed to Plaintiffs that Defendants never provided them with accurate wage statements or Notices of Pay Rate for their PDP shifts.

### 1)    Plaintiffs' Work for Target

1285.   At all times during their PDP shifts at Target, the NYPD and Target jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Target radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while

136

working for Target; (3) the conduct or behavior that was prohibited versus what was expected while working for Target; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Target did not want on their premises; (8) specific instructions on how to interact with Target's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1286.   Grant worked at least six (6) PDP shifts for Target but was never paid timely wages for his work, instead typically waiting at least two months for his paychecks.

1287.   For example, on March 17, 2024, Grant worked a seven (7) hour PDP shift for Target and was not paid for his work until approximately three months later in June 2024.

1288.   Faysal also worked at least 13 PDP shifts at Target, most recently on July 22, 2025.

1289.   Faysal never received timely payment of wages for the PDP shifts he worked for Target and instead waited multiple weeks and even months for his paychecks.

1290.   For example, Faysal worked an eight (8) hour PDP shift for Target on February 13, 2024, but waited multiple months to receive his paycheck.

1291.   To this day, Faysal has still never been paid for a PDP shift he worked for Target over a year ago on February 14, 2025.

137

1292. Ruiz-Reyes worked at least three (3) PDP shifts for Target, most recently on March 4, 2023, and never received timely payment of wages for his work, instead typically waiting about two months for his paychecks.

1293. Divino worked at least five (5) PDP shifts for Target, most recently on August 31, 2023, and never received timely payment of wages for his work, instead typically waiting two to four months, and sometimes longer, for his paychecks.

1294. Likewise, Daly worked at least seven (7) PDP shifts for Target, most recently on July 31, 2024, and never received timely payment of wages for her work, instead waiting multiple weeks and even months for her paychecks.

1295. For example, Daly worked an eight (8) hour PDP shift for Target on July 28, 2024, and waited almost two months, until September 2024, to receive her paycheck.

1296. Yanez worked over 100 PDP shifts for Target, most recently on August 14, 2025, and never received timely payment of wages for his work, instead typically waiting multiple weeks and even months for his paychecks.

1297. On July 9, 2024, Yanez worked a seven (7) hour PDP shift for Target but was not paid for his work until three months later in October 2024.

1298. As another example, on July 3, 2024, Yanez worked an eight (8) hour PDP shift for Target but was not paid for his work until over two months later in September 2024.

1299. To this day, Yanez has not been paid any wages at all for the PDP shifts he worked for Target almost 1.5 years ago on December 2, 2024 and almost a year ago on June 9, 2025.

1300. Similarly, on May 18, 2024, Garlinska worked a seven (7) hour PDP shift for Target but did not receive timely payment of wages for her work, instead waiting well over two months for her paycheck.

138

1301.   Martinez also worked a seven (7) hour PDP shift for Target and waited over a month for his paycheck.

1302.   Kmiotek also worked at least 13 PDP shifts for Target and never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

1303.   Dawkins worked at least 30 PDP shifts for Target, most recently on February 24, 2025, and never received timely payment of wages for his work, instead typically waiting multiple weeks and even months for his paychecks.

1304.   Miron also worked at least three (3) PDP shifts for Target, most recently on February 6, 2024, and never received timely payment of wages for his work, instead waiting multiple months for his paychecks.

1305.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Target.

### 2)    Plaintiffs' Work for MSG

1306.   At all times during their PDP shifts at MSG, the NYPD and MSG jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them MSG radios and MSG employee identification lanyards and signs, as well as MSG colored bands, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for MSG; (3) the conduct or behavior that was prohibited versus what was expected while working for MSG; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) a specific list of individuals with photographs they were required to be on the lookout for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) how to handle loiterers, EDPs, or other persons MSG did not want on their premises; (9) how to assist MSG employees

139

with monitoring the ticket line and the metal detectors; (10) how to handle intoxicated individuals; (11) specific instructions on how to interact with and treat VIP patrons or other special individuals; (12) the specific time they were permitted to take a meal break; (13) what they were required to do upon their return from lunch; (14) which other Officers they were required to relieve; (15) which individuals were permitted into the building and which were prohibited; and (16) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1307. Piney worked at least three (3) PDP shifts for MSG but was never paid timely wages for his work, instead waiting over two months for his paychecks.

1308. For example, on March 4, 2024, Piney worked a five (5) hour PDP shift for MSG but was not paid for his work until months later.

1309. Faysal also worked a five (5) hour PDP shift for MSG and waited almost four months to receive his paycheck.

1310. Martinez worked over 10 PDP shifts for MSG that ranged from five (5) hours to 10.5 hours each, and was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1311. Likewise, Yanez worked at least 10 PDP shifts for MSG but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1312. For example, on September 7, 2024, Yanez worked a six (6) hour PDP shift for MSG but was not paid for his work until over a month later in October 2024.

1313. On January 22, 2024, Daly worked a six (6) hour PDP shift for MSG and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

1314.  Similarly, on October 31, 2024, Garlinska worked an eight (8) hour PDP shift for MSG but did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

1315.  C. Diaz also worked over 10 PDP shifts for MSG but was never paid timely wages for his work, instead typically waiting multiple weeks and even months for his wages.

1316.  For example, on November 12, 2023, C. Diaz worked an 8.5-hour PDP shift for MSG and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1317.  Ting also worked at least seven (7) PDP shifts for MSG and was never paid timely wages for his work, instead typically waiting months to receive his paychecks.

1318.  For example, on April 3, 2023, Ting worked an eight (8) hour PDP shift for MSG but did not receive timely payment of wages for his work, instead waiting months for his paycheck.

1319.  As another example, on May 17, 2023, Khan worked a five (5) hour PDP shift for MSG and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1320.  Grant also worked at least 13 PDP shifts for MSG but never received timely payment of wages for his work, instead waiting multiple months for his paychecks.

1321.  Delgado also worked at least nine (9) PDP shifts for MSG but was never paid timely wages for his work, instead typically waiting multiple weeks for his paychecks.

1322.  Kmiotek also worked at least two (2) PDP shifts for MSG but was never paid timely wages for his work, instead waiting multiple months for his paychecks.

1323.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for MSG.

141

**3)      Plaintiffs' Work for Yankees**

1324.    At all times during their PDP shifts at Yankees, the NYPD and Yankees jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Yankee radios, Yankees employee identification lanyards and signs, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yankees; (3) the conduct or behavior that was prohibited versus what was expected while working for Yankees; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) individuals they were required to be on the lookout for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) how to handle loiterers, EDPs, or other persons Yankees did not want on their premises; (9) specific instructions on how to interact with Yankees' patrons; (10) how to handle intoxicated individuals; (11) when they were permitted to take a meal break; (12) which individuals were permitted onto the premises and which were prohibited; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their uniform throughout the entirety of their shift.

1325.    Suazo worked over 60 shifts for Yankees, most recently on December 28, 2024, and was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1326.    For example, on May 19, 2024, Suazo worked a six (6) hour PDP shift for Yankees but was not paid for his work until approximately two months later in July 2024.

1327.    Yanez also worked over five (5) PDP shifts for Yankees but was never paid timely wages for his work.

142

1328.   For example, on July 23, 2023, Yanez worked a 6.5-hour PDP shift for Yankees and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1329.   Likewise, Daly also worked a six (6) hour PDP shift for Yankees and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

1330.   Grant also worked at least two (2) PDP shifts for Yankees but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1331.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yankees.

**4)    Plaintiffs' Work for RXR**

1332.   At all times during their PDP shifts at RXR, the NYPD and RXR jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them RXR radios and RXR employee identification lanyards and signs, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for RXR; (3) the conduct or behavior that was prohibited versus what was expected while working for RXR; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons RXR did not want on their premises; (8) the manner in which RXR required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which third party vendors were allowed on the premises and under what circumstances; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they

143

maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1333.   From 2023 to 2024, Piney worked over 40 PDP shifts for RXR but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

1334.    For example, on October 29, 2024, Piney worked an eight (8) hour PDP shift for RXR and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1335.   As another example, on October 14, 2024, Piney worked another eight (8) hour PDP shift for RXR but was not paid for his work until approximately two months later, in late December 2024.

1336.   C. Diaz also worked at least three (3) PDP shifts for RXR and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1337.   For example, on May 11, 2023, C. Diaz worked a four (4) hour PDP shift for RXR and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1338.   Khan also worked at least eight (8) PDP shifts for RXR but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1339.   For example, Khan had to wait until mid-March to receive his paycheck for a 7.5-hour PDP shift he worked for RXR two months earlier, on January 7, 2026.

1340.   Yanez also worked at least two (2) PDP shifts for RXR and was never paid timely wages for his work.

1341.   For example, on January 2, 2026, Yanez worked a PDP shift for RXR and had to wait multiple weeks to receive his paycheck.

1342.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for RXR.

### 5)    Plaintiffs' Work for The Spiral

1343.  At all times during their PDP shifts at The Spiral, the NYPD and The Spiral jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them The Spiral radios, The Spiral employee identification lanyards and signs, as well as The Spiral key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for The Spiral; (3) the conduct or behavior that was prohibited versus what was expected while working for The Spiral; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons The Spiral did not want on their premises; (8) the manner in which The Spiral required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1344.  From 2023 to 2025, Piney worked over 30 PDP shifts for The Spiral but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

1345.  For example, on April 1, 2025, Piney worked an eight (8) hour PDP shift for The Spiral and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

145

1346. As another example, on June 18, 2024, Piney worked an eight (8) hour PDP shift for The Spiral but was not paid for his work until over a month later in August 2024.

1347. Khan also worked at least nine (9) PDP shifts for The Spiral and was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1348. For example, on September 1, 2024, Khan worked an eight (8) hour PDP shift for The Spiral and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1349. Similarly, on September 5, 2025, Yanez worked an eight (8) hour PDP shift for The Spiral but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1350. On July 16, 2025, Martinez worked an eight (8) hour PDP shift for The Spiral but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1351. Dawkins worked at least 12 PDP shifts for The Spiral but was never paid timely wages for his work.

1352. For example, on February 4, 2024, Dawkins worked an eight (8) hour PDP shift for The Spiral and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1353. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for The Spiral.

### 6)    Plaintiffs' Work for LIC Site B-1

1354. At all times during their PDP shifts at LIC Site B-1, the NYPD and LIC Site B-1 jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them

LIC Site B-1 radios, LIC Site B-1 employee identification lanyards and signs, as well as LIC Site B-1 key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for LIC Site B-1; (3) the conduct or behavior that was prohibited versus what was expected while working for LIC Site B-1; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons LIC Site B-1 did not want on their premises; (8) the manner in which LIC Site B-1 required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1355. Kmiotek worked at least two (2) PDP shifts for LIC Site B-1 but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1356. For example, on April 4, 2023, Kmiotek worked an eight (8) hour PDP shift for LIC Site B-1 and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1357. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for LIC Site B-1.

7)    **Plaintiffs' Work for Rockefeller Center**

1358. At all times during their PDP shifts at Rockefeller Center, the NYPD and Rockefeller Center jointly supervised and controlled the terms of Plaintiffs' employment by, *inter*

147

*alia*, assigning them Rockefeller Center radios and Rockefeller Center employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rockefeller Center; (3) the conduct or behavior that was prohibited versus what was expected while working for Rockefeller Center; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) strict instructions on not being permitted to sit down or stand in one location for longer than specific periods of time; (6) suspicious activity they were required to look out for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) how to handle loiterers, EDPs, or other persons Rockefeller Center did not want on their premises; (9) the specific manner in which Rockefeller Center required them to perform perimeter checks; (10) the specific time they were permitted to take a meal break; (11) what they were required to do upon their return from lunch; (12) which other Officers they were required to relieve; (13) which individuals were permitted onto the premises and which were prohibited; (14) which third party vendors were allowed on the premises and under what circumstances; and (15) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1359. Piney worked over 100 PDP shifts for Rockefeller Center but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

1360. For example, on July 24, 2023, Piney worked an eight (8) hour PDP shift for Rockefeller Center but was not paid for his work until multiple weeks later in late August 2023.

1361. Similarly, on December 1, 2024, Suazo worked an eight (8) hour PDP shift for Rockefeller Center but was not paid for his work until approximately 2.5 months later, on February 13, 2025.

1362. Martinez worked at least eight (8) PDP shifts for Rockefeller Center and was never paid timely wages for his work.

1363. For example, on September 8, 2025, Martinez worked a 12-hour PDP shift for Rockefeller Center and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1364. To this day, Martinez has still never been paid for the PDP shift he worked for Rockefeller Center on February 28, 2026.

1365. From November 2022 to December 2022, Divino worked three (3) PDP shifts for Rockefeller Center, each eight (8) hours long, and was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1366. Likewise, Yanez worked at least five (5) PDP shifts for Rockefeller Center and was never paid timely wages for his work.

1367. For example, on August 7, 2024, Yanez worked an eight (8) hour PDP shift for Rockefeller Center but was not paid for his work until multiple weeks later in September 2024.

1368. Also on March 11, 2025, Yanez worked an eight (8) hour PDP shift for Rockefeller Center and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1369. On December 8, 2023, Zorrilla worked an eight (8) hour PDP shift for Rockefeller Center and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1370.  Dawkins also worked at least five (5) PDP shifts for Rockefeller Center and was never paid timely wages for his work.

1371.  For example, on September 13, 2025, Dawkins worked a 12-hour PDP shift for Rockefeller Center and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1372.  On April 1, 2025, Eveillard worked an eight (8) hour PDP shift for Rockefeller Center.

1373.  Eveillard did not receive timely payment of wages for the PDP shift she worked for Rockefeller Center and instead waited multiple weeks for her paycheck.

1374.  Likewise, on June 16, 2024, Faysal worked an eight (8) hour PDP shift for Rockefeller Center but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1375.  Ting also worked an eight (8) hour PDP shift at Rockefeller Center but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1376.  Lauzier also worked an eight (8) hour PDP shift for Rockefeller Center and waited well over a month for her paycheck.

1377.  Khan worked over four (4) PDP shifts for Rockefeller Center and was never paid timely wages for his work.

1378.  For example, on November 16, 2024, Khan worked a seven (7) hour PDP shift for Rockefeller Center and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1379.  Delgado also worked at least two (2), eight (8) hour PDP shifts for Rockefeller Center and waited approximately a month for his paychecks.

1380.   Likewise, Garlinska worked an eight (8) hour PDP shift for Rockefeller Center and waited approximately two months for her paycheck.

1381.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rockefeller Center.

**8)      Plaintiffs' Work for Disney**

1382.   At all times during their PDP shifts at Disney, the NYPD and Disney jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Disney radios, Disney employee identification lanyards and signs, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Disney; (3) the conduct or behavior that was prohibited versus what was expected while working for Disney; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) how to assist Disney employees with monitoring the ticket line, the ticket box, and the metal detectors; (6) suspicious activity they were required to look out for; (7) the manner in which they were required to respond to various incidents and disturbances before, during, and after each show; (8) how to handle loiterers, EDPs, or other persons Disney did not want on their premises; (9) how to handle intoxicated individuals; (10) the specific time they were permitted to take a meal break; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1383.   From 2023 to 2024, Piney worked over 15 PDP shifts for Disney but was never paid timely wages for his work, instead typically waiting two to three months for his wages.

1384.   For example, on March 28, 2024, Piney worked a six (6) hour PDP shift for Disney and did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

1385.   On December 5, 2023, Dawkins worked a 10-hour PDP shift for Disney but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1386.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Disney.

### 9)    **Plaintiffs' Work for Boston Properties**

1387.   At all times during their PDP shifts at Boston Properties, the NYPD and Boston Properties jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Boston Properties radios and Boston Properties employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Boston Properties; (3) the conduct or behavior that was prohibited versus what was expected while working for Boston Properties; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Boston Properties did not want on their premises; (8) the manner in which Boston Properties required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1388.   Piney worked at least three (3) PDP shifts for Boston Properties but was never paid timely wages for his work.

1389.   For example, on November 10, 2023, Piney worked an eight (8) hour PDP shift for Boston Properties and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1390.   Faysal also worked an eight (8) hour PDP shift for Boston Properties and was not paid timely wages for his work, instead waiting multiple weeks to receive his paycheck.

1391.   Likewise, Yanez worked at least three (3) PDP shifts for Boston Properties, each eight (8) hours long, and was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1392.   For example, on November 4, 2025, Yanez worked an eight (8) hour PDP shift for Boston Properties but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1393.   Martinez also worked at least 13 PDP shifts for Boston Properties and was never paid timely wages for his work, instead waiting well over a month for his paychecks.

1394.   For example, on October 8, 2025, Martinez worked a 12-hour PDP shift for Boston Properties and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1395.   C. Diaz also worked at least four (4) PDP shifts for Boston Properties but was never paid timely wages for his work.

1396.   For example, on July 2, 2023, C. Diaz worked an eight (8) hour PDP shift for Boston Properties and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

153

1397.   On October 22, 2022, Chow worked a PDP shift for Boston Properties but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1398.   Osorio worked at least three (3) PDP shifts for Boston Properties but was never paid timely wages for his work.

1399.   For example, on July 12, 2023, Osorio worked an eight (8) hour PDP shift for Boston Properties and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1400.   Ting also worked at least three (3) PDP shifts for Boston Properties but never received timely wages for his work.

1401.   For example, on April 10, 2025, Ting worked an eight (8) hour PDP shift for Boston Properties but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1402.   Likewise, on November 10, 2024, Cannon worked an eight (8) hour PDP shift for Boston Properties and never received timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1403.   Similarly, on November 29, 2024, Garlinska worked an eight (8) hour PDP shift for Boston Properties but did not receive timely payment of wages for her work, instead waiting approximately two months for her paycheck.

1404.   R. Diaz also worked at least four (4) PDP shifts for Boston Properties but never received timely wages for his work, instead waiting well over a month for his paychecks.

1405.   Senese also worked over 80 PDP shifts for Boston Properties but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

154

1406.   For example, on October 28, 2025, Senese worked an eight (8) hour PDP shift for Boston Properties and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1407.   Khan worked at least five (5) PDP shifts for Boston Properties and was never paid timely wages for his work, instead typically waiting about a month for his paychecks.

1408.   For example, on May 10, 2025, Khan worked an eight (8) hour PDP shift for Boston Properties and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1409.   Grant also worked at least two (2) PDP shifts for Boston Properties but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1410.   Likewise, Abouabdallah worked at least two (2) PDP shifts for Boston Properties but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1411.   For example, on July 6, 2023, Abouabdallah worked an eight (8) hour PDP shift for Boston Properties and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1412.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Boston Properties.

**10)    Plaintiffs' Work for Royal Realty**

1413.   At all times during their PDP shifts at Royal Realty, the NYPD and Royal Realty jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Royal Realty radios and Royal Realty employee identification lanyards and signs, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the

155

specific policies and regulations Plaintiffs were required to follow while working for Royal Realty; (3) the conduct or behavior that was prohibited versus what was expected while working for Royal Realty; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Royal Realty did not want on their premises; (8) the manner in which Royal Realty required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1414.    Kmiotek worked at least four (4) PDP shifts for Royal Realty but was never paid timely wages for work, instead typically waiting well over a month for his wages.

1415.    For example, on January 23, 2022, Kmiotek worked an eight (8) hour PDP shift for Royal Realty and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1416.    Piney also worked at least two (2) PDP shifts for Royal Realty, each eight (8) hours long, and was never paid timely wages for his work, instead waiting approximately two months for his paychecks.

1417.    Ting worked at least four (4) PDP shifts for Royal Realty and was never paid timely wages for his work, instead typically waiting multiple months for his paychecks.

1418.    For example, on October 21, 2022, Ting worked a PDP shift for Royal Realty but did not receive timely payment of wages for his work, instead waiting months for his paycheck.

1419. Lauzier also worked at least four (4) PDP shifts for Royal Realty but was never paid timely wages for her work.

1420. For example, on November 15, 2022, Lauzier worked an eight (8) hour PDP shift for Royal Realty and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

1421. Likewise, Delgado worked at least 12 PDP shifts for Royal Realty but was never paid timely wages for his work.

1422. For example, on January 31, 2023, Delgado worked an eight (8) hour PDP shift for Royal Realty and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1423. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Royal Realty.

**11)   Plaintiffs' Work for NYP**

1424. At all times during their PDP shifts at NYP, the NYPD and NYP jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NYP radios and NYP employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NYP; (3) the conduct or behavior that was prohibited versus what was expected while working for NYP; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NYP did not want on their premises; (8) the manner in which NYP required them to perform perimeter

157

checks; (9) specific instructions on how to interact with NYP patients and employees; (10) which individuals are not permitted to leave NYP without specific documentation; (11) when they were permitted to take a meal break; (12) which individuals were permitted into the building and which were prohibited; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1425.   Faysal worked seven (7) PDP shifts for NYP, each eight (8) hours long, and never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

1426.   For example, on May 28, 2019, Faysal worked an eight (8) hour PDP shift for NYP but was not paid for his work until two months later in July 2019.

1427.   Martinez worked over 20 PDP shifts for NYP, each eight (8) hours long, and was never paid timely wages for his work, instead typically waiting multiple weeks and well over a month for his paychecks.

1428.   Suazo also worked at least 10 PDP shifts for NYP, each eight (8) hours long, and was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1429.   Likewise, Yanez worked at least seven (7) PDP shifts for NYP, each eight (8) hours long, and was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1430.   Pantoja also worked at least 13 PDP shifts for NYP and was never paid timely wages for her work, instead waiting multiple weeks for her paychecks.

1431.   Ting worked at least five (5) PDP shifts for NYP and was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1432.   Kmiotek also worked at least six (6) PDP shifts for NYP but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1433.   Grant also worked an eight (8) hour PDP shift for NYP but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1434.   Similarly, Delgado worked at least three (3) PDP shifts for NYP and waited approximately a month for his paychecks.

1435.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NYP.

**12)     Plaintiffs' Work for NYU Langone**

1436.   At all times during their PDP shifts at NYU Langone, the NYPD and NYU Langone jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NYU Langone radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NYU Langone; (3) the conduct or behavior that was prohibited versus what was expected while working for NYU Langone; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NYU Langone did not want on their premises; (8) specific instructions on how to interact with NYU Langone patients and employees; (9) which individuals were not permitted to leave NYU Langone without specific documentation; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

159

1437. Eveillard never received timely payment of wages for the PDP shifts she worked for NYU Langone and instead waited weeks for her paychecks.

1438. For example, on June 1, 2025 and June 2, 2025, Eveillard worked two, eight (8) hour PDP shifts for NYU Langone but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paychecks.

1439. Martinez worked at least eight (8) PDP shifts for NYU Langone but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

1440. For example, on June 6, 2025, Martinez worked an eight (8) hour PDP shift for NYU Langone and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1441. Faysal worked at least (4) PDP shifts for NYU Langone and was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1442. For example, on August 18, 2025 and August 24, 2025, Faysal worked two, eight (8) hour PDP shifts for NYU Langone but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1443. As another example, on September 30, 2019, Faysal worked an eight (8) hour PDP shift for NYU Langone but was not paid for his work until over three months later in January 2020.

1444. Likewise, Yanez worked at least three (3) PDP shifts for NYU Langone, each eight (8) hours long but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1445. Dawkins worked over 40 PDP shifts for NYU Langone but was never paid timely wages for his work.

1446. For example, on September 26, 2025, Dawkins worked an eight (8) hour PDP shift

for NYU Langone but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1447.   Pantoja also worked at least 10 PDP shifts for NYU Langone but was never paid timely wages for her work.

1448.   For example, on June 1, 2025, Pantoja worked an eight (8) hour PDP shift for NYU Langone and did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1449.   Chow also worked at least six (6) PDP shifts for NYU Langone but was never paid timely wages for his work, instead typically waiting multiple months for his paychecks.

1450.   For example, on January 28, 2023, Chow worked an eight (8) hour PDP shift for NYU Langone and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1451.   Osorio worked at least 17 PDP shifts for NYU Langone and never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

1452.   For example, on September 2, 2025, Osorio worked an eight (8) hour PDP shift for NYU Langone but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1453.   Ting worked at least three (3) PDP shifts for NYU Langone and was never paid timely wages for his work.

1454.   For example, on April 12, 2025, Ting worked an eight (8) hour PDP shift for NYU Langone and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

161

1455. Likewise, Abouabdallah worked at least six (6) PDP shifts for NYU Langone, most recently on October 9, 2024, and never received timely payment of wages for his work, instead typically waiting over a month for his paychecks.

1456. Lauzier also worked at least seven (7) PDP shifts for NYU Langone but was never paid timely wages for her work, instead typically waiting well over a month for her paychecks.

1457. For example, on July 27, 2025, Lauzier worked an eight (8) hour PDP shift for NYU Langone but did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

1458. To this day, Lauzier has never been paid any wages at all for the PDP shift she worked for NYU Langone on February 28, 2026.

1459. Mansour also worked at least 45 PDP shifts for NYU Langone but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

1460. For example, on October 25, 2025, Mansour worked an eight (8) hour PDP shift for NYU Langone and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1461. Khan worked at least seven (7) PDP shifts for NYU Langone but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1462. For example, on February 29, 2024, Khan worked an eight (8) hour PDP shift for NYU Langone and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1463. Delgado also worked at least two (2) PDP shifts for NYU Langone and waited approximately a month for his paychecks.

1464.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NYU Langone.

### 13)    Plaintiffs' Work for Mount Sinai

1465.   At all times during their PDP shifts at Mount Sinai, the NYPD and Mount Sinai jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Mount Sinai radios, Mount Sinai employee identification lanyards and signs, as well as Mount Sinai key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Mount Sinai; (3) the conduct or behavior that was prohibited versus what was expected while working for Mount Sinai; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Mount Sinai did not want on their premises; (8) specific instructions on how to interact with Mount Sinai patients and employees; (9) which individuals were not permitted to leave Mount Sinai without specific documentation; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1466.   R. Diaz worked over 75 PDP shifts for Mount Sinai but was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1467.   For example, on January 2, 2024, R. Diaz worked an eight (8) hour PDP shift for Mount Sinai but was not paid for his work until multiple weeks later in February 2024.

163

1468.    Yanez worked over 30 PDP shifts for Mount Sinai but was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1469.    For example, on July 4, 2025, Yanez worked an eight (8) hour PDP shift for Mount Sinai but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1470.    As another example, on December 31, 2023, Yanez worked an eight (8) hour PDP shift for Mount Sinai but was not paid for his work until two months later in February 2024.

1471.    From 2023 to 2024, Zorrilla worked approximately 14 PDP shifts for Mount Sinai and was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1472.    For example, on June 7, 2024, Zorrilla worked an eight (8) hour PDP shift for Mount Sinai but was not paid for his work until two months later, on August 2, 2024.

1473.    On February 8, 2023, Dawkins worked an eight (8) hour PDP shift for Mount Sinai but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1474.    As another example, on January 22, 2023, Chow worked an eight (8) hour PDP shift for Mount Sinai and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1475.    Osorio worked at least three (3) PDP shifts for Mount Sinai but was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1476.    For example, on June 14, 2023, Osorio worked an eight (8) hour PDP shift for Mount Sinai but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1477. On October 22, 2022, Faysal worked an eight (8) hour PDP shift for Mount Sinai but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

1478. Khan also worked at least two (2) PDP shifts for Mount Sinai but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

1479. For example, on November 11, 2023, Khan worked an eight (8) hour PDP shift for Mount Sinai and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1480. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Mount Sinai.

## 14)    Plaintiffs' Work for NYT

1481. At all times during their PDP shifts at NYT, the NYPD and NYT jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NYT employee identification lanyards and signs, as well as NYT key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NYT; (3) the conduct or behavior that was prohibited versus what was expected while working for NYT; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NYT did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted into the building and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

165

1482.   R. Diaz worked at least 20 PDP shifts for NYT but was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1483.   For example, on February 21, 2024, R. Diaz worked an eight (8) hour PDP shift for NYT but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1484.   As another example, on December 8, 2023, R. Diaz worked an eight (8) hour PDP shift for NYT but was not paid for his work until approximately two months later in February 2024.

1485.   Yanez also worked at least seven (7) PDP shifts for NYT but was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1486.   For example, on February 12, 2025, Yanez worked an eight (8) hour PDP shift for NYT but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1487.   As another example, on August 6, 2024, Yanez worked an eight (8) hour PDP shift for NYT but was not paid for his work until two months later in October 2024.

1488.   Likewise, on December 9, 2022, Divino worked an eight (8) hour PDP shift for NYT and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1489.   Similarly, on November 10, 2025, Divino worked an eight (8) hour PDP shift for NYT and again did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

166

1490.  On September 25, 2024, Dawkins also worked a 12-hour PDP shift for NYT but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1491.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NYT.

### 15)    Plaintiffs' Work for Kering

1492.  At all times during their PDP shifts at Kering, the NYPD and Kering jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Kering; (3) the conduct or behavior that was prohibited versus what was expected while working for Kering; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Kering did not want on their premises; (8) specific instructions on how to interact with Kering customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1493.  Martinez worked over 90 PDP shifts for Kering and never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

1494.  For example, on February 25, 2025, Martinez worked an 8.25-hour PDP shift for Kering but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

167

1495.   On August 10, 2023, Yanez also worked an eight (8) hour PDP shift for Kering but was not paid for his work until multiple weeks later.

1496.   Likewise, Daly worked an 8.25-hour PDP shift for Kering and waited multiple weeks for her paycheck.

1497.   Osorio worked at least two (2) PDP shifts for Kering but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1498.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Kering.

### 16)   Plaintiffs' Work for BJs

1499.   At all times during their PDP shifts at BJs, the NYPD and BJs jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them BJs radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for BJs; (3) the conduct or behavior that was prohibited versus what was expected while working for BJs; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons BJs did not want on their premises; (8) specific instructions on how to interact with BJs' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

168

1500. Martinez worked at least four (4) PDP shifts for BJs but was never paid timely wages for his work.

1501. For example, on December 18, 2024, Martinez worked an eight (8) hour PDP shift for BJs and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1502. Faysal also worked at least 15 PDP shifts for BJs but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1503. For example, on September 24, 2025, Faysal worked a 6.5-hour PDP shift for BJs but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1504. As another example, on June 21, 2022, Faysal worked an eight (8) hour PDP shift for BJs but was not paid for his work until over a month later in August 2022.

1505. Yanez also worked at least four (4) PDP shifts for BJs but was never paid timely wages for his work, instead typically waiting well over a month and sometimes over two months for his paychecks.

1506. For example, Yanez waited approximately a month, until mid-February, for his paycheck for the 5.5-hour PDP shift he worked for BJs on January 12, 2025.

1507. Likewise, Yanez waited over two months for his paycheck for the 10-hour PDP shift he worked for BJs on December 5, 2024.

1508. Similarly, Daly worked a 5.5-hour PDP shift for BJs and waited over seven months for her paycheck.

1509. Kmiotek worked over 145 PDP shifts for BJs but was never paid timely wages for his work.

169

1510. For example, on October 21, 2025, Kmiotek worked a 6.5-hour PDP shift for BJs and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1511. To this day, Kmiotek has not been paid for the PDP shift he worked for BJs on March 1, 2026.

1512. Dawkins also worked at least 11 PDP shifts for BJs but was never paid timely wages for his work.

1513. For example, on October 4, 2024, Dawkins worked a 6.5-hour PDP shift for BJs and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1514. Chow worked at least three (3) PDP shifts for BJs but was never paid timely wages for his work, instead typically waiting multiple weeks to well over a month for his paychecks.

1515. For example, on March 17, 2023, Chow worked a 6.5-hour PDP shift for BJs and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1516. Osorio also worked at least three (3) PDP shifts for BJs but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1517. Ting worked over 22 PDP shifts for BJs and was never paid timely wages for his work.

1518. For example, on July 15, 2025 and July 22, 2025, Ting worked two (2) PDP shifts for BJs but did not receive timely payment of wages for his work, instead waiting over a month for his paychecks.

170

1519. Likewise, Abouabdallah worked at least nine (9) PDP shifts for BJs, most recently on March 9, 2025 but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1520. Similarly, on June 1, 2025, Rondon worked a 5.5-hour PDP shift for BJs and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1521. Garlinska also worked at least four (4) PDP shifts for BJs but was never paid timely wages for her work, instead typically waiting over a month for her paychecks.

1522. For example, on August 9, 2024, Garlinska also worked a 6.5-hour PDP shift for BJs but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1523. Senese also worked at least five (5) PDP shifts for BJs but was never paid timely wages for his work.

1524. For example, on January 10, 2024, Senese worked an eight (8) hour PDP shift for BJs and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1525. Miron also worked at least two (2) PDP shifts for BJs, most recently on January 25, 2024, but was never paid timely wages for his work, instead typically waiting multiple weeks to well over a month for his paychecks.

1526. On October 22, 2025, Mansour worked a six (6) hour PDP shift for BJs but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1527. Lauzier worked over 65 PDP shifts for BJs and was never paid timely wages for her work, instead typically waiting well over a month for her paychecks.

171

1528.   For example, on December 2, 2025, Lauzier worked an eight (8) hour PDP shift for BJs but never received timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1529.   To this day, Lauzier has never been paid any wages at all for the PDP shift she worked for BJs over a month ago, on February 5, 2026.

1530.   Grant also worked at least 17 PDP shifts for BJs but was never paid timely wages for his work, instead typically waiting well over a month and sometimes over two months for his paychecks.

1531.   Delgado also worked at least 20 PDP shifts for BJs but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

1532.   For example, on April 14, 2025, Delgado worked a 7.5-hour PDP shift for BJs and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1533.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for BJs.

**17)    Plaintiffs' Work for Rodeph Sholom**

1534.   At all times during their PDP shifts at Rodeph Sholom, the NYPD and Rodeph Sholom jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Rodeph Sholom radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rodeph Sholom; (3) the conduct or behavior that was prohibited versus what was expected while working for Rodeph Sholom; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required

172

to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rodeph Sholom did not want on their premises; (8) specific instructions on how to interact with Rodeph Sholom visitors and students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Rodeph Sholom employees with clearing traffic and monitoring students; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1535.  Martinez worked at least nine (9) PDP shifts for Rodeph Sholom but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1536.  For example, on March 27, 2025, Martinez worked a 7.5-hour PDP shift for Rodeph Sholom and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1537.  As another example, on September 21, 2024, Martinez worked a 6.5-hour PDP shift for Rodeph Sholom but was not paid for his work until approximately a month later in October 2024.

1538.  Faysal also worked an 8.5-hour PDP shift for Rodeph Sholom and was not paid for his work until multiple weeks later.

1539.  Likewise, on May 3, 2023, Abouabdallah worked an eight (8) hour PDP shift for Rodeph Sholom but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1540.  Ting also worked an 8.5-hour PDP shift for Rodeph Sholom but did not receive timely payment of wages for his work, instead waiting almost two months his paycheck.

1541. Similarly, Garlinska worked at least four (4) PDP shifts for Rodeph Sholom but was never paid timely wages for her work.

1542. For example, on September 16, 2024, Garlinska worked an 8.5-hour PDP shift for Rodeph Sholom and did not receive timely payment of wages for her work, instead waiting approximately a month for her paycheck.

1543. Grant also worked an 8.5-hour PDP shift for Rodeph Sholom but did not receive timely payment of wages for his work, instead waiting almost two months for his paycheck.

1544. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rodeph Sholom.

### 18)   **Plaintiffs' Work for Apple**

1545. At all times during their PDP shifts at Apple, the NYPD and Apple jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Apple; (3) the conduct or behavior that was prohibited versus what was expected while working for Apple; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Apple did not want on their premises; (8) specific instructions on how to interact with Apple's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they

174

maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1546.  On September 18, 2024 and September 19, 2024, Martinez worked two, seven (7) hour PDP shifts for Apple but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1547.  Faysal worked at least five (5) PDP shifts for Apple and never received timely payment of wages for his work.

1548.  For example, on April 15, 2025 and July 8, 2025, Faysal worked two, seven (7) hour PDP shifts for Apple but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1549.  Dawkins worked at least 11 PDP shifts for Apple, most recently on September 22, 2025, and was never paid timely wages for his work, instead waiting multiple weeks and well over a month for his paychecks.

1550.  For example, on March 24, 2025 and March 25, 2025, Dawkins worked two, nine (9) hour PDP shifts for Apple but did not receive timely payment of wages for his work, instead waiting well over a month for his paychecks.

1551.  On March 3, 2025 and March 10, 2025, Pantoja worked two, nine (9) hour PDP shifts for Apple and did not receive timely payment of wages for her work, instead waiting multiple weeks for her paychecks.

1552.  As another example, on May 11, 2025, Eveillard worked a nine (9) hour PDP shift for Apple but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

175

1553.   Likewise, on January 16, 2024, Senese worked an eight (8) hour PDP shift for Apple but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1554.   Khan also worked at least 12 PDP shifts for Apple, most recently on May 20, 2025, and never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

1555.   For example, on February 26, 2023, Khan worked a nine (9) hour PDP shift for Apple and did not receive timely payment of wages for his work, instead waiting over two months for his paycheck.

1556.   As another example, on May 20, 2024, Khan worked an eight (8) hour PDP shift for Apple and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1557.   In 2025, Antonio worked at least 10 PDP shifts for Apple and was never paid timely wages for his work.

1558.   For example, on August 31, 2025, Antonio worked an eight (8) hour PDP shift for Apple but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1559.   To this day, Antonio has never been paid any wages for the two PDP shifts he worked for Apple on February 19, 2026 and February 26, 2026.

1560.   Likewise, Garlinska worked at least three (3) PDP shifts for Apple but was never paid timely wages for her work.

1561.   For example, on October 30, 2024, Garlinska worked a nine (9) hour PDP shift for Apple and did not receive timely payment of wages for her work, instead waiting approximately a month for her paycheck.

1562.   On February 17, 2023, Cannon worked a seven (7) hour PDP shift for Apple but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1563.   As another example, on December 13, 2025, Kmiotek worked an eight (8) hour PDP shift for Apple but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1564.   Lauzier worked two (2) PDP shifts for Apple, most recently on November 22, 2025, and was never paid timely wages for her work, instead waiting multiple weeks for her paychecks.

1565.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Apple.

**19)    Plaintiffs' Work for 34th St.**

1566.   At all times during their PDP shifts at 34th St., the NYPD and 34th St. jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for 34th St.; (3) the conduct or behavior that was prohibited versus what was expected while working for 34th St.; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons 34th St. did not want on their premises; (8) the manner in which 34th St. required them to perform perimeter checks; (9) when

177

they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1567.   On March 16, 2023, Martinez worked an eight (8) hour PDP shift for 34th St. and did not receive timely payment of wages for his work, instead waiting well over two months for his paycheck.

1568.   Likewise, Daly worked an eight (8) hour PDP shift for 34th St. and waited almost two months for her paycheck.

1569.   Dawkins worked at least nine (9) PDP shifts for 34th St. but was never paid timely wages for his work, instead typically waiting two to three months, and sometimes even longer for his paychecks.

1570.   For example, on February 6, 2025, Dawkins worked a 12-hour PDP shift for 34th St. and did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

1571.   Similarly, Garlinska worked at least three (3) PDP shifts for 34th St. but was never paid timely wages for her work, instead typically waiting at least two months for her paychecks.

1572.   For example, on September 23, 2024, Garlinska worked a 10-hour PDP shift for 34th St. and did not receive timely payment of wages for her work, instead waiting well over two months for her paycheck.

1573.   Likewise, on February 17, 2025, Ting worked a 10-hour PDP shift for 34th St. but did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

178

1574.   Delgado also worked at least seven (7) PDP shifts for 34th St. but was never paid timely wages for his work, instead typically waiting well over a month and sometimes two months for his paychecks.

1575.   For example, on January 5, 2024, Delgado worked a 12-hour PDP shift for 34th St. and did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

1576.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for 34th St.

### 20)    **Plaintiffs' Work for BOA**

1577.   At all times during their PDP shifts at BOA, the NYPD and BOA jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them BOA radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for BOA; (3) the conduct or behavior that was prohibited versus what was expected while working for BOA; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons BOA did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted into the building and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1578.   On March 6, 2023, Martinez worked a four (4) hour PDP shift for BOA and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

179

1579.   Likewise, Daly worked a six (6) hour PDP shift for BOA and waited multiple weeks for her paycheck.

1580.   Yanez also worked a six (6) hour PDP shift for BOA and waited multiple weeks for his paycheck.

1581.   Osorio worked at least seven (7) PDP shifts for BOA and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1582.   On July 21, 2023, Cannon also worked a six (6) hour PDP shift for BOA and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1583.   Garlinska also worked at least two (2) PDP shifts for BOA but was never paid timely wages for her work, instead waiting over a month for her paychecks.

1584.   For example, on March 7, 2023, Garlinska worked a six (6) hour PDP shift for BOA and did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1585.   Grant also worked a six (6) hour PDP shift for BOA but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1586.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages until weeks and even months after they worked their PDP shifts for BOA.

**21)    Plaintiffs' Work for 180 Maiden**

1587.   At all times during their PDP shifts at 180 Maiden, the NYPD and 180 Maiden jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for 180 Maiden; (3) the conduct or behavior that was prohibited versus what was expected while working for 180 Maiden; (4) the specific areas they were required to monitor and the manner in which they were required

to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons 180 Maiden did not want on their premises; (8) the manner in which 180 Maiden required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1588.  On December 1, 2022, Martinez worked a four (4) hour PDP shift for 180 Maiden and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1589.  Chow worked at least nine (9) PDP shifts for 180 Maiden but was never paid timely wages for his work, instead typically waiting multiple months for his wages.

1590.  For example, on March 8, 2023, Chow worked a five (5) hour PDP shift for 180 Maiden and did not receive timely payment of wages for his work, instead waiting months for his paycheck.

1591.  As another example, on January 20, 2023, Delgado worked a four (4) hour PDP shift for 180 Maiden and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1592.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for 180 Maiden.

### 22)    Plaintiffs' Work for Marshalls

1593.  At all times during their PDP shifts at Marshalls, the NYPD and Marshalls jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them

181

Marshalls radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Marshalls; (3) the conduct or behavior that was prohibited versus what was expected while working for Marshalls; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Marshalls did not want on their premises; (8) specific instructions on how to interact with Marshalls' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1594.   On May 11, 2022, Grant worked a six (6) hour PDP shift for Marshalls and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1595.   Faysal also worked numerous PDP shifts for Marshalls and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1596.   For example, Faysal waited over a month to receive his paycheck for the 5.5-hour PDP shift he worked for Marshalls on September 23, 2025.

1597.   To this day, Faysal has still never been paid any wages at all for eight (8) PDP shifts he worked for Marshalls approximately 3.5 months ago on November 29th, December 4th, 5th, 10th, 11th, 16th, 17th, and 22nd 2025.

1598.  On February 28, 2023, Kmiotek worked a 5.5-hour PDP shift for Marshalls and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1599.  Ruiz-Reyes worked over 20 PDP shifts for Marshalls but was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1600.  For example, on April 25, 2023, Ruiz-Reyes worked a 5.5-hour PDP shift for Marshalls and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1601.  Dawkins also worked at least 10 PDP shifts for Marshalls and was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1602.  For example, on February 28, 2025, Dawkins worked a 6.5-hour PDP shift for Marshalls and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1603.  Ting also worked at least six (6) PDP shifts for Marshalls and was never paid timely wages for his work.

1604.  For example, on April 5, 2025, Ting worked a six (6) hour PDP shift for Marshalls but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1605.  Garlinska also worked at least two (2) PDP shifts for Marshalls but was never paid timely wages for her work, instead waiting four to six months for her paychecks.

1606.  Miron also worked a 5.5-hour PDP shift for Marshalls but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

183

1607.  Lauzier also worked at least four (4) PDP shifts for Marshalls but was never paid timely wages for her work, instead waiting multiple months for her paychecks.

1608.  For example, on October 26, 2024, Lauzier worked a five (5) hour PDP shift for Marshalls but did not receive timely payment of wages for her work, instead waiting months for her paycheck.

1609.  Delgado also worked at least 20 PDP shifts for Marshalls but was never paid timely wages for his work, instead waiting well over a month for his paychecks.

1610.  For example, on April 5, 2025, Delgado worked a 6.5-hour PDP shift for Marshalls and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1611.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Marshalls.

**23)    Plaintiffs' Work for TJ Maxx**

1612.  At all times during their PDP shifts at TJ Maxx, the NYPD and TJ Maxx jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them TJ Maxx radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for TJ Maxx; (3) the conduct or behavior that was prohibited versus what was expected while working for TJ Maxx; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons TJ Maxx did not want on their premises; (8) specific instructions on how to interact with TJ Maxx's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were

184

prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1613.   Ruiz-Reyes worked at least 10 PDP shifts for TJ Maxx and was never paid timely wages for his work, instead typically waiting one to two months, and sometimes even longer for his paychecks.

1614.   For example, on August 25, 2025, Ruiz-Reyes worked a six (6) hour PDP shift for TJ Maxx and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1615.   Yanez also worked at least (3) PDP shifts for TJ Maxx but was never paid timely wages for his work, instead typically waiting multiple months for his paychecks.

1616.   Daly also worked at least three (3) PDP shifts for TJ Maxx, each ranging from four to five hours long, but was never paid timely wages for her work, instead waiting well over a month for her paychecks.

1617.   As another example, on July 9, 2023, Dawkins worked a five (5) hour PDP shift for TJ Maxx and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1618.   Similarly, Rondon worked at least 11 PDP shifts for TJ Maxx but was never paid timely wages for his work, instead waiting well over a month for his paychecks.

1619.   For example, on September 24, 2024, Rondon worked a six (6) hour PDP shift for TJ Maxx but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1620. Likewise, Abouabdallah worked at least nine (9) PDP shifts for TJ Maxx, most recently on June 26, 2025, and was never paid timely wages for his work, instead typically waiting well over a month and sometimes over two months for his paychecks.

1621. Mansour also worked at least five (5) PDP shifts for TJ Maxx but was never paid timely wages for his work, instead typically waiting multiple months for his paychecks.

1622. Khan worked at least 23 PDP shifts for TJ Maxx but was never paid timely wages for his work, instead typically waiting one to two months, and sometimes even longer for his paychecks.

1623. For example, on April 6, 2025, Khan worked a six (6) hour PDP shift for TJ Maxx and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1624. Garlinska also worked a six (6) hour PDP shift for TJ Maxx and had to wait over three months for her paycheck.

1625. On June 2, 2025, Grant worked a five (5) hour PDP shift for TJ Maxx but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1626. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for TJ Maxx.

### 24)    **Plaintiffs' Work for Resorts World Casino**

1627. At all times during their PDP shifts at Resorts World Casino, the NYPD and Resorts World Casino jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Resorts World Casino radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Resorts World Casino; (3) the conduct or behavior that was prohibited versus what was expected while working for Resorts World Casino; (4) the specific

186

areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle EDPs or other persons Resorts World Casino did not want on their premises; (8) the specific time they were permitted to take a meal break; (9) what they were required to do upon their return from lunch; (10) which other Officers they were required to relieve; (11) which individuals were permitted onto the premises and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1628.  Grant worked at least three (3) PDP shifts for Resorts World Casino but was never paid timely wages for his work.

1629.  For example, on August 13, 2023, Grant worked a five (5) hour PDP shift for Resorts World Casino but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1630.  Daly also worked at least 14 PDP shifts for Resorts World Casino but was never paid timely wages for her work, instead typically waiting well over a month for her wages.

1631.  For example, on August 16, 2024, Daly worked a 10-hour PDP shift for Resorts World Casino and did not receive timely payment of wages for her work, instead waiting approximately a month for her paycheck.

1632.  As another example, on July 17, 2024, Daly worked a 10-hour PDP shift for Resorts World Casino but was not paid for her work until multiple weeks later in August 2024.

187

1633. Likewise, Faysal worked at least five (5) PDP shifts for Resorts World Casino and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1634. For example, on September 3, 2021, Faysal worked an eight (8) hour PDP shift for Resorts World Casino but was not paid for his work until over a month later in October 2021.

1635. As another example, on August 25, 2025, Faysal worked a 10-hour PDP shift for Resorts World Casino but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1636. Yanez also worked at least five (5) PDP shifts for Resorts World Casino but was never paid timely wages for his work.

1637. For example, on June 2, 2024, Yanez worked a 10-hour PDP shift for Resorts World Casino but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1638. On January 24, 2026, Kmiotek worked a 10-hour PDP shift for Resorts World Casino but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1639. Dawkins worked at least 20 PDP shifts for Resorts World Casino, most recently on September 22, 2024, but was never paid timely wages for his work, instead waiting months for his paychecks.

1640. For example, on August 17, 2024, Dawkins worked a 10-hour PDP shift for Resorts World Casino but did not receive timely payment of wages for his work, instead waiting months for his paycheck.

1641.   Osorio worked at least five (5) PDP shifts for Resorts World Casino but was never paid timely wages for his work, instead typically waiting multiple weeks and even months for his wages.

1642.   For example, on August 21, 2022, Osorio worked an eight (8) hour PDP shift for Resorts World Casino but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1643.   Ting also worked an eight (8) hour PDP shift for Resorts World Casino but did not receive timely payment of wages for his work, instead waiting months for his paycheck.

1644.   Likewise, Lauzier worked over 55 PDP shifts for Resorts World Casino but was never paid timely wages for her work, instead typically waiting well over a month for her paychecks.

1645.   For example, on October 30, 2025, Lauzier worked a 9.5-hour PDP shift for Resorts World Casino but never received timely payment of wages for her work, instead waiting over a month for her paycheck.

1646.    Likewise, Mansour worked at least six (6) PDP shifts for Resorts World Casino but was never paid timely wages for his work, instead waiting well over a month for his paychecks.

1647.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Resorts World Casino.

**25)    Plaintiffs' Work for Primark**

1648.   At all times during their PDP shifts at Primark, the NYPD and Primark jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Primark; (3) the

189

conduct or behavior that was prohibited versus what was expected while working for Primark; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Primark did not want on their premises; (8) specific instructions on how to interact with Primark's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1649. Yanez worked at least six (6) PDP shifts for Primark and never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

1650. For example, Yanez received payment for the nine (9) hour PDP shift he worked for Primark on December 1, 2024, over two months later, and for a five (5) hour shift worked on September 12, 2024 over five months later.

1651. As another example, on August 18, 2024, Yanez worked an eight (8) hour PDP shift for Primark but was not paid for his work until over two months later in October 2024.

1652. Dawkins also worked at least two (2) PDP shifts for Primark but was never paid timely wages for his work.

1653. For example, on April 8, 2024, Dawkins worked a five (5) hour PDP shift for Primark but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

190

1654. Faysal also worked a four (4) hour PDP shift for Primark on April 20, 2025, and had to wait multiple weeks for his paycheck.

1655. Likewise, on May 24, 2025, Antonio worked a four (4) hour PDP shift for Primark but did not receive timely wages for his work, instead waiting multiple weeks for his paycheck.

1656. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Primark.

### 26)   Plaintiffs' Work for Aldi

1657. At all times during their PDP shifts at Aldi, the NYPD and Aldi jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Aldi; (3) the conduct or behavior that was prohibited versus what was expected while working for Aldi; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Aldi did not want in their stores; (8) specific instructions on how to interact with Aldi's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1658. Faysal worked at least four (4) PDP shifts for Aldi but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

1659.  For example, on January 21, 2025, Faysal worked an eight (8) hour PDP shift for Aldi but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1660.  On May 12, 2024, Dawkins worked a six (6) hour PDP shift for Aldi but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1661.  Likewise, Lauzier worked at least eight (8) PDP shifts for Aldi and was never paid timely wages for her work, instead typically waiting multiple months for her paychecks.

1662.  For example, on September 12, 2024 and September 21, 2024, Lauzier worked two six (6) hour PDP shifts for Aldi and did not receive timely payment of wages for her work, instead waiting over two months for her paychecks.

1663.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Aldi.

### 27)    **Plaintiffs' Work for Wegmans**

1664.  At all times during their PDP shifts at Wegmans, the NYPD and Wegmans jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Wegmans radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Wegmans; (3) the conduct or behavior that was prohibited versus what was expected while working for Wegmans; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Wegmans did not want on their premises; (8) specific instructions on how to interact with Wegmans' customers; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from

lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted into the store and which were prohibited; (13) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (14) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1665. Faysal worked over 85 PDP shifts for Wegmans but was never paid timely wages for his work, instead typically waiting multiple weeks and even months for his paychecks.

1666. For example, on May 26, 2025, Faysal worked a 7.5-hour PDP shift for Wegmans but was not paid for his work until approximately two months later in July 2025.

1667. As another example, on November 15, 2021, Faysal worked an 8.5-hour PDP shift for Wegmans but was not paid for his work until almost two months later in January 2022.

1668. Lauzier also worked over seven (7) PDP shifts for Wegmans but was never paid timely wages for her work, instead typically waiting over a month for her paychecks.

1669. For example, on November 6, 2025 and November 7, 2025, Lauzier worked two, eight (8) hour PDP shifts for Wegmans but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paychecks.

1670. Yanez worked at least three (3) PDP shifts for Wegmans but was never paid timely wages for his work.

1671. For example, on January 11, 2025, Yanez worked an 8.5-hour PDP shift for Wegmans but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1672. As another example, on June 24, 2024, Yanez worked an eight (8) hour PDP shift for Wegmans but was not paid for his work until over a month later, at the end of July 2024.

1673. Kmiotek also worked over 45 PDP shifts for Wegmans but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

1674. For example, on September 15, 2025, Kmiotek worked an eight (8) hour PDP shift for Wegmans and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1675. On December 5, 2022, Kmiotek worked an 8.5-hour PDP shift for Wegmans but was not paid for his work until January 2023.

1676. As another example, on December 28, 2022, Kmiotek worked another 8.5-hour PDP shift for Wegmans and was not paid for his work until February 2023.

1677. Pantoja also worked at least 10 PDP shifts for Wegmans but was never paid timely wages for her work, instead typically waiting multiple weeks for her paychecks.

1678. Ting also worked an 8.5-hour PDP shift for Wegmans but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1679. Mansour also worked an 8.5-hour PDP shift for Wegmans but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1680. Likewise, on December 1, 2024, Cannon worked a five (5) hour PDP shift for Wegmans and did not receive timely payment of wages for his work, instead waiting approximately three months for his paycheck.

1681. Miron also worked at least three (3) PDP shifts for Wegmans but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1682. Delgado also worked at least four (4) PDP shifts for Wegmans but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

194

1683. For example, on January 4, 2024, Delgado worked an eight (8) hour PDP shift for Wegmans and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1684. Abouabdallah also worked an 8.5-hour PDP shift for Wegmans and had to wait approximately a month for his paycheck.

1685. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Wegmans.

## 28) Plaintiffs' Work for Neue Galerie

1686. At all times during their PDP shifts at Neue Galerie, the NYPD and Neue Galerie jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Neue Galerie; (3) the conduct or behavior that was prohibited versus what was expected while working for Neue Galerie; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) strict instructions on not being permitted inside the building regardless of the weather; (6) suspicious activity they were required to look out for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) how to handle loiterers, EDPs, or other persons Neue Galerie did not want on their premises; (9) a specific list of individuals with photographs they were required to be on the lookout for; (10) the specific time they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

195

1687. On November 10, 2024, Faysal worked a nine (9) hour PDP shift for Neue Galerie but was not paid timely wages for his work, instead waiting over 1.5 months, until the end of December 2024, to receive his wages.

1688. Chow also worked at least six (6) PDP shifts for Neue Galerie, most recently on October 6, 2024, and never received timely payment of wages for his work, instead waiting over a month for his paychecks.

1689. Osorio also worked a PDP shift for Neue Galerie but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1690. Similarly, on October 8, 2025, Rondon worked a six (6) hour PDP shift for Neue Galerie and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1691. On December 22, 2022, Garlinska worked a 12-hour PDP shift for Neue Galerie and did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

1692. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Neue Galerie.

### 29)    **Plaintiffs' Work for V&R Payroll**

1693. At all times during their PDP shifts at V&R Payroll, the NYPD and V&R Payroll jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for V&R Payroll; (3) the conduct or behavior that was prohibited versus what was expected while working for V&R Payroll; (4) the specific areas they were required to monitor and the manner in which they were required

196

to monitor them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons V&R Payroll did not want on their premises; (8) specific instructions on how to interact with V&R Payroll's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1694.  On October 17, 2024, Faysal worked an eight (8) hour PDP shift for V&R Payroll but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1695.  Likewise, on December 3, 2024, Cannon worked an eight (8) hour PDP shift for V&R Payroll and did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

1696.  As another example, on October 16, 2025, Lauzier worked an eight (8) hour PDP shift for V&R Payroll but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1697.  Delgado also worked at least 22 PDP shifts for V&R Payroll but was not paid timely wages for his work.

1698.  For example, on September 3, 2025, Delgado worked an eight (8) hour PDP shift for V&R Payroll and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1699.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for V&R Payroll.

### 30)    Plaintiffs' Work for ShopRite

1700.   At all times during their PDP shifts at ShopRite, the NYPD and ShopRite jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them ShopRite radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for ShopRite; (3) the conduct or behavior that was prohibited versus what was expected while working for ShopRite; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons ShopRite did not want on their premises; (8) specific instructions on how to interact with ShopRite's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1701.   Lauzier worked over 20 PDP shifts for ShopRite and never received timely payment of wages for her work.

1702.   For example, on October 12, 2025 and November 17, 2025, Lauzier worked two, six (6) hour PDP shifts for Shoprite at McDonald Ave but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paychecks.

1703.   On November 26, 2025, Lauzier worked a five (5) hour PDP shift for Shoprite at College Point but never received timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1704.   On December 10, 2025, Lauzier again worked a PDP shift for Shoprite at McDonald Ave and again did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1705.   As another example, on October 30, 2024, Lauzier worked a six (6) hour PDP shift for Shoprite at Gateway but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1706.   To this day, Lauzier has never been paid any wages at all for the PDP shift she worked for Shoprite at Gateway on February 23, 2026.

1707.   Faysal also worked multiple PDP shifts for ShopRite and typically had to wait several months to get his paychecks.

1708.   For example, on September 29, 2025, Faysal worked a six (6) hour PDP shift for Shoprite at McDonald Ave but was not paid for his work until two months later.

1709.   Similarly, on May 13, 2024, Faysal worked a five (5) hour PDP shift for Shoprite at College Point and also had to wait approximately two months for his paycheck.

1710.   Cannon also worked multiple PDP shifts for ShopRite but never received timely payment of wages for his work, instead waiting one to two months to receive his paychecks.

1711.   For example, on September 20, 2025, Cannon worked a five (5) hour PDP shift for Shoprite at Bruckner Blvd but was not paid for his work until well over a month later.

1712. As another example, on August 29, 2024, Rondon worked a seven (7) hour PDP shift for Shoprite at Bruckner Blvd but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1713. Dawkins also never received timely payment of wages for the PDP shifts he worked for ShopRite, instead waiting multiple weeks for his paychecks.

1714. For example, on March 27, 2025, Dawkins worked a six (6) hour PDP shift for Shoprite at Gateway but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1715. As another example, on June 9, 2023, Dawkins worked a six (6) hour PDP shift for Shoprite at McDonald Ave but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1716. Similarly, Miron worked at least 19 PDP shifts for ShopRite but was never paid timely wages for his work, instead typically waiting multiple weeks for his paychecks.

1717. For example, on May 6, 2023, Miron worked a five (5) hour PDP shift for Shoprite at Gateway but was not paid for his work until multiple weeks later.

1718. As another example, on October 3, 2023, Miron worked a five (5) hour PDP shift for Shoprite at College Point but was not paid for his work until approximately a month later.

1719. Likewise, Daly never received timely payment of wages for the PDP shifts she worked for ShopRite, instead waiting well over a month for her paychecks.

1720. For example, on August 31, 2024, Daly worked a five (5) hour PDP shift for Shoprite at College Point but did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

1721.   As another example, on July 14, 2024, Daly worked a five (5) hour PDP shift for Shoprite at College Point but also did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1722.   On April 12, 2023, Ting worked a five (5) hour PDP shift for Shoprite at College Point but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1723.   Similarly, on December 31, 2024, Kmiotek worked a five (5) hour PDP shift for Shoprite at College Point and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1724.   Ruiz-Reyes also worked multiple PDP shifts for ShopRite but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1725.   For example, on November 20, 2025 and November 29, 2025, Ruiz-Reyes worked two (2) PDP shifts for Shoprite at Bruckner Blvd but was not paid for his work until multiple weeks later.

1726.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for ShopRite.

**31)     Plaintiffs' Work for Barclays Bank**

1727.   At all times during their PDP shifts at Barclays Bank, the NYPD and Barclays Bank jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Barclays Bank; (3) the conduct or behavior that was prohibited versus what was expected while working for Barclays Bank; (4) the specific areas they were required to monitor and the manner in which they were required to monitor them; (5) suspicious activity they were required to look out for; (6) the manner

in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Barclays Bank did not want on their premises; (8) when they were permitted to take a meal break; (9) specific instructions on how to interact with Barclays Bank's customers; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1728.    Faysal worked multiple PDP shifts for Barclays Bank and never received timely payment of wages for his work.

1729.    For example, on May 4, 2024 and May 5, 2024, Faysal worked two, six (6) hour PDP shifts for Barclays Bank but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1730.    Dawkins worked at least five (5) PDP shifts for Barclays Bank and was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1731.    For example, on October 3, 2025, Dawkins worked a 12-hour PDP shift for Barclays Bank but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1732.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Barclays Bank.

**32)    Plaintiffs' Work for Bank of NY Mellon**

1733.    At all times during their PDP shifts at Bank of NY Mellon, the NYPD and Bank of NY Mellon jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Bank of NY Mellon radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs

202

were required to follow while working for Bank of NY Mellon; (3) the conduct or behavior that was prohibited versus what was expected while working for Bank of NY Mellon; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bank of NY Mellon did not want on their premises; (8) the manner in which Bank of NY Mellon required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted into the building and which were prohibited; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1734. Faysal worked at least three (3) PDP shifts for Bank of NY Mellon and was never paid timely wages for his work.

1735. For example, on May 17, 2025, Faysal worked an eight (8) hour PDP shift for Bank of NY Mellon but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1736. Yanez also worked at least three (3) PDP shifts for Bank of NY Mellon but was never paid timely wages for his work.

1737. For example, on April 10, 2024, Yanez worked a 10.5-hour PDP shift for Bank of NY Mellon but was not paid for his work until multiple weeks later in May 2024.

1738. Likewise, Divino worked at least 16 PDP shifts for Bank of NY Mellon but was never paid timely wages for his work.

1739.   For example, on December 15, 2023, Divino worked a 10.5-hour PDP shift for Bank of NY Mellon and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1740.   On July 7, 2023, Dawkins worked a 10.5-hour PDP shift for Bank of NY Mellon and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1741.   Likewise, Cannon worked at least two, eight (8) hour PDP shifts for Bank of NY Mellon, most recently on October 19, 2025, and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1742.   On March 24, 2025, Khan worked an eight (8) hour PDP shift for Bank of NY Mellon and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1743.   Martinez worked at least eight (8) PDP shifts for Bank of NY Mellon and was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1744.   For example, on June 9, 2025, Martinez worked an eight (8) hour PDP shift for Bank of NY Mellon and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1745.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Bank of NY Mellon.

### 33)    Plaintiffs' Work for Schwarzman Animal Medical

1746.   At all times during their PDP shifts at Schwarzman Animal Medical, the NYPD and Schwarzman Animal Medical jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Schwarzman Animal Medical phones and directing

them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Schwarzman Animal Medical; (3) the conduct or behavior that was prohibited versus what was expected while working for Schwarzman Animal Medical; (4) the specific areas they were required to monitor and the manner in which they were required to monitor them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Schwarzman Animal Medical did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted into the building and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1747.  On August 31, 2025, Faysal worked a 12-hour PDP shift for Schwarzman Animal Medical but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1748.  As another example, Faysal also worked a 12-hour PDP shift for Schwarzman Animal Medical on April 20, 2024, and again had to wait multiple weeks for his paycheck.

1749.  Dawkins also worked at least 20 PDP shifts for Schwarzman Animal Medical but was never paid timely wages for his work, instead waiting over a month for his paychecks.

1750.   For example, on August 14, 2025, Dawkins worked a 12-hour PDP shift for Schwarzman Animal Medical and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1751.  Likewise, Chow worked at least two (2) PDP shifts for Schwarzman Animal Medical but was never paid timely wages for his work.

1752. For example, on March 31, 2024, Chow worked a 12-hour PDP shift for Schwarzman Animal Medical and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1753. Osorio worked at least two (2) PDP shifts for Schwarzman Animal Medical but was never paid timely wages for his work, instead waiting over a month for his paychecks.

1754. For example, on October 16, 2023, Osorio worked a 12-hour PDP shift for Schwarzman Animal Medical and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1755. Pantoja worked at least three (3) PDP shifts for Schwarzman Animal Medical but did not receive timely payment of wages for her work.

1756. For example, on May 12, 2025, Pantoja worked a 12-hour PDP shift for Schwarzman Animal Medical but did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

1757. Likewise, Lauzier worked over 55 PDP shifts for Schwarzman Animal Medical but was never paid timely wages for her work, instead typically waiting well over a month for her paychecks.

1758. For example, on November 14, 2025, Lauzier worked 12-hour PDP shift for Schwarzman Animal Medical but never received timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1759. To this day, Lauzier has never been paid any wages at all for the PDP shift she worked for Schwarzman Animal Medical over a month ago, on February 4, 2026.

1760. Khan worked at least 14 PDP shifts for Schwarzman Animal Medical but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

206

1761.   For example, on April 29, 2025, Khan worked a 12-hour PDP shift for Schwarzman Animal Medical and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1762.   Delgado also worked at least 10 PDP shifts for Schwarzman Animal Medical but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

1763.   For example, on May 20, 2025, Delgado worked a 12-hour PDP shift for Schwarzman Animal Medical and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1764.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Schwarzman Animal Medical.

### 34)   Plaintiffs' Work for Queens Yeshiva Ketana

1765.   At all times during their PDP shifts at Queens Yeshiva Ketana, the NYPD and Queens Yeshiva Ketana jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Queens Yeshiva Ketana; (3) the conduct or behavior that was prohibited versus what was expected while working for Queens Yeshiva Ketana; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Queens Yeshiva Ketana did not want on their premises; (8) specific instructions on how to interact with Queens Yeshiva Ketana's students and their parents; (9) when they were permitted to take a meal break;

207

(10) which individuals were permitted into the building and which were prohibited; (11) how to assist Queens Yeshiva Ketana employees with clearing traffic and monitoring students; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1766.   On February 14, 2024, Faysal worked a 10-hour PDP shift for Queens Yeshiva Ketana and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1767.   On December 22, 2023, Ting worked a 4.5-hour PDP shift for Queens Yeshiva Ketana but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1768.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Queens Yeshiva Ketana.

### 35)   Plaintiffs' Work for Parker Jewish Institute

1769.   At all times during their PDP shifts at Parker Jewish Institute, the NYPD and Parker Jewish Institute jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Parker Jewish Institute radios and Parker Jewish Institute employee identification lanyards and signs, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Parker Jewish Institute; (3) the conduct or behavior that was prohibited versus what was expected while working for Parker Jewish Institute; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or

other persons Parker Jewish Institute did not want on their premises; (8) specific instructions on how to interact with Parker Jewish Institute's patients; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1770.   On August 15, 2022, Faysal worked an eight (8) hour PDP shift for Parker Jewish Institute but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1771.   Kmiotek also worked at least 12 PDP shifts for Parker Jewish Institute but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1772.   For example, on August 14, 2024, Kmiotek worked a 10-hour PDP shift for Parker Jewish Institute and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1773.   As another example, on December 30, 2022, Kmiotek worked an eight (8) hour PDP shift for Parker Jewish Institute but was not paid for his work until February 2023.

1774.   Osorio also worked at least two (2) PDP shifts for Parker Jewish Institute but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1775.   Likewise, on July 21, 2025, Ting worked a 10-hour PDP shift for Parker Jewish Institute but also did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1776. Similarly, Garlinska worked at least three (3) PDP shifts for Parker Jewish Institute but was never paid timely wages for her work, instead typically waiting well over a month for her paychecks.

1777. For example, on May 26, 2023, Garlinska worked an eight (8) hour PDP shift for Parker Jewish Institute but did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

1778. Miron also worked at least five (5) PDP shifts for Parker Jewish Institute but did not receive timely payment of wages for his work, instead waiting approximately a month for his paychecks.

1779. Lauzier also worked at least two (2) PDP shifts for Parker Jewish Institute but was never paid timely wages for her work.

1780. For example, on August 13, 2023, Lauzier worked an eight (8) hour PDP shift for Parker Jewish Institute and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

1781. Grant also worked a five (5) hour PDP shift for Parker Jewish Institute but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1782. Similarly, Delgado worked at least seven (7) PDP shifts for Parker Jewish Institute but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1783. For example, on September 26, 2025, Delgado worked a 10-hour PDP shift for Parker Jewish Institute and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1784.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Parker Jewish Institute.

**36)    Plaintiffs' Work for Young Israel of Queens Valley**

1785.   At all times during their PDP shifts at Young Israel of Queens Valley, the NYPD and Young Israel of Queens Valley jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Young Israel of Queens Valley; (3) the conduct or behavior that was prohibited versus what was expected while working for Young Israel of Queens Valley; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Young Israel of Queens Valley did not want on their premises; (8) specific instructions on how to interact with Young Israel of Queens Valley's students and their parents; (9) the manner in which Young Israel of Queens Valley required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist Young Israel of Queens Valley's employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1786.   On July 23, 2022, Faysal worked a five (5) hour PDP shift for Young Israel of Queens Valley but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1787. On October 5, 2022, Kmiotek worked a six (6) hour PDP shift for Young Israel of Queens Valley and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1788. On February 10, 2024, Daly worked a five (5) hour PDP shift for Young Israel of Queens Valley and did not receive timely payment of wages for her work, instead waiting approximately a month for her paycheck.

1789. On January 27, 2024, Chow worked a five (5) hour PDP shift for Young Israel of Queens Valley but also did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

1790. On April 20, 2024, Eveillard worked a five (5) hour PDP shift for Young Israel of Queens Valley but also did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1791. Ting also worked a five (5) hour PDP shift for Young Israel of Queens Valley but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1792. Delgado worked at least two (2) PDP shifts for Young Israel of Queens Valley but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1793. For example, on December 7, 2024, Delgado worked a five (5) hour PDP shift for Young Israel of Queens Valley and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1794.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Young Israel of Queens Valley.

**37)     Plaintiffs' Work for Yeshiva Darchei**

1795.   At all times during their PDP shifts at Yeshiva Darchei, the NYPD and Yeshiva Darchei jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Yeshiva Darchei radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yeshiva Darchei; (3) the conduct or behavior that was prohibited versus what was expected while working for Yeshiva Darchei; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Yeshiva Darchei did not want on their premises; (8) specific instructions on how to interact with Yeshiva Darchei's students and their parents; (9) the manner in which Yeshiva Darchei required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist Yeshiva Darchei employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1796.   Faysal worked two (2) PDP shifts for Yeshiva Darchei, on June 23, 2022 and July 22, 2022.

1797.   Faysal did not receive timely payment of wages for the PDP shifts he worked for Yeshiva Darchei, instead waiting multiple weeks for his paychecks.

213

1798.   Osorio also worked approximately 40 PDP shifts for Yeshiva Darchei but was never paid timely wages for his work, instead typically waiting multiple weeks and even months for his paychecks.

1799.   For example, on October 19, 2023, Osorio worked a seven (7) hour PDP shift for Yeshiva Darchei and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1800.   On December 26, 2022, Garlinska worked an eight (8) hour PDP shift for Yeshiva Darchei and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

1801.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yeshiva Darchei.

### 38)    Plaintiffs' Work for Torah Center

1802.   At all times during their PDP shifts at Torah Center, the NYPD and Torah Center jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Torah Center; (3) the conduct or behavior that was prohibited versus what was expected while working for Torah Center; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Torah Center did not want on their premises; (8) specific instructions on how to interact with Torah Center visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner

214

in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1803.   Kmiotek worked at least two (2) PDP shifts for Torah Center but was never paid timely wages for his work.

1804.   For example, on September 26, 2022, Kmiotek worked a 5.5-hour PDP shift for Torah Center and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1805.   Likewise, Miron worked at least two (2) PDP shifts for Torah Center but did not receive timely payment of wages for his work, instead waiting over a month for his paychecks.

1806.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Torah Center.

### 39)   **Plaintiffs' Work for Burlington**

1807.   At all times during their PDP shifts at Burlington, the NYPD and Burlington jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Burlington radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Burlington; (3) the conduct or behavior that was prohibited versus what was expected while working for Burlington; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Burlington did not want on their premises; (8) specific instructions on how to interact with Burlington's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and

which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1808.   On June 29, 2022, Faysal worked a seven (7) hour PDP shift for Burlington and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1809.   Ruiz-Reyes also worked at least 10 PDP shifts for Burlington but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

1810.    For example, on May 21, 2022, Ruiz-Reyes worked a seven (7) hour PDP shift for Burlington but did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

1811.   Dawkins worked at least 20 PDP shifts for Burlington but was never paid timely wages for his work, instead typically waiting multiple weeks for his paychecks.

1812.   For example, on March 8, 2023, Dawkins worked a six (6) hour PDP shift for Burlington but did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

1813.   On November 11, 2022, Osorio worked a five (5) hour PDP shift for Burlington but did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

1814.   Likewise, Ting worked at least 10 PDP shifts for Burlington and was never paid timely wages for his work.

1815.  For example, on December 17, 2023, Ting worked a five (5) hour PDP shift for Burlington but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1816.  Likewise, on February 25, 2023, Cannon also worked an eight (8) hour PDP shift for Burlington but did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

1817.  On November 26, 2022, Garlinska worked a six (6) hour PDP shift for Burlington but did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

1818.  Lauzier worked at least 20 PDP shifts for Burlington but was never paid timely wages for her work, instead typically waiting multiple months for her paychecks.

1819.  For example, on March 29, 2023, Lauzier worked a six (6) hour PDP shift for Burlington and did not receive timely payment of wages for her work, instead waiting months for her paycheck.

1820.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Burlington.

### 40)   Plaintiffs' Work for ABC

1821.  At all times during their PDP shifts at ABC, the NYPD and ABC jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them ABC employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for ABC; (3) the conduct or behavior that was prohibited versus what was expected while working for ABC; (4) the specific areas they were required to

217

monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons ABC did not want on their premises; (8) the manner in which ABC required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1822. Faysal worked at least four (4) PDP shifts for ABC and was never paid timely wages for his work.

1823. For example, on June 28, 2022, Faysal worked a five (5) hour PDP shift for ABC and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1824. Ting also worked at least two (2) PDP shifts for ABC and was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1825. Lauzier worked at least two (2) PDP shifts for ABC and was never paid timely wages for her work.

1826. For example, on December 16, 2022, Lauzier worked a four (4) hour PDP shift for ABC and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

1827. Similarly, Khan worked over 18 PDP shifts for ABC but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

218

1828. For example, on November 26, 2024, Khan worked a four (4) hour PDP shift for ABC and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1829. Martinez worked at least two (2) PDP shifts for ABC, most recently on May 10, 2025, and never received timely payment of wages for his work, instead waiting approximately a month for his paychecks.

1830. Delgado also worked at least 11 PDP shifts for ABC but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1831. For example, on February 22, 2024, Delgado worked a five (5) hour PDP shift for ABC and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1832. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for ABC.

**41)    Plaintiffs' Work for Sephardic Lebanese**

1833. At all times during their PDP shifts at Sephardic Lebanese, the NYPD and Sephardic Lebanese jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Sephardic Lebanese; (3) the conduct or behavior that was prohibited versus what was expected while working for Sephardic Lebanese; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Sephardic Lebanese did not want on their premises; (8) specific instructions on how to interact with Sephardic Lebanese's visitors;

219

(9) the manner in which Sephardic Lebanese required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1834.   Faysal worked at least two (2) PDP shifts for Sephardic Lebanese but was never paid timely wages for his work.

1835.   For example, on June 25, 2022, Faysal worked a five (5) hour PDP shift for Sephardic Lebanese but was not paid for his work until over a month later at the end of July 2022.

1836.   Osorio also worked a 10-hour PDP shift for Sephardic Lebanese but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1837.   Likewise, Abouabdallah worked at least four (4) PDP shifts for Sephardic Lebanese but was never paid timely wages for his work.

1838.   For example, on August 15, 2022, Abouabdallah worked a four (4) hour PDP shift for Sephardic Lebanese but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1839.   Mansour worked at least 13 PDP shifts for Sephardic Lebanese but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

1840.   For example, on October 21, 2023, Mansour worked a six (6) hour PDP shift for Sephardic Lebanese and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1841. Similarly, on May 11, 2022, Dawkins worked a four (4) hour PDP shift for Sephardic Lebanese but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1842. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Sephardic Lebanese.

### 42)    Plaintiffs' Work for Rochdale Village

1843. At all times during their PDP shifts at Rochdale Village, the NYPD and Rochdale Village jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Rochdale Village radios and Rochdale Village employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rochdale Village; (3) the conduct or behavior that was prohibited versus what was expected while working for Rochdale Village; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rochdale Village did not want on their premises; (8) the manner in which Rochdale Village required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted onto the premises and which were prohibited; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

221

1844.   Faysal worked at least three (3) PDP shifts for Rochdale Village, most recently on June 16, 2022, and never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

1845.   Yanez also worked at least two (2) PDP shifts for Rochdale Village but was never paid timely wages for his work, instead waiting well over a month for his paychecks.

1846.   As another example, on November 6, 2022, Dawkins worked an eight (8) hour PDP shift for Rochdale Village but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1847.   Pantoja also worked an eight (8) hour PDP shift for Rochdale Village but did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

1848.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rochdale Village.

### 43)    **Plaintiffs' Work for Vornado**

1849.   At all times during their PDP shifts at Vornado, the NYPD and Vornado jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Vornado radios and Vornado employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Vornado; (3) the conduct or behavior that was prohibited versus what was expected while working for Vornado; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Vornado did not want on their premises; (8) the manner in which Vornado

222

required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1850.   Faysal worked at least four (4) PDP shifts for Vornado and was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1851.   For example, on May 27, 2019, Faysal worked a 10-hour PDP shift for Vornado but was not paid for his work until three months later at the end of August 2019.

1852.   Yanez also worked at least nine (9) PDP shifts for Vornado but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1853.   For example, on February 14, 2025, Yanez worked an eight (8) hour PDP shift for Vornado and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1854.   Kmiotek also worked at least 27 PDP shifts for Vornado but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1855.   For example, on January 22, 2025, Kmiotek worked an eight (8) hour PDP shift for Vornado and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1856.   Pantoja also worked at least 10 PDP shifts for Vornado but was never paid timely wages for her work, instead waiting multiple weeks for her paychecks.

1857.   Likewise, on May 5, 2025, Ting worked an eight (8) hour PDP shift for Vornado and also did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

223

1858.   Khan also worked at least five (5) PDP shifts for Vornado but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1859.   For example, on February 4, 2024, Khan worked an eight (8) hour PDP shift for Vornado and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1860.   Grant also worked at least five (5) PDP shifts for Vornado but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1861.   Martinez also worked at least three (3) PDP shifts for Vornado but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1862.   Delgado worked at least 74 PDP shifts for Vornado but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1863.   For example, on June 25, 2024, Delgado worked a 12-hour PDP shift for Vornado and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1864.   Likewise, on January 20, 2023, Garlinska worked a 10-hour PDP shift for Vornado and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

1865.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Vornado.

**44)**    **Plaintiffs' Work for HSS**

1866.   At all times during their PDP shifts at HSS, the NYPD and HSS jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them HSS radios and HSS employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and

224

regulations Plaintiffs were required to follow while working for HSS; (3) the conduct or behavior that was prohibited versus what was expected while working for HSS; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons HSS did not want on their premises; (8) specific instructions on how to interact with HSS patients and employees; (9) how to assist HSS employees with clearing traffic; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1867. On November 8, 2025, Daly worked a PDP shift for HSS and still has never been paid any wages at all for her work.

1868. Faysal worked at least three (3) PDP shifts for HSS but was never paid timely wages for his work.

1869. For example, on September 12, 2022, Faysal worked an eight (8) hour PDP shift for HSS and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1870. As another example, on August 16, 2019, Faysal worked an eight (8) hour PDP shift for HSS but was not paid for his work until over a month later in September 2019.

1871. Martinez was never paid timely wages for the PDP shifts he worked for HSS, instead waiting multiple weeks for his paychecks.

1872. On April 21, 2025, Martinez worked an eight (8) hour PDP shift for HSS and still has never been paid anything at all for his work.

225

1873.    Pantoja also worked an eight (8) hour PDP shift for HSS but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1874.    Ting also worked a five (5) hour PDP shift for HSS but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1875.    Likewise, Lauzier worked at least six (6) PDP shifts for HSS and was never paid timely wages for her work.

1876.    For example, March 31, 2024, Lauzier worked an eight (8) hour PDP shift for HSS and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

1877.    Khan also worked at least three (3) PDP shifts for HSS but was never paid timely wages for his work.

1878.    For example, on June 21, 2023, Khan worked an eight (8) hour PDP shift for HSS and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1879.    Delgado also worked an eight (8) hour PDP shift for HSS, but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

1880.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for HSS.

**45)    Plaintiffs' Work for JPM**

1881.    At all times during their PDP shifts at JPM, the NYPD and JPM jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them JPM radios and JPM employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for JPM; (3) the conduct or behavior

that was prohibited versus what was expected while working for JPM; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons JPM did not want on their premises; (8) the manner in which JPM required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1882.   Faysal worked at least 15 PDP shifts for JPM but was never paid timely wages for his work, instead typically waiting approximately a month for his paychecks.

1883.   For example, on December 6, 2022, Faysal worked an eight (8) hour PDP shift for JPM and did not receive timely payment of wages for his work, instead waiting about a month for his paycheck.

1884.   As another example, on September 2, 2019, Faysal worked an eight (8) hour PDP shift for JPM but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1885.   Yanez also worked at least 12 PDP shifts for JPM but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1886.   For example, on December 9, 2024, Yanez also worked an eight (8) hour PDP shift for JPM but was not paid for his work until over a month later in late January 2025.

1887.   On March 28, 2024, Yanez worked another eight (8) hour PDP shift for JPM but was not paid for his work until a month later at the end of April 2024.

1888.   As another example, on October 19, 2025, Yanez worked an eight (8) hour PDP shift for JPM and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1889.   Martinez also worked at least four (4) PDP shifts for JPM, each eight (8) hours long, but was never paid timely wages for his work, instead typically waiting multiple weeks for his paychecks.

1890.   Similarly, on October 10, 2023, Garlinska worked an eight (8) hour PDP shift for JPM but did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

1891.   Likewise, Divino worked at least 16 PDP shifts for JPM but was never paid timely wages for his work, instead typically waiting approximately a month for his paychecks.

1892.   For example, on December 20, 2023, Divino worked a 10-hour PDP shift for JPM and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1893.   Zorrilla worked over 20 PDP shifts for JPM but was never paid timely wages for his work.

1894.   For example, on March 24, 2025, Zorrilla worked a six (6) hour PDP shift for JPM and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

1895.   Pantoja also worked an eight (8) hour PDP shift for JPM and waited approximately a month for her paycheck.

1896.   On December 1, 2022, Chow worked an eight (8) hour PDP shift for JPM but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1897.   Miron also worked at least two (2) PDP shifts for JPM, each six (6) hours long, but was never paid timely wages for his work, instead typically waiting multiple weeks for his paychecks.

1898.   As another example, on October 20, 2025 and October 12, 2025, Cannon worked two, eight (8) hour PDP shifts for JPM but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1899.   Similarly, on September 24, 2025, Dawkins worked an eight (8) hour PDP shift for JPM but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1900.   Grant also worked at least two (2) PDP shifts for JPM, each six (6) hours long, but was never paid timely wages for his work, instead waiting approximately a month for his paychecks.

1901.   Delgado also worked at least eight (8) PDP shifts for JPM and waited multiple weeks for his paychecks.

1902.   Likewise, Kmiotek worked a six (6) hour PDP shift for JPM and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1903.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for JPM.

**46)    Plaintiffs' Work for UBS**

1904.   At all times during their PDP shifts at UBS, the NYPD and UBS jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them UBS employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for UBS; (3) the conduct or behavior that was prohibited

229

versus what was expected while working for UBS; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons UBS did not want on their premises; (8) the manner in which UBS required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1905.  Yanez worked at least 10 PDP shifts for UBS but was never paid timely wages for his work.

1906.  For example, on October 14, 2025, Yanez worked a 12-hour PDP shift for UBS but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1907.  Faysal also worked a 12-hour PDP shift for UBS, but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

1908.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for UBS.

**47)   Plaintiffs' Work for Citi Field**

1909.  At all times during their PDP shifts at Citi Field, the NYPD and Citi Field jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Citi Field radios and Citi Field employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Citi Field; (3) the conduct or

230

behavior that was prohibited versus what was expected while working for Citi Field; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) individuals they were required to be on the lookout for; (7) the manner in which they were required to respond to various incidents and disturbances; (8) the manner in which Citi Field required them to perform perimeter checks; (9) how to handle loiterers, EDPs, or other persons Citi Field did not want on their premises; (10) specific instructions on how to interact with Citi Field's patrons; (11) how to handle intoxicated individuals; (12) specific instructions on how to interact with and treat VIP patrons or other special individuals; (13) when they were permitted to take a meal break; (14) which individuals were permitted onto the premises and which were prohibited; and (15) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their uniform throughout the entirety of their shift.

1910.  Yanez worked at least three (3) PDP shifts for Citi Field but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1911.  For example, on June 9, 2024, Yanez worked a seven (7) hour PDP shift for Citi Field but was not paid for his work until a month later in July 2024.

1912.  Kmiotek also worked at least eight (8) PDP shifts for Citi Field but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1913.  For example, on June 13, 2023 and June 14, 2023, Kmiotek worked two, six (6) hour PDP shifts for Citi Field and did not receive timely payment of wages for his work, instead waiting over a month for his paychecks.

1914.  Likewise, Antonio worked at least 10 PDP shifts for Citi Field but was never paid timely wages for his work, instead typically waiting approximately two months for his paychecks.

231

1915.   For example, Antonio waited until December 29, 2025 to receive his paycheck for a PDP shift he worked for Citi Field approximately 1.5 months earlier on November 15, 2025.

1916.   Eveillard never received timely payment of wages for the PDP shifts she worked for Citi Field, instead waiting multiple weeks for her paychecks.

1917.   For example, on April 4, 2025 and May 26, 2025 Eveillard worked two (2) PDP shifts for Citi Field but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paychecks.

1918.   Similarly, on April 12, 2023, Garlinska worked a 5.5-hour PDP shift for Citi Field but did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

1919.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Citi Field.

**48)    Plaintiffs' Work for Taino Towers**

1920.   At all times during their PDP shifts at Taino Towers, the NYPD and Taino Towers jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Taino Towers radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Taino Towers; (3) the conduct or behavior that was prohibited versus what was expected while working for Taino Towers; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Taino Towers did not want on their premises; (8) the manner in which Taino Towers required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were

232

permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1921. On August 5, 2022, Yanez worked an eight (8) hour PDP shift for Taino Towers but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1922. Dawkins also worked at least nine (9) PDP shifts for Taino Towers but was never paid timely wages for his work.

1923. For example, on September 10, 2023, Dawkins worked an eight (8) hour PDP shift for Taino Towers but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1924. Pantoja worked at least four (4) PDP shifts for Taino Towers but was never paid timely wages for her work, instead waiting multiple weeks for her paychecks.

1925. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Taino Towers.

### 49)    Plaintiffs' Work for MIR Hanson

1926. At all times during their PDP shifts at MIR Hanson, the NYPD and MIR Hanson jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for MIR Hanson; (3) the conduct or behavior that was prohibited versus what was expected while working for MIR Hanson; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which

they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons MIR Hanson did not want on their premises; (8) specific instructions on how to interact with customers; (9) the manner in which MIR Hanson required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted onto the premises and which were prohibited; (12) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1927. Yanez worked at least two (2) PDP shifts for MIR Hanson but was never paid timely wages for his work.

1928. For example, on March 14, 2024, Yanez worked an eight (8) hour PDP shift for MIR Hanson but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1929. In 2024, Divino worked four (4) PDP shifts for MIR Hanson but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1930. For example, on February 29, 2024, Divino worked an eight (8) hour PDP shift for MIR Hanson but was not paid timely wages for his work, instead waiting approximately a month to receive his paycheck.

1931. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for MIR Hanson.

50) **Plaintiffs' Work for NYU**

1932. At all times during their PDP shifts at NYU, the NYPD and NYU jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NYU radios and

234

directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NYU; (3) the conduct or behavior that was prohibited versus what was expected while working for NYU; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NYU did not want on their premises; (8) the manner in which NYU required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1933.    Yanez worked at least two (2) PDP shifts for NYU but was never paid timely wages for his work.

1934.    For example, on December 9, 2023, Yanez worked an eight (8) hour PDP shift for NYU but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1935.    To this day, Pantoja has still never been paid any wages at all for the PDP shift she worked for NYU on February 16, 2026.

1936.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NYU.

### 51)    **Plaintiffs' Work for St. Barnabas**

1937.    At all times during their PDP shifts at St. Barnabas, the NYPD and St. Barnabas jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them St. Barnabas radios and directing them as to: (1) the specific instructions and directions for the

work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for St. Barnabas; (3) the conduct or behavior that was prohibited versus what was expected while working for St. Barnabas; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons St. Barnabas did not want on their premises; (8) specific instructions on how to interact with St. Barnabas's patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1938.  Ruiz-Reyes worked at least 20 PDP shifts for St. Barnabas but was never paid timely wages for his work.

1939.  For example, on April 19, 2024, Ruiz-Reyes worked an eight (8) hour PDP shift for St. Barnabas but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1940.  Khan also worked at least eight (8) PDP shifts for St. Barnabas but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

1941.  For example, on September 26, 2024, Khan worked an eight (8) hour PDP shift for St. Barnabas and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1942.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for St. Barnabas.

**52)    Plaintiffs' Work for Manhattan Beer**

1943.    At all times during their PDP shifts at Manhattan Beer, the NYPD and Manhattan Beer jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Manhattan Beer; (3) the conduct or behavior that was prohibited versus what was expected while working for Manhattan Beer; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Manhattan Beer did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1944.    Ruiz-Reyes worked multiple PDP shifts for Manhattan Beer and never received timely payment of wages for his work.

1945.    For example, on March 17, 2024 and March 18, 2024, Ruiz-Reyes worked two, eight (8) hour PDP shifts for Manhattan Beer but did not receive timely payment of wages for his work, instead waiting approximately a month to receive his paychecks.

1946.    On May 6, 2024, Faysal worked an eight (8) hour PDP shift for Manhattan Beer.

237

1947.   Faysal did not receive timely payment of wages for the PDP shift he worked for Manhattan Beer, instead waiting multiple weeks for his paycheck.

1948.   In 2023, Rosa worked at least two (2) PDP shifts for Manhattan Beer.

1949.   Rosa never received timely payment of wages for the PDP shifts he worked for Manhattan Beer but instead waited at least three months for his paychecks.

1950.   Osorio worked at least six (6) PDP shifts for Manhattan Beer, most recently on September 28, 2024, and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

1951.   For example, on May 19, 2024 and June 3, 2024, Osorio worked two, eight (8) hour PDP shifts for Manhattan Beer, but was not paid timely wages for his work, instead waiting approximately a month to receive his paychecks.

1952.   Lauzier also worked at least 13 PDP shifts for Manhattan Beer and was never paid timely wages for her work.

1953.   For example, on January 3, 2025 and January 4, 2025, Lauzier worked two, eight (8) hour PDP shifts for Manhattan Beer but did not receive timely payment of wages for her work, instead waiting well over two months for her paychecks.

1954.   On July 26, 2023, Ting also worked an eight (8) hour PDP shift for Manhattan Beer but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1955.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Manhattan Beer.

238

**53)** **Plaintiffs' Work for Montefiore**

1956. At all times during their PDP shifts at Montefiore, the NYPD and Montefiore jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Montefiore radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Montefiore; (3) the conduct or behavior that was prohibited versus what was expected while working for Montefiore; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Montefiore did not want on their premises; (8) specific instructions on how to interact with Montefiore patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1957. Daly worked at least two (2) PDP shifts for Montefiore but was never paid timely wages for her work, instead typically waiting well over a month for her wages.

1958. For example, on November 5, 2025, Daly worked a PDP shift for Montefiore and waited over two months to receive a paycheck for her work.

1959. Ruiz-Reyes worked at least three (3) PDP shifts for Montefiore but was never paid timely wages for his work.

1960. For example, on February 14, 2023, Ruiz-Reyes worked an eight (8) hour PDP shift for Montefiore but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1961. Yanez also worked an eight (8) hour PDP shift for Montefiore but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

1962. Martinez also worked an eight (8) hour PDP shift for Montefiore but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

1963. On March 27, 2023, Ting worked an eight (8) hour PDP shift at Montefiore but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

1964. Antonio also worked at least seven (7) PDP shifts for Montefiore but was never paid timely wages for his work, instead typically waiting approximately two months for his paychecks.

1965. For example, Antonio waited until December 29, 2025 to receive his paychecks for two (2) PDP shifts he worked for Montefiore over 1.5 months earlier on November 6, 2025 and November 12, 2025.

1966. To this day, Antonio has not been paid any wages for the PDP shift he worked for Montefiore on March 3, 2026.

1967. Likewise, Khan worked at least six (6) PDP shifts for Montefiore and was never paid timely wages for his work.

1968. For example, on February 21, 2025, Khan worked an eight (8) hour PDP shift for Montefiore but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1969. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Montefiore.

240

**54)    Plaintiffs' Work for Northwell**

1970.    At all times during their PDP shifts at Northwell, the NYPD and Northwell jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Northwell radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Northwell; (3) the conduct or behavior that was prohibited versus what was expected while working for Northwell; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Northwell did not want on their premises; (8) specific instructions on how to interact with Northwell patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

1971.    Kmiotek worked at least 19 PDP shifts for Northwell but was never paid timely wages for his work.

1972.    For example, on September 23, 2025, Kmiotek worked an eight (8) hour PDP shift for Northwell and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1973.    Daly worked at least two (2) PDP shifts for Northwell but was never paid timely wages for her work.

1974. For example, on February 22, 2024, Daly worked an eight (8) hour PDP shift for Northwell and did not receive timely payment of wages for her work, instead waiting approximately a month for her paycheck.

1975. As another example, on May 14, 2025, Faysal worked an eight (8) hour PDP shift for Northwell but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1976. Yanez also worked at least five (5) PDP shifts for Northwell, each eight (8) hours long, but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

1977. Martinez also worked at least seven (7) PDP shifts for Northwell but was never paid timely wages for his work, instead waiting well over a month for his wages.

1978. For example, on May 25, 2025, Martinez worked an eight (8) hour PDP shift for Northwell but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1979. Dawkins worked at least three (3) PDP shifts for Northwell but was never paid timely wages for his work.

1980. For example, on August 5, 2023, Dawkins worked an eight (8) hour PDP shift for Northwell but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1981. Chow also worked at least seven (7) PDP shifts for Northwell but was never paid timely wages for his work, instead typically waiting over a month for his wages.

242

1982. For example, on September 20, 2025, Chow worked an eight (8) hour PDP shift for Northwell and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1983. Osorio worked over five (5) PDP shifts for Northwell but was never paid timely wages for his work, instead waiting multiple weeks and even months for his paychecks.

1984. For example, on June 21, 2023, Osorio worked an eight (8) hour PDP shift for Northwell but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1985. Eveillard also did not receive timely payment of wages for the PDP shifts she worked for Northwell, instead waiting multiple weeks for her paychecks.

1986. For example, on April 27, 2025, Eveillard worked an eight (8) hour PDP shift for Northwell but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1987. On August 8, 2025, Ting worked an eight (8) hour PDP shift for Northwell but also did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1988. Likewise, Abouabdallah worked at least 30 PDP shifts for Northwell and was never paid timely wages for his work.

1989. For example, on February 21, 2025, Abouabdallah worked an eight (8) hour PDP shift for Northwell but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1990. To this day, Abouabdallah has not been paid any wages at all for the PDP shift he worked for Northwell on February 22, 2026.

243

1991.   Senese also worked at least eight (8) PDP shifts for Northwell but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

1992.   For example, on July 31, 2025, Senese worked an eight (8) hour PDP shift for Northwell but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

1993.   On January 30, 2024, Miron worked an eight (8) hour PDP shift for Northwell but did not receive timely wages for his work, instead waiting a month, until February 29, 2024, to receive his paycheck.

1994.   Lauzier also worked at least 10 PDP shifts for Northwell but was never paid timely wages for her work, instead typically waiting multiple weeks to well over a month for her paychecks.

1995.   For example, on November 28, 2025, Lauzier worked an eight (8) hour PDP shift for Northwell but never received timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

1996.   Mansour also worked at least 200 PDP shifts for Northwell but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

1997.   For example, on December 2, 2025, Mansour worked an eight (8) hour PDP shift for Northwell and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

1998.   To this day, Mansour has still never been paid any wages at all for PDP shifts he worked for Northwell up to two months ago, on January 17th, February 6th, February 7th, February 14th, February 21st, February 27th, and February 28th, 2026.

244

1999. Similarly, Khan worked over 11 PDP shifts for Northwell but was never paid timely wages for his work.

2000. For example, on December 13, 2024, Khan worked an eight (8) hour PDP shift for Northwell and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2001. Grant also worked at least two (2) PDP shifts for Northwell but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2002. Delgado also worked an eight (8) hour PDP shift for Northwell, but was not paid timely wages for his work, instead waiting approximately a month for his paycheck.

2003. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Northwell.

**55)    Plaintiffs' Work for Morton Williams**

2004. At all times during their PDP shifts at Morton Williams, the NYPD and Morton Williams jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Morton Williams; (3) the conduct or behavior that was prohibited versus what was expected while working for Morton Williams; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Morton Williams did not want in their stores; (8) specific instructions on how to interact with Morton Williams' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals

245

suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2005.   Kmiotek also worked at least 10 PDP shifts for Morton Williams, most recently on January 16, 2023, and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2006.   On October 21, 2022, Chow worked a seven (7) hour PDP shift for Morton Williams but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2007.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Morton Williams.

### 56)   Plaintiffs' Work for GFP Real Estate

2008.   At all times during their PDP shifts at GFP Real Estate, the NYPD and GFP Real Estate jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for GFP Real Estate; (3) the conduct or behavior that was prohibited versus what was expected while working for GFP Real Estate; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons GFP Real Estate did not want on their premises; (8) the manner in which GFP Real Estate required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances,

246

including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2009.  Kmiotek worked at least three (3) PDP shifts for GFP Real Estate but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2010.  For example, on January 11, 2023, Kmiotek worked a seven (7) hour PDP shift for GFP Real Estate and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2011.  On December 8, 2022, Garlinska also worked a seven (7) hour PDP shift for GFP Real Estate but did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2012.  As another example, on February 23, 2023, Khan worked a seven (7) hour PDP shift for GFP Real Estate but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2013.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for GFP Real Estate.

### 57)    Plaintiffs' Work for Rosco

2014.  At all times during their PDP shifts at Rosco, the NYPD and Rosco jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rosco; (3) the conduct or behavior that was prohibited versus what was expected while working for Rosco; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which

247

they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rosco did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2015. Kmiotek worked at least three (3) PDP shifts for Rosco but was never paid timely wages for his work, instead typically waiting multiple months for his wages.

2016. For example, on March 15, 2022 and March 21, 2022, Kmiotek worked two (2) PDP shifts for Rosco but did not receive timely payment of wages for his work, instead waiting multiple months for his paychecks.

2017. Likewise, Abouabdallah worked a six (6) hour PDP shift for Rosco but was never paid timely wages for his work, instead waiting over a month for his paycheck.

2018. Ting also worked a six (6) hour PDP shift for Rosco but did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

2019. Miron also worked a six (6) hour PDP shift for Rosco but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2020. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rosco.

**58)** **Plaintiffs' Work for SL Green**

2021. At all times during their PDP shifts at SL Green, the NYPD and SL Green jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them SL Green radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for SL Green; (3) the conduct or behavior that was prohibited versus what was expected

while working for SL Green; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons SL Green did not want on their premises; (8) the manner in which SL Green required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2022.  Daly worked at least five (5) PDP shifts for SL Green but was never paid timely wages for her work, instead typically waiting well over a month for her wages.

2023.  For example, on September 22, 2024, Daly worked an eight (8) hour PDP shift for SL Green but did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

2024.  On June 20, 2023, Osorio worked an eight (8) hour PDP shift for SL Green but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2025.  Ting also worked at least two (2) PDP shifts for SL Green but was never paid timely wages for his work, instead waiting over a month for his paychecks.

2026.  Garlinska also worked an eight (8) hour PDP shift for SL Green but did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2027.  Likewise, on April 23, 2025, Antonio worked an eight (8) hour PDP shift for SL Green but did not receive timely wages for his work, instead waiting well over two months for his paycheck.

249

2028.   Khan also worked at least two (2) PDP shifts for SL Green but was never paid timely wages for his work.

2029.   For example, on March 18, 2025, Khan worked an eight (8) hour PDP shift for SL Green and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2030.   Grant also worked an eight (8) hour PDP shift for SL Green but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2031.   On March 26, 2025, Martinez worked an eight (8) hour PDP shift for SL Green but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2032.   Delgado also worked an eight (8) hour PDP shift for SL Green and waited approximately a month for his paycheck.

2033.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for SL Green.

**59)   Plaintiffs' Work for Grand Central**

2034.   At all times during their PDP shifts at Grand Central, the NYPD and Grand Central jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Grand Central radios and Grand Central employee identification lanyards and signs, and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Grand Central; (3) the conduct or behavior that was prohibited versus what was expected while working for Grand Central; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how

to handle loiterers, EDPs, or other persons Grand Central did not want on their premises; (8) the manner in which Grand Central required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which third party vendors were allowed on the premises and under what circumstances; (11) which individuals they were required to be on the lookout for; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2035. On September 15, 2024, Daly worked a 10-hour PDP shift for Grand Central but did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

2036. Dawkins worked at least 10 PDP shifts for Grand Central but was never paid timely wages for his work.

2037. For example, on April 30, 2025, Dawkins worked a 10-hour PDP shift for Grand Central but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2038. Similarly, on September 29, 2024, Garlinska worked a 10-hour PDP shift for Grand Central but did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2039. Likewise, on May 22, 2024, Ting worked an eight (8) hour PDP shift for Grand Central but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2040. Grant also worked an eight (8) hour PDP shift for Grand Central but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

251

2041.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Grand Central.

**60)  Plaintiffs' Work for Bloomingdale's**

2042.  At all times during their PDP shifts at Bloomingdale's, the NYPD and Bloomingdale's jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Bloomingdale's radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Bloomingdale's; (3) the conduct or behavior that was prohibited versus what was expected while working for Bloomingdale's; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bloomingdale's did not want on their premises; (8) specific instructions on how to interact with Bloomingdale's' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2043.  Daly worked at least seven (7) PDP shifts for Bloomingdale's but was never paid timely wages for her work, instead typically waiting multiple months for her wages.

2044.  For example, on August 11, 2024, Daly worked an eight (8) hour PDP shift for Bloomingdale's and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2045. Yanez also worked an 11-hour PDP shift for Bloomingdale's but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2046. Dawkins worked at least 40 PDP shifts for Bloomingdale's but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2047. For example, on September 4, 2025, Dawkins worked a 10.5-hour PDP shift for Bloomingdale's but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2048. On December 21, 2024, Garlinska worked a 12-hour PDP shift for Bloomingdale's but did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2049. Faysal also worked an 11-hour PDP shift for Bloomingdale's but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2050. As another example, Lauzier worked an 8.5-hour PDP shift for Bloomingdale's and had to wait well over a month for her paycheck.

2051. Khan also worked at least two (2) PDP shifts for Bloomingdale's but was never paid timely wages for his work.

2052. For example, on January 15, 2023, Khan worked a nine (9) hour PDP shift for Bloomingdale's but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2053. Grant also worked at least two (2) PDP shifts for Bloomingdale's but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2054. Likewise, on June 10, 2025, Martinez worked a 10.5-hour PDP shift for Bloomingdale's but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2055. To this day, Martinez has still never been paid for the PDP shift he worked for Bloomingdale's over a month earlier on January 28, 2026.

2056. As another example, Abouabdallah worked an 11-hour PDP shift for Bloomingdale's but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2057. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Bloomingdale's.

### 61)    Plaintiffs' Work for Fresh Meadows

2058. At all times during their PDP shifts at Fresh Meadows, the NYPD and Fresh Meadows jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Fresh Meadows; (3) the conduct or behavior that was prohibited versus what was expected while working for Fresh Meadows; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Fresh Meadows did not want on their premises; (8) specific instructions on how to interact with Fresh Meadows visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which

were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2059.    On July 27, 2024, Daly worked a four (4) hour PDP shift for Fresh Meadows and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2060.    On August 7, 2021, Faysal also worked a four (4) hour PDP shift for Fresh Meadows but was not paid for his work until over two months later in late October 2021.

2061.    On May 25, 2024, Chow worked a four (4) hour PDP shift for Fresh Meadows but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2062.    Miron worked at least three (3) PDP shifts for Fresh Meadows but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2063.    For example, on October 15, 2025, Miron worked a 4.5-hour PDP shift for Fresh Meadows but did not receive timely payment of wages for his work, instead waiting 1.5 months, until November 28, 2025, for his paycheck.

2064.    Likewise, on October 26, 2024, Garlinska worked a four (4) hour PDP shift for Fresh Meadows but did not receive timely payment of wages for her work, instead waiting approximately two months for her paycheck.

2065.    Kmiotek also worked a 4.5-hour PDP shift for Fresh Meadows but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2066.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Fresh Meadows.

**62)**    **Plaintiffs' Work for Goldman**

2067.  At all times during their PDP shifts at Goldman, the NYPD and Goldman jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Goldman radios and Goldman employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Goldman; (3) the conduct or behavior that was prohibited versus what was expected while working for Goldman; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Goldman did not want on their premises; (8) the manner in which Goldman required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2068.  Zorrilla worked at least two (2) PDP shifts for Goldman but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2069.  For example, on September 16, 2024, Zorrilla worked an eight (8) hour PDP shift for Goldman but was not paid for his work until about 1.5 months later, on October 28, 2024.

2070.  Faysal also worked at least two (2) PDP shifts for Goldman and was never paid timely wages for his work.

2071.  For example, on March 29, 2019, Faysal worked an eight (8) hour PDP shift for Goldman but was not paid for his work until six months later in September 2019.

256

2072.   Yanez also worked at least five (5) PDP shifts for Goldman but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2073.   For example, on April 23, 2025, Yanez worked an eight (8) hour PDP shift for Goldman but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2074.   Martinez also worked at least five (5) PDP shifts for Goldman and was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2075.   To this day, Martinez has still never been paid for the eight (8) hour PDP shift he worked for Goldman on February 27, 2026.

2076.   Osorio worked at least two (2) PDP shifts for Goldman but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2077.   Garlinska also worked at least three (3) PDP shifts for Goldman but was never paid timely wages for her work, instead typically waiting approximately two months for her paychecks.

2078.   For example, on March 24, 2023, Garlinska worked an eight (8) hour PDP shift for Goldman and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2079.   Likewise, Cannon worked at least two (2) PDP shifts for Goldman but was never paid timely wages for his work.

2080.   For example, on November 19, 2024, Cannon worked an eight (8) hour PDP shift for Goldman and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2081.   Mansour also worked at least 19 PDP shifts for Goldman but did not receive timely payment of wages for his work, instead waiting approximately a month for his paychecks.

257

2082.   Khan also worked at least six (6) PDP shifts for Goldman but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2083.   Similarly, Grant worked a 12-hour PDP shift for Goldman but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2084.   Delgado worked at least seven (7) PDP shifts for Goldman but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2085.   For example, on March 24, 2023, Delgado worked an eight (8) hour PDP shift for Goldman and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2086.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Goldman.

**63)   Plaintiffs' Work for Park Avenue Synagogue**

2087.   At all times during their PDP shifts at Park Avenue Synagogue, the NYPD and Park Avenue Synagogue jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Park Avenue Synagogue; (3) the conduct or behavior that was prohibited versus what was expected while working for Park Avenue Synagogue; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Park Avenue Synagogue did not want on their premises; (8) specific instructions on how to interact with Park Avenue Synagogue visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in

258

which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2088.   Zorrilla worked at least five (5) PDP shifts for Park Avenue Synagogue but was never paid timely wages for his work.

2089.   For example, on March 1, 2022, Zorrilla worked a seven (7) hour PDP shift for Park Avenue Synagogue and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2090.   Yanez also worked a 12-hour PDP shift for Park Avenue Synagogue, but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

2091.   Likewise, Martinez worked an eight (8) hour PDP shift for Park Avenue Synagogue and was not paid timely wages for his work, also waiting multiple weeks for his paycheck.

2092.   Similarly, on December 2, 2024, Garlinska worked a 9.5-hour PDP shift for Park Avenue Synagogue, but was not paid timely wages for her work, instead waiting multiple months for her paycheck.

2093.   Abouabdallah also worked at least four (4) PDP shifts for Park Avenue Synagogue, most recently on July 24, 2024, and was not paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2094.   Ting also worked a 10-hour PDP shift at Park Avenue Synagogue but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2095.   Grant also worked at least (2) PDP shifts for Park Avenue Synagogue but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2096.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Park Avenue Synagogue.

**64)**   **Plaintiffs' Work for Bais Yaakov**

2097.   At all times during their PDP shifts at Bais Yaakov, the NYPD and Bais Yaakov jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Bais Yaakov; (3) the conduct or behavior that was prohibited versus what was expected while working for Bais Yaakov; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bais Yaakov did not want on their premises; (8) specific instructions on how to interact with Bais Yaakov's visitors, students, and parents; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2098.   On March 6, 2024, Daly worked a nine (9) hour PDP shift for Bais Yaakov and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2099.   On August 11, 2022, Osorio worked a 7.25-hour PDP shift for Bais Yaakov but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2100.   Likewise, Miron worked at least three (3) PDP shifts for Bais Yaakov but was never paid timely wages for his work.

260

2101.  For example, on October 18, 2023, Miron worked a nine (9) hour PDP shift for Bais Yaakov and did not receive timely payment of wages for his work, instead waiting approximately a month to receive his paycheck.

2102.  On May 24, 2024, Lauzier worked a 4.5-hour PDP shift for Bais Yaakov but did not receive timely payment of wages for her work, instead waiting months for her paycheck.

2103.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Bais Yaakov.

### 65)    **Plaintiffs' Work for Chelsea Piers**

2104.  At all times during their PDP shifts at Chelsea Piers, the NYPD and Chelsea Piers jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Chelsea Piers employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Chelsea Piers; (3) the conduct or behavior that was prohibited versus what was expected while working for Chelsea Piers; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Chelsea Piers did not want on their premises; (8) the specific manner in which Chelsea Piers required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which individuals were permitted onto the premises and which were prohibited; (12) which third party vendors were allowed on the premises and under what circumstances; and (13) the manner in

which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2105. On January 26, 2024, Daly worked an eight (8) hour PDP shift for Chelsea Piers and did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

2106. Lauzier also worked over 15 PDP shifts for Chelsea Piers but was never paid timely wages for her work, instead typically waiting multiple weeks to approximately a month for her paychecks.

2107. For example, on December 12, 2025, Lauzier worked an eight (8) hour PDP shift for Chelsea Piers but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2108. To this day, Lauzier has never been paid any wages at all for the PDP shifts she worked for Chelsea Piers on February 14, 2026 and February 27, 2026.

2109. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Chelsea Piers.

66)    **Plaintiffs' Work for Beth-El**

2110. At all times during their PDP shifts at Beth-El, the NYPD and Beth-El jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Beth-El; (3) the conduct or behavior that was prohibited versus what was expected while working for Beth-El; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which

262

they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Beth-El did not want on their premises; (8) specific instructions on how to interact with Beth-El's visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2111.   On January 20, 2024, Daly worked a 10-hour PDP shift for Beth-El and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2112.   As another example, on May 24, 2025, Delgado worked a five (5) hour PDP shift for Beth-El and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2113.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Beth-El.

**67)   Plaintiffs' Work for Yeshiva University**

2114.   At all times during their PDP shifts at Yeshiva University, the NYPD and Yeshiva University jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yeshiva University; (3) the conduct or behavior that was prohibited versus what was expected while working for Yeshiva University; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Yeshiva University did not want on their premises; (8) specific instructions on how to interact with Yeshiva University students

263

and visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Yeshiva University required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2115.  Dawkins worked at least 10 PDP shifts for Yeshiva University but was never paid timely wages for his work.

2116.  For example, on July 5, 2025, Dawkins worked an eight (8) hour PDP shift for Yeshiva University but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2117.  Likewise, Senese worked at least four (4) PDP shifts for Yeshiva University but was never paid timely wages for his work.

2118.  For example, on July 2, 2024, Senese worked an eight (8) hour PDP shift for Yeshiva University and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2119.  On March 7, 2025, Khan worked an eight (8) hour PDP shift for Yeshiva University and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2120.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yeshiva University.

### 68)    Plaintiffs' Work for Empire Force

2121.  At all times during their PDP shifts for Empire Force, the NYPD and Empire Force jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them

as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Empire Force; (3) the conduct or behavior that was prohibited versus what was expected while working for Empire Force; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Empire Force did not want on the premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2122.   On May 5, 2024, Dawkins worked a 12-hour PDP shift for Empire Force.

2123.   Dawkins did not receive timely payment of wages for the PDP shift he worked for Empire Force, instead waiting multiple weeks for his paycheck.

2124.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Empire Force.

### 69)    Plaintiffs' Work for FedEx

2125.   At all times during their PDP shifts at FedEx, the NYPD and FedEx jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for FedEx; (3) the conduct or behavior that was prohibited versus what was expected while working for FedEx; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which

265

they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons FedEx did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2126. On February 28, 2024, Dawkins worked a four (4) hour PDP shift for FedEx and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2127. Miron also worked a four (4) hour PDP shift for FedEx but did not receive timely wages for his work, instead waiting multiple months for his paycheck.

2128. Likewise, Lauzier worked at least 12 PDP shifts for FedEx and was never paid timely wages for her work.

2129. For example, on August 30, 2024, Lauzier worked a four (4) hour PDP shift for FedEx and did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2130. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for FedEx.

**70)  Plaintiffs' Work for Avenues School**

2131. At all times during their PDP shifts at Avenues School, the NYPD and Avenues School jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Avenues School; (3) the conduct or behavior that was prohibited versus what was expected while working for Avenues School; (4) the specific areas they were required to monitor and the manner

266

in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Avenues School did not want on their premises; (8) specific instructions on how to interact with Avenues School's students and their parents; (9) the manner in which Avenues School required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist Avenues School employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2132.   Dawkins worked at least two (2) PDP shifts for Avenues School but was never paid timely wages for his work.

2133.   For example, on April 5, 2023, Dawkins worked an 8.5-hour PDP shift for Avenues School but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2134.   On January 23, 2023, Garlinska worked an 8.5-hour PDP shift for Avenues School but did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2135.   Likewise, Lauzier worked at least 12 PDP shifts for Avenues School but was never paid timely wages for her work.

2136.   For example, on November 10, 2023, Lauzier worked an 8.5-hour PDP shift for Avenues School and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

267

2137. As another example, Abouabdallah worked an 8.5-hour PDP shift for Avenues School and did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

2138. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Avenues School.

### 71)    Plaintiffs' Work for MOMA

2139. At all times during their PDP shifts at MOMA, the NYPD and MOMA jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them MOMA radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for MOMA; (3) the conduct or behavior that was prohibited versus what was expected while working for MOMA; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons MOMA did not want on their premises; (8) how to interact with MOMA patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2140. On March 5, 2023, Dawkins worked an eight (8) hour PDP shift for MOMA and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2141.   Yanez also worked at least two (2) PDP shifts for MOMA but was never paid timely wages for his work, instead waiting multiple months for his paychecks.

2142.   On May 4, 2025, Ting worked an eight (8) hour PDP shift for MOMA but did not receive timely payment of wages for his work, instead waiting almost two months for his paycheck.

2143.   Likewise, on May 14, 2025, Antonio worked an eight (8) hour PDP shift for MOMA but did not receive timely wages for his work, instead waiting approximately a month for his paycheck.

2144.   Similarly, Garlinska worked at least two (2) PDP shifts for MOMA but was never paid timely wages for her work, instead typically waiting well over a month for her paychecks.

2145.   For example, on August 23, 2024, Garlinska worked an eight (8) hour PDP shift for MOMA but did not receive timely wages for her work, instead waiting over a month for her paycheck.

2146.   Lauzier also worked at least two (2) PDP shifts for MOMA and was never paid timely wages for her work.

2147.   For example, on July 19, 2022, Lauzier worked an eight (8) hour PDP shift for MOMA and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2148.   Khan also worked at least two (2) PDP shifts for MOMA but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2149.   For example, on July 3, 2023, Khan worked an eight (8) hour PDP shift for MOMA and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

269

2150.  Grant also worked at least two (2) PDP shifts for MOMA, both eight (8) hours long, but never received timely payment of wages for his work, instead waiting well over a month for his paychecks.

2151.  Martinez also worked an eight (8) hour PDP shift for MOMA but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2152.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for MOMA.

**72)    Plaintiffs' Work for Bryant Park**

2153.  At all times during their PDP shifts at Bryant Park, the NYPD and Bryant Park jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Bryant Park radios and Bryant Park employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Bryant Park; (3) the conduct or behavior that was prohibited versus what was expected while working for Bryant Park; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bryant Park did not want on their premises; (8) the specific manner in which Bryant Park required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which individuals were permitted onto the premises and which were prohibited; (12) which third party vendors were allowed on the premises and under what circumstances; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2154. Dawkins worked at least six (6) PDP shifts for Bryant Park but was never paid timely wages for his work, instead waiting multiple months for his wages.

2155. For example, on December 7, 2023, Dawkins worked a 10-hour PDP shift for Bryant Park and waited well over two months for his paycheck.

2156. As another example, on November 8, 2023, Dawkins worked a 15-hour PDP shift for Bryant Park but did not receive timely payment of wages for his work, instead waiting well over three months for his paycheck.

2157. Daly also worked at least 11 PDP shifts for Bryant Park but was never paid timely wages for her work, instead typically waiting multiple months for her wages.

2158. For example, on September 28, 2021, Daly worked an eight (8) hour PDP shift for Bryant Park and did not receive timely payment of wages for her work, instead waiting approximately three months for her paycheck.

2159. Ting also worked an eight (8) hour PDP shift for Bryant Park but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2160. On January 18, 2023, Garlinska worked a 10-hour PDP shift for Bryant Park but did not receive timely payment of wages for her work, instead waiting almost three months for her paycheck.

2161. Osorio also worked an eight (8) hour PDP shift for Bryant Park but did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

2162. On November 18, 2024, Lauzier worked a 10-hour PDP shift for Bryant Park and did not receive timely payment of wages for her work, instead waiting well over three months for her paycheck.

2163.   Khan also worked at least four (4) PDP shifts for Bryant Park and was never paid timely wages for his work, instead typically waiting over two months for his paychecks.

2164.   For example, on February 15, 2023, Khan worked a 10-hour PDP shift for Bryant Park and did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

2165.   As another example, on March 12, 2021, Delgado worked an eight (8) hour PDP shift for Bryant Park and did not receive timely payment of wages for his work, instead waiting over two months for his paycheck.

2166.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages until weeks and even months after they worked their PDP shifts for Bryant Park.

**73)      Plaintiffs' Work for Brooklyn Museum**

2167.   At all times during their PDP shifts at Brooklyn Museum, the NYPD and Brooklyn Museum supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Brooklyn Museum; (3) the conduct or behavior that was prohibited versus what was expected while working for Brooklyn Museum; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Brooklyn Museum did not want on their premises; (8) how to interact with Brooklyn Museum patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2168.   On November 5, 2022, Dawkins worked an eight (8) hour PDP shift for Brooklyn Museum.

2169.   Dawkins did not receive timely payment of wages for the PDP shift he worked for Brooklyn Museum, instead waiting multiple weeks for his paycheck.

2170.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Brooklyn Museum.

**74)    Plaintiffs' Work for Safra Synagogue**

2171.   At all times during their PDP shifts at Safra Synagogue, the NYPD and Safra Synagogue jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Safra Synagogue; (3) the conduct or behavior that was prohibited versus what was expected while working for Safra Synagogue; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Safra Synagogue did not want on their premises; (8) specific instructions on how to interact with Safra Synagogue's visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

273

2172. On October 14, 2023, Dawkins worked a four (4) hour PDP shift for Safra Synagogue but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2173. Faysal also worked at least two (2) PDP shifts for Safra Synagogue but never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

2174. For example, on May 11, 2019, Faysal worked a five (5) hour PDP shift for Safra Synagogue but was not paid for his work until almost two months later in July 2019.

2175. Likewise, on October 10, 2022, Faysal worked another six (6) hour PDP shift for Safra Synagogue and again had to wait multiple weeks for his paycheck.

2176. On October 18, 2022, Chow worked a four (4) hour PDP shift for Safra Synagogue but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2177. Likewise, Mansour worked at least five (5) PDP shifts for Safra Synagogue but did not receive timely payment of wages for his work, instead waiting multiple months for his paychecks.

2178. On October 10, 2022, Lauzier worked a four (4) hour PDP shift for Safra Synagogue and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2179. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Safra Synagogue.

274

**75)    Plaintiffs' Work for Best Buy**

2180.   At all times during their PDP shifts at Best Buy, the NYPD and Best Buy jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Best Buy; (3) the conduct or behavior that was prohibited versus what was expected while working for Best Buy; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Best Buy did not want on their premises; (8) specific instructions on how to interact with Best Buy's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2181.   On October 9, 2023, Dawkins worked an 11-hour PDP shift for Best Buy but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2182.   As another example, on March 16, 2025, Dawkins worked a 10-hour PDP shift for Best Buy and again had to wait multiple weeks for his paycheck.

2183.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Best Buy.

**76)    Plaintiffs' Work for Century 21**

2184.   At all times during their PDP shifts at Century 21, the NYPD and Century 21 jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to:

275

(1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Century 21; (3) the conduct or behavior that was prohibited versus what was expected while working for Century 21; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Century 21 did not want on their premises; (8) specific instructions on how to interact with Century 21's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2185.  Dawkins worked at least three (3) PDP shifts for Century 21 but was never paid timely wages for his work.

2186.  For example, on July 10, 2023, Dawkins worked a 10-hour PDP shift for Century 21 but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2187.  Yanez also worked at least four (4) PDP shifts for Century 21 and was also never paid timely wages for his work.

2188.  For example, on December 6, 2024, Yanez worked a 10-hour PDP shift for Century 21 and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2189.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Century 21.

### 77)    Plaintiffs' Work for Brookdale Hospital

2190.   At all times during their PDP shifts at Brookdale Hospital, the NYPD and Brookdale Hospital jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Brookdale Hospital radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Brookdale Hospital; (3) the conduct or behavior that was prohibited versus what was expected while working for Brookdale Hospital; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Brookdale Hospital did not want on their premises; (8) specific instructions on how to interact with Brookdale Hospital patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2191.   Dawkins worked at least five (5) PDP shifts for Brookdale Hospital but was never paid timely wages for his work, instead waiting well over a month for his paychecks.

2192.   For example, on September 25, 2025, Dawkins worked an eight (8) hour PDP shift for Brookdale Hospital but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2193.   Yanez also worked at least three (3) PDP shifts for Brookdale Hospital and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2194.   Daly also worked an eight (8) hour PDP shift for Brookdale Hospital and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2195.   Likewise, Pantoja worked an eight (8) hour PDP shift for Brookdale Hospital and was not paid timely wages for her work, instead waiting multiple weeks for her paycheck.

2196.   Osorio worked at least four (4) PDP shifts for Brookdale Hospital and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2197.   Garlinska also worked an eight (8) hour PDP shift for Brookdale Hospital but did not receive timely payment of wages for her work, instead waiting over two months for her paycheck.

2198.   Delgado also worked at least 43 PDP shifts for Brookdale Hospital but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

2199.   For example, on May 28, 2025, Delgado worked an eight (8) hour PDP shift for Brookdale Hospital and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2200.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Brookdale Hospital.

**78)   Plaintiffs' Work for Times Square Church**

2201.   At all times during their PDP shifts at Times Square Church, the NYPD and Times Square Church jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Times

278

Square Church; (3) the conduct or behavior that was prohibited versus what was expected while working for Times Square Church; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Times Square Church did not want on their premises; (8) specific instructions on how to interact with Times Square Church's visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Times Square Church required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2202.  On August 3, 2023, Dawkins worked a 12-hour PDP shift for Times Square Church and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2203.  On February 14, 2025, Ting worked a four (4) hour PDP shift for Times Square Church but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2204.  Likewise, Cannon worked at least five (5) PDP shifts for Times Square Church but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2205.  For example, on October 17, 2025, Cannon worked a four (4) hour PDP shift for Times Square Church and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

279

2206.   Grant also worked at least five (5) PDP shifts for Times Square Church but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2207.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Times Square Church.

### 79)    Plaintiffs' Work for Asphalt Green

2208.   At all times during their PDP shifts at Asphalt Green, the NYPD and Asphalt Green jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Asphalt Green; (3) the conduct or behavior that was prohibited versus what was expected while working for Asphalt Green; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Asphalt Green did not want on their premises; (8) specific instructions on how to interact with Asphalt Green members and visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; (11) the specific manner in which Asphalt Green required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2209.   On August 9, 2023, Dawkins worked an 8.5-hour PDP shift for Asphalt Green.

2210.   Dawkins did not receive timely payment of wages for the PDP shift he worked for Asphalt Green, instead waiting multiple weeks for his paycheck.

2211.   On July 21, 2025, Faysal worked an eight (8) hour PDP shift for Asphalt Green but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2212.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Asphalt Green.

### 80)    Plaintiffs' Work for Lauren B

2213.   At all times during their PDP shifts at Lauren B, the NYPD and Lauren B jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Lauren B; (3) the conduct or behavior that was prohibited versus what was expected while working for Lauren B; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Lauren B did not want on their premises; (8) specific instructions on how to interact with Lauren B's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2214.   On June 18, 2023, Dawkins worked a 6.5-hour PDP shift for Lauren B.

2215.   Dawkins did not receive timely payment of wages for the PDP shift he worked for Lauren B, instead waiting multiple weeks for his paycheck.

281

2216.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Lauren B.

### 81)    Plaintiffs' Work for NY Botanical Garden

2217.   At all times during their PDP shifts at NY Botanical Garden, the NYPD and NY Botanical Garden supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them NY Botanical Garden radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NY Botanical Garden; (3) the conduct or behavior that was prohibited versus what was expected while working for NY Botanical Garden; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NY Botanical Garden did not want on their premises; (8) how to interact with NY Botanical Garden patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2218.   In 2023, Rosa worked at least three (3) PDP shifts for NY Botanical Garden.

2219.   Rosa never received timely payment of wages for the PDP shifts he worked for NY Botanical Garden, but instead waited at least three months, until well into 2024, to be paid for each of the PDP shifts he worked in 2023.

2220.   Daly also worked at least two (2) PDP shifts for NY Botanical Garden but was never paid timely wages for her work, instead waiting well over a month for her paychecks.

2221. Garlinska also worked an eight (8) hour PDP shift for NY Botanical Garden but did not receive timely payment of wages for her work, instead waiting approximately two months for her paycheck.

2222. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NY Botanical Garden.

### 82)    Plaintiffs' Work for Brooklyn Hospital

2223. At all times during their PDP shifts at Brooklyn Hospital, the NYPD and Brooklyn Hospital jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Brooklyn Hospital radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Brooklyn Hospital; (3) the conduct or behavior that was prohibited versus what was expected while working for Brooklyn Hospital; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Brooklyn Hospital did not want on their premises; (8) specific instructions on how to interact with Brooklyn Hospital patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2224. Pantoja worked at least 10 PDP shifts for Brooklyn Hospital but was never paid timely wages for her work.

2225. For example, on December 30, 2024, Pantoja worked an eight (8) hour PDP shift for Brooklyn Hospital but was not paid for her work until almost a month later in late January 2025.

2226. Pantoja waited until mid-February to receive her paycheck for the eight (8) hour PDP shift she worked for Brooklyn Hospital on January 19, 2025.

2227. On June 2, 2025, Pantoja worked another eight (8) hour PDP shift for Brooklyn Hospital but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2228. On July 9, 2023, Chow worked an eight (8) hour PDP shift for Brooklyn Hospital and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2229. On May 23, 2024, Osorio worked a PDP shift for Brooklyn Hospital but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2230. On April 8, 2025, Faysal worked an eight (8) hour PDP shift for Brooklyn Hospital but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2231. Likewise, Abouabdallah worked at least three (3) PDP shifts for Brooklyn Hospital, most recently on June 10, 2025, and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2232. Similarly, Dawkins worked at least two (2) PDP shifts for Brooklyn Hospital but was never paid timely wages for his work.

284

2233.   For example, on June 14, 2025, Dawkins worked an eight (8) hour PDP shift for Brooklyn Hospital and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2234.   On July 29, 2023, Cannon also worked an eight (8) hour PDP shift for Brooklyn Hospital but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2235.   Martinez worked at least two (2) PDP shifts for Brooklyn Hospital, most recently on May 14, 2025, and never received timely payment of wages for his work, instead waiting approximately a month for his paychecks.

2236.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Brooklyn Hospital.

### 83)    **Plaintiffs' Work for NBC**

2237.   At all times during their PDP shifts at NBC, the NYPD and NBC jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia,* assigning them NBC radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NBC; (3) the conduct or behavior that was prohibited versus what was expected while working for NBC; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NBC did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted onto the premises and which were prohibited;

and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2238.   On November 2, 2022, Divino worked a 6.5-hour PDP shift for NBC and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2239.   Faysal also worked at least eight (8) PDP shifts for NBC but was never paid timely wages for his work.

2240.   For example, on May 8, 2024, Faysal worked a five (5) hour PDP shift for NBC but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2241.   Yanez also worked at least five (5) PDP shifts for NBC but was never paid timely wages for his work, instead typically waiting multiple weeks for his paychecks.

2242.   Martinez worked at least five (5) PDP shifts for NBC and was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2243.   Piney also worked at least three (3) PDP shifts for NBC but was never paid timely wages for his work, instead waiting approximately a month for his paychecks.

2244.   On November 28, 2022, Chow worked a 6.5-hour PDP shift for NBC but did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

2245.   Rondon also worked at least 10 PDP shifts for NBC and typically had to wait multiple weeks for his paychecks.

2246.   For example, on September 10, 2025, Rondon worked a five (5) hour PDP shift for NBC but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

2247.   To this day, Rondon has not been paid any wages for the PDP shift he worked for NBC on February 24, 2026.

286

2248.   Similarly, on October 23, 2024, Garlinska worked an eight (8) hour PDP shift for NBC but did not receive timely payment of wages for her work, instead waiting over a month for her paycheck.

2249.   Ting worked at least two (2) PDP shifts for NBC but was never paid timely wages for his work, instead waiting over a month for his paychecks.

2250.   Mansour also worked at least 15 PDP shifts for NBC but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2251.   Lauzier worked at least four (4) PDP shifts for NBC but was never paid timely wages for her work.

2252.   For example, on December 30, 2022, Lauzier worked a four (4) hour PDP shift for NBC and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2253.   Khan also worked at least 10 PDP shifts for NBC and was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2254.   For example, on August 17, 2024, Khan worked a five (5) hour PDP shift for NBC and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2255.   Grant also worked an eight (8) hour PDP shift for NBC but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2256.   Delgado also worked at least two (2) PDP shifts for NBC but was never paid timely wages for his work, instead waiting approximately a month for his paychecks.

2257.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NBC.

287

**84)    Plaintiffs' Work for Sam Ash**

2258.    At all times during their PDP shifts at Sam Ash, the NYPD and Sam Ash jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Sam Ash; (3) the conduct or behavior that was prohibited versus what was expected while working for Sam Ash; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Sam Ash did not want on their premises; (8) when they were permitted to take a meal break; (9) the specific manner in which Sam Ash required them to perform perimeter checks; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2259.    In 2023, C. Diaz worked at least eight (8) PDP shifts for Sam Ash but was never paid timely wages for his work, instead waiting at least two to three months for each of his paychecks.

2260.    For example, on July 10, 2023, C. Diaz worked an eight (8) hour PDP shift for Sam Ash and did not receive timely payment of wages for his work, instead waiting months for his paycheck.

2261.    Similarly, on May 5, 2023, Garlinska worked an eight (8) hour PDP shift for Sam Ash but did not receive timely payment of wages for her work, instead waiting approximately four months for her paycheck.

288

2262. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Sam Ash.

### 85) Plaintiffs' Work for Zara

2263. At all times during their PDP shifts at Zara, the NYPD and Zara jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Zara radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Zara; (3) the conduct or behavior that was prohibited versus what was expected while working for Zara; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Zara did not want on their premises; (8) specific instructions on how to interact with Zara's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2264. On April 29, 2024, Eveillard worked an eight (8) hour PDP shift for Zara.

2265. Eveillard did not receive timely payment of wages for the PDP shift she worked for Zara, instead waiting over a month for her paycheck.

2266. Ting worked at least four (4) PDP shifts for Zara and was never paid timely wages for his work.

289

2267.  For example, on December 6, 2024, Ting worked an eight (8) hour PDP shift for Zara but did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

2268.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Zara.

### 86)    Plaintiffs' Work for Jewish Heritage

2269.  At all times during their PDP shifts at Jewish Heritage, the NYPD and Jewish Heritage jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Jewish Heritage; (3) the conduct or behavior that was prohibited versus what was expected while working for Jewish Heritage; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Jewish Heritage did not want on their premises; (8) how to interact with Jewish Heritage patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2270.  Chow worked at least six (6) PDP shifts for Jewish Heritage, most recently on October 13, 2024, and never received timely payment of wages for his work, instead waiting months and even years for his paychecks.

2271.  To this day, Chow has never been paid for the PDP shift he worked for Jewish Heritage over 1.5 years ago on June 6, 2024.

2272.  As another example, on October 1, 2024 and October 13, 2024, Chow worked two (2) PDP shifts for Jewish Heritage but did not receive timely payment of wages for his work, instead waiting well over two months for his paychecks.

2273.  Osorio also worked at least five (5) PDP shifts for Jewish Heritage but never received timely payment of wages for his work, instead waiting multiple weeks and even months for his paychecks.

2274.  Martinez also worked at least three (3) PDP shifts for Jewish Heritage and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2275.  Likewise, Grant worked an 11-hour PDP shift for Jewish Heritage but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2276.  Mansour also worked multiple PDP shifts for Jewish Heritage but never received timely payment of wages for his work, instead waiting approximately a month for his paychecks.

2277.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Jewish Heritage.

**87)  Plaintiffs' Work for Torah Academy**

2278.  At all times during their PDP shifts at Torah Academy, the NYPD and Torah Academy jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Torah Academy; (3) the conduct or behavior that was prohibited versus what was expected while working for Torah Academy; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how

to handle loiterers, EDPs, or other persons Torah Academy did not want on their premises; (8) specific instructions on how to interact with Torah Academy's students and their parents; (9) the manner in which Torah Academy required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2279.  Osorio worked at least six (6) PDP shifts for Torah Academy but was never paid timely wages for his work.

2280.  For example, on May 14, 2025, Osorio worked an 8.75-hour PDP shift for Torah Academy and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2281.  Likewise, Miron worked at least 60 PDP shifts for Torah Academy but was never paid timely wages for his work, instead typically waiting over two months for his paychecks.

2282.  For example, on September 8th, 15th, and 16th, 2025, Miron worked three 8.75-hour PDP shifts for Torah Academy and did not receive timely payment of wages for his work, instead having to wait for approximately two months, until December 12, 2025, for his paychecks.

2283.  As another example, Miron worked another PDP shift for Torah Academy on March 1, 2024, and had to wait for nearly three months to receive his paycheck, on May 28, 2024.

2284.  To this day, Miron has not been paid any wages at all for the two PDP shifts he worked for Torah Academy over a month ago on February 4th and 5th, 2026.

2285.  Likewise, Mansour worked an 8.75-hour PDP shift for Torah Academy and never received timely payment of wages for his work, instead waiting over a month for his paycheck.

292

2286.  As another example, on October 26, 2022, Faysal worked an 8.75-hour PDP shift for Torah Academy but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2287.  Delgado also worked a 4.75-hour PDP shift for Torah Academy and waited approximately a month for his paycheck.

2288.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Torah Academy.

### 88)    Plaintiffs' Work for Omni Eye

2289.  At all times during their PDP shifts at Omni Eye, the NYPD and Omni Eye jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Omni Eye; (3) the conduct or behavior that was prohibited versus what was expected while working for Omni Eye; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Omni Eye did not want on their premises; (8) specific instructions on how to interact with Omni Eye patients and employees; (9) which individuals were permitted into the building and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

293

2290. On November 2, 2022, Osorio worked a nine (9) hour PDP shift for Omni Eye and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2291. Martinez also worked a nine (9) hour PDP shift for Omni Eye but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2292. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Omni Eye.

### 89)   **Plaintiffs' Work for Plaza Honda**

2293. At all times during their PDP shifts at Plaza Honda, the NYPD and Plaza Honda jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Plaza Honda; (3) the conduct or behavior that was prohibited versus what was expected while working for Plaza Honda; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Plaza Honda did not want on their premises; (8) when they were permitted to take a meal break; (9) specific instructions on how to interact with Plaza Honda's customers; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2294. Osorio worked over 45 PDP shifts for Plaza Honda, most recently on June 6, 2022.

2295. Osorio never received timely payment of wages for the PDP shifts he worked for Plaza Honda, instead waiting multiple weeks and even months for his paychecks.

2296. Likewise, Miron worked at least two (2) PDP shifts for Plaza Honda but did not receive timely payment of wages for his work, instead waiting multiple weeks to over a month for his paychecks.

2297. As another example, on May 26, 2025, Lauzier worked a 10-hour PDP shift for Plaza Honda but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2298. To this day, Lauzier has never been paid any wages at all for two PDP shifts she worked for Plaza Honda almost two months ago on January 21, 2026 and also on February 11, 2026.

2299. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Plaza Honda.

**90)    Plaintiffs' Work for 47th Street BID**

2300. At all times during their PDP shifts at 47th Street BID, the NYPD and 47th Street BID jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for 47th Street BID; (3) the conduct or behavior that was prohibited versus what was expected while working for 47th Street BID; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons 47th Street BID did

295

not want on their premises; (8) the manner in which 47th Street BID required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2301.  On December 29, 2023, Ting worked an eight (8) hour PDP shift for 47th Street BID but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2302.  Likewise, Garlinska worked at least two (2) PDP shifts for 47th Street BID, most recently on August 8, 2024, and never received timely payment of wages for her work, instead waiting multiple weeks for her paychecks.

2303.  On May 1, 2025, Antonio worked an eight (8) hour PDP shift for 47th Street BID and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2304.  Likewise, Mansour worked at least three (3) PDP shifts for 47th Street BID but never received timely wages for his work, instead waiting multiple weeks for his paychecks.

2305.  Faysal also worked a 12-hour PDP shift for 47th Street BID but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2306.  Osorio also worked an eight (8) hour PDP shift for 47th Street BID but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2307.  Delgado also worked at least seven (7) PDP shifts for 47th Street BID and waited multiple weeks for his paychecks.

296

2308.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for 47th Street BID.

**91)    Plaintiffs' Work for Breezy Point**

2309.   At all times during their PDP shifts at Breezy Point, the NYPD and Breezy Point jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Breezy Point; (3) the conduct or behavior that was prohibited versus what was expected while working for Breezy Point; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Breezy Point did not want on their premises; (8) the manner in which Breezy Point required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2310.   In 2024, Osorio worked over 20 PDP shifts for Breezy Point but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2311.   For example, on November 1, 2025, Osorio worked an eight (8) hour PDP shift for Breezy Point but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2312. On August 30, 2025, Faysal worked an eight (8) hour PDP shift for Breezy Point but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2313. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Breezy Point.

**92)    Plaintiffs' Work for Citigroup**

2314. At all times during their PDP shifts at Citigroup, the NYPD and Citigroup jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Citigroup; (3) the conduct or behavior that was prohibited versus what was expected while working for Citigroup; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Citigroup did not want on their premises; (8) the manner in which Citigroup required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2315. Daly worked at least three (3) PDP shifts for Citigroup but was never paid timely wages for her work.

298

2316.  For example, on August 1, 2024, Daly worked an eight (8) hour PDP shift for Citigroup and did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2317.  R. Diaz also worked a six (6) hour PDP shift for Citigroup but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2318.  As another example, Lauzier also worked a six (6) hour PDP shift for Citigroup but was not paid timely wages for her work, instead waiting multiple months for her paycheck.

2319.  Likewise, Faysal also worked a six (6) hour PDP shift for Citigroup and waited multiple weeks for his paycheck.

2320.  Grant also worked a six (6) hour PDP shift for Citigroup but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2321.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Citigroup.

**93)    Plaintiffs' Work for DII Deals & Discounts**

2322.  At all times during their PDP shifts at DII Deals & Discounts, the NYPD and DII Deals & Discounts jointly supervised and controlled the terms of Plaintiffs' employment by directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for DII Deals & Discounts; (3) the conduct or behavior that was prohibited versus what was expected while working for DII Deals & Discounts; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons DII Deals & Discounts did not want on their premises; (8) the manner in which DII Deals & Discounts required them to perform

perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2323.  Ting worked at least two (2) PDP shifts for DII Deals & Discounts but was never paid timely wages for his work.

2324.  For example, on February 15, 2025, Ting worked a six (6) hour PDP shift for DII Deals & Discounts and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2325.  Chow also worked a four (4) hour PDP shift for DII Deals & Discounts and did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

2326.  Likewise, on November 12, 2023, Delgado worked a five (5) hour PDP shift for DII Deals & Discounts and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2327.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for DII Deals & Discounts.

### 94)    Plaintiffs' Work for Fifth Avenue BID

2328.  At all times during their PDP shifts at Fifth Avenue BID, the NYPD and Fifth Avenue BID jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Fifth Avenue BID; (3) the conduct or behavior that was prohibited versus what was expected while working for Fifth Avenue BID; (4) the specific areas they were required to monitor and the manner

in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Fifth Avenue BID did not want on their premises; (8) the manner in which Fifth Avenue BID required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2329.   On August 22, 2025, Dawkins worked a four (4) hour PDP shift for Fifth Avenue BID but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2330.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Fifth Avenue BID.

**95)    Plaintiffs' Work for 787 Seventh Avenue**

2331.   At all times during their PDP shifts at 787 Seventh Avenue, the NYPD and 787 Seventh Avenue jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for 787 Seventh Avenue; (3) the conduct or behavior that was prohibited versus what was expected while working for 787 Seventh Avenue; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or

301

other persons 787 Seventh Avenue did not want on their premises; (8) the manner in which 787 Seventh Avenue required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2332.  Yanez also worked at least three (3) PDP shifts for 787 Seventh Avenue but was never paid timely wages for his work.

2333.  For example, on October 7, 2025, Yanez worked an 11-hour PDP shift for 787 Seventh Avenue but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2334.  Likewise, on September 15, 2025, Cannon worked an 11-hour PDP shift for 787 Seventh Avenue but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2335.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for 787 Seventh Avenue.

**96)**   **Plaintiffs' Work for Macy's**

2336.  At all times during their PDP shifts at Macy's, the NYPD and Macy's jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Macy's; (3) the conduct or behavior that was prohibited versus what was expected while working for Macy's; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to

302

look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Macy's did not want on their premises; (8) the manner in which Macy's required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2337. On June 15, 2025, Dawkins worked a 10-hour PDP shift for Macy's but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2338. Grant also worked at least three (3) PDP shifts for Macy's, each eight (8) hours long, and was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2339. Ting also worked at least six (6) PDP shifts for Macy's and was never paid timely wages for his work.

2340. For example, on April 23, 2024, Ting worked a 10-hour PDP shift for Macy's but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2341. Garlinska also worked an eight (8) hour PDP shift for Macy's but did not receive timely payment of wages for her work, instead waiting approximately three months for her paycheck.

2342. Kmiotek also worked an eight (8) hour PDP shift for Macy's but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2343.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Macy's.

**97)    Plaintiffs' Work for Ramaz School**

2344.    At all times during their PDP shifts at Ramaz School, the NYPD and Ramaz School jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Ramaz School; (3) the conduct or behavior that was prohibited versus what was expected while working for Ramaz School; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Ramaz School did not want on their premises; (8) the manner in which Ramaz School required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2345.    Senese worked at least eight (8) PDP shifts for Ramaz School but was never paid timely wages for his work.

2346.    For example, on October 3, 2024, Senese worked a seven (7) hour PDP shift for Ramaz School and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2347.    R. Diaz also worked a seven (7) hour PDP shift for Ramaz School, but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

2348.  On March 25, 2024, Lauzier worked a five (5) hour PDP shift for Ramaz School and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2349.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Ramaz School.

### 98)     Plaintiffs' Work for Manhattan High School for Girls

2350.  At all times during their PDP shifts at Manhattan High School for Girls, the NYPD and Manhattan High School for Girls jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them company radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Manhattan High School for Girls; (3) the conduct or behavior that was prohibited versus what was expected while working for Manhattan High School for Girls; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Manhattan High School for Girls did not want on their premises; (8) the manner in which Manhattan High School for Girls required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

305

2351.   Senese worked at least 15 PDP shifts for Manhattan High School for Girls but was never paid timely wages for his work, instead typically waiting at least two to four months for his paychecks.

2352.   For example, on April 11, 2024, Senese worked a nine (9) hour PDP shift for Manhattan High School for Girls and did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

2353.   Chow also worked an eight (8) hour PDP shift for Manhattan High School for Girls and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2354.   Likewise, on April 18, 2023, Abouabdallah worked an 8.75-hour PDP shift for Manhattan High School for Girls but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2355.   Similarly, on October 29, 2024, Garlinska worked a nine (9) hour PDP shift for Manhattan High School for Girls but did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2356.   Lauzier also worked an 8.5-hour PDP shift for Manhattan High School for Girls and waited well over a month for her paycheck.

2357.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Manhattan High School for Girls.

**99)    Plaintiffs' Work for Bnai Jeshurun**

2358.   At all times during their PDP shifts at Bnai Jeshurun, the NYPD and Bnai Jeshurun jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific

306

policies and regulations Plaintiffs were required to follow while working for Bnai Jeshurun; (3) the conduct or behavior that was prohibited versus what was expected while working for Bnai Jeshurun; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Bnai Jeshurun did not want on their premises; (8) specific instructions on how to interact with Bnai Jeshurun visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2359. Chow worked at least two (2) PDP shifts for Bnai Jeshurun but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

2360. For example, on June 3, 2023, Chow worked a five (5) hour PDP shift for Bnai Jeshurun and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2361. Khan also worked at least two (2) PDP shifts Bnai Jeshurun but was never paid timely wages for his work.

2362. For example, on May 6, 2023, Khan worked a five (5) hour PDP shift for Bnai Jeshurun and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2363. R. Diaz also worked at least two (2) shifts for Bnai Jeshurun, each six (6) hours long, but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

307

2364.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Bnai Jeshurun.

**100)    Plaintiffs' Work for Central Synagogue**

2365.   At all times during their PDP shifts at Central Synagogue, the NYPD and Central Synagogue jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Central Synagogue; (3) the conduct or behavior that was prohibited versus what was expected while working for Central Synagogue; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Central Synagogue did not want on their premises; (8) specific instructions on how to interact with Central Synagogue visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2366.   On September 24, 2025, Yanez worked a six (6) hour PDP shift for Central Synagogue but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2367.   Faysal also worked a five (5) hour PDP shift for Central Synagogue and was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

2368.   R. Diaz also worked a four (4) hour PDP shift for Central Synagogue, but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

2369.   On August 25, 2022, Lauzier worked a four (4) hour PDP shift for Central Synagogue and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2370.   As another example, on March 20, 2023, Delgado worked a five (5) hour PDP shift for Central Synagogue and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2371.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Central Synagogue.

**101)   Plaintiffs' Work for Sheiris Israel**

2372.   At all times during their PDP shifts at Sheiris Israel, the NYPD and Sheiris Israel jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Sheiris Israel; (3) the conduct or behavior that was prohibited versus what was expected while working for Sheiris Israel; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Sheiris Israel did not want on their premises; (8) specific instructions on how to interact with Sheiris Israel visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner

309

in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2373.  Chow worked at least three (3) PDP shifts for Sheiris Israel but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

2374.  For example, on April 6, 2024, Chow worked a four (4) hour PDP shift for Sheiris Israel and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2375.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Sheiris Israel.

**102)  Plaintiffs' Work for St. Thomas Church**

2376.  At all times during their PDP shifts at St. Thomas Church, the NYPD and St. Thomas Church jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them St. Thomas Church radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for St. Thomas Church; (3) the conduct or behavior that was prohibited versus what was expected while working for St. Thomas Church; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons St. Thomas Church did not want on their premises; (8) specific instructions on how to interact with St. Thomas Church visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were

prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2377. Chow worked at least two (2) PDP shifts for St. Thomas Church but was never paid timely wages for his work, instead typically waiting multiple months for his wages.

2378. For example, on March 12, 2023, Chow worked an 8.5-hour PDP shift for St. Thomas Church and did not receive timely payment of wages for his work, instead waiting months for his paycheck.

2379. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for St. Thomas Church.

### 103) **Plaintiffs' Work for Blackrock**

2380. At all times during their PDP shifts at Blackrock, the NYPD and Blackrock jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Blackrock radios and Blackrock employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Blackrock; (3) the conduct or behavior that was prohibited versus what was expected while working for Blackrock; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Blackrock did not want on their premises; (8) the manner in which Blackrock required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and

311

(11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2381.  Yanez worked at least two (2) PDP shifts for Blackrock but was never paid timely wages for his work.

2382.  For example, on October 8, 2025, Yanez worked an eight (8) hour PDP shift for Blackrock and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2383.  As another example, on October 30, 2025, Rondon worked a six (6) hour PDP shift for Blackrock and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2384.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Blackrock.

**104)    Plaintiffs' Work for Morgan Stanley**

2385.  At all times during their PDP shifts at Morgan Stanley, the NYPD and Morgan Stanley jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, Morgan Stanley employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Morgan Stanley; (3) the conduct or behavior that was prohibited versus what was expected while working for Morgan Stanley; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Morgan Stanley did not want on their premises; (8) the manner in which

312

Morgan Stanley required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2386.   Yanez worked at least 10 PDP shifts for Morgan Stanley but was never paid timely wages for his work.

2387.   For example, on September 8, 2025, Yanez worked an eight (8) hour PDP shift for Morgan Stanley but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2388.   To this day, Yanez has never been paid any wages at all for the PDP shift he worked for Morgan Stanley over two months ago, on January 9, 2026.

2389.   On October 27, 2025, Divino worked an eight (8) hour PDP shift for Morgan Stanley but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2390.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Morgan Stanley.

**105)   Plaintiffs' Work for Richmond Medical Center**

2391.   At all times during their PDP shifts at Richmond Medical Center, the NYPD and Richmond Medical Center jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Richmond Medical Center radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Richmond Medical Center; (3) the conduct or behavior that was prohibited versus what was expected while working for

313

Richmond Medical Center; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Richmond Medical Center did not want on their premises; (8) specific instructions on how to interact with Richmond Medical Center patients and employees; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2392.   On August 29, 2025, Faysal worked a 12-hour PDP shift for Richmond Medical Center and waited five months, until January 28, 2026, to receive his wages.

2393.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Richmond Medical Center.

### 106)   Plaintiffs' Work for Pastavino

2394.   At all times during their PDP shifts at Pastavino, the NYPD and Pastavino jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Pastavino; (3) the conduct or behavior that was prohibited versus what was expected while working for Pastavino; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Pastavino did not want on their premises; (8) the manner in which

314

Pastavino required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2395.   On July 20, 2025, Faysal worked a nine (9) hour PDP shift for Pastavino but did not receive timely payment of wages for his work, instead waiting over two months to receive his paycheck.

2396.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Pastavino.

**107)   Plaintiffs' Work for Alo Yoga**

2397.   At all times during their PDP shifts at Alo Yoga, the NYPD and Alo Yoga jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Alo Yoga; (3) the conduct or behavior that was prohibited versus what was expected while working for Alo Yoga; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Alo Yoga did not want on their premises; (8) specific instructions on how to interact with Alo Yoga customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

315

2398.  Dawkins worked at least 10 PDP shifts for Alo Yoga but was never paid timely wages for his work.

2399.  For example, on October 13, 2025, Dawkins worked a 10-hour PDP shift for Alo Yoga and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2400.  Yanez also worked at least two (2) PDP shifts for Alo Yoga and was never paid timely wages for his work.

2401.  For example, on October 13, 2025, Yanez worked a 10-hour PDP shift for Alo Yoga and had to wait multiple weeks for his paycheck.

2402.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Alo Yoga.

### 108)  Plaintiffs' Work for Newsmax

2403.  At all times during their PDP shifts at Newsmax, the NYPD and Newsmax jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Newsmax employee identification lanyards and signs and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Newsmax; (3) the conduct or behavior that was prohibited versus what was expected while working for Newsmax; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Newsmax did not want on their premises; (8) the manner in which Newsmax required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the

316

manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2404. Yanez worked at least two (2) PDP shifts for Newsmax but was never paid timely wages for his work.

2405. For example, on October 16, 2025, Yanez worked a six (6) hour PDP shift for Newsmax and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2406. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Newsmax.

### 109)   Plaintiffs' Work for Church of the City New York

2407. At all times during their PDP shifts at Church of the City New York, the NYPD and Church of the City New York jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Church of the City New York radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Church of the City New York; (3) the conduct or behavior that was prohibited versus what was expected while working for Church of the City New York; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Church of the City New York did not want on their premises; (8) specific instructions on how to interact with Church of the City New York visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they

maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2408.   On January 14, 2024, Ting worked a five (5) hour PDP shift for Church of the City New York but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2409.   Likewise, on August 17, 2025, Cannon worked a five (5) hour PDP shift for Church of the City of New York and did not receive timely payment of wages for his work, instead waiting well over two months for his paycheck.

2410.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Church of the City New York.

**110)   Plaintiffs' Work for Brookfield**

2411.   At all times during their PDP shifts at Brookfield, the NYPD and Brookfield jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Brookfield employee identification lanyards and signs, as well as Brookfield key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Brookfield; (3) the conduct or behavior that was prohibited versus what was expected while working for Brookfield; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Brookfield did not want on their premises; (8) the manner in which Brookfield required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and

318

which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2412. On May 26, 2025, Martinez worked a 10-hour PDP shift for Brookfield and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2413. Likewise, on September 19, 2025, Dawkins worked a 10-hour PDP shift for Brookfield but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2414. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Brookfield.

**111)    Plaintiffs' Work for Yavneh Minyan**

2415. At all times during their PDP shifts at Yavneh Minyan, the NYPD and Yavneh Minyan jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yavneh Minyan; (3) the conduct or behavior that was prohibited versus what was expected while working for Yavneh Minyan; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Yavneh Minyan did not want on their premises; (8) specific instructions on how to interact with Yavneh Minyan visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

319

2416.   Chow worked at least three (3) PDP shifts for Yavneh Minyan but was never paid timely wages for his work, instead typically waiting approximately two months for his wages.

2417.   For example, on February 15, 2025, Chow worked a four (4) hour PDP shift for Yavneh Minyan and did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

2418.   Lauzier also worked at least four (4) PDP shifts for Yavneh Minyan but was never paid timely wages for her work, instead typically waiting over a month to receive her paychecks.

2419.   For example, on January 18, 2025, Lauzier worked a four (4) hour PDP shift for Yavneh Minyan but did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2420.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yavneh Minyan.

### 112)   **Plaintiffs' Work for BronxCare**

2421.   At all times during their PDP shifts at BronxCare, the NYPD and BronxCare jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for BronxCare; (3) the conduct or behavior that was prohibited versus what was expected while working for BronxCare; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons BronxCare did not want on their premises; (8) specific instructions on how to interact with BronxCare patients and employees; (9) when they were permitted to take a meal

break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2422.   Khan worked at least seven (7) PDP shifts for BronxCare and was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2423.   For example, on November 5, 2024, Khan worked an eight (8) hour PDP shift for BronxCare and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2424.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for BronxCare.

### 113)   Plaintiffs' Work for PEI Media

2425.   At all times during their PDP shifts at PEI Media, the NYPD and PEI Media jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for PEI Media; (3) the conduct or behavior that was prohibited versus what was expected while working for PEI Media; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons PEI Media did not want on their premises; (8) the manner in which PEI Media required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and

(11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2426.   On March 29, 2023, Khan worked an 11.75-hour PDP shift for PEI Media but did not receive timely payment of wages for his work, instead waiting approximately six months for his paycheck.

2427.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for PEI Media.

### 114)   Plaintiffs' Work for Rudin Management

2428.   At all times during their PDP shifts at Rudin Management, the NYPD and Rudin Management jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Rudin Management radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rudin Management; (3) the conduct or behavior that was prohibited versus what was expected while working for Rudin Management; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rudin Management did not want on their premises; (8) the manner in which Rudin Management required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

322

2429. On April 22, 2025, Khan worked an eight (8) hour PDP shift for Rudin Management but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2430. Khan had to wait until mid-March to receive his paycheck for a PDP shift he worked for Rudin Management two months earlier, on January 16, 2026.

2431. On September 28, 2022, Lauzier worked a five (5) hour PDP shift for Rudin Management and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2432. Yanez also worked at least eight (8) PDP shifts for Rudin Management but was never paid timely wages for his work.

2433. For example, on November 6, 2025, Yanez worked a PDP shift for Rudin Management and had to wait multiple weeks to receive his paycheck.

2434. To this day, Yanez has never been paid any wages at all for the PDP shifts he worked for Rudin Management over a month ago, on February 3rd, February 9th, February 13th, and February 18th, 2026.

2435. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rudin Management.

### 115) Plaintiffs' Work for Fairway Markets

2436. At all times during their PDP shifts at Fairway Markets, the NYPD and Fairway Markets jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Fairway Markets; (3) the conduct or behavior that was prohibited versus what was expected while

323

working for Fairway Markets; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Fairway Markets did not want on their premises; (8) specific instructions on how to interact with Fairway Markets' customers; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted into the store and which were prohibited; (13) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (14) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2437. Khan worked at least three (3) PDP shifts for Fairway Markets, but never received timely payment of wages for his work, instead typically waiting over a month for his paychecks.

2438. For example, on May 3, 2025, Khan worked a six (6) hour PDP shift for Fairway Markets but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2439. Likewise, Rondon worked at least 12 PDP shifts for Fairway Markets but was never paid timely wages for his work, instead typically waiting well over a month and sometimes two months for his paychecks.

2440. For example, on August 19, 2024, Rondon worked a six (6) hour PDP shift for Fairway Markets and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2441.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Fairway Markets.

**116)   Plaintiffs' Work for CVS**

2442.   At all times during their PDP shifts at CVS, the NYPD and CVS jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for CVS; (3) the conduct or behavior that was prohibited versus what was expected while working for CVS; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons CVS did not want on their premises; (8) specific instructions on how to interact with CVS customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2443.   Khan worked at least eight (8) PDP shifts for CVS, each eight (8) hours long, and was never paid timely wages for his work, instead waiting well over a month for his paychecks.

2444.   Grant also worked at least 30 PDP shifts for CVS, each eight (8) hours long, but was never paid timely wages for his work, instead waiting multiple months for his paychecks.

2445.   Likewise, Abouabdallah worked at least two (2) PDP shifts for CVS and was never paid timely wages for his work, instead waiting well over a month for his paychecks.

325

2446.   Ting also worked an eight (8) hour PDP shift for CVS but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2447.   Osorio also worked at least 10 PDP shifts for CVS but was never paid timely wages for his work, instead waiting multiple weeks if not months for his paychecks.

2448.   Martinez also worked an eight (8) hour PDP shift for CVS but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2449.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for CVS.

### 117)   **Plaintiffs' Work for BK Botanic Garden**

2450.   At all times during their PDP shifts at BK Botanic Garden, the NYPD and BK Botanic Garden supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them BK Botanic Garden radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for BK Botanic Garden; (3) the conduct or behavior that was prohibited versus what was expected while working for BK Botanic Garden; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons BK Botanic Garden did not want on their premises; (8) how to interact with BK Botanic Garden patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2451.   On April 24, 2025, Antonio worked a six (6) hour PDP shift for BK Botanic Garden but did not receive timely payment of wages for his work, instead waiting over two months for his paycheck.

2452.   Lauzier worked at least three (3) PDP shifts for BK Botanic Garden and never received timely payment of wages for her work, instead typically waiting well over a month for her paychecks.

2453.   For example, on November 20, 2025, Lauzier worked a six (6) hour PDP shift for BK Botanic Garden but never received timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2454.   On November 25, 2023, Chow worked a five (5) hour PDP shift for BK Botanic Garden but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2455.   On August 24, 2022, Dawkins worked a six (6) hour PDP shift for BK Botanic Garden but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2456.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for BK Botanic Garden.

118)   **Plaintiffs' Work for Brooklyn Heights Synagogue**

2457.   At all times during their PDP shifts at Brooklyn Heights Synagogue, the NYPD and Brooklyn Heights Synagogue jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Brooklyn Heights Synagogue; (3) the conduct or behavior that was

327

prohibited versus what was expected while working for Brooklyn Heights Synagogue; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Brooklyn Heights Synagogue did not want on their premises; (8) specific instructions on how to interact with Brooklyn Heights Synagogue visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2458. Lauzier worked at least five (5) PDP shifts for Brooklyn Heights Synagogue but was never paid timely wages for her work, instead typically waiting multiple months for her paychecks.

2459. For example, on October 18, 2024, Lauzier worked a four (4) hour PDP shift for Brooklyn Heights Synagogue but did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2460. Likewise, Delgado worked at least five (5) PDP shifts for Brooklyn Heights Synagogue but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2461. For example, on March 3, 2025, Delgado worked a five (5) hour PDP shift for Brooklyn Heights Synagogue and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2462.   Miron worked at least two (2) PDP shifts for Brooklyn Heights Synagogue but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2463.   For example, on March 18, 2025, Miron worked a five (5) hour PDP shift for Brooklyn Heights Synagogue but was not paid for his work until over 1.5 months later, on May 5, 2025.

2464.   Grant also worked a five (5) hour PDP shift for Brooklyn Heights Synagogue but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2465.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Brooklyn Heights Synagogue.

## 119)   Plaintiffs' Work for Levy Foods

2466.   At all times during their PDP shifts at Levy Foods, the NYPD and Levy Foods jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Levy Foods; (3) the conduct or behavior that was prohibited versus what was expected while working for Levy Foods; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Levy Foods did not want on their premises; (8) the manner in which Levy Foods required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and

329

(11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2467.   On September 3, 2024, Lauzier worked an eight (8) hour PDP shift for Levy Foods and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2468.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Levy Foods.

**120)    Plaintiffs' Work for Tashkent**

2469.   At all times during their PDP shifts at Tashkent, the NYPD and Tashkent jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Tashkent; (3) the conduct or behavior that was prohibited versus what was expected while working for Tashkent; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Tashkent did not want on their premises; (8) specific instructions on how to interact with Tashkent's customers; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted into the store and which were prohibited; (13) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (14) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2470.   On April 12, 2024, Lauzier worked a six (6) hour PDP shift for Tashkent but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2471.   Likewise, Abouabdallah worked at least 47 PDP shifts for Tashkent, most recently on March 7, 2025, and never received timely payment of wages for his work, instead typically waiting multiple weeks to over a month for his paychecks.

2472.   Similarly, Kmiotek worked at least two (2) PDP shifts for Tashkent and never received timely payment of wages for his work, instead typically waiting well over a month for his paychecks.

2473.   Pantoja worked at least five (5) PDP shifts for Tashkent but did not receive timely payment of wages for her work, instead waiting multiple weeks for her paychecks.

2474.   Osorio also worked an eight (8) hour PDP shift for Tashkent but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2475.   Delgado also worked an eight (8) hour PDP shift for Tashkent but was not paid timely wages for his work, instead waiting approximately a month for his paycheck.

2476.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Tashkent.

**121)   Plaintiffs' Work for Yeshiva Rabbi Chaim Berlin**

2477.   At all times during their PDP shifts at Yeshiva Rabbi Chaim Berlin, the NYPD and Yeshiva Rabbi Chaim Berlin jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yeshiva Rabbi Chaim Berlin; (3) the conduct or behavior that was prohibited versus what was expected while working for Yeshiva Rabbi Chaim Berlin; (4) the specific areas they

were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Yeshiva Rabbi Chaim Berlin did not want on their premises; (8) specific instructions on how to interact with Yeshiva Rabbi Chaim Berlin's students and their parents; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Yeshiva Rabbi Chaim Berlin employees with clearing traffic and monitoring students; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2478.   Lauzier worked at least two (2) PDP shifts for Yeshiva Rabbi Chaim Berlin and was never paid timely wages for her work.

2479.   For example, on June 11, 2024, Lauzier worked a four (4) hour PDP shift for Yeshiva Rabbi Chaim Berlin and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2480.   Chow also worked at least three (3) PDP shifts for Yeshiva Rabbi Chaim Berlin but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

2481.   For example, on October 11, 2025, Chow worked a four (4) hour PDP shift for Yeshiva Rabbi Chaim Berlin but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2482.   Likewise, Mansour worked at least four (4) PDP shifts for Yeshiva Rabbi Chaim Berlin and never received timely payment of wages for his work, instead waiting well over a month for his paychecks.

332

2483.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yeshiva Rabbi Chaim Berlin.

**122)  Plaintiffs' Work for BK Tabernacle**

2484.  At all times during their PDP shifts at BK Tabernacle, the NYPD and BK Tabernacle jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for BK Tabernacle; (3) the conduct or behavior that was prohibited versus what was expected while working for BK Tabernacle; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons BK Tabernacle did not want on their premises; (8) specific instructions on how to interact with BK Tabernacle visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2485.  Lauzier worked at least six (6) PDP shifts for BK Tabernacle but was never paid timely wages for her work, instead typically waiting multiple months for her paychecks.

2486.  For example, on October 7, 2025, Lauzier worked a four (4) hour PDP shift for BK Tabernacle but never received timely payment of wages for her work, instead waiting multiple months for her paycheck.

333

2487. Mansour worked at least six (6) PDP shifts for BK Tabernacle and never received timely payment of wages for his work, instead typically waiting well over a month for his paychecks.

2488. For example, on November 4, 2025 Mansour worked a PDP shift for BK Tabernacle but was never paid timely wages for his work, instead waiting 3.5 months, until February 23, 2026, to receive a paycheck for his work.

2489. Likewise, on May 3, 2022, Dawkins worked a four (4) hour PDP shift for BK Tabernacle but never received timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2490. Faysal also worked at least two (2) PDP shifts for BK Tabernacle, each seven (7) hours long, and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2491. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for BK Tabernacle.

### 123)    Plaintiffs' Work for Okka Foods Market

2492. At all times during their PDP shifts at Okka Foods Market, the NYPD and Okka Foods Market jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Okka Foods Market; (3) the conduct or behavior that was prohibited versus what was expected while working for Okka Foods Market; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and

334

disturbances; (7) how to handle loiterers, EDPs, or other persons Okka Foods Market did not want on their premises; (8) specific instructions on how to interact with Okka Foods Market's customers; (9) when they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted into the store and which were prohibited; (13) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (14) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2493.    On August 30, 2025, Lauzier worked a six (6) hour PDP shift for Okka Foods Market but did not receive timely payment of wages for her work, instead waiting approximately a month for her paycheck.

2494.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Okka Foods Market.

### 124)    Plaintiffs' Work for Temple Shaaray Tefila

2495.    At all times during their PDP shifts at Temple Shaaray Tefila, the NYPD and Temple Shaaray Tefila jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Temple Shaaray Tefila; (3) the conduct or behavior that was prohibited versus what was expected while working for Temple Shaaray Tefila; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Temple Shaaray

Tefila did not want on their premises; (8) specific instructions on how to interact with Temple Shaaray Tefila visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2496.  On October 13, 2025, Rondon worked a 4.5-hour PDP shift for Temple Shaaray Tefila and had to wait almost five months, until mid-March 2026, to receive a paycheck for his work.

2497.  Khan also worked at least two (2) PDP shifts for Temple Shaaray Tefila but was never paid timely wages for his work.

2498.  For example, on October 14, 2023, Khan worked a six (6) hour PDP shift for Temple Shaaray Tefila and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2499.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Temple Shaaray Tefila.

### 125)    Plaintiffs' Work for Paramount Group

2500.  At all times during their PDP shifts at Paramount Group, the NYPD and Paramount Group jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Paramount Group; (3) the conduct or behavior that was prohibited versus what was expected while working for Paramount Group; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out

336

for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Paramount Group did not want on their premises; (8) the manner in which Paramount Group required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2501.   On June 19, 2024, Rondon worked an eight (8) hour PDP shift for Paramount Group and was not paid timely wages for his work, instead waiting approximately two months for his paycheck.

2502.   Ting also worked at least eight (8) shifts for Paramount Group but was never paid timely wages for his work.

2503.   For example, on October 8, 2023, Ting worked an eight (8) hour PDP shift for Paramount Group but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2504.   Chow also worked at least two (2) PDP shifts for Paramount Group, each eight (8) hours long, and never received timely payment of wages for his work, instead waiting well over a month for his paychecks.

2505.   Likewise, Garlinska worked an eight (8) hour PDP shift for Paramount Group and did not receive timely payment of wages for her work, instead waiting approximately well over two months for her paycheck.

2506.   Delgado also worked an eight (8) hour PDP shift for Paramount Group and waited approximately a month for his paycheck.

337

2507.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Paramount Group.

### 126) Plaintiffs' Work for Ohav Sholom

2508.  At all times during their PDP shifts at Ohav Sholom, the NYPD and Ohav Sholom jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Ohav Sholom; (3) the conduct or behavior that was prohibited versus what was expected while working for Ohav Sholom; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Ohav Sholom did not want on their premises; (8) specific instructions on how to interact with Ohav Sholom visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2509.  Rondon worked at least five (5) PDP shifts for Ohav Sholom but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2510.  For example, on August 17, 2024, Rondon worked a four (4) hour PDP shift for Ohav Sholom and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2511.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Ohav Sholom.

### 127)   Plaintiffs' Work for Temple Emanu-El

2512.   At all times during their PDP shifts at Temple Emanu-El, the NYPD and Temple Emanu-El jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Temple Emanu-El; (3) the conduct or behavior that was prohibited versus what was expected while working for Temple Emanu-El; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Temple Emanu-El did not want on their premises; (8) specific instructions on how to interact with Temple Emanu-El visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2513.   Chow worked at least two (2) PDP shifts for Temple Emanu-El but was never paid timely wages for his work, instead typically waiting approximately two months for his paychecks.

2514.   For example, on September 21, 2025, Chow worked a four (4) hour PDP shift for Temple Emanu-El and did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

2515.  Rondon worked at least two (2) PDP shifts for Temple Emanu-El but was never paid timely wages for his work, instead typically waiting multiple months for his paychecks.

2516.  For example, on May 8, 2024, Rondon worked a seven (7) hour PDP shift for Temple Emanu-El and did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

2517.  Likewise, on September 11, 2024, Garlinska worked a seven (7) hour PDP shift for Temple Emanu-El but did not receive timely payment of wages for her work, instead waiting approximately two months for her paycheck.

2518.  Lauzier also worked a seven (7) hour PDP shift for Temple Emanu-El and waited well over a month for her paycheck.

2519.  Faysal also worked a four (4) hour PDP shift for Temple Emanu-El but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

2520.  Abouabdallah also worked at least four (4) PDP shifts for Temple Emanu-El but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

2521.  For example, on November 14, 2023, Abouabdallah worked a nine (9) hour PDP shift for Temple Emanu-El but did not receive timely wages for his work, instead waiting over a month for his paycheck.

2522.  Divino also worked a five (5) hour PDP shift for Temple Emanu-El but did not receive timely wages for his work, instead waiting multiple weeks for his paycheck.

2523.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Temple Emanu-El.

**128)   Plaintiffs' Work for Columbia University**

2524.  At all times during their PDP shifts at Columbia University, the NYPD and Columbia University jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Columbia University; (3) the conduct or behavior that was prohibited versus what was expected while working for Columbia University; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Columbia University did not want on their premises; (8) specific instructions on how to interact with Columbia University students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Columbia University required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2525.  On May 18, 2025, Rondon worked an eight (8) hour PDP shift for Columbia University and did not receive timely payment of wages for his work, instead waiting well over three months for his paycheck.

2526.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Columbia University.

341

**129)    Plaintiffs' Work for The Jewish Museum**

2527.   At all times during their PDP shifts at The Jewish Museum, the NYPD and The Jewish Museum supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for The Jewish Museum; (3) the conduct or behavior that was prohibited versus what was expected while working for The Jewish Museum; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons The Jewish Museum did not want on their premises; (8) how to interact with The Jewish Museum patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2528.   On May 8, 2025, Antonio worked a 9.5-hour PDP shift for The Jewish Museum but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2529.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for The Jewish Museum.

**130)    Plaintiffs' Work for Monroe College**

2530.   At all times during their PDP shifts at Monroe College, the NYPD and Monroe College jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform;

342

(2) the specific policies and regulations Plaintiffs were required to follow while working for Monroe College; (3) the conduct or behavior that was prohibited versus what was expected while working for Monroe College; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Monroe College did not want on their premises; (8) specific instructions on how to interact with Monroe College students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Monroe College required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2531.   On June 26, 2025, Antonio worked a seven (7) hour PDP shift for Monroe College but did not receive timely payment of wages for his work instead waiting approximately two months for his paycheck.

2532.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Monroe College.

### 131)   Plaintiffs' Work for New Water Street

2533.   At all times during their PDP shifts at New Water Street, the NYPD and New Water Street jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them New Water Street radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for New Water Street; (3) the conduct or behavior that was prohibited versus what was expected while working for New Water Street; (4) the specific areas

they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons New Water Street did not want on their premises; (8) the manner in which New Water Street required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2534.   On April 21, 2025, Antonio worked an eight (8) hour PDP shift for New Water Street but did not receive timely payment of wages for his work, instead waiting approximately three months for his paycheck.

2535.   Ting also worked an eight (8) hour PDP shift at New Water Street but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2536.   Likewise, Cannon worked at least three (3) PDP shifts for New Water Street but was never paid timely wages for his work.

2537.   For example, on August 25, 2025, Cannon worked an eight (8) hour PDP shift for New Water Street and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2538.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for New Water Street.

344

### 132)    Plaintiffs' Work for NY Historical Society

2539.    At all times during their PDP shifts at NY Historical Society, the NYPD and NY Historical Society supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for NY Historical Society; (3) the conduct or behavior that was prohibited versus what was expected while working for NY Historical Society; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons NY Historical Society did not want on their premises; (8) how to interact with NY Historical Society patrons; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2540.    Antonio worked at least 15 PDP shifts for NY Historical Society but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2541.    For example, on August 23, 2025, Antonio worked a six (6) hour PDP shift for NY Historical Society but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2542.    To this day, Antonio has not been paid any wages for the PDP shift he worked for NY Historical Society on February 27, 2026.

2543.    Likewise, Chow worked at least two (2) PDP shifts for NY Historical Society but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

345

2544.   For example, on December 17, 2022, Chow worked a five (5) hour PDP shift for NY Historical Society and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2545.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for NY Historical Society.

### 133)   Plaintiffs' Work for Rego Park Jewish Center

2546.   At all times during their PDP shifts at Rego Park Jewish Center, the NYPD and Rego Park Jewish Center jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rego Park Jewish Center; (3) the conduct or behavior that was prohibited versus what was expected while working for Rego Park Jewish Center; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rego Park Jewish Center did not want on their premises; (8) specific instructions on how to interact with Rego Park Jewish Center visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2547.   On September 24, 2025, Antonio worked a six (6) hour PDP shift for Rego Park Jewish Center but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

346

2548.  Likewise, Faysal worked an 11.5-hour PDP shift for Rego Park Jewish Center but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2549.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rego Park Jewish Center.

**134)   Plaintiffs' Work for SAR Academy**

2550.  At all times during their PDP shifts at SAR Academy, the NYPD and SAR Academy jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for SAR Academy; (3) the conduct or behavior that was prohibited versus what was expected while working for SAR Academy; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons SAR Academy did not want on their premises; (8) specific instructions on how to interact with SAR Academy's students and their parents; (9) the manner in which SAR Academy required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist SAR Academy employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2551.  Garlinska worked at least two (2) PDP shifts for SAR Academy but was never paid timely wages for her work, instead typically waiting approximately three months for her paychecks.

2552.  For example, on December 7, 2024, Garlinska worked a 10-hour PDP shift for SAR Academy and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2553.  Likewise, R. Diaz worked a 6.5-hour PDP shift for SAR Academy and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2554.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for SAR Academy.

### 135)    Plaintiffs' Work for Israel Center

2555.  At all times during their PDP shifts at Israel Center, the NYPD and Israel Center jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Israel Center; (3) the conduct or behavior that was prohibited versus what was expected while working for Israel Center; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Israel Center did not want on their premises; (8) specific instructions on how to interact with Israel Center visitors; (9) the manner in which Israel Center required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in

which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2556.  On October 3, 2024, Garlinska worked a five (5) hour PDP shift for Israel Center and did not receive timely payment of wages for her work, instead waiting over two months for her paycheck.

2557.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Israel Center.

### 136)    Plaintiffs' Work for 92nd St. Y

2558.  At all times during their PDP shifts at 92nd St. Y, the NYPD and 92nd St. Y jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for 92nd St. Y; (3) the conduct or behavior that was prohibited versus what was expected while working for 92nd St. Y; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons 92nd St. Y did not want on their premises; (8) specific instructions on how to interact with 92nd St. Y visitors; (9) the manner in which 92nd St. Y required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

349

2559.   On October 22, 2024, Garlinska worked a seven (7) hour PDP shift for 92nd St. Y and did not receive timely payment of wages for her work, instead waiting over two months for her paycheck.

2560.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for 92nd St. Y.

### 137)    Plaintiffs' Work for Yeshiva Har Torah

2561.   At all times during their PDP shifts at Yeshiva Har Torah, the NYPD and Yeshiva Har Torah jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yeshiva Har Torah; (3) the conduct or behavior that was prohibited versus what was expected while working for Yeshiva Har Torah; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Yeshiva Har Torah did not want on their premises; (8) specific instructions on how to interact with Yeshiva Har Torah's students and their parents; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Yeshiva Har Torah employees with clearing traffic and monitoring students; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2562. On September 18, 2024, Garlinska worked a four (4) hour PDP shift for Yeshiva Har Torah and did not receive timely payment of wages for her work, instead waiting over two months for her paycheck.

2563. Likewise, on December 17, 2024, Miron worked a four (4) hour PDP shift for Yeshiva Har Torah but did not receive timely wages for his work, instead waiting multiple weeks for his paycheck.

2564. To this day, Lauzier has never been paid any wages at all for the PDP shift she worked for Yeshiva Har Torah a month ago, on February 12, 2026.

2565. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yeshiva Har Torah.

### 138) Plaintiffs' Work for Hines

2566. At all times during their PDP shifts at Hines, the NYPD and Hines jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Hines; (3) the conduct or behavior that was prohibited versus what was expected while working for Hines; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Hines did not want on their premises; (8) the manner in which Hines required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in

351

which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2567.   Khan worked at least five (5) PDP shifts for Hines but was never paid timely wages for his work, instead typically waiting one to three months for his paychecks.

2568.   For example, on November 18, 2022, Khan worked a four (4) hour PDP shift for Hines and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2569.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Hines.

### 139)    Plaintiffs' Work for Yeshiva Sholom Schachna

2570.   At all times during their PDP shifts at Yeshiva Sholom Schachna, the NYPD and Yeshiva Sholom Schachna jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Yeshiva Sholom Schachna; (3) the conduct or behavior that was prohibited versus what was expected while working for Yeshiva Sholom Schachna; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Yeshiva Sholom Schachna did not want on their premises; (8) specific instructions on how to interact with Yeshiva Sholom Schachna's students and their parents; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Yeshiva Sholom Schachna employees with clearing traffic and monitoring

352

students; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2571. On January 29, 2023, Chow worked a 7.5-hour PDP shift for Yeshiva Sholom Schachna and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2572. Likewise, on January 6, 2023, Miron worked a five (5) hour PDP shift for Yeshiva Sholom Schachna and did not receive timely payment of wages for his work, instead waiting a month, until February 4, 2023, for his paycheck.

2573. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Yeshiva Sholom Schachna.

**140)    Plaintiffs' Work for Kehila Kedosha**

2574. At all times during their PDP shifts at Kehila Kedosha, the NYPD and Kehila Kedosha jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Kehila Kedosha; (3) the conduct or behavior that was prohibited versus what was expected while working for Kehila Kedosha; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Kehila Kedosha did not want on their premises; (8) specific instructions on how to interact with Kehila Kedosha visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were

353

prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2575.  On June 3, 2023, Abouabdallah worked a four (4) hour PDP shift for Kehila Kedosha but did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2576.  Chow also worked a four (4) hour PDP shift for Kehila Kedosha and did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

2577.  Khan worked at least two (2) PDP shifts for Kehila Kedosha but was never paid timely wages for his work.

2578.  For example, on May 20, 2023, Khan worked a four (4) hour PDP shift for Kehila Kedosha and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2579.  Likewise, Faysal worked a four (4) hour PDP shift for Kehila Kedosha and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2580.  Daly also worked a four (4) hour PDP shift for Kehila Kedosha and did not receive timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2581.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Kehila Kedosha.

**141)** **Plaintiffs' Work for Tribeca Synagogue**

2582.  At all times during their PDP shifts at Tribeca Synagogue, the NYPD and Tribeca Synagogue jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for

354

Tribeca Synagogue; (3) the conduct or behavior that was prohibited versus what was expected while working for Tribeca Synagogue; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Tribeca Synagogue did not want on their premises; (8) specific instructions on how to interact with Tribeca Synagogue visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2583.   Khan worked a four (4) hour PDP shift for Tribeca Synagogue and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2584.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Tribeca Synagogue.

### 142)   Plaintiffs' Work for MetLife

2585.   At all times during their PDP shifts at MetLife, the NYPD and MetLife jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for MetLife; (3) the conduct or behavior that was prohibited versus what was expected while working for MetLife; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers,

355

EDPs, or other persons MetLife did not want on their premises; (8) the manner in which MetLife required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) what they were required to do upon their return from lunch; (11) which other Officers they were required to relieve; (12) which individuals were permitted into the building and which were prohibited; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2586.    On October 24, 2022, Faysal worked a seven (7) hour PDP shift for MetLife but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2587.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for MetLife.

### 143)    Plaintiffs' Work for Khal Bnei

2588.    At all times during their PDP shifts at Khal Bnei, the NYPD and Khal Bnei jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Khal Bnei; (3) the conduct or behavior that was prohibited versus what was expected while working for Khal Bnei; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Khal Bnei did not want on their premises; (8) specific instructions on how to interact with Khal Bnei visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in

356

which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2589.   Faysal worked a seven (7) hour PDP shift for Khal Bnei and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2590.   Likewise, Mansour worked at least six (6) PDP shifts for Khal Bnei, each four (4) hours long, and never received timely payment of wages for his work, instead waiting multiple months for his paychecks.

2591.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Khal Bnei.

### 144)   Plaintiffs' Work for Trinity Tabernacle

2592.   At all times during their PDP shifts at Trinity Tabernacle, the NYPD and Trinity Tabernacle jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Trinity Tabernacle; (3) the conduct or behavior that was prohibited versus what was expected while working for Trinity Tabernacle; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Trinity Tabernacle did not want on their premises; (8) specific instructions on how to interact with Trinity Tabernacle visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Trinity Tabernacle required them to perform perimeter checks; and (12) the manner in which they maintained their appearances,

357

including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2593.   Miron worked a four (4) hour PDP shift for Trinity Tabernacle and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2594.   Likewise, Chow worked at least two (2) PDP shifts for Trinity Tabernacle but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2595.   For example, on November 13, 2022, Chow worked a four (4) hour PDP shift for Trinity Tabernacle and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2596.   Mansour also worked at least two (2) PDP shifts for Trinity Tabernacle, each four (4) hours long, and never received timely payment of wages for his work, instead waiting multiple months for his paychecks.

2597.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Trinity Tabernacle.

### 145)   Plaintiffs' Work for Young Israel of Forest Hills

2598.   At all times during their PDP shifts at Young Israel of Forest Hills, the NYPD and Young Israel of Forest Hills jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Young Israel of Forest Hills; (3) the conduct or behavior that was prohibited versus what was expected while working for Young Israel of Forest Hills; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious

358

activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Young Israel of Forest Hills did not want on their premises; (8) specific instructions on how to interact with Young Israel of Forest Hills visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2599.   Delgado worked at least two (2) PDP shifts for Young Israel of Forest Hills but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2600.   For example, on September 27, 2022, Delgado worked a six (6) hour PDP shift for Young Israel of Forest Hills and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2601.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Young Israel of Forest Hills.

**146)   Plaintiffs' Work for Benjamin Partners**

2602.   At all times during their PDP shifts at Benjamin Partners, the NYPD and Benjamin Partners jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Benjamin Partners radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Benjamin Partners; (3) the conduct or behavior that was prohibited versus what was expected while working for Benjamin Partners; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5)

suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Benjamin Partners did not want on their premises; (8) specific instructions on how to interact with Benjamin Partners' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2603.  Lauzier worked at least three (3) PDP shifts for Benjamin Partners but was never paid timely wages for her work, instead typically waiting multiple months for her paychecks.

2604.  For example, on July 14, 2021, Lauzier worked a five (5) hour PDP shift for Benjamin Partners and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2605.  R. Diaz worked a five (5) hour PDP shift for Benjamin Partners but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

2606.  Garlinska also worked a five (5) hour PDP shift for Benjamin Partners and did not receive timely payment of wages for her work, instead waiting multiple months for her paycheck.

2607.  Grant also worked a seven (7) hour PDP shift for Benjamin Partners but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2608.  Delgado also worked a five (5) hour PDP shift for Benjamin Partners, but was not paid timely wages for his work, instead waiting approximately a month for his paycheck.

2609. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Benjamin Partners.

## 147) Plaintiffs' Work for Empire Outlets

2610. At all times during their PDP shifts at Empire Outlets, the NYPD and Empire Outlets jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Empire Outlets radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Empire Outlets; (3) the conduct or behavior that was prohibited versus what was expected while working for Empire Outlets; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Empire Outlets did not want on their premises; (8) specific instructions on how to interact with Empire Outlets' customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2611. Mansour worked at least 15 PDP shifts for Empire Outlets but was never paid timely wages for his work, instead typically waiting two to three months for his paychecks.

2612. For example, on April 10, 2022, Mansour worked a seven (7) hour PDP shift for Empire Outlets and did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

361

2613.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Empire Outlets.

### 148)   Plaintiffs' Work for Etz Chaim of Flatbush

2614.   At all times during their PDP shifts at Etz Chaim of Flatbush, the NYPD and Etz Chaim of Flatbush jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Etz Chaim of Flatbush; (3) the conduct or behavior that was prohibited versus what was expected while working for Etz Chaim of Flatbush; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Etz Chaim of Flatbush did not want on their premises; (8) specific instructions on how to interact with Etz Chaim of Flatbush visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2615.   Mansour worked at least 17 PDP shifts for Etz Chaim of Flatbush but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

2616.   For example, on October 13, 2025, Mansour worked a four (4) hour PDP shift for Etz Chaim of Flatbush but was not paid for his work until approximately a month later in November 2025.

2617.   Likewise, R. Diaz worked a four (4) hour PDP shift for Etz Chaim of Flatbush and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2618.   Abouabdallah also worked at least two (2) PDP shifts for Etz Chaim of Flatbush, most recently on October 26, 2024, and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2619.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Etz Chaim of Flatbush.

### 149)   Plaintiffs' Work for Ner Mitzvah

2620.   At all times during their PDP shifts at Ner Mitzvah, the NYPD and Ner Mitzvah jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Ner Mitzvah; (3) the conduct or behavior that was prohibited versus what was expected while working for Ner Mitzvah; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Ner Mitzvah did not want on their premises; (8) specific instructions on how to interact with Ner Mitzvah visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

363

2621.   Mansour worked at least three (3) PDP shifts for Ner Mitzvah but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2622.   For example, on September 16, 2021, Mansour worked an 11.5-hour PDP shift for Ner Mitzvah and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2623.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Ner Mitzvah.

### 150)   Plaintiffs' Work for Treeco Hylan

2624.   At all times during their PDP shifts at Treeco Hylan, the NYPD and Treeco Hylan jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia,* directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Treeco Hylan; (3) the conduct or behavior that was prohibited versus what was expected while working for Treeco Hylan; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Treeco Hylan did not want on their premises; (8) specific instructions on how to interact with Treeco Hylan's customers; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the store and which were prohibited; (11) specific instructions on how to respond to shoplifters and individuals suspected of theft; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

364

2625.  Mansour worked at least two (2) PDP shifts for Treeco Hylan but was never paid timely wages for his work, instead typically waiting multiple weeks for his paychecks.

2626.  For example, on October 31, 2025, Mansour worked an eight (8) hour PDP shift for Treeco Hylan but did not receive timely wages for his work, instead waiting over a month for his paycheck.

2627.  Abouabdallah worked at least seven (7) PDP shifts for Treeco Hylan but was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2628.  For example, on August 11, 2025, Abouabdallah worked an eight (8) hour PDP shift for Treeco Hylan and did not receive timely payment of wages for his work, instead waiting approximately 1.5 months for his paycheck.

2629.  As another example, on November 4, 2025, Faysal also worked an eight (8) hour PDP shift for Treeco Hylan and did not receive timely payment of wages for his work, instead waiting almost two months for his paycheck.

2630.  On January 15, 2026, Faysal worked another PDP shift for Treeco Hylan and again waited over a month to receive a paycheck for his work.

2631.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Treeco Hylan.

### 151)  **Plaintiffs' Work for Plaza College**

2632.  At all times during their PDP shifts at Plaza College, the NYPD and Plaza College jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Plaza College; (3) the conduct or behavior that was prohibited versus what was expected while working for Plaza

College; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Plaza College did not want on their premises; (8) specific instructions on how to interact with Plaza College students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Plaza College required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2633.  Delgado worked at least five (5) PDP shifts for Plaza College but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

2634.  For example, on January 16, 2025, Delgado worked a four (4) hour PDP shift for Plaza College and did not receive timely payment of wages for his work, instead waiting approximately a month for his paycheck.

2635.  Faysal also worked a four (4) hour PDP shift for Plaza College but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2636.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Plaza College.

**152)    Plaintiffs' Work for Machane Chodosh**

2637.  At all times during their PDP shifts at Machane Chodosh, the NYPD and Machane Chodosh jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for

366

Machane Chodosh; (3) the conduct or behavior that was prohibited versus what was expected while working for Machane Chodosh; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Machane Chodosh did not want on their premises; (8) specific instructions on how to interact with Machane Chodosh visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2638.    On October 3, 2024, Delgado worked a six (6) hour PDP shift for Machane Chodosh but did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2639.    Likewise, Chow worked a four (4) hour PDP shift for Machane Chodosh and did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

2640.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Machane Chodosh.

**153)    Plaintiffs' Work for Queens Jewish Center**

2641.    At all times during their PDP shift at Queens Jewish Center, the NYPD and Queens Jewish Center jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for

367

Queens Jewish Center; (3) the conduct or behavior that was prohibited versus what was expected while working for Queens Jewish Center; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Queens Jewish Center did not want on their premises; (8) specific instructions on how to interact with Queens Jewish Center visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2642.   Delgado worked at least three (3) PDP shifts for Queens Jewish Center but was never paid timely wages for his work, instead typically waiting well over a month and sometimes two months for his paychecks.

2643.   For example, on May 20, 2023, Delgado worked a five (5) hour PDP shift for Queens Jewish Center but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2644.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Queens Jewish Center.

**154)   Plaintiffs' Work for Sholom Sholom**

2645.   At all times during their PDP shifts at Sholom Sholom, the NYPD and Sholom Sholom jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for

368

Sholom Sholom; (3) the conduct or behavior that was prohibited versus what was expected while working for Sholom Sholom; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Sholom Sholom did not want on their premises; (8) specific instructions on how to interact with Sholom Sholom's students and their parents; (9) the manner in which Sholom Sholom required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist Sholom Sholom employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2646. Delgado worked at least four (4) PDP shifts for Sholom Sholom and was never paid timely wages for his work, instead typically waiting well over a month and sometimes two months for his paychecks.

2647. For example, on June 20, 2023, Delgado worked a four (4) hour PDP shift for Sholom Sholom but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2648. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Sholom Sholom.

### 155) Plaintiffs' Work for Stephen Wise Free

2649. At all times during their PDP shifts at Stephen Wise Free, the NYPD and Stephen Wise Free jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform;

369

(2) the specific policies and regulations Plaintiffs were required to follow while working for Stephen Wise Free; (3) the conduct or behavior that was prohibited versus what was expected while working for Stephen Wise Free; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Stephen Wise Free did not want on their premises; (8) specific instructions on how to interact with Stephen Wise Free visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2650.   Chow worked at least two (2) PDP shifts for Stephen Wise Free but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

2651.   For example, on September 7, 2025, Chow worked a four (4) hour PDP shift for Stephen Wise Free and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2652.   R. Diaz worked at least five (5) PDP shifts for Stephen Wise Free but was never paid timely wages for his work, instead waiting multiple weeks for his paychecks.

2653.   Likewise, Faysal worked a 5.5-hour PDP shift for Stephen Wise Free and never received timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2654.   On August 1, 2025, Cannon worked a four (4) hour PDP shift for Stephen Wise Free and did not receive timely payment of wages for his work, instead waiting approximately two months for his paycheck.

370

2655.   Divino also worked a 5.5-hour PDP shift for Stephen Wise Free and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2656.   Kmiotek also worked a 5.5-hour PDP shift for Stephen Wise Free and was not paid timely wages for his work, instead waiting well over a month for his paycheck.

2657.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Stephen Wise Free.

**156)   Plaintiffs' Work for Rainbow Hill**

2658.   At all times during their PDP shifts at Rainbow Hill, the NYPD and Rainbow Hill jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rainbow Hill; (3) the conduct or behavior that was prohibited versus what was expected while working for Rainbow Hill; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rainbow Hill did not want on their premises; (8) the manner in which Rainbow Hill required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted onto the premises and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2659.   Mansour worked at least nine (9) PDP shifts for Rainbow Hill but was never paid timely wages for his work, instead typically waiting over a month for his paychecks.

371

2660.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rainbow Hill.

### 157)  Plaintiffs' Work for TOV

2661.  At all times during their PDP shifts at TOV, the NYPD and TOV jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them TOV radios and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for TOV; (3) the conduct or behavior that was prohibited versus what was expected while working for TOV; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons TOV did not want on their premises; (8) specific instructions on how to interact with TOV visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2662.  Likewise, Chow worked a six (6) hour PDP shift for TOV and did not receive timely payment of wages for his work, instead waiting multiple months for his paycheck.

2663.  Faysal also worked a 6.5-hour PDP shift for TOV and never received timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2664.  On December 9, 2023, Miron worked a four (4) hour PDP shift for TOV but did not receive timely wages for his work, instead having to wait over six months, until June 15, 2024, to receive his paycheck.

2665.   Likewise, on October 21, 2023, Delgado worked a four (4) hour PDP shift for TOV and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2666.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for TOV.

### 158)   Plaintiffs' Work for Etz Chaim of Kew Gardens Hills

2667.   At all times during their PDP shifts at Etz Chaim of Kew Gardens Hills, the NYPD and Etz Chaim of Kew Gardens Hills jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Etz Chaim of Kew Gardens Hills; (3) the conduct or behavior that was prohibited versus what was expected while working for Etz Chaim of Kew Gardens Hills; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Etz Chaim of Kew Gardens Hills did not want on their premises; (8) specific instructions on how to interact with Etz Chaim of Kew Gardens Hills visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2668.   Miron worked at least six (6) PDP shifts for Etz Chaim of Kew Gardens Hills but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

2669.   For example, on February 1, 2025, Miron worked a four (4) hour PDP shift for Etz Chaim of Kew Gardens Hills but was not paid for his work until over 1.5 months later, on March 18, 2025.

2670.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Etz Chaim of Kew Gardens Hills.

### 159)   Plaintiffs' Work for Rabbinical Seminary of America

2671.   At all times during their PDP shifts at Rabbinical Seminary of America, the NYPD and Rabbinical Seminary of America jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Rabbinical Seminary of America; (3) the conduct or behavior that was prohibited versus what was expected while working for Rabbinical Seminary of America; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Rabbinical Seminary of America did not want on their premises; (8) specific instructions on how to interact with Rabbinical Seminary of America's students and their parents; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Rabbinical Seminary of America employees with clearing traffic and monitoring students; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2672.   Miron worked at least three (3) PDP shifts for Rabbinical Seminary of America but was never paid timely wages for his work, instead waiting multiple months for his paychecks.

2673.   For example, on June 15, 2024, Miron worked a four (4) hour PDP shift for Rabbinical Seminary of America and did not receive timely payment of wages for his work, instead having to wait four months, until October 7, 2024, to receive his paycheck.

2674.   Likewise, Faysal worked a 7.75-hour PDP shift for Rabbinical Seminary of America but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2675.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Rabbinical Seminary of America.

**160)   Plaintiffs' Work for Temple Gates of Prayer**

2676.   At all times during their PDP shifts at Temple Gates of Prayer, the NYPD and Temple Gates of Prayer jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Temple Gates of Prayer; (3) the conduct or behavior that was prohibited versus what was expected while working for Temple Gates of Prayer; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Temple Gates of Prayer did not want on their premises; (8) specific instructions on how to interact with Temple Gates of Prayer visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they

375

maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2677. Miron worked at least three (3) PDP shifts for Temple Gates of Prayer but was never paid timely wages for his work.

2678. For example, on August 23, 2025, Miron worked a four (4) hour PDP shift for Temple Gates and did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2679. Likewise, Ting worked a four (4) hour PDP shift for Temple Gates of Prayer but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2680. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Temple Gates of Prayer.

**161)** **Plaintiffs' Work for Hebrew Home**

2681. At all times during their PDP shifts at Hebrew Home, the NYPD and Hebrew Home jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Hebrew Home; (3) the conduct or behavior that was prohibited versus what was expected while working for Hebrew Home; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Hebrew Home did not want on their premises; (8) specific instructions on how to interact with Hebrew Home visitors; (9) when they were permitted to take

376

a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2682.   On October 26, 2025, Lauzier worked a five (5) hour PDP shift for Hebrew Home but never received timely payment of wages for her work, instead waiting multiple months for her paycheck.

2683.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Hebrew Home.

## 162)   Plaintiffs' Work for UN School

2684.   At all times during their PDP shifts at UN School, the NYPD and UN School jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for UN School; (3) the conduct or behavior that was prohibited versus what was expected while working for UN School; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons UN School did not want on their premises; (8) specific instructions on how to interact with UN School's students and their parents; (9) the manner in which UN School required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist UN School employees with clearing traffic and monitoring students; and (13) the manner in

which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2685. Cannon worked at least 23 PDP shifts for UN School but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

2686. For example, on November 10, 2025, Cannon worked an 8.5-hour PDP shift for UN School and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2687. Faysal also worked an 8.5-hour PDP shift for UN School but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2688. Lauzier worked at least three (3) PDP shifts for UN School but was never paid timely wages for her work, instead typically waiting multiple months for her paychecks.

2689. For example, on August 17, 2022, Lauzier worked an eight (8) hour PDP shift for UN School and did not receive timely payment of wages for her work, instead waiting well over a month for her paycheck.

2690. Martinez also worked at least two (2) PDP shifts for UN School but never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2691. Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for UN School.

**163)  Plaintiffs' Work for Kane Street**

2692. At all times during their PDP shifts at Kane Street, the NYPD and Kane Street jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Kane Street; (3) the

378

conduct or behavior that was prohibited versus what was expected while working for Kane Street; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Kane Street did not want on their premises; (8) specific instructions on how to interact with Kane Street visitors; (9) the manner in which Kane Street required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2693.    Abouabdallah worked at least two (2) PDP shifts for Kane Street, most recently on October 25, 2024, and never received timely payment of wages for his work, instead waiting multiple weeks for his paychecks.

2694.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Kane Street.

### 164)    Plaintiffs' Work for Wagner College

2695.    At all times during their PDP shifts at Wagner College, the NYPD and Wagner College jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Wagner College; (3) the conduct or behavior that was prohibited versus what was expected while working for Wagner College; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out

for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Wagner College did not want on their premises; (8) specific instructions on how to interact with Wagner College students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) the specific manner in which Wagner College required them to perform perimeter checks; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2696.   Abouabdallah worked at least three (3) PDP shifts for Wagner College and was never paid timely wages for his work, instead typically waiting multiple months for his paychecks.

2697.   For example, on September 21, 2024, Abouabdallah worked a PDP shift for Wagner College but did not receive timely payment of wages for his work, instead waiting over two months for his paycheck.

2698.   As another example, on November 12, 2022, Chow worked a seven (7) hour PDP shift for Wagner College but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2699.   Mansour also worked a five (5) hour PDP shift for Wagner College and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2700.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Wagner College.

### 165)   Plaintiffs' Work for Salesforce

2701.   At all times during their PDP shifts at Salesforce, the NYPD and Salesforce jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Salesforce employee identification lanyards and signs and directing them as to: (1) the specific

instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Salesforce; (3) the conduct or behavior that was prohibited versus what was expected while working for Salesforce; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Salesforce did not want on their premises; (8) the manner in which Salesforce required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2702.  On May 4, 2023, Abouabdallah worked an 8.5-hour PDP shift for Salesforce but did not receive timely payment of wages for his work, instead waiting approximately six months for his paycheck.

2703.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Salesforce.

### 166)  Plaintiffs' Work for Greater Jamaica

2704.  At all times during their PDP shifts at Greater Jamaica, the NYPD and Greater Jamaica jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, assigning them Greater Jamaica radios, Greater Jamaica employee identification lanyards and signs, as well as Greater Jamaica key cards and directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Greater Jamaica; (3) the conduct or behavior that was

381

prohibited versus what was expected while working for Greater Jamaica; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Greater Jamaica did not want on their premises; (8) the manner in which Greater Jamaica required them to perform perimeter checks; (9) the specific time they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2705.   On April 5, 2023, Ting worked a four (4) hour PDP shift for Greater Jamaica but did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2706.   Likewise, Miron worked at least two (2) PDP shifts for Greater Jamaica but did not receive timely payment of wages for his work, instead waiting over a month for his paychecks.

2707.   Grant also worked a four (4) hour PDP shift for Greater Jamaica but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2708.   Delgado also worked a four (4) hour PDP shift for Greater Jamaica, but was not paid timely wages for his work, instead waiting multiple weeks for his paycheck.

2709.   Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Greater Jamaica.

### 167)   Plaintiffs' Work for Manhattan Beach

2710.   At all times during their PDP shifts at Manhattan Beach, the NYPD and Manhattan Beach jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*,

382

directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Manhattan Beach; (3) the conduct or behavior that was prohibited versus what was expected while working for Manhattan Beach; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Manhattan Beach did not want on their premises; (8) specific instructions on how to interact with Manhattan Beach visitors; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2711.   Chow worked at least three (3) PDP shifts for Manhattan Beach and was never paid timely wages for his work, instead typically waiting well over a month for his paychecks.

2712.   For example, on September 14, 2024, Chow worked a four (4) hour PDP shift for Manhattan Beach and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2713.   On November 29, 2025, Lauzier worked a four (4) hour PDP shift for Manhattan Beach but never received timely payment of wages for her work, instead waiting multiple weeks for her paycheck.

2714.   Grant also worked a four (4) hour PDP shift for Manhattan Beach but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2715.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Manhattan Beach.

### 168)    Plaintiffs' Work for School of Visual Arts

2716.    At all times during their PDP shifts at School of Visual Arts, the NYPD and School of Visual Arts jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for School of Visual Arts; (3) the conduct or behavior that was prohibited versus what was expected while working for School of Visual Arts; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons School of Visual Arts did not want on their premises; (8) specific instructions on how to interact with School of Visual Arts' students and their parents; (9) the manner in which School of Visual Arts required them to perform perimeter checks; (10) when they were permitted to take a meal break; (11) which individuals were permitted into the building and which were prohibited; (12) how to assist School of Visual Arts employees with clearing traffic and monitoring students; and (13) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2717.    Osorio worked a seven (7) hour PDP shift for the School of Visual Arts but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2718.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for School of Visual Arts.

**169)  Plaintiffs' Work for Hillcrest Jewish**

2719.  At all times during their PDP shifts at Hillcrest Jewish, the NYPD and Hillcrest Jewish jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Hillcrest Jewish; (3) the conduct or behavior that was prohibited versus what was expected while working for Hillcrest Jewish; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Hillcrest Jewish did not want on their premises; (8) specific instructions on how to interact with Hillcrest Jewish visitors and students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Hillcrest Jewish employees with clearing traffic and monitoring attendees; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2720.  On September 25, 2023, Delgado worked a five (5) hour PDP shift for Hillcrest Jewish and did not receive timely payment of wages for his work, instead waiting well over a month for his paycheck.

2721.  Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Hillcrest Jewish.

**170)**    **Plaintiffs' Work for Sea Breeze Jewish**

2722.    At all times during their PDP shifts at Sea Breeze Jewish, the NYPD and Sea Breeze Jewish jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Sea Breeze Jewish; (3) the conduct or behavior that was prohibited versus what was expected while working for Sea Breeze Jewish; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Sea Breeze Jewish did not want on their premises; (8) specific instructions on how to interact with Sea Breeze Jewish visitors and students; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; (11) how to assist Sea Breeze Jewish employees with clearing traffic and monitoring attendees; and (12) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2723.    Chow worked at least three (3) PDP shifts for Sea Breeze Jewish but was never paid timely wages for his work, instead typically waiting well over a month for his wages.

2724.    For example, on October 3, 2024, Chow worked a 5.5-hour PDP shift for Sea Breeze Jewish and did not receive timely payment of wages for his work, instead waiting over a month for his paycheck.

2725.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Sea Breeze Jewish.

**171)    Plaintiffs' Work for Ross Dress For Less**

2726.    At all times during their PDP shifts at Ross Dress For Less, the NYPD and Ross Dress For Less jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to: (1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Ross Dress For Less; (3) the conduct or behavior that was prohibited versus what was expected while working for Ross Dress For Less; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Ross Dress For Less did not want on their premises; (8) the manner in which Ross Dress For Less required them to perform perimeter checks; (9) when they were permitted to take a meal break; (10) which individuals were permitted into the building and which were prohibited; and (11) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2727.    On November 8, 2025, Yanez worked an eight (8) hour PDP shift for Ross Dress For Less but did not receive timely payment of wages for his work, instead waiting multiple weeks for his paycheck.

2728.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages either at all or until weeks and even months after they worked their PDP shifts for Ross Dress For Less.

**172)    Plaintiffs' Work for Amex**

2729.    At all times during their PDP shifts at Amex, the NYPD and Amex jointly supervised and controlled the terms of Plaintiffs' employment by, *inter alia*, directing them as to:

387

(1) the specific instructions and directions for the work they were to perform; (2) the specific policies and regulations Plaintiffs were required to follow while working for Amex; (3) the conduct or behavior that was prohibited versus what was expected while working for Amex; (4) the specific areas they were required to monitor and the manner in which they were required to patrol them; (5) suspicious activity they were required to look out for; (6) the manner in which they were required to respond to various incidents and disturbances; (7) how to handle loiterers, EDPs, or other persons Amex did not want on their premises; (8) when they were permitted to take a meal break; (9) which individuals were permitted into the building and which were prohibited; and (10) the manner in which they maintained their appearances, including the requirement that Plaintiffs wear their eight-point hat throughout the entirety of their shift.

2730.    On February 9, 2026, Pantoja worked a 10-hour PDP shift for Amex and still has never been paid any wages for her work.

2731.    Numerous other Officers confirmed to Plaintiffs that they too were not paid their wages until weeks and even months after they worked their PDP shifts for Amex.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

2732.    Plaintiffs bring their FLSA claims as a collective action on behalf of themselves and all other similarly situated persons who have been employed by the NYPD and participated in the PDP at any time during the full statute of limitations period (the "FLSA Collective").

2733.    At all relevant times, Plaintiffs and the FLSA Collective were similarly situated, had substantially similar job requirements, were paid in the same manner and under the same common policies, and were subject to Defendants' practices of: (i) failing to compensate Plaintiffs and the FLSA Collective at the federal minimum wage for all hours worked in a workweek; and (ii) failing and refusing to timely pay all wages owed.

388

2734.   At all relevant times, Defendants have been fully aware of the duties performed by Plaintiffs and the FLSA Collective, and that those duties are not exempt from the provisions of the FLSA.

2735.   Defendants' violations of the FLSA have been willful, repeated, knowing, intentional, and without a good faith basis, and have significantly damaged Plaintiffs and the FLSA Collective.

2736.   As a result of their unlawful conduct, Defendants are liable to Plaintiffs and the FLSA Collective for the full amount of their unpaid and late wages, with interest, plus an additional equal amount as liquidated damages, plus reasonable attorneys' fees and costs incurred by Plaintiffs and the FLSA Collective.

2737.   While the exact number is unknown to Plaintiffs at this time, upon information and belief, there are approximately 7,500 members of the FLSA Collective.

2738.   Plaintiffs are currently unaware of the identities of the individual members of the FLSA Collective.

2739.   Accordingly, the Court should require Defendants to provide Plaintiffs with a list of all members of the proposed FLSA Collective, along with their last known home addresses, telephone numbers, and email addresses, so that Plaintiffs may provide the members of the FLSA Collective with notice of this action and an opportunity to make an informed decision regarding whether to participate in the same.

## CLASS ACTION ALLEGATIONS

2740.   Plaintiffs bring this action, in part, as a class action under the NYLL and FIFA, as well as all applicable regulations thereunder.

A.      **Class Definition**

2741.   Plaintiffs seek to maintain claims, pursuant to FRCP 23, on behalf of themselves and a class of all other Officers who worked for the NYPD and participated in the PDP at any time during the full statute of limitations period (the "Class").

2742.   Plaintiffs allege, on behalf of themselves and the Class, that the Vendors violated the NYLL and FIFA by, *inter alia*: (i) failing to compensate Plaintiffs and the Class at the State minimum wage for all hours worked; (ii) failing to compensate Plaintiffs and the Class at their established regular rates of pay and in accordance with their agreed terms of employment; (iii) failing to timely pay all wages owed; (iv) failing to provide Plaintiffs and the Class with Notices of Pay Rate; and (v) failing to furnish accurate wage statements to Plaintiffs and the Class.

2743.   Plaintiffs and the Class have standing to seek such relief because of the adverse effects that the Vendors' wage practices have had on them individually and as a group.

2744.   The wage practices described herein are part of the Vendors' normal course of conduct.

2745.   Pursuant to FRCP 23, Plaintiffs' NYLL and FIFA claims may be pursued by all similarly situated persons who do not opt out of the Class.

B.      **Numerosity and Impracticability of Joinder**

2746.   The members of the Class are so numerous that joinder is impracticable.

2747.   While the exact number is unknown to Plaintiffs at this time, upon information and belief, there are approximately 15,000 members of the Class.

2748.   Therefore, the numerosity requirement of FRCP 23(a)(1) is satisfied.

390

**C.**    **Common Questions of Law and Fact**

2749.  Common questions of law and fact, the answers to which will meaningfully advance this litigation, exist as to the Class and predominate over any questions only affecting the members of the Class individually.

2750.  Indeed, there are few, if any, purely individual issues in this action.

2751.  The questions of law and fact that are common to Plaintiffs and the Class include, without limitation:

> (a)    Whether the Vendors failed to pay Plaintiffs and the Class all minimum wages owed;
>
> (b)    Whether the Vendors failed to pay Plaintiffs and the Class all wages owed at their regular rates of pay and in accordance with their agreed terms of employment;
>
> (c)    Whether the Vendors failed to timely pay Plaintiffs and the Class their wages;
>
> (d)    Whether the Vendors failed to provide Plaintiffs and the Class with Notices of Pay Rate;
>
> (e)    Whether the Vendors failed to furnish accurate wage statements to Plaintiffs and the Class; and
>
> (f)    Whether Plaintiffs and the Class are entitled to liquidated damages and injunctive relief.

2752.  Therefore, the common question requirement of FRCP 23(a)(2) is satisfied.

**D.**    **Typicality of Claims and Relief Sought**

2753.  Plaintiffs' claims are typical of the claims of the members of the Class they seek to represent.

2754.    Plaintiffs and the Class work, or have worked, for the Vendors and are, or were, subject to the same compensation policies and practices.

2755.    The wage practices suffered by Plaintiffs, and the damages resulting therefrom, are typical of the Vendors' treatment of Officers assigned to them through the PDP, generally, and of the Class specifically.

2756.    Therefore, the typicality requirement of FRCP 23(a)(3) is satisfied.

**E.    Adequacy of Representation**

2757.    Plaintiffs will fairly and adequately protect the interests of the Class because their interests are coextensive and aligned with those of the Class.

2758.    Plaintiffs have no interests adverse to the Class they seek to represent.

2759.    Plaintiffs are willing and able to represent the Class as fairly and vigorously as they pursue their similar individual claims.

2760.    Plaintiffs have retained competent counsel who are qualified and experienced in employment class action litigation and able to meet the demands necessary to litigate a class action of this size and complexity.

2761.    The combined interests, experience, and resources of Plaintiffs and their counsel to competently litigate the individual and Class claims at issue in the instant action satisfy the adequacy of representation requirement of FRCP 23(a)(4).

**F.    Requirements of Rule 23(b)(1)**

2762.    Without certification of the Class, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

2763.   Accordingly, certification of the Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Class, and the Vendors.

2764.   By filing this Complaint, Plaintiffs preserve the rights of the members of the Class with respect to the statute of limitations on their claims.

2765.   Therefore, not certifying the Class would substantially impair and/or impede the ability of the members thereof to protect their interests.

## G.      Requirements of Rule 23(b)(2)

2766.   The Vendors acted on grounds, described herein, generally applicable to Plaintiffs and the Class by denying Plaintiffs and the Class minimum wages, failing to pay them in accordance with their agreed terms of employment, failing to pay wages on time, failing to pay wages at their regular rates of pay, and failing to provide Notices of Pay Rate and furnish accurate wage statements.

2767.   These acts are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Class as a whole.

2768.   Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the entitlement to, and denial of, minimum wages, wages paid at their regular rates of pay, timely payment of wages, Notices of Pay Rate, and accurate wage statements.

2769.   Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs and the Class's entitlement to monetary and non-monetary remedies for such wage violations.

2770.   Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**H.    Requirements of Rule 23(b)(3)**

2771.    The common issues of fact and law affecting Plaintiffs' claims and those of the Class – including, without limitation, the common issues identified above – predominate over issues affecting only individual claims.

2772.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and those of the Class.

2773.    The cost of proving the Vendors' pattern and practice of denying minimum and other wages makes it impractical for the members of the Class to pursue their claims individually.

2774.    This class action will not be difficult to manage for reasons including, without limitation, the discrete organizational nature of the members of the Class (they must have worked for the NYPD and participated in the PDP during the statutory period), as well as the common questions of law and fact described herein.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE FLSA: LATE PAYMENT OF WAGES**
*(On Behalf of Plaintiffs and the FLSA Collective against all Defendants)*

2775.    Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

2776.    During the full statutory period, Plaintiffs and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and all applicable regulations thereunder.

2777.    The FLSA requires covered employers, including Defendants, to pay Officers all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

2778.    Plaintiffs and the FLSA Collective were not exempt from the requirement that Defendants timely pay them their wages.

394

2779. During the statute of limitations period, Defendants have engaged in a policy and practice of failing to pay Plaintiffs and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

2780. As a result of Defendants' failure to pay Plaintiffs and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, Defendants have violated the FLSA and/or applicable regulations thereunder.

2781. Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA.

2782. Defendants' violations of the FLSA have significantly harmed Plaintiffs and the FLSA Collective and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF THE FLSA: FAILURE TO PAY MINIMUM WAGE**
***(On Behalf of Plaintiffs and the FLSA Collective against all Defendants)***

2783. Plaintiffs, on behalf of themselves and the FLSA Collective, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

2784. During the full statutory period, Plaintiffs and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and applicable regulations thereunder.

2785. The FLSA requires covered employers, including Defendants, to compensate employees at a rate not less than the federal minimum wage for all hours worked in a workweek.

2786. Plaintiffs and the FLSA Collective were not exempt from the requirement that their employers pay them minimum wages under the FLSA.

395

2787. During the statute of limitations period, Defendants have engaged in a policy and practice of failing to compensate Plaintiffs and the FLSA Collective at a rate not less than the federal minimum wage for all hours worked in a workweek.

2788. As a result of Defendants' failures to compensate Plaintiffs and the FLSA Collective at a rate not less than the federal minimum wage for all hours worked in a workweek, Defendants have violated the FLSA and/or applicable regulations thereunder.

2789. Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA.

2790. Defendants' violations of the FLSA have significantly damaged Plaintiffs and the FLSA Collective and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: LATE PAYMENT OF WAGES
*(On Behalf of Plaintiffs and the Class against the Vendors)*

2791. Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

2792. During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

2793. The NYLL requires covered employers, including the Vendors, to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

2794. Plaintiffs and the Class were not exempt from the requirement that the Vendors timely pay them their wages.

2795.  Throughout the statute of limitations period, the Vendors have engaged in a policy and practice of failing to pay Plaintiffs all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

2796.  As a result of the Vendors' failure to pay Plaintiffs and the Class all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, the Vendors have violated the NYLL and/or applicable regulations thereunder.

2797.  The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

2798.  The Vendors' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: FAILURE TO PAY MINIMUM WAGE
*(On Behalf of Plaintiffs and the Class against the Vendors)*

2799.  Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

2800.  During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

2801.  The NYLL requires covered employers, including the Vendors, to compensate Officers at a rate not less than the applicable State minimum wage for all hours worked in a workweek.

2802.  Plaintiffs and the Class were not exempt from the requirement that the Vendors pay them minimum wages under the NYLL.

397

2803.   During the statute of limitations period, the Vendors have engaged in a policy and practice of failing to compensate Plaintiffs and the Class at a rate not less than the applicable State minimum wage for all hours worked in a workweek.

2804.   As a result of the Vendors' failure to compensate Plaintiffs and the Class at a rate not less than the applicable State minimum wage for all hours worked in a workweek, the Vendors have violated the NYLL and/or applicable regulations thereunder.

2805.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

2806.   The Vendors' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### VIOLATIONS OF THE NYLL: FAILURE TO PAY ALL WAGES OWED
**(*On Behalf of Plaintiffs and the Class against the Vendors*)**

2807.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

2808.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

2809.   The NYLL requires covered employers, including the Vendors, to compensate Officers at their established regular rates of pay for all hours worked.

2810.   Plaintiffs and the Class were not exempt from the requirement that the Vendors pay them at their established regular rates of pay for all hours worked under the NYLL.

398

2811.  During the statute of limitations period, the Vendors have engaged in a common policy and practice of failing to compensate Plaintiffs and the Class at their established regular rates of pay for all hours worked in a workweek.

2812.  As a result of the Vendors' failures to compensate Plaintiffs and the Class at their established regular rates of pay for all hours worked in a workweek, the Vendors have violated the NYLL and/or applicable regulations thereunder.

2813.  The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the NYLL.

2814.  The Vendors' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
## VIOLATIONS OF THE NYLL: FAILURE TO PROVIDE NOTICES OF PAY RATE
### (On Behalf of Plaintiffs and the Class against the Vendors)

2815.  Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

2816.  During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

2817.  The NYLL requires covered employers, including the Vendors, to provide employees, "at the time of hiring, a notice containing the following information:  the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; . . . the regular pay day designated by the employer [ ]; the name of the employer; any 'doing business as' names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of

399

the employer; plus such other information as the commissioner deems material and necessary[,]" which is commonly referred to as a Notice of Pay Rate.  NYLL § 195(1)(a).

2818.  Plaintiffs and the Class were not exempt from the requirement that the Vendors provide them with Notices of Pay Rate.

2819.  During the statute of limitations period, the Vendors have engaged in a policy and practice of unlawfully failing to provide Notices of Pay Rate to Plaintiffs and the Class.

2820.  As a result of the Vendors' failure to provide Notices of Pay Rate to Plaintiffs and the Class, the Vendors have violated the NYLL and/or applicable regulations thereunder, including, *inter alia*, NYLL § 195.

2821.  The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to provide proper notices to Plaintiffs and the Class in accordance with the NYLL.

2822.  Further, due to the Vendors' failure to provide Notices of Pay Rate, Plaintiffs and the Class have suffered concrete harm.

2823.  Specifically, Plaintiffs and the Class have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid and/or not paid properly; and (iii) taking appropriate action to obtain payments due to them.

2824.  The Vendors' violations of the NYLL entitle Plaintiffs and each member of the Class to recover $50.00 for each workday the violation occurred, not to exceed $5,000.00, plus attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
## VIOLATIONS OF THE NYLL: INACCURATE WAGE STATEMENTS
### (*On Behalf of Plaintiffs and the Class against the Vendors*)

2825.  Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

400

2826.  During the full statutory period, Plaintiffs and the Class were protected by the provisions of the NYLL, N.Y. Lab. Law §§ 1, *et seq.*, and all applicable regulations thereunder.

2827.  The NYLL requires covered employers, including the Vendors, to "furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages;  name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; . . . and net wages."  NYLL § 195(3).

2828.  Plaintiffs and the Class were not exempt from the requirement that the Vendors furnish them proper wage statements.

2829.  During the statute of limitations period, the Vendors have engaged in a policy and practice of unlawfully failing to provide accurate wage statements to Plaintiffs and the Class.

2830.  As a result of the Vendors' failure to furnish accurate wage statements to Plaintiffs and the Class, the Vendors have violated the NYLL and/or applicable regulations thereunder, including, *inter alia*, NYLL § 195.

2831.  The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to provide proper wage statements to Plaintiffs and the Class in accordance with the NYLL.

2832.  Further, due to the Vendors' failure to furnish accurate wage statements, Plaintiffs and the Class have suffered concrete harm.

2833.  Specifically, Plaintiffs and the Class have been prevented from, *inter alia*: (i) realizing their true hours worked; (ii) realizing that they were underpaid and/or not paid properly; and (iii) taking appropriate action to obtain payments due to them.

2834.   The Vendors' violations of the NYLL have significantly damaged Plaintiffs and the Class and entitle them to recover $250 for each workday the violation occurred, not to exceed $5,000, plus attorneys' fees and costs.

### EIGHTH CAUSE OF ACTION
### VIOLATIONS OF THE FIFA: LATE PAYMENT OF COMPENSATION
*(On Behalf of Plaintiffs and the Class against the Vendors)*
*(Brought in the Alternative to Plaintiffs' and the Class's Claims under the FLSA and NYLL)*

2835.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

2836.   In the alternative to their claims brought under the FLSA and NYLL, Plaintiffs and the Class allege violations of the FIFA, N.Y.C. Admin. Code §§ 20-927, *et seq.*, and all applicable regulations thereunder.

2837.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the FIFA and all applicable regulations thereunder.

2838.   The FIFA requires hiring parties, including the Vendors, to pay freelance workers all contracted compensation on or before the date such contracted compensation is due under the terms of a contract or, if the contract does not specify when the contracted compensation is due or the mechanism by which such due date shall be determined, no later than 30 days after completion of the freelance worker's services under the contract.

2839.   Plaintiffs and the Class were not exempt from the requirement that the Vendors timely pay them their contracted compensation under the FIFA.

2840.   During the statute of limitations period, the Vendors have engaged in a policy and practice of hiring Plaintiffs and the Class to complete services without specifying when contracted compensation is due or the mechanism by which such due date shall be determined.

2841.   As a result, Plaintiffs and the Class are owed all contracted compensation within 30 days of the completion of services by Plaintiffs and the Class.

2842.   Throughout the full statute of limitations periods, the Vendors have engaged in a policy and practice of failing to pay Plaintiffs and the Class all contracted compensation within 30 days of the completion of services performed by Plaintiffs and the Class under their contracts.

2843.   As a result of the Vendors' failure to pay Plaintiffs and the Class all contracted compensation within 30 days of completion of services, the Vendors have violated the FIFA and/or applicable regulations thereunder.

2844.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the FIFA.

2845.   The Vendors' violations of the FIFA have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid compensation, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## NINTH CAUSE OF ACTION
## VIOLATIONS OF THE FIFA: FAILURE TO PAY ALL COMPENSATION
### (*On Behalf of Plaintiffs and the Class against the Vendors*)
### (*Brought in the Alternative to Plaintiffs' and the Class' Claims under the FLSA and NYLL*)

2846.   Plaintiffs, on behalf of themselves and the Class, hereby repeat and reallege the foregoing allegations as if set forth fully herein.

2847.   In the alternative to their claims brought under the FLSA and NYLL, Plaintiffs and the Class allege violations of the FIFA, N.Y.C. Admin. Code §§ 20-927, *et seq.*, and all applicable regulations thereunder.

2848.   During the full statutory period, Plaintiffs and the Class were protected by the provisions of the FIFA and all applicable regulations thereunder.

403

2849.   The FIFA requires hiring parties, including the Vendors, to pay freelance workers all contracted compensation on or before the date such contracted compensation is due under the terms of a contract or, if the contract does not specify when the contracted compensation is due or the mechanism by which such due date shall be determined, no later than 30 days after completion of the freelance worker's services under the contract.

2850.   Plaintiffs and the Class were not exempt from the requirement that the Vendors pay them their contracted compensation under the FIFA, and they are entitled to be paid all contracted compensation for all services completed for the Vendors.

2851.   During the statute of limitations period, the Vendors have engaged in a policy and practice of hiring Plaintiffs and the Class to complete services without specifying when contracted compensation is due or the mechanism by which such due date shall be determined.

2852.   As a result, the Vendors owe all contracted compensation to Plaintiffs and the Class within 30 days of the completion of services by Plaintiffs and the Class.

2853.   During the statute of limitations periods, the Vendors have engaged in a policy and practice of failing to pay Plaintiffs and the Class all contracted compensation for the completion of services by Plaintiffs and the Class.

2854.   As a result of the Vendors' failure to pay Plaintiffs and the Class all contracted compensation for completion of services by Plaintiffs and the Class, the Vendors have violated the FIFA and/or applicable regulations thereunder.

2855.   The Vendors have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the Class in accordance with the FIFA.

2856.   The Vendors' violations of the FIFA have significantly damaged Plaintiffs and the Class and entitle them to recover the total amount of their unpaid compensation, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the FLSA Collective, and the Class, respectfully request that this Court:

A.   Declare that the practices complained of herein are unlawful under applicable federal, State, and City law;

B.   Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.   Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. § 216, and direct Defendants to provide Plaintiffs with a list of all members of the FLSA Collective, including all last known addresses, telephone numbers, and e-mail addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

D.   Declare this action to be maintainable as a class action pursuant to FRCP 23, and direct Defendants to provide Plaintiffs with a list of all members of the Class, including all last known addresses, telephone numbers, and email addresses of each such person, so Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

E.   Designate Plaintiffs as the representatives of the Class, and their counsel of record as class counsel;

F.   Determine the damages sustained by Plaintiffs and the FLSA Collective as a result of Defendants' violations of the FLSA, and award those damages against Defendants and in favor

of Plaintiffs and the FLSA Collective, plus such pre-judgment and post-judgment interest as may be allowed by law;

G.      Determine the damages sustained by Plaintiffs and the Class as a result of the Vendors' violations of the NYLL and FIFA, and award those damages against the Vendors and in favor of Plaintiffs and the Class, plus such pre-judgment and post-judgment interest as may be allowed by law;

H.      Award Plaintiffs, the FLSA Collective, and/or the Class an additional equal amount as liquidated damages because Defendants' violations were without a good faith basis;

I.      Award Plaintiffs, the FLSA Collective, and/or the Class their reasonable attorneys' fees and costs and disbursements in this action including, without limitation, any accountants' or experts' fees; and

J.      Grant Plaintiffs, the FLSA Collective, and/or the Class such other and further relief that the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves, the FLSA Collective and the Class, hereby demand a trial by jury on all issues of fact and damages.

Dated:  March 11, 2026
       New York, NY

**FARUQI & FARUQI, LLP**

By:  */s/ Innessa M. Huot*
    Innessa M. Huot

685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
ihuot@faruqilaw.com

*Attorneys for Plaintiffs, the FLSA*
*Collective, and the Proposed Class*

406